**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EUGENE VOLOKH, RUMBLE CANADA INC., and LOCALS TECHNOLOGY INC. <br><br> *Plaintiffs*, <br><br> v. <br><br> LETITIA JAMES, in her official capacity as Attorney General of New York, <br><br> *Defendant*. | Civil Action No.: 1:22-cv-10195 |

**VERIFIED COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

DARPANA M. SHETH
(New York Bar No. 4287918)
DANIEL M. ORTNER*
(California State Bar No. 329866)
JAMES M. DIAZ*
(Vermont Bar No. 5014)
FOUNDATION FOR INDIVIDUAL RIGHTS AND
    EXPRESSION
510 Walnut St., Suite 1250
Philadelphia, PA 19106
Telephone: (215) 717-3473
daniel.ortner@thefire.org
jay.diaz@thefire.org
darpana.sheth@thefire.org

BARRY N. COVERT**
(New York Bar No. 27118)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Ave., Suite 120
Buffalo, NY 14202
Tel: (716) 849-1333 x 365
bcovert@lglaw.com

*Attorneys for Plaintiff*
**Pro Hac Vice* Motions Forthcoming
\*\* S.D.N.Y. Admission Pending

## INTRODUCTION

1.      The State of New York has enacted a new law, slated to take effect December 3, 2022, with one goal: to silence disfavored—but constitutionally protected—expression. New York General Business Law Section 394-ccc ostensibly targets "hateful conduct," but in reality, regulates protected online speech that someone, somewhere perceives to "vilify, humiliate, or incite violence against a group or class of persons" based on race, color, religion, or other protected categories (the "Online Hate Speech Law").

2.      New York's Online Hate Speech Law, titled "Social media networks; hateful conduct prohibited," hangs like the Sword of Damocles over a broad swath of online services (such as websites and apps), threatening to drop if they do not properly address speech that expresses certain state-disfavored viewpoints, as the state now mandates they must. In something of a First Amendment "double whammy," the Online Hate Speech Law burdens the publication of disfavored but protected speech through unconstitutionally compelled speech—forcing online services to single out "hate speech" with a dedicated policy, a mandatory report & response mechanism, and obligatory direct replies to each report. If a service refuses, the law threatens New York Attorney General investigations, subpoenas, and daily fines of $1,000 per violation.

3.      There can be no reasonable doubt New York will enforce the Online Hate Speech Law to strong-arm online services into censoring protected speech. The Attorney General's intentions, in fact, could not be clearer; as recited, for example, in an October press release, the Attorney General declared that "[o]nline platforms should be held accountable for allowing hateful and dangerous content to spread on their platforms" because an alleged "lack of oversight, transparency, and accountability of these platforms allows hateful and extremist views to proliferate online." Press Release, Office of the New York State Attorney General, *Attorney*

*General James and Governor Hochul Release Report on the Role of Online Platforms in the Buffalo Shooting* (Oct. 18, 2022), https://ag.ny.gov/press-release/2022/attorney-general-james-and-governor-hochul-release-report-role-online-platforms [https://perma.cc/L5VP-3EMN].

4.    The threat posed by the new Online Hate Speech Law is of critical concern to online services like those operated by the Plaintiffs here.

5.    Plaintiff Eugene Volokh operates The Volokh Conspiracy, a legal blog subject to the Online Hate Speech Law. The Volokh Conspiracy is dedicated to maintaining a free and open marketplace of ideas, and thus generally avoids regulating or removing visitor comments from his site based on viewpoint. Volokh does not believe that speech targeted by the Online Hate Speech Law warrants the now mandated policy, report & response mechanism, or direct replies to reports.

6.    Plaintiffs Rumble Canada Inc. and Locals Technology Inc. own and operate online services subject to the Online Hate Speech Law. The sites compete with market leaders such as YouTube by touting their acceptance of a robust variety of speech, including viewpoints rejected by other platforms. Both sites generally avoid regulating or removing creator content or visitor comments from their sites so long as the content or comments comply with their content policies. Neither Plaintiff has a business reason to create a dedicated policy and report & response mechanism, or to directly reply to reports for the speech targeted by the Online Hate Speech Law.

7.    New York cannot regulate disfavored online speech by compelling online services to "mouth support for views they find objectionable," *Janus v. Am. Fed'n of State, Cnty. and Mun. Emps.*, 138 S. Ct. 2448, 2463 (2018), in hopes of deterring or eliminating hate speech. Plaintiffs bring this lawsuit to vindicate their constitutional and statutory rights because the First Amendment does not tolerate efforts, like those of the State of New York, to "cleanse public debate." *Cohen v. California*, 403 U.S. 15, 25 (1971).

## JURISDICTION

8.     This action arises under the First and Fourteenth Amendments to the United States Constitution and the following federal laws: (a) the Civil Rights Act of 1871, 42 U.S.C. Sections 1983 and 1988; (b) Section 230 of the Communications Decency Act, 47 U.S.C. Section 230; and (c) the Declaratory Judgment Act, 28 U.S.C. Sections 2201–02.

9.     Plaintiffs seek declaratory and injunctive relief declaring that New York General Business Law § 394-ccc is unconstitutional, facially and as-applied, under the First and Fourteenth Amendments, and is also preempted by Section 230 of the Communications Decency Act.

10.     This Court has original jurisdiction over these federal claims under 28 U.S.C. Sections 1331 and 1343.

## VENUE

11.     Venue is proper in this judicial district under 28 U.S.C. Section 1391(b)(1) because Defendant resides in the Southern District of New York. The New York Attorney General maintains an office in this District and conducts a substantial portion of its activity in this District. *Buffalo Tchrs. Fed'n, Inc. v. Helsby*, 426 F. Supp. 828, 830 (S.D.N.Y. 1976).

## THE PARTIES

### *Plaintiffs*

12.     Plaintiff Eugene Volokh, a California resident and constitutional law professor at UCLA School of Law,[*] is co-owner and operator of The Volokh Conspiracy, a legal blog with posts by Volokh, other professors, and various academically minded lawyers from around the country (collectively "Volokh" or "The Volokh Conspiracy"). The site is hosted at reason.com/volokh by Reason magazine, a print and online publication dedicated to "free minds

---

[*] Eugene Volokh is participating in this lawsuit on his own behalf. UCLA has taken no position on the matter.

and free markets." Volokh and his co-bloggers have final editorial authority on The Volokh Conspiracy, including with regard to content selection. Visitors to the site, after registering, may comment on published blog posts and reply to other commenters. The public can view all comments and replies. New York's Online Hate Speech Law regulates The Volokh Conspiracy as a "social media network" because it is an "internet platform[] . . . designed to enable users to share any content with other users or to make such content available to the public." Volokh objects to the Online Hate Speech Law's requirements as contrary to The Volokh Conspiracy's mission.

13.    Plaintiff Rumble Canada Inc., headquartered in Toronto and a wholly owned subsidiary of Rumble Inc. (which is headquartered in Longboat Key, Florida), is the owner and operator of Rumble.com (collectively "Rumble"), an online service similar to YouTube in that it allows independent creators to upload and share video content, and registered users to comment on videos and to reply to other commenters. The public can view all videos, comments, and replies on Rumble. New York's Online Hate Speech Law regulates Rumble as a "social media network" because it is an "internet platform[] . . . designed to enable users to share any content with other users or to make such content available to the public." Rumble objects to the Online Hate Speech Law's requirements as contrary to its pro-free speech purpose and mission "to protect a free and open internet" and to "create technologies that are immune to cancel culture." *About Us*, Rumble Inc., https://corp.rumble.com (last visited Nov. 25, 2022).

14.    Plaintiff Locals Technology Inc., headquartered in Longboat Key, Florida, and a wholly owned subsidiary of Rumble Inc., is the owner and operator of Locals.com (collectively "Locals"), an online service that allows creators to communicate and share content directly with unpaid and paid subscribers. Visitors to Locals, after registering, may comment on creator pages or reply to other commenters. New York's Online Hate Speech Law regulates Locals as a "social

media network" because it is an "internet platform[] . . . designed to enable users to share any content with other users or to make such content available to the public." Locals objects to the Online Hate Speech Law's requirements as contrary to its pro-free speech purpose and mission of being "committed to fostering a community that is safe, respectful, and dedicated to the free exchange of ideas." *Community Guidelines*, Locals, https://locals.com/community-guidelines (last visited Nov. 25, 2022).

