UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EUGENE VOLOKH, RUMBLE CANADA INC., and LOCALS TECHNOLOGY INC.

Plaintiffs,

- against -

LETITIA JAMES, in her official capacity as Attorney General of New York,

Defendant.

No. 22 Civ. 10195 (ALC)

# DECLARATION OF RICK SAWYER IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Under 28 U.S.C. § 1746, I, Rick Sawyer, Special Counsel, Office of the New York State Attorney General, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1. I am Special Counsel for Hate Crimes in the Civil Rights Bureau of the Office of the New York State Attorney General ("OAG"), and attorney for Defendant LETITIA JAMES, in her official capacity as Attorney General of New York, in the above-captioned action.

2. I make this declaration in support of Defendant's Opposition to Plaintiffs' Preliminary Injunction Motion based on personal knowledge for the limited purpose of providing the Court with the attached appendix of exhibits, cited in the Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction, all of which this Court may take judicial notice under Federal Rule of Evidence 201.

3. On October 18, 2022, the OAG published the *Investigative Report on the Role of Online Platforms in the Tragic Mass Shooting in Buffalo on May 14, 2022*. Attached as **Exhibit A** is a true and accurate copy of that report. The report was prepared in response to a request made by Governor Kathy Hochul under Executive Law § 63(8) and was based on an investigation conducted by the OAG. It is judicially noticeable under Rule 201 and can be found at https://ag.ny.gov/sites/default/files/buffaloshooting-onlineplatformsreport.pdf (retrieved on December 12, 2012).

4. On May 14, 2022, a teenage white supremacist livestreamed himself systematically slaughtering Black people with an assault rifle at a grocery store in East Buffalo, New York. Ex. A at 9–10. The attack left 10 Black people dead and 3 others wounded. *Id.* at 10.

5. Within hours, a recording of the livestream went viral on social media. *Id.* at 34.

1

6. Before the shooting began, the shooter published a manifesto touting his racist views and calling for the mass killing of Black people. *Id.* at 9, 15–16. That, too, was shared widely on social media. *Id.* at 34–35.

7. The shooter's expressed intention in livestreaming his attack and posting his manifesto and livestreaming his mass murder was to inspire others to follow in his footsteps and commit racially motivated murder. *Id.* at 9, 15–16.

8. The Buffalo shooter took his inspiration from a similar 2019 massacre in Christchurch, New Zealand, in which the shooter livestreamed an attack on two separate mosques, killing 51 people. *Id.* at 15, 17–19.

9. Like the Buffalo shooter, the Christchurch shooter also created published a manifesto on social media that was widely shared on social media across the internet. *Id.* at 19. The Buffalo shooter explicitly credited the Christchurch livestream as the impetus for event as the inspiration that "started my real research into the problems with immigration and foreigners in our White lands." *Id.*

10. The U.S. Department of Homeland Security has labeled domestic violent extremists, like the Buffalo shooter, as one of the key threats facing national security today. Attached as **Exhibit B** is a true and accurate copy of the Department of Homeland Security's October 2020 Homeland Threat Assessment. It is available at: https://www.dhs.gov/sites/default/files/publications/2020_10_06_homeland-threat-assessment.pdf (retrieved on December 12, 2012).

11. Attached as **Exhibit C** is a true and accurate copy of the Assembly Memorandum in Support of Legislation for A7865A (2022), which was ultimately enacted as New York General Business Law § 394-ccc. It is available at: https://nyassembly.gov/leg/?bn=A07865&term=&Summary=Y&Actions=Y&Votes=Y&Memo=Y&Text=Y (retrieved on December 12, 2012).

12. Attached as **Exhibit D** is a true and accurate copy of the Assembly Floor Debate for A7865A (June 1, 2022). It is available at: https://nystateassembly.granicus.com/DocumentViewer.php?file=nystateassembly_8ee840ed9d90b1cc1aacbe7e84c00f2b.pdf&view=1 (retrieved on December 12, 2012).

13. During the floor debate, Assemblymember Patricia Fahy, the sponsor of A7865A, declared:

> It would now—this bill would require a clear and concise policy regarding how social media platforms or networks would respond to incidences of hateful conduct on their platforms, as well as have them—require them to maintain an easily accessible mechanism for

>   reporting that conduct on the platforms. It doesn't tell them how, it just lays out that they—they must have one.

Ex. D at 183.

14. During the floor debate, Assemblymember Patricia Fahy, the sponsor of A7865A, declared:

    > Estimates are that 80 percent of mass shooters have shown signs of crisis, and about one-half of that 80 percent have estimated to have revealed their plans ahead of time by a social media post. So we know we have an issue. We know we need more tools to address it.

    Ex. D at 191.

15. During the floor debate, Assemblymember Patricia Fahy, the sponsor of A7865A, declared:

    > We also include a provision that says that the—the social media networks themselves need to show how they plan to respond. But we have left this purposely open, if you will, because we are leaving it up to them.

    Ex. D at 195.

16. During the floor debate, Assemblymember Steven Otis, in support of A7865A, declared:

    > This is a very simple bill. This is a bill that basically raises the standard for social media sites to have a—and I'll read the language—easily— easily accessible mechanism to report hateful material. That's all the bill really does. It -- it would have to report on they handle the complaints. But what the bill does not do is the bill is not about the First Amendment, we don't tell the social media sites what they do, what—what judgments they make. It is not about the government telling social media sites what to keep up or what to take down. And it's not very complicated. What it does do is it sets up -- it doesn't -- doesn't tell them what their role should be. What the bill does is basically say we want speed in getting hateful material down. The site's going to figure out what material on their own policies they're going to take down or they're going to keep up.

    Ex. D at 201–03.

17. During the floor debate, the following colloquy took place between Assemblymember Mike Lawler and Assemblymember Patricia Fahy, the sponsor of A7865A:

3

>MR. LAWLER: But if we're saying that they need to come up with some mechanism to report and they need to let us know how they may respond to hateful conduct, what if their response is, you know, that they're not going to remove it? That's a response. I mean, so the Attorney General is going to be able to go after them for not removing what she deems hateful?
>
>MS. FAHY: This does not empower her in that regard.

Ex. D at 207.

18. During the floor debate, Assemblymember Patricia Fahy, the sponsor of A7865A, declared:

>It is just telling them that they should have a policy. And because we're not telling social media companies what that policy should be, it does not, I do not believe, implicate the First Amendment.

Ex. D at 224.

19. For the reasons set forth in the accompanying Memorandum of Law, it is respectfully requested that Plaintiffs' Preliminary Injunction Motion be denied.

Dated: December 13, 2022

/s/ Rick Sawyer
Rick Sawyer
Special Counsel for Hate Crimes
Office of the New York State Attorney General