***Defendant***

15.     Defendant Letitia James, New York's Attorney General, is responsible for enforcing the Online Hate Speech Law, which provides her office investigative authority, subpoena powers, and the ability to assess civil penalties for violations and carry out this obligation. N.Y. Gen. Bus. Law § 394-ccc(5). At all relevant times, Attorney General James was and is acting under the color of state law. Attorney General James is sued in her official capacity only.

## FACTUAL ALLEGATIONS

16.     Hate speech is generally viewed as "[s]peech that demeans on the basis of race, ethnicity, gender, religion, age, disability, or any other similar ground." *Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017). But it is nonetheless protected against viewpoint-based suppression. *Id.*

17.     Since the end of World War II, as other nations across the globe passed laws to prohibit or penalize hate speech, our Supreme Court has repeatedly struck down laws purporting to target hate speech. *See* Roni Cohen, *Regulating Hate Speech: Nothing Customary About It*, 15 Chi. J. Int'l L. 229, 238–48 (2014). "As a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder v. Phelps*, 562 U.S. 443, 461 (2011). As the Court recently emphasized, limiting speech perceived to be

hateful, insulting, or offensive "strikes at the heart of the First Amendment." *Matal*, 137 S.Ct. at 1764. For the United States, "the interest in encouraging freedom of expression in a democratic society outweighs any theoretical but unproven benefit of censorship." *Reno v. Am. C.L. Union*, 521 U.S. 844, 885 (1997).

18.     Despite its First Amendment protection, after New York's lawmakers spent several years targeting online "hate speech," the State passed a law that singles out and penalizes this speech. Acting in the wake of a racially motivated mass shooting, New York's Legislature fast-tracked the Online Hate Speech Law, passing it with little debate after only nineteen days.  New York Governor Kathy Hochul praised the law, saying it would require "social media networks to monitor and report hateful conduct on their platforms." Governor Kathy Hochul, *Governor Hochul Signs Landmark Legislative Package to Strengthen Gun Laws and Protect New Yorkers* at 12:30– 13:07 (June 6, 2022), https://youtu.be/SNrci_ey8L4?t=750. Attorney General James said the law was necessary because "social media platforms provide an unchecked vehicle for [] dangerous and corrosive ideas to spread," and it would allow her office to "expand our work . . . to address this growing threat" from "dangerous and hateful platforms." *Id.* at 35:50–36:35.

19.     Effective December 3, 2022, New York's law requires virtually every online service that is accessed by New Yorkers and allows third parties to share information, to endorse the state's definition of hate speech, mislabeled as "hateful conduct." Specifically, the law compels online services to single out hate speech with a dedicated policy, a report & response mechanism, and mandated direct replies to each report. In doing so, the law targets and burdens protected speech that someone, somewhere believes to "vilify, humiliate, or incite violence against a group or a class of persons" based on race, color, religion, or other protected categories. N.Y. Gen. Bus. Law § 394-ccc(a).

20.     Plaintiffs, owners of online services subject to New York's law, object to the law's impositions. They seek to promote free and open debate on their platforms because they believe in the free marketplace of ideas. They publish all manner of speech and do not believe that the speech targeted by the Online Hate Speech Law should be chilled, prohibited, or removed as a result of a government edict. They do not want to parrot the state's message or be required to reply to every complaint of alleged "hate speech."

21.     Plaintiffs allow a wide range of speech and are concerned that publishing a policy and mechanisms targeting a specific form of speech is likely to chill the protected speech of commenters, and thus implicate their platforms in the chilling of protected speech.

22.     Moreover, as a result of the law's vague terms, Plaintiffs are not even sure how to comply. The law's title "Social media networks; hateful conduct prohibited" suggests Plaintiffs must ban speech that meets state-defined hate speech. The definition's vague terms, "vilify," "humiliate," "incite," and "violence," make it impossible for either Plaintiffs or the public to know exactly what speech constitutes "hateful conduct."

23.     Under New York's expansive hate speech definition, a John Oliver comedy/news segment poking fun at the British monarchy could be categorized as humiliating English people based on their national origin, LastWeekTonight, *The Monarchy: Last Week Tonight with John Oliver (HBO)* (Nov. 14, 2022), https://www.youtube.com/watch?v=KWterDbJKjY; an interview by ReasonTV discussing a satirical tweet by the Babylon Bee calling the Biden Administration's Assistant Secretary for Health Rachel Levine its "man of the year" may be "vilifying" or "humiliating" to transgender people, ReasonTV, *Babylon Bee Won't Back Down Over Trans Joke Twitter Ban* (Aug. 23, 2022), https://rumble.com/v1h339k-babylon-bee-wont-back-down-over-trans-joke-twitter-ban.html [https://perma.cc/3VDG-EDAX]; a video from London's Barbican Art

Gallery showcasing a photography exhibit on masculinity and patriarchy might humiliate or vilifying men, Barbican Centre, *Curator Tour: Masculinities: Liberation through Photography at the Barbican Art Gallery* (Jul. 20, 2022) https://www.youtube.com/watch?v=AivPz4enrmA; a Wall Street Journal book review article with comments quoting Gandhi's use of a racist term for Black South Africans may be vilifying or humiliating Black South Africans, Indians, or both based on their race or ethnicity, Wm. Roger Louis, *Ghandi The Imperialist*, Wall St. J. (Jan. 8, 2016), https://www.wsj.com/articles/Gandhi-the-imperialist-1452290431; and a black and white historical video of Malcom X discussing white people's guilt could be viewed as vilifying or humiliating white people based on their race, MalcolmShabazz, *Malcolm X On White People's Guilt Complex* (Jan. 30, 2018), https://www.youtube.com/watch?v=q0nNSRuSzx4.

24.    New York cannot justify such a sweeping regulation of protected speech. The Online Hate Speech Law violates the First Amendment because it burdens the publication of speech based on its viewpoint, unconstitutionally compels speech, and is overbroad. It is also vague in violation of the Fourteenth Amendment, *see Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1891 (2018) ("It is self-evident that an indeterminate prohibition carries with it the opportunity for abuse." (quotation marks and alterations omitted)), and preempted by Section 230 of the Communications Decency Act. Given well-settled Supreme Court precedent, the New York's law must be enjoined and struck down.

***New York Aims to Adopt the Online Hate Speech Law to Control Certain Internet Speech.***

**A. New York officials have been trying to suppress certain online speech for several years.**

25.    For at least the last several years, New York policymakers have tried to compel online services to chill, prohibit, or remove online speech disfavored by the state.

26.     For example, in 2019, New York State Senator David Carlucci introduced Senate Bill S.7275, or the "Social Media Hate Speech Accountability Act." S.B. 7275, 2019–20 Leg. Sess. (N.Y. 2019), https://www.nysenate.gov/legislation/bills /2019/s7275.

27.     S.7275 sought to "require social media network platforms to create a process to remove" so-called "hate speech." Sponsor Memo, S.B. 7275, 2019–20 Leg. Sess. (N.Y. 2019), https://www.nysenate.gov/legislation/bills/2019/s7275.

28.     S.7275 would have required social media networks to remove or block "hate speech" within 24 hours of receiving a visitor complaint and "immediately" notify the complainant of a decision along with the network's reasoning for the decision. S.B. 7275 § 3(b)(ii)-(iv). Violations of the statute, "including any offense not committed in this state," would have been punishable by a fine of up to one million dollars per violation. S.B. 7275 § 5(a)(ii).

29.     In announcing S.7275, Senator Carlucci said, "While social media companies do have policies in place against what content is deemed hate speech or which can be removed, no one but the company is enforcing it. This bill will allow the State to take action and hold social media platforms accountable." Press Release, David Carlucci, Senator, New York State Senate, *Senator David Carlucci Introduces Legislation to Combat Hate Speech on Social Media* (Jan. 21, 2020), https://www.nysenate.gov/newsroom/press-releases/david-carlucci/senator-david-carlucci -introduces-legislation-combat-hate.

30.     In May of 2021, New York Assemblywoman Patricia Fahy and State Senator Anna Kaplan announced a package of legislation, including companion bills S.4511 and A7865, aimed at addressing the proliferation of online hate speech (as well as "misinformation"). Press Release, Anna M. Kaplan, Senator, New York State Senate, *Lawmakers Push for Better Enforcement of Social Media Standards Against Hate and Misinformation* (May 5, 2021),

https://www.nysenate.gov/newsroom/press-releases/anna-m-kaplan/lawmakers-push-better-enforcement-social-media-standards.

31.     S.4511 and A7865 drew from Carlucci's S.7275, but included fewer defined terms and removed the enforcement provisions.

32.     In the May 5, 2021, press release, Assemblywoman Fahy decried "[t]he alarming spread of misinformation and hate speech across our online and social media platforms."

33.     Assemblywoman Fahy also expressed concern that online services "self-promulgated guidelines" for online speech were "often ineffective at preventing the spread of hate speech or other misinformation online before its simply too late."

34.     The bills remained in legislative committees for a year.

**B.  In the wake of a racially motivated mass shooting in Buffalo, New York's highest public officials blamed the internet.**

35.     On May 14, 2022, a white supremacist murdered ten Black people and injured three others at a Buffalo supermarket.

36.     The killer livestreamed the mass shooting via online streaming service Twitch for approximately two minutes to 28 viewers before Twitch ended the stream.

37.     New York officials immediately blamed social media for the attack. The following day on national television, Governor Kathy Hochul blamed "evil ideas . . . all induced by the internet" and faulted "platforms . . . willing to share this information, allow it to be posted." *Meet the Press—May 15, 2022*, NBC News (May 15, 2022), https://www.nbcnews.com/news/ncna 1295425.

38.     On May 18, 2022, Governor Hochul directed New York Attorney General Letitia James, pursuant to New York Executive Law Section 63(8), to investigate various online platforms for "civil or criminal liability for their role in promoting, facilitating, or providing a platform to

plan or promote violence." Letter from Kathy Hochul, Governor of New York, to Letitia James, Attorney General of New York, (May 18, 2022), https://www.governor.ny.gov/sites/default /files/2022-05/Executive_Law_63_Referral.pdf.

39.     That same day, Attorney General James launched an investigation into "social media companies and other online resources," alleging that the Buffalo shooting "revealed the depths and danger of the online forums that spread and promote hate." Press Release, Office of the New York State Attorney General, *Attorney General James Launches Investigations Into Social Media Companies for Role in Buffalo Attack* (May 18, 2022), https://ag.ny.gov/press-release/2022/attorney-general-james-launches-investigations-social-media-companies-role.

40.     Contemporaneously, the New York Legislature reacted by hastily amending the Fahy/Kaplan bills to include an enforcement provision, substituting the bills with Assembly Bill A7865A.

41.     A7685A was then passed on June 2, 2022.

42.     In promoting the bill's passage, Assemblywoman Fahy focused her ire on the internet and social media companies, declaring on Facebook: "racist and violent hate speech has been allowed to spread on the internet and social media almost unchecked." Assemblymember Patricia A. Fahy, Facebook (June 1, 2022), https://www.facebook.com/Assemblymember PatriciaFahy/posts/pfbid0svnTeCD5m3zhbGDT6Hzs45mgoMBxCcQfWzfUJqgdtRbKqryve12o b9Rd8BriPvBEl.

43.     And in a press release, Assemblywoman Fahy said "we need social media platforms to put into place clear, concise policies on how to report and address hateful content." Press Release, Carl E. Heastie, Assembly Speaker, New York State Assembly, *Assembly Passes*

*Package of Legislation to Strengthen State's Gun Laws and Protect New York Communities* (June 2, 2022), https://nyassembly.gov/Press/?sec=story&story=102242.

44.      At a June 6, 2022, press conference to sign the bill, among others, Governor Hochul declared that the Online Hate Speech Law required "social media networks to monitor and report hateful conduct on their platforms," noting that "[o]ur great leader, our Attorney General, will be championing this cause with every power her office can bring in at their disposal." Governor Kathy Hochul, *Governor Hochul Signs Landmark Legislative Package to Strengthen Gun Laws and Protect New Yorkers* at 12:30–13:07 (June 6, 2022), https://youtu.be/SNrci_ey8L4?t=750.

45.      At the same press conference, Attorney General James alleged that mass shooters' motives are "enabled by the dark corners of the internet" because "social media platforms provide an unchecked vehicle for [] dangerous and corrosive ideas to spread." The Attorney General noted the Online Hate Speech Law would allow her office to "expand our work to study and to address this growing threat" from "dangerous and hateful platforms." Governor Kathy Hochul, *Governor Hochul Signs Landmark Legislative Package to Strengthen Gun Laws and Protect New Yorkers* at 35:50–36:35 (June 6, 2022), https://youtu.be/SNrci_ey8L4?t=2150.

**C.  Attorney General James's report shows her intent to pressure online services across the internet to chill, prohibit, and remove protected speech New York disfavors.**

46.      On October 18, 2022, Attorney General James released her responsive investigative report. Office of New York State Attorney General Letita James, *Investigative Report On The Role Of Online Platforms In The Tragic Mass Shooting in Buffalo on May 14, 2022* (Oct. 18, 2022), https://ag.ny.gov/sites/default/files/buffaloshooting-onlineplatformsreport .pdf (the "Report").

47.     For the report, Attorney General James investigated a variety of online services: video sharing services like Rumble; online messaging boards like Reddit, 4Chan, and 8kun, "and their Derivatives;" Quora, a community-based questions and answers online service; Twitch; Discord; and widely known social network sites such as Facebook and Twitter. Report at 6.

48.     The report squarely blames "[a]nonymous, virtually unmoderated websites and platforms," for a purported correlating rise in mass shootings, alleging that "their refusal to moderate content in any meaningful way ensures that these platforms are and remain breeding grounds for racist hate speech and radicalization." Report at 3.

49.     The report's executive summary, signed by Attorney General James, closes with a dubiously premised rallying cry to pass laws "ensuring online platforms no longer enable horrific mass shootings and hate-based violence." Report at 4.

50.     The report shows that Attorney General James expansively interprets the term "online platform" as everything "from fringe websites to mainstream platforms like Facebook, Instagram, Twitter, and others." Report at 3.

51.     The report also calls for federal and state lawmakers to punish online platforms for not censoring "hate speech" by dramatically limiting Section 230—memorably described as the twenty-six words that created the internet—and imposing civil liability on platforms and individuals for the transmission or distribution of such speech and violent videos or images. *See* Rep. at 41–43; Stephen Engelberg, *Twenty-six Words Created the Internet. What Will It Take to Save it?*, ProPublica (Feb. 9, 2021), https://www.propublica.org/article/nsu-section-230.

52.     In an October 18, 2022, press release promoting the report, Governor Hochul and Attorney General James claimed that a "lack of oversight, transparency, and accountability of these platforms allowed hateful and extremist views to proliferate online." Press Release, Office

of the New York State Attorney General, *Attorney General James and Governor Hochul Release Report on the Role of Online Platforms in the Buffalo Shooting* (Oct. 18, 2022),

https://ag.ny.gov/press-release/2022/attorney-general-james-and-governor-hochul-release-report-role-online-platforms.

53.     In the October 18, 2022, press release, Attorney General James called for "online platforms [to] be held accountable for allowing hateful and dangerous content to spread on their platforms." *Id.*

54.     The Attorney General's report and statements demonstrate her office will expansively interpret and zealously enforce the Online Hate Speech Law.

*The Online Hate Speech Law is Designed to Encourage the Removal of Protected Speech*

**A.  The Online Hate Speech Law Encourages the Removal of protected speech on a vast array of online services.**

55.     The Online Hate Speech Law is titled "Social media networks; hateful conduct prohibited."

56.     The Online Hate Speech Law requires "social media networks" to endorse the state's treatment of disfavored speech, mislabeled as "hateful conduct" and defined as "use of a social media network" that is perceived by someone, somewhere, at some point in time, to "vilify, humiliate, or incite violence against a group or class of persons" based on based on race, color, religion, or other protected categories.

57.     While the Online Hate Speech Law purports to regulate "hateful conduct" on "social media network[s]," the definition of "hateful conduct" only includes speech, because the only way to "use" a "social media network" is to create or share expressive content such as videos or comments.

58.     Most, if not all, internet speech that someone, somewhere might argue serves to "vilify, humiliate, or incite violence against a group or class of persons" based on race, color, religion or other protected category is protected by the First Amendment because restrictions on such "bias-motivated" speech "silenc[e] speech on the basis of its content." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 392 (1992). The Online Hate Speech Law thus seeks to regulate constitutionally protected internet speech.

59.     The Online Hate Speech Law does not define "vilify," "humiliate," "incite," or "violence."

60.     The law does not suggest that the speaker must intend to "vilify, humiliate, or incite violence," just that the speech can be perceived, by an unspecified *someone*, as doing one of those three things.

61.     Such speech is included in a wide variety of comedy, art, journalism, historical documentation, and commentary on matters of public concern that enjoy First Amendment protection. *See supra* ¶ 23.

62.     "Social media network" is defined as "service providers, which, for profit-making purposes, operate internet platforms that are designed to enable users to share any content with other users or to make such content available to the public." N.Y. Gen. Bus. Law § 394-ccc(1)(a).

63.     The Online Hate Speech Law does not define "service provider," "for profit-making purposes," "user," "internet platform," "share," or "content."

64.     However, New York elsewhere expansively defines "Internet service provider" as "any person, business or organization qualified to do business in this state that provides individuals, corporations, or other entities with the ability to connect to the internet." N.Y. Pub. Serv. Law § 224-c.

65.     The New York statute implies that an entity is organized for "profit-making purposes" so long as it has "net earnings . . . which inure to the benefit of any private shareholder or individual." N.Y. Lab. Law § 190.

66.     "User" is not defined in New York statute.

67.     Based on the term's plain meaning in context, however, a "user" is, at a minimum, anyone who comments on content posted on an online service, as well as those that create and share content.

68.     "Internet platform" is not defined in New York statute.

69.     Based on the term's plain meaning in context, however, an "internet platform" is, at a minimum, an online service including a website or a mobile app.

70.     "Share" is not defined in New York statute.

71.     Based on the term's plain meaning in context, however, "share" is, at a minimum, exchanging information of some kind.

72.     "Content" is not defined in New York statute.

73.      Based on the term's plain meaning in context, however, "content" is, at a minimum, information that is displayed on an online service.

74.     During the New York Assembly's debate on A7865A, Assemblywoman Fahy said that the law would apply to any website that has a "footprint" in New York or is "used by residents here." Transcript of Session Proceedings at 189, New York State Assembly, 2021–22 Sess. (June 1, 2022).

75.     "Social media network" is defined so broadly that it includes any for-profit online service with a comment section that has been visited by at least one person in New York.

76.     The Online Hate Speech Law applies regardless of whether any state-defined hate speech has ever appeared on the "social media network."

**B. The Online Hate Speech Law compels "social media networks" to express New York's disdain for particular protected speech.**

77.     The Online Hate Speech Law requires "social media networks" to take three actions regarding "prohibited" hate speech.

78.     First, "social media network[s]" must develop and publish a policy describing how they "will respond [to] and address" visitor complaints of hate speech (the "Hate Speech Policy").

79.     Second, "social media network[s]" must create a "clear and easily accessible mechanism" for visitors to complain about perceived hate speech on the site and receive responses (the "Report & Response Mechanism").

80.     Third, "social media network[s]" must "provide a direct response" to individual complainants, "informing them of how the matter is being handled" (the "Reply Requirement").

81.     The Online Hate Speech Law does not define "respond," "address," or "handled."

82.     The law's statutory title "Social media networks; hateful conduct *prohibited*," suggests that these undefined terms should be understood as meaning "prohibit" when referring to how online services should treat hate speech on their platforms. (emphasis added).

83.     The New York Attorney General has the authority to enforce the Online Hate Speech Law through assessment of a $1,000 daily fine per violation. N.Y. Gen. Bus. Law § 394-ccc(5).

84.     The law also empowers the New York Attorney General to issue subpoenas and investigate compliance. *Id.*

85.     Once the Online Hate Speech Law goes into effect on December 3, 2022, Attorney General James may begin enforcing Section 394-ccc, under her own interpretation of the statute.

***Eugene Volokh and The Volokh Conspiracy Are Committed to Free Speech and Open Debate.***

86.     Co-founded by Eugene Volokh, The Volokh Conspiracy is a legal blog hosted at the reason.com/volokh page of a website operated by Reason magazine, a print and online publication dedicated to the principles of "free minds and free markets."



87.     Volokh and his co-bloggers post regularly about current legal developments, frequently regarding free expression issues.

88.     While Reason magazine hosts The Volokh Conspiracy website, Eugene Volokh and his co-bloggers retain full editorial control over the blog's content and policies.

89.     The Volokh Conspiracy's co-bloggers reside in or are employed throughout the United States, including in California, Colorado, Georgia, Illinois, Indiana, New Jersey, New York, Ohio, Texas, Utah, Virginia, and Washington, D.C.

90.     The Volokh Conspiracy is organized "for-profit making purposes." It generates revenue through targeted advertisements, including ads targeted to New York visitors.

91.     In 2021, 10% of The Volokh Conspiracy's viewers were people in New York. And according to user internet protocol (IP) locations, around 3.9% of comments were posted by New Yorkers.

92.     While Volokh appreciates the revenue that comes from The Volokh Conspiracy, he considers blogging to be an act of professional and personal passion by which he shares his and others' views on a variety of legal topics.

93.     The Volokh Conspiracy is a "social media network" because it is a "service provider" operating an "internet platform" that is "designed to enable users to share [] content" with each other and the public.

94.     Each Volokh Conspiracy blog post includes a publicly viewable comment section where registered commenters may comment and reply to other commenters.

95.     The Volokh Conspiracy currently employs a comment policy that does not exclude any viewpoints: "We invite comments and request that they be civil and on-topic. We do not moderate or assume any responsibility for comments, which are owned by the readers who post them. Comments do not represent the views of Reason.com or the Reason Foundation. We reserve the right to delete any comment for any reason at any time. Comments may only be edited within 5 minutes of posting."

96.     Volokh and his co-bloggers are the sole decisionmakers as to whether comments warrant deletion; in particular, he is the sole decisionmaker as to whether comments posted responding to his own posts warrant deletion.

97.     The Volokh Conspiracy does not have a Hate Speech Policy because its policy does not address "how [The Volokh Conspiracy] *will* respond and address reports of" hate speech. N.Y. Gen. Bus. Law § 394-ccc(3) (emphasis added). Nor does its comment policy reference speech that may be perceived to "vilify, humiliate, or incite violence against a group or class of persons" based on race, color, religion, or other protected categories. Regardless, the law's vagueness makes it impossible for Volokh to know whether the comment policy satisfies New York's Hate Speech Policy requirement or how it could do so.

98.     The Volokh Conspiracy does not have a Report & Response Mechanism to allow visitors to submit complaints, nor does Volokh feel obligated to reply to complainants.

99.     Volokh and his co-bloggers regularly post blog posts in favor of broad free expression rights under the First Amendment.

100.    Volokh and his co-bloggers frequently post content arguing against the regulation of speech that some may consider vilifying, insulting, humiliating, offensive, or hateful.

101.    Volokh believes that most, if not all, of the speech included in the state's definition of "hateful conduct" is constitutionally protected.

102.    Volokh believes that developing and publishing a Hate Speech Policy, creating a Report & Response Mechanism, and fulfilling the Reply Requirement to single out state-defined hate speech through a designated policy, Report & Response Mechanism, or Reply Requirement is contrary to The Volokh Conspiracy's ethos, purpose, and mission.

103.    Posts on The Volokh Conspiracy often receive dozens to hundreds of comments.

104.    Weekly, Volokh hosts an open comment section for commenters to post whatever is on their mind. The weekly comment section routinely receives several hundred comments.

105.    Some commenters on The Volokh Conspiracy have accused other commenters of engaging in hate speech because they post controversial views on topics concerning one or more of the protected categories identified in New York's law. Volokh therefore believes that if he created the Report & Response Mechanism, he would receive numerous complaints alleging that some comments qualify as state-defined hate speech, meant to be "prohibited."

106.    Reviewing and responding to each of these comments, as per the Reply Requirement, will be time-consuming and burdensome, especially given the fact that Volokh would be individually responsible for handling this process.

***Rumble is Committed to Free Speech and Open Debate.***

107.    Rumble is an internet video streaming platform that invites independent creators to upload video content and allows registered users to comment on the videos and communicate with each other.

108.    Rumble has a pro-free speech mission and purpose, described on its "about us" page: "We are Rumble[.] We are for people with something to say and something to share, who believe in authentic expression, and want to control the value of their own creations. We create technologies that are immune to cancel culture. Because everyone benefits when we have access to more ideas, diverse opinions, and dialogue. Join us. We are on a mission to protect a free and

open internet."



109.   Rumble Inc. is publicly traded on the NASDAQ, an American Stock Exchange based in New York City.

110.   Rumble Inc. and its subsidiaries are organized "for-profit making purposes," generating revenue through advertisements and other sources, including ads targeted to New York visitors.

111.   Rumble has many content creators based in New York.

112.   In the third quarter of 2022, Rumble had an average of 71 million global monthly active users, 57 million of whom were based in the United States and Canada. Many New Yorkers access Rumble each month and many New Yorkers post comments on Rumble videos.

113.    Rumble is a "social media network" because it is a "service provider" that operates an "internet platform" and is "designed to enable users to share [] content" with each other and the public.

114.    Content creators share video content with the public on Rumble and registered visitors can comment on videos and reply to other commenters.

115.    Rumble is known as a neutral video platform that does not impose arbitrary censorship on its content creators, including creators of controversial content that some may perceive as "hateful." *See supra* ¶ 23.

116.    Rumble's policies prohibit content that, among other things, a) is illegal; b) is pornographic, obscene, or of an adult or sexual nature; c) "is grossly offensive to the online community, including but not limited to, racism, anti-semitism and hatred;" d) supports or incites violence or unlawful acts; e) supports groups that support or incite violence or unlawful acts; or f) promotes terrorist organizations. *Website Terms and Conditions of Use and Agency Agreement, Rumble Content Policies*, Rumble, https://rumble.com/s/terms.

117.    Rumble reserves "the right to . . . remove messages which Rumble in its sole discretion determines to be undesirable, inciting violence, harmful, offensive or otherwise in violation of [its] Terms of Use." *Id*. In other words, Rumble is the sole determinant of whether its criteria are met.

118.    Rumble does not have a Hate Speech Policy as required by the Online Hate Speech Law because it has no policy addressing "how [Rumble] *will* respond and address reports of" hate speech. N.Y. Gen. Bus. Law § 394-ccc(3) (emphasis added). Rumble has a policy against racist or antisemitic content, but it does not prohibit content because it may "vilify" or "humiliate." New York's law would force Rumble to create a policy based around the state's definition of "hate

speech" rather than the lines that Rumble has chosen for itself. Nor does it reference speech that may be perceived to "vilify, humiliate, or incite violence against a group or class of persons" based on race, color, religion, or other protected categories. Further, the law's vagueness makes it impossible for Rumble to know whether its policy satisfies New York's Hate Speech Policy requirement or how it could do so.

119. Some of the videos that content creators post on Rumble's online service may be perceived as "hateful" by some visitors. *See supra* ¶ 23.

120. Rumble does not believe that all Rumble content that may appear to some as "hateful" under the Online Hate Speech Law warrants a designated Hate Speech Policy, Report & Response Mechanism, or Reply Requirement.

121. Rumble does not have a Report & Response Mechanism within the meaning of the Online Hate Speech Law. While Rumble visitors may email complaints to the email address support@rumble.com, and Rumble "attempt[s] to respond to every complaint," "Rumble will take appropriate actions in its sole discretion and has no responsibility to at any time report" to the complainant "the status or outcome of its investigation or any actions Rumble has taken as a result." *Website Terms and Conditions of Use and Agency Agreement, Complaint Procedure*, Rumble, https://rumble.com/s/terms.

122. Furthermore, Rumble cannot be certain that its support@rumble.com email address is a sufficient "mechanism" to "allow [Rumble] to provide a direct response to any individual reporting" hate speech to satisfy the law's Report & Response Mechanism requirement. In addition, even if the email address satisfied the requirement, the law's vagueness makes it impossible to know whether its mechanism is sufficiently "clear and easily accessible" or how it could be so to satisfy the law.

123.    Some commenters on Rumble have accused other commenters of engaging in hate speech because they post controversial views on topics concerning one or more of the protected categories identified in New York's law.

124.    If Rumble is required to create a "clear and easily accessible" Report & Response Mechanism and fulfill the Reply Requirement, it believes it will be inundated with many more complaints alleging that content and comments on Rumble qualify as state-defined hate speech, meant to be "prohibited" regardless of whether such content and comments fall within the definitions of the Online Hate Speech Law.

125.    Reviewing and responding to each of these complaints, as per the Reply Requirement, will be a time-consuming and burdensome process. To avoid assuming this burden Rumble may need to devote additional resources, more aggressively remove content, and/or limit the ability for registered users to participate in Rumble's comment sections.

***Locals is Committed to Free Speech and Open Debate.***

126.    Locals is an online community-building site that allows content creators to crowdfund and create engaged communities. Creators can develop exclusive content and ask interested members to pay a monthly fee to join the creator's "community."

127.    Locals is organized "for-profit making purposes," generating revenue through the fees that members pay to join a creator's community.

128.    Locals has content creators and community members in New York City.

129.    Locals has advertised in New York City, including a recent promotion in Times Square:



130.    Locals is a "social media network" because it is a "service provider" which operates an "internet platform" that is "designed to enable users to share [] content" with each other and the public. Locals content creators can share video, audio, and text content with members of their community, and registered members of a creator's community may post comments or respond to other community members' comments.

131.    Locals "is committed to fostering a community that is safe, respectful, and dedicated to the free exchange of ideas."



132.   To further its mission, within its limited guidelines, Locals allows its creators to independently police content in their "communities."

133.   Locals Community Guidelines list just a few categories of content that are wholly prohibited on its platform: a) content that violates the rights of third parties like a copyright violation; b) content that violates a law or regulation; c) content that fits Locals' definition of "sexual activity;" and d) content that threatens violence against an individual or group of people. Locals makes the sole determination of whether speech violates the community guidelines.

134.   Locals does not have a Hate Speech Policy within the meaning of the Online Hate Speech Law because it has no policy addressing "how [Locals] *will* respond and address reports of" hate speech. N.Y. Gen. Bus. Law § 394-ccc(3) (emphasis added). Nor do its community guidelines reference speech that may be perceived to "vilify, humiliate, or incite violence against a group or class of persons" based on race, color, religion, or other protected categories. Regardless, the law's vagueness makes it impossible for Locals to know whether its policy satisfies New York's Hate Speech Policy requirement or how it could do so.

135.   Some of the content on Locals may offend some visitors.

136.   Locals does not believe that all Locals content that may appear to some as "hateful conduct" under the Online Hate Speech Law warrants a designated Hate Speech Policy, Report & Response Mechanism, or Reply Requirement.

137.   Members of Locals communities can email complaints to Locals about content in their communities to support@locals.com, but there is no requirement that complaints will receive a response from Locals.

138.   Furthermore, Locals general email address is not a "mechanism" that will also "allow [Locals] to provide a direct response to any individual reporting" hate speech, and therefore

may not satisfy the law's Report & Response Mechanism requirement. In addition, even if the email address satisfied the requirement, the law's vagueness makes it impossible to know whether the "mechanism" is sufficiently "clear and easily accessible" or how it could be so to satisfy the law.

139.     Some commenters on Locals have accused other commenters of engaging in hate speech because they post controversial views on topics concerning one or more of the protected categories identified in New York's law.

140.     If Locals is required to post a "clear and easily accessible" Report & Response Mechanism and fulfill the Reply Requirement, it believes it will be inundated with many more complaints alleging that content and comments on Locals qualify as state-defined hate speech, meant to be "prohibited."

141.     Reviewing and responding to each of these complaints, as per the Reply Requirement, will be time-consuming and burdensome. To avoid assuming this burden Locals may need to devote additional resources, more aggressively remove content, and/or limit the ability for Locals members to participate in community comment sections.

***The Online Hate Speech Law Deprives Plaintiffs of Their Rights and Their Injury Will Be Ongoing.***

142.     As of December 3, 2022, as a direct and proximate result of New York's Online Hate Speech Law, Plaintiffs will be required to develop and publish a Hate Speech Policy.

143.     The Plaintiffs each disagree with the speech and message that the Online Hate Speech Law will compel them to convey.

144.     As of December 3, 2022, as a direct and proximate result of the Online Hate Speech Law, Plaintiffs will be required to publish a "clear and easily accessible" Report & Response

Mechanism on their online services for visitors to submit complaints about state-defined hate speech on their online services.

145.    Plaintiffs do not want to create and publish the Report & Response Mechanism, nor do they want to communicate to visitors that they endorse the state's definition of hate speech—which differs from their own content policies—or agree with the state's mandated response to it.

146.    As of December 3, 2022, as a direct and proximate result of the Online Hate Speech Law, Plaintiffs will be required to respond to visitor complaints about state-defined hate speech on their online services, and to describe "how the matter is being handled."

147.    Plaintiffs each disagree with the state's message implied by fulfilling the Reply Requirement for visitor complaints about state-defined hate speech and being compelled to describe "how the matter is being handled."

148.    Plaintiffs do not want to communicate, in any way, to visitors that they endorse New York's definition of hate speech or agree with the state's mandated response to it. Being required to do so will harm their reputations as serious advocates of free speech and open debate.

149.    Plaintiffs do not want to be compelled to respond to every visitor complaint about state-defined hate speech, which may or may not align with the content policies of their platforms.

150.    As of December 3, 2022, as a direct and proximate cause of New York's Online Hate Speech Law, Plaintiffs Rumble and Locals will likely be inundated with complaints and either need to hire additional staff to process these complaints, more aggressively remove content, or limit users' ability to participate in their comment sections. Doing so is likely to cause Rumble and Locals to suffer additional financial burdens, and may force them to make significant changes to their platforms and visitor experience.

151.    As of December 3, 2022, Plaintiff Eugene Volokh will be required to respond to each comment personally, a significant new burden, as a direct and proximate cause of New York's Online Hate Speech Law.

152.    As of December 3, 2022, as a direct and proximate cause of New York's Online Hate Speech Law, Plaintiffs will be required to either comply with the terms of the law or risk investigations, subpoenas, and daily fines of $1,000 per violation.

153.    As a result of being pressured to respond in the state's prescribed manner to constitutionally protected expression under the Online Hate Speech Law, Plaintiffs will suffer ongoing irreparable injury to their constitutional and statutory rights. The denial of these constitutional rights is an irreparable injury *per se*. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

154.    As a result of being compelled to speak or having to risk civil penalties under the Online Hate Speech Law, Plaintiffs will suffer ongoing irreparable injury to their constitutional and statutory rights. The denial of these constitutional rights is an irreparable injury *per se*. *Id.*

155.    As a result of the Online Hate Speech Law's overbreadth, Plaintiffs will be both (a) required to develop and enforce a policy dealing with constitutionally protected expression and (b) compelled to speak. Plaintiffs will suffer ongoing irreparable injury to their constitutional and statutory rights. The denial of these constitutional rights is an irreparable injury *per se*. *Id.*

156.    As a result of the Online Hate Speech Law's vagueness, Plaintiffs will be both (a) required to develop and enforce a policy regulating constitutionally protected expression and (b) compelled to speak. Plaintiffs will suffer ongoing irreparable injury to their constitutional and statutory rights. The denial of these constitutional rights is an irreparable injury *per se*. *Id*.

157.    As a result of the Online Hate Speech Law's incompatibility with Section 230, Plaintiffs will be required to assume the risk of liability or civil penalty for their role as publisher

of online content. As result, Plaintiffs' right to publish constitutionally protected expression will be burdened and they will suffer ongoing irreparable injury to their constitutional and statutory rights. *See Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 845 (M.D. Tenn. 2013) (granting a preliminary injunction on both First Amendment and Section 230 preemption grounds); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1273 (W.D. Wash. 2012) (same); *Backpage.com, LLC v. Hoffman*, No. 13-CV-03952 DMC JAD, 2013 WL 4502097, at *6 (D.N.J. Aug. 20, 2013) (same).

158.    Without declaratory and injunctive relief from this Court, New York's unconstitutional law will remain enforceable and Plaintiffs will indefinitely suffer irreparable harm.

159.    Plaintiffs have no other adequate legal remedy to prevent their injury other than an injunction from this Court.

### FIRST CAUSE OF ACTION
### Facial and As-Applied First Amendment Challenge to
### New York General Business Law § 394-ccc
### (Content- and Viewpoint-Based Regulation of Speech)

160.    Plaintiffs re-allege and incorporate the preceding paragraphs as if repeated here.

161.    The First Amendment generally prohibits laws that target speech because of the content or viewpoint expressed. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829–30 (1995).

162.    New York's Online Hate Speech Law is content- and viewpoint-based. It is content-based because it singles out speech that is directed at or pertains to groups or classes of persons based on specified protected class statuses. *R.A.V.*, 505 U.S. at 392; *see Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed.").

163.    New York's Online Hate Speech Law is viewpoint-based because it applies only to speech perceived to "vilify, humiliate, or incite violence against a group or class of persons" and not to speech that, for instance, is perceived to affirm or uplift. *See Matal*, 137 S. Ct. at 1763 ("Giving offense is a viewpoint."). Viewpoint discrimination is an "egregious form of content discrimination" and is "presumptively unconstitutional." *Rosenberger*, 515 U.S. at 829–30.

164.    New York policymakers, including Governor Hochul and Attorney General James, have threatened that online platforms will be held accountable for publishing state-defined hate speech. The threat is reflected in 1) the Online Hate Speech Law's title—"Social media networks; hateful conduct prohibited"; 2) the Governor's signing statement that the Online Hate Speech Law required "social media networks to monitor and report hateful conduct on their platforms"; and 3) the Attorney General's report calling for sweeping restrictions on online services if they did not take further steps to remove hate speech; among other official statements.

165.    The Online Hate Speech Law places unconstitutional content- and viewpoint-based burdens on protected speech through the ever-present threat to "social media network[s]" of Attorney General investigations or civil penalties for failing to respond to complaints about viewpoints New York deems "hateful." It also places content- and viewpoint-based burdens on speech by requiring "social media network[s]" to bear the cost of developing and publishing the Hate Speech Policy, creating the Report & Response Mechanism, and fulfilling the Reply Requirement.

166.    To avoid these costs, Plaintiffs Rumble and Locals and many other online services are likely to be forced to hire additional staff to conduct moderation, aggressively remove content

that receives a complaint, or limit their comments sections—significantly suppressing speech across their platforms.

167.   The First Amendment prohibits New York from burdening protected speech through "thinly veiled threats" that if "social media network[s]" do not treat the speech in the way the government wishes, they will face consequences from state action. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963) ("People do not lightly disregard public officers' thinly veiled threats to institute . . . proceedings against them if they do not come around."). "The sword of Damocles causes harm because it hangs, not necessarily because it drops." *PSINet v. Chapman*, 167 F. Supp. 2d 878, 888 (W.D. Va. 2001), *aff'd*, 362 F.3d 227 (4th Cir. 2004); *see also Backpage.com, LLC v. Dart*, 807 F.3d 229, 237–38 (7th Cir. 2015) (First Amendment is violated when government officials "coupl[e] threats with denunciations of the activity that the official wants stamped out").

168.   New York lacks a compelling government interest for pressuring "social media network[s]" to remove protected speech. Indeed, the law lacks even a legitimate interest. The law has no legislative findings providing a government interest. In fact, the only purported interest, stated in the New York Governor's Section 394-ccc signing statement and the Attorney General's report—silencing protected speech—is constitutionally illegitimate. *United States v. Eichman*, 496 U.S. 310, 315 (1990) (where "the Government's asserted interest is related to the suppression of free expression" it "cannot justify its infringement on First amendment rights." (quotation marks and citation omitted) (emphasis omitted)).

169.   The Online Hate Speech Law is not a narrowly tailored means of achieving New York's interest. To the contrary, there are many less restrictive alternatives such as enforcing

criminal laws and the government engaging in its own anti-hate speech expression rather than restricting or coopting online services.

170.     As a direct and proximate result of the Online Hate Speech Law, New York will burden a vast amount of internet speech and Plaintiffs will suffer ongoing irreparable injuries, including the deprivation of their constitutional right to publish protected speech without the undue burden imposed by an unconstitutional state mandate.

### SECOND CAUSE OF ACTION
### Facial and As-Applied First Amendment Challenge to
### New York General Business Law § 394-ccc
### (Compelled Speech)

171.     Plaintiffs re-allege and incorporate the preceding paragraphs as if repeated here.

172.     The First Amendment prohibits laws that compel speech. Generally, laws that compel speech are subject to strict scrutiny because they "plainly alter [] the content of . . . speech." *Nat'l Ins. of Family and Life Advocates v. Beccera*, 138 S. Ct. 2361, 2371 (2018); *see also W. Va. St. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.").

173.     The Volokh Conspiracy, Rumble, and Locals all object to conveying the message that hate speech should be singled out for chilling, prohibition, or removal.

174.     The Online Hate Speech Law compels Volokh, Rumble, Locals, and most other "social media network[s]" to espouse the state's message by requiring them to fulfill three requirements.

175.    First, it compels them to develop and publish a policy for addressing speech on their online services that some may perceive to "vilify, humiliate, or incite violence against a group or class of persons" based on race, color, religion, or other protected category.

176.    Plaintiffs do not have policies that address hate speech in the manner prescribed by the state—speech that some may perceive to "vilify, humiliate, or incite violence against a group or class of persons" based on race, color, religion or other protected category. While Rumble has a policy prohibiting speech that incites violence generally, as well as racist and antisemitic content, it does not extend to speech that may be perceived to vilify or humiliate a wide range of groups. Regardless, the Online Hate Speech Law's vagueness makes it impossible to know whether Rumble's existing policy satisfies New York's law in this regard or how it could do so.

177.    Forcing "social media network[s]" to develop and publish a policy singling out state-defined hate speech compels Plaintiffs to endorse the state's message—in the least, that such speech is particularly worthy of a designated policy.

178.    Plaintiffs disagree with and do not want to convey the state's message as required by the Online Hate Speech Law.

179.    Second, the Online Hate Speech Law requires "social media network[s]" to create a "clear and easily accessible" Report & Response Mechanism for visitors to report state-defined hate speech and receive a direct response "informing them of how the matter is being handled." N.Y. Gen. Bus. Law § 394-ccc(2).

180.    Volokh does not have a Report & Response Mechanism. Rumble and Locals provide an email address for complaints, but not a mechanism specific to reporting and responding to complaints about perceived hate speech (or one that assures a response as to *any* speech). Volokh occasionally gets complaints through his individual e-mail address, but does not have a mechanism

specific to reporting and responding to complaints about perceived hate speech (or one that assures a response as to *any* speech).

181.    Forcing "social media network[s]" to create a "clear and easily accessible" Report & Response Mechanism for state-defined hate speech compels Plaintiffs to speak and to effectively endorse the state's message that, in the least, such speech is particularly worthy of singling out for complaint and direct response.

182.    Plaintiffs disagree with and do not want to create a Report & Response Mechanism because it requires them to constructively endorse the state's message.

183.    Third, the Online Hate Speech Law requires Plaintiffs to "provide a direct response to any individual" complaining about perceived state-defined hate speech, "informing them of how the matter is being handled." *Id*.

184.    Plaintiffs Volokh and Locals do not have a formal practice of providing a direct response to any complaint of state-defined hate speech or otherwise. While Rumble's policy states that it may provide a direct response to complaints, it explicitly states that it has no obligation to do so.

185.    Forcing "social media network[s]" to "provide a direct response" to complaints of state-defined hate speech about "how the matter is being handled" compels them to speak to these complainants. It also requires them to effectively endorse the state's message that complaints about such speech deserve a "direct response" and that state-defined hate speech must be "addressed" and "handled" because it is particularly worthy of direct response.

186.    Plaintiffs do not want to provide a direct response to every individual complaining about state-defined hate speech because it will effectively endorse the state's message with which they disagree.

187.    New York lacks a compelling government interest for compelling "social media network[s]" to speak by posting a Hate Speech Policy, creating a Report & Response Mechanism, or fulfilling the Reply Requirement.

188.    Indeed, the law lacks even a legitimate interest. The law does not include legislative findings, and thus no description of a government interest. In fact, the only purported interest, stated in the New York Governor's section 394-ccc signing statement and the Attorney General's report—silencing protected speech—is constitutionally illegitimate. *Eichman*, 496 U.S. at 315 (where "the Government's asserted interest is related to the suppression of free expression" it "cannot justify its infringement on First amendment rights." (quotation marks omitted)). The Online Hate Speech Law is not a narrowly tailored means of achieving New York's interest. To the contrary, there are many less restrictive alternatives such as enforcing criminal laws and the government engaging in its own anti-hate speech expression rather than restricting or coopting online services.

189.    As a direct and proximate result of the Online Hate Speech Law, Plaintiffs will suffer ongoing irreparable injuries, including being deprived of their constitutional right against being compelled to speak.

### THIRD CAUSE OF ACTION
### Facial and As-Applied First Amendment Challenge to
### New York General Business Law § 394-ccc
### (Overbreadth)

190.    Plaintiffs re-allege and incorporate the preceding paragraphs as if repeated here.

191.    First Amendment overbreadth doctrine prohibits laws that regulate speech if "a substantial number of [their] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quotation marks and citations omitted).

192.   The Online Hate Speech Law is facially overbroad because it pressures online services to chill, prohibit, or remove a substantial amount of constitutionally protected online speech and compels them to voice the state's pro-censorship view. Much speech that may be perceived to "vilify, humiliate, or incite violence against a group or class of persons" is constitutionally protected even when it concerns protected class status. *See, e.g., Snyder v. Phelps*, 562 U.S. 443 (2011) ("God hates fags," "Thank God for 9/11," "Priests Rape Boys," among other signs constitutionally protected); *see also Brandenburg v. Ohio*, 395 U.S. 444, 447–48 (1969) ("[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action . . . . *A statute which fails to draw this distinction* impermissibly intrudes upon the freedoms guaranteed by the First and Fourteenth Amendments." (emphasis added) (citations omitted)).

193.   The Online Hate Speech Law has no legitimate sweep because it seeks to unlawfully chill protected speech. Assuming *arguendo* that the law has *some* legitimate sweep with regard to speech that incites violence, its unconstitutional applications dwarf that legitimate sweep because the law reaches all manner of comedy, art, journalism, historical documentation, and commentary on important matters of public concern just because someone, somewhere believes it to "vilify" or "humiliate." *See supra* ¶ 23.

194.   Laws or policies attempting to restrict speech using terms similar to "vilify" and "humiliate" have routinely been struck down as either vague or overbroad. *See, e.g., Saxe v. St. Coll. Area Sch. Dist.*, 240 F.3d 200, 210 (3d Cir. 2001) (striking down policy "prohibiting disparaging speech"); *see also Beverly v. Watson*, No. 14 C 4970, 2017 WL 4339795, at *8 (N.D. Ill. Sept. 29, 2017) (collecting cases).

195.    As a direct and proximate result of the Online Hate Speech Law's overbreadth, Plaintiffs will suffer ongoing irreparable injuries, including being deprived of their constitutional right to publish protected speech and against being pressured to chill protected speech.

**FOURTH CAUSE OF ACTION**
**Facial and As-Applied Fourteenth Amendment Challenge to**
**New York General Business Law § 394-ccc**
**(Vagueness)**

196.    Plaintiffs re-allege and incorporate the preceding paragraphs as if repeated here.

197.    Fourteenth Amendment vagueness doctrine prohibits laws that do not "give the person of ordinary intelligence a reasonable opportunity to know what is" required, or do not "provide explicit standards for those who apply them" to prevent arbitrary and discriminatory enforcement. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). And "[w]hen speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012).

198.    The Online Hate Speech Law uses broad and ambiguous terms.

199.    The Online Hate Speech Law's most important terms, such as "vilify," "humiliate," "incite," "user," "internet platform," "content," "clear and concise," and "clear and easily accessible," among others, do not have an objective plain meaning.

200.    The terms "vilify" and "humiliate" in particular are incapable of reasoned application. *See Mansky*, 138 S. Ct. at 1888 (emphasizing that when regulating speech "the State must be able to articulate some sensible basis for distinguishing what may come in from what must stay out"). They are subject to "a virtually open-ended interpretation" since any two people can widely disagree on what vilifies or humiliates. *Id.* at 1891.

201.    The Online Hate Speech Law therefore does not provide a person of ordinary intelligence a reasonable opportunity to know, for example, 1) what online services are regulated

40

given the fact that "social media network" is defined so broadly that it includes any for-profit online service with a comment section that has been visited by at least one person in New York; 2) what speech must be addressed by the compelled Hate Speech Policy; 3) whether an online service's Hate Speech Policy and Report & Response Mechanism are "clear," "concise," or "easily accessible"; or 4) whether a site has sufficiently responded to complaints.

202.    The Online Hate Speech Law's lack of explicit standards also unconstitutionally invites arbitrary and discriminatory enforcement in determining, for example, (1) which "social media network[s]" the law applies to; (2) whether an online service's policy provides a sufficiently "clear and concise" description of how the site "will respond [to] and address" state-defined hate speech; (3) whether an online service's Report & Response Mechanism is "clear and easily accessible;" and (4) whether an online service has sufficiently responded to complaints.

203.    In light of the law's formal title, Governor Hochul and Attorney General James's official statements, and the Attorney General's report, and in combination with its vague terms, Plaintiffs reasonably believe that the Online Hate Speech Law will be expansively interpreted and aggressively enforced. At a minimum, the vagueness of the law's operative terms affords the Attorney General unbound discretion to adopt such expansive interpretation, whether the Attorney General ultimately does or not, and online services like Plaintiffs will have no way of knowing whether the law will be taken to that extreme and must operate with the expectation that it will. Thus, the law's vagueness encourages Plaintiffs and those similarly situated "to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked," *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)) (quotation marks and internal citation omitted), and thereby unconstitutionally incentivizing them to chill

speech on their platform and compelling them to parrot the state's message in order to avoid investigation and civil penalties.

204.    The Online Hate Speech Law contains a savings clause stating that it is not to be construed as (a) imposing an "obligation" on the social media network "that adversely affects the rights or freedoms of any person" under the First Amendment; or (b) adding to or increasing "liability for anything other than the failure to provide a mechanism for a user to report . . . and to receive a response on such report." N.Y. Gen. Bus. Law § 394-ccc(4).

205.    But this vague savings clause does not place "adequate publicly disclosed limits on . . . discretion," *Battle v. City of Seattle*, 89 F. Supp. 3d 1092, 1107 (W.D. Wash. 2015), and therefore cannot save the Online Hate Speech Law. *Stevens*, 559 U.S. at 480 ("The First Amendment protects against the Government; it does not leave us at the mercy of noblesse oblige.").

206.    As a direct and proximate result of the Online Hate Speech Law's vagueness, Plaintiffs will suffer ongoing irreparable injury, including being deprived of their constitutional right to a reasonable opportunity to know how they can comport with the law's requirements.

### FIFTH CAUSE OF ACTION
### Statutory Preemption Challenge Under 47 U.S.C. § 230 to
### New York General Business Law § 394-ccc

207.    Plaintiffs re-allege and incorporate the preceding paragraphs as if repeated here.

208.    Congress enacted Section 230 of the Communications Decency Act (47 U.S.C. § 230) to protect providers of "interactive computer services" from liability for decisions to moderate or not moderate user-generated content.

209.    Section 230 defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to

a computer server, including specifically a service or system that provides access to the Internet." 47 U.S.C. § 230(f)(2).

210.     The Plaintiffs each qualify as an "interactive computer service" because they offer visitors access to content and the ability to post their own content or comments. In fact, every online service that qualifies as a "social media network" under the Online Hate Speech Law would necessarily qualify as an "interactive computer service" under Section 230.

211.     Section 230(c)(1) provides, in pertinent part, that a "provider" of an "interactive computer service" shall "not be treated as the publisher or speaker of any information provided by" a content creator or commenter for purposes of civil or criminal liability. Section 230(e)(3) preempts inconsistent state laws and prevents the imposition of liability. 47 U.S.C. § 230(e)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."); *see Cooper*, 939 F. Supp. 2d at 805 (invalidating a Tennessee law that regulated websites due to Section 230 preemption).

212.     Section 230 protects an online service's "exercise of its editorial and self-regulatory functions," *Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.*, 206 F.3d 980, 986 (10th Cir. 2000), including the ability to establish third-party content policies free from a duty to scrutinize creator or commenter content. The immunity "extends to . . . website policies and practices," and their "construct and operation." *Jane Doe No. 1 v. Backpage.com*, 817 F.3d 12, 20 (1st Cir. 2016). Decisions not to change online service policies or its "construct and operation" are as much editorial decisions as not deleting any particular third-party post. *Id*. (citing *Universal Commc'n Sys., v. Lycos*, 478 F.3d 413, 422 (1st Cir. 2007).

213.     The Online Hate Speech Law treats "social media network[s]," Plaintiffs included, as publishers, unlawfully holding them liable based on third-party content if they do not fulfill any of three obligations New York has imposed.

214.     First, the Online Hate Speech Law requires "social media network[s]" to develop and publish a Hate Speech Policy describing how they "will respond [to] and address" state-defined hate speech on their platforms, including third-party creator or commenter speech, presupposing that such "response," whatever it may be, is required. Second, the law requires a "clear and easily accessible" Report & Response Mechanism, regulating the "construct and operation" of their sites. Third, the Reply Requirement mandates that online services monitor and screen third-party content in order to "provide a direct response" to visitor complaints.

215.     In these ways the Online Hate Speech Law subjects Plaintiffs to potential investigations, subpoenas, and civil penalties for their decisions as online publishers of third-party content, and it is accordingly preempted by Section 230.

216.     As a direct and proximate result of the Online Hate Speech Law's violation of their protection as publishers under Section 230, Plaintiffs will suffer ongoing irreparable injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Eugene Volokh, Rumble Canada Inc., and Locals Technology Inc. respectfully request that this Court enter judgment in favor of Plaintiffs and against Defendant and issue the following relief:

A.     A declaration that:

1.     New York General Business Law § 394-ccc is unconstitutional on its face and as applied to Plaintiffs under the First Amendment to the Constitution of the United States

because it is a content-based and viewpoint-based regulation of speech that is not narrowly tailored to achieve a compelling government interest.

      2.    New York General Business Law § 394-ccc is unconstitutional on its face and as applied to Plaintiffs under the First Amendment to the Constitution of the United States because it compels their speech.

      3.    New York General Business Law § 394-ccc is unconstitutional on its face and as applied to Plaintiffs under the First Amendment to the Constitution of the United States because it overbroad.

      4.    New York General Business Law § 394-ccc is unconstitutional on its face and as applied to Plaintiffs under the Fourteenth Amendment to the Constitution of the United States because it impermissibly vague.

      5.    New York General Business Law § 394-ccc is preempted by Section 230 of the Communications Decency Act.

    B.    Preliminary injunctive relief against Defendant, prospectively enjoining enforcement of New York General Business Law § 394-ccc during the pendency of this litigation.

    C.    Permanent injunctive relief against Defendant, prospectively enjoining enforcement of New York General Business Law § 394-ccc.

    D.    An award of attorneys' fees and costs under 42 U.S.C. § 1988 and other applicable law; and

    E.    All other further legal and equitable relief as the Court may deem just and proper.

DATED: December 1, 2022

Respectfully submitted,

/s/ Darapana M. Sheth

DARPANA M. SHETH
(New York Bar No. 4287918)
DANIEL M. ORTNER*
(California State Bar No. 329866)
JAMES M. DIAZ*
(Vermont Bar No. 5014)
FOUNDATION FOR INDIVIDUAL RIGHTS AND
    EXPRESSION
510 Walnut St., Suite 1250
Philadelphia, PA 19106
Telephone: (215) 717-3473
daniel.ortner@thefire.org
jay.diaz@thefire.org
darpana.sheth@thefire.org

BARRY N. COVERT**
(New York Bar No. 27118)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Ave., Suite 120
Buffalo, NY 14202
Tel: (716) 849-1333 x 365
bcovert@lglaw.com

*Attorneys for Plaintiff*
**Pro Hac Vice* Motions Forthcoming
** S.D.N.Y. Admission Pending

## VERIFICATION OF EUGENE VOLOKH

Pursuant to 28 U.S.C. § 1746, I, EUGENE VOLOKH, declare as follows:

1. I am a Plaintiff in the present case and a citizen of the United States of America.

2. I am the co-founder and owner of the blog The Volokh Conspiracy that was originally located at www.volokh.com and is now hosted at www.reason.com/volokh.

3. I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief.

4. I have personal knowledge of the factual allegations in paragraphs 5, 12,  86-106, 142-149, 151, 152-159, 176-189, 195,  203, 206, and 215-216 of the Complaint and know them to be true regarding Eugene Volokh and the Volokh Conspiracy.

5. I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on November 30, 2022.

Eugene Volokh

Plaintiff

## VERIFICATION OF MICHAEL ELLIS

Pursuant to 28 U.S.C. § 1746, I, MICHAEL ELLIS, declare as follows:

1. I am an authorized representative of the Plaintiffs, Rumble Canada Inc. and Locals Technology Inc., in the present case and a citizen of the United States of America.

2. I am the General Counsel and Corporate Secretary of Rumble Inc., the parent company of Rumble Canada Inc. and Locals Technology Inc.

3. I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief.

4. I have personal knowledge of the factual allegations in paragraphs 6, 13, 14, 23 (that the video that is listed as being on Rumble is in fact found on Rumble as of today), 107-125, 126-141, 142-150, 152-159, 176-189, 166, 195, 203, 206, and 215-216 of the Complaint, and know them to be true with regard to Rumble Canada Inc. and Locals Technology Inc.

5. I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on December 1, 2022.

_____
Michael Ellis
Rumble Canada Inc. and Locals Technology Inc.
Plaintiffs