# EXHIBIT D

**WEDNESDAY, JUNE 1, 2022**                    **11:58 A.M.**

ACTING SPEAKER AUBRY:  The House will come to order.

In the absence of clergy, let us pause for a moment of silence.

(Whereupon, a moment of silence was observed.)

Visitors are invited to join the members in the Pledge of Allegiance.

(Whereupon, Acting Speaker Aubry led visitors and members in the Pledge of Allegiance.)

A quorum being present, the Clerk will read the Journal of Tuesday, May 31st.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, I move to

1

**NYS ASSEMBLY**                                              **JUNE 1, 2022**

dispense with the further reading of the Journal of Tuesday, May the 31st and ask that the same stand approved.

ACTING SPEAKER AUBRY:  Without objection, so ordered.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, sir.  I'd like to begin with a quote today.  This one is from Booker T. Washington. Most of you remember who Booker T. was from our history lessons. No matter where you went to school at you learned of his work.  But the words that he's sharing with us today, Mr. Speaker, is that, *Education is not a thing apart from life.  It's not a system nor a philosophy, it is the direct teaching of how to live and how to work*. Again, these words from Booker T. Washington.

Colleagues and guests that are in the Chambers, if you can just give me a few minutes I will explain where we're going today.  Colleagues have on their desk a main Calendar and an A-Calendar as well as a debate list.  I move to advance that A-Calendar, Mr. Speaker.

ACTING SPEAKER AUBRY:  On Mrs. Peoples-Stokes' motion the A-Calendar is advanced.

Mrs. Peoples--

MRS. PEOPLES-STOKES:  Thank you, sir.  We're going to begin our work today by taking up resolutions which are on page 3.  And then we're going to take up on debate with Calendar No. No. 280 by Ms. Rosenthal.  And immediately after the debate with

2

**NYS ASSEMBLY**                                        **JUNE 1, 2022**

Ms. Rosenthal we're going to go straight to consent the A-Calendar, beginning with Rules Report No. 15 as well as the resolution that's on the A-Calendar.  Following consent, we will then take up the following bills on debate with Calendar No. 560 by Ms. Rozic, Rules Report No. 270 by Ms. Pheffer Amato, Rules Report No. 313 by Ms. Fahy, Rules Report No. 318 by Mr. Bronson, Rules Report No. 366 by Ms. Cruz, Rules Report No. 369, Mr. Thiele, Rules Report No. 389, Mr. Braunstein, Rules Report No. 390, Mr. Cahill, Rules Report No. 391 by Mr. Anderson.  I'm just going to ask again for colleagues' patience.  Much like we did yesterday we've got a very long day but we got a lot of things done.  We'd like to duplicate that by getting as much or more completed today.  So I want to thank you in advance for your cooperation and your patience and your ability to let colleagues debate without a lot of chatter in the Chambers.  Thank you so much for that in advance.  If there is going to be a need for further announcements, Mr. Speaker, I will announce it at the appropriate time.  Now is a great time for you to do housekeeping and/or introductions if you have any.

ACTING SPEAKER AUBRY:  No housekeeping, Mrs. Peoples-Stokes.  However, we do have introductions.

Ms. Williams for the purpose of an introduction.

MS. WILLIAMS:  Thank you, Mr. Speaker, for allowing me to speak before today's Body to today's colleagues.  Today we have some special guests.  One of them is very special who you guys may know, and those of you who are new members.  So I'd

3

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

like to welcome on this day as we celebrate our Caribbean culture

former Assemblymember Diana Richardson, who is now the Deputy

Borough President for Brooklyn.  We have Consul General from

Trinidad and Tobago, Mr. André Laveau.  We have Consul General

for Barbados, Mackie Holder.  We have the Consul General for St.

Lucia, Jeremiah Hyacinth.  Dominican Republic Vice Consul Ivan

Tolentino.  Dr. Judy Newton, retired NYPD officer -- sorry, detective.

Sharon Long.  Brooklyn Chamber President Randy Peers.  And from

Brooklyn Chamber as well, Vladimir Sterlin (inaudible), and from

Emblem Health we have Ann Marie Adamson.  And we also have

some guests from Brooklyn Borough Hall.  You guys can all stand.

Mr. Speaker, I would like you to welcome all the

guests today as we celebrate Caribbean History Month.

ACTING SPEAKER AUBRY:  Certainly.  On behalf

of Ms. Williams, the Speaker and all the members, we welcome you

here, this distinguished group, to the New York State Assembly,

extend to you the privileges of the floor.  Know that we appreciate the

cultures that you represent, the countries that you represent, and that

you have chosen to spend this day with us is a honor.  But then

particularly for our former member, as we always say, once a member,

always a member.  So your privileges have been established for life.

So good to see you.  Hope you're enjoying your new role in the

Borough of Brooklyn.  But to all of you, you're welcome here any

time.  This is always going to be a place where you will find a

welcoming home.  Thank you so very much.  Congratulations to all of

you.

(Applause)

Mr. Lawler for the purposes of a introduction.

MR. LAWLER:  Thank you, Mr. Speaker.  It is my privilege to introduce to this Body Lori Alhadeff, the President of Make Our Schools Safe, and her mother Terry Rabinowitz.  They are here from Parkland, Florida where Lori's daughter Alyssa was shot eight times in her English classroom in the horrific massacre at Marjorie Stoneman Douglas High School on Valentine's Day 2018. Mr. Speaker, Lori's cousin Jordan Turner and his daughter Jane who live in Rockland County, and they have connected myself and Assemblyman Zebrowski with Lori and Terry.  Since that tragic day, Lori and her family have formed Make Our Schools Safe, a 501(c)(3) national non-profit organized -- organization dedicated to protecting students and teachers at schools.  Their mission is to empower students and staff to help create and maintain a culture of safety and vigilance in a secure school environment.  Mr. Speaker, as we saw just last week, another senseless school shooting that took the life of 19 children and two teachers, destroying families across Uvalde, Texas and forcing families like the Alhadeffs to relive the tragic death of their daughter.  Mr. Speaker, they are here today and will be here through the week to demand action, to protect our schools and to ensure that this never happens again.  That is why they are tireless advocates for Alyssa's Law, named after her daughter, a critical piece of legislation that addresses the issue of law enforcement response

5

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

time when a life-threatening emergency occurs because time equals life.  The law, which has passed the State Senate and is carried by Mr. Zebrowski in this Chamber, calls for the installation of silent panic alarms that are directly linked to law enforcement so in case of any emergency they will get on the scene as quickly as possible and end the threat and triage the victims.  Mr. Speaker, I join them in their urgency to see this legislation passed and encourage all of my colleagues here to demand an up or down vote before we leave Albany this week.

Mr. Speaker, I'd ask that you please welcome Ms. Alhadeff and Ms. Rabinowitz and extend all the courtesies and privileges of the floor to them, and may we always remember their beautiful daughter and granddaughter Alyssa and all of the children who have lost their lives due to gun violence in our schools.

ACTING SPEAKER AUBRY:  Certainly.  On behalf of Mr. Lawler, Mr. Zebrowski, the Speaker and all the members, we welcome you here to the New York State Assembly.  And we stand in awe of those who have suffered and turned that suffering into the process of trying to ensure no one else follows you in that task.  And we understand and respect the work that you do.  So you have here the privileges of the floor and also the hearts and minds of the people of the State of New York.  Thank you so very much.

(Applause)

We go to resolutions on page 3.  The Clerk will read.

THE CLERK:  Assembly Resolution No. 1040, Rules

**NYS ASSEMBLY**                                        **JUNE 1, 2022**

at the request of Mr. Cusick.

Legislative Resolution memorializing Governor Kathy Hochul to proclaim June 1, 2022 as Global Running Day in the State of New York.

ACTING SPEAKER AUBRY:  On the resolution, all those in favor signify by saying aye; opposed, no.  The resolution is adopted.

THE CLERK:  Assembly Resolution No. 1041, Rules at the request of Ms. Davila.

Legislative Resolution memorializing Governor Kathy Hochul to proclaim June 1-8, 2022 as Fibro -- Fibroadenoma Awareness Week in the State of New York.

ACTING SPEAKER AUBRY:  On the resolution, all those in favor signify by saying aye; opposed, no.  The resolution is adopted.

THE CLERK:  Assembly Resolution No. 1042, Rules at the request of Ms. Solages.

Legislative Resolution memorializing Governor Kathy Hochul to proclaim June 13-19, 2022 as Infant Mental Health Awareness Week in the State of New York.

ACTING SPEAKER AUBRY:  On the resolution, all those in favor signify by saying aye; opposed, no.  The resolution is adopted.

THE CLERK:  Assembly Resolution No. 1043, Rules at the request of Mr. Zebrowski.

7

**NYS ASSEMBLY**                                              **JUNE 1, 2022**

Legislative Resolution memorializing Governor Kathy Hochul to proclaim June 2022 as Migraine and Headache Awareness Month in the State of New York.

ACTING SPEAKER AUBRY:  On the resolution, all those in favor signify by saying aye; opposed.  The resolution is adopted.

THE CLERK:  Assembly Resolution No. 1044, Rules at the request of Ms. Lupardo.

Legislative Resolution memorializing Governor Kathy Hochul to proclaim June 2022 as Dairy Month in the State of New York.

ACTING SPEAKER AUBRY:  On the resolution, all those in favor signify by saying aye; opposed, no.  The resolution is adopted.

THE CLERK:  Assembly Resolution No. 1045, Rules at the request of Mrs. Barrett.

Legislative Resolution memorializing Governor Kathy Hochul to proclaim June 2022 as Farmers Market Appreciation Month in the State of New York.

ACTING SPEAKER AUBRY:  On the resolution, all those in favor signify by saying aye; opposed, no.  The resolution is adopted.

THE CLERK:  Assembly Resolution No. 1046, Rules -- Rules at the request of Ms. Williams.

Legislative Resolution memorializing Governor

8

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

Kathy Hochul to proclaim June 2022 as Caribbean Heritage Month in the State of New York.

ACTING SPEAKER AUBRY:  Ms. Williams on the resolution.

MS. WILLIAMS:  Thank you, Mr. Speaker, for allowing me to speak on this resolution.  As a proud Trinidad-American who also has roots from Venezuela, today I'm proud to stand before this Body to pay tribute to the cultural heritage of so many ethnic groups which comprise and contribute to the richness and diversity of the Caribbean culture as we adopt June as Caribbean Heritage Month.  And today we'll be serving lunch in Room 711-A via our local restaurant back in Brooklyn from Trini Jam, and we also have Calvin and Latoya, the sole owners that's here with us.

Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you.

Ms. Chandler-Waterman on the resolution.

MS. CHANDLER-WATERMAN:  Hello.  Thank you to the Speaker, Majority Leader, my colleagues, the Assemblywoman Jaime Williams.  As many of you know, I'm a proud Caribbean woman from Barbados and Jamaica who represents a district filled with the rich culture of our people.  Many of -- and you know I have -- I must say pardon me, big up to my mentor Nick Perry who's not here with us but always with me.  Many of my constituents are or come from immigrant families that come to the United States in search of the opportunity for a better life or the American Dream, as we call it.

9

It is those individuals and opportunities that give me the inspiration to do the work that we do.  Like many of my colleagues, my office serves as a community resource hub that not only connects people to services, but also leverage our platform to assist residents to navigate the immigration process so that we can live, work and prosper without fear of being torn away from our families.  It is our obligation as elected officials to serve our constituents and work to bring communities together.  Unfortunately, many of the issues that plague my community cross district lines, and only through collaboration between elected officials and community stakeholders would these challenges be sufficiently addressed.  I look forward to working with you all to ensure that we create a new normal for our people where resources and opportunities are easily accessible to all of our constituents.

        Thank you.

        ACTING SPEAKER AUBRY:  Thank you.

        Mrs. Peoples-Stokes on the resolution.

        MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker, for the opportunity to speak on the resolution.  I -- I want to congratulate my colleague because I think it's critically important that we do ask the Governor to honor the heritage of the people who have contributed so much to this country.  And, you know, we are in a time and space in -- in the United States where there are many folks who don't think immigrants have a role here, and they -- they don't understand that if it was not for people like Alexander Hamilton we

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

would not even have our country founded in the way that it has been.

He was from the Caribbean.  And so to -- to think that people just got

here is not accurate.  We've always been here, Caribbeans have always

been here, Africans have always been here and we're being joined by

other immigrants.  But it's important for people to honor and know

their culture.  Because when you know your culture and know your

soul, you will succeed no matter how many obstacles are put in front

of you.

        So, I honor my colleague for doing this resolution.  I

honor all her guests that she has brought to celebrate this, and I hope

that I have time to run by 711-A for lunch.  Again, Mr. Speaker, I

want to congratulate her and thank her for her work in this area.  And

it's great to see our colleague Diana Richardson back, too.

        ACTING SPEAKER AUBRY:  On the resolution, all

those in favor signify by saying aye; opposed.  The resolution is

adopted.

        THE CLERK:  Assembly Resolution No. 1047, Rules

at the request of Ms. Glick.

        Legislative Resolution memorializing Governor

Kathy Hochul to proclaim June 2022 Gay Pride Month in the State of

New York.

        ACTING SPEAKER AUBRY:  Ms. Glick on the

resolution.

        MS. GLICK:  Thank you, Mr. Speaker.  June is Gay

Pride Month because in 1969 a group of folks who were at the

11

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

Stonewall Inn were tired of the harassment and the police raids and pushed back and fought back. And the Stonewall uprising was the beginning of the modern gay rights movement. It is in my district. It is now a national park, a historic site. And while New York State has come a long way, in 2002 we guaranteed basic civil rights for lesbians and gay men in this State. That was 11 years after I became a member of this Body. And in 2011, this State took a major step forward in legalizing same-sex marriage. And I have to say that as far as we have come over this period of time, it saddens me to see the rhetoric that harkens back to a disgraceful period when lesbians and gay men and transgender Americans were used as political pawns to inflame the electorate for political purposes. The gay Americans deserve the same respect that everybody expects for them and their families. We deserve no less. And to have people use that notion of grooming, recruiting, to have a bill in some states that say that you can't even discuss it and use children as the vehicle for anxiety for their parents shows that we are not as mature a people as we like to think we are. What do first- and second-graders talk about or kindergartners? They talk about their families. But if you have two moms or two dads, your teacher is in danger if you mention that. So there are parts of this country that demonize who we are and then pretend to talk about how they're -- everybody's God's children. Those words should stick in their throats. So we are here today to call on the Governor to declare June Gay Pride Month because we are proud of who we are, we're proud of our families. We're proud of the fact that we have overcome

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

stigma, discrimination and violence against us.  Whether we're lesbian, gay, transgender should make no difference.  We are all a part of humanity, and we only ask that people behave in the same way to us as they expect us to behave towards them.

Now, my parents were straight.  Many of our parents were straight.  So where did we come from?  We are just who we are. We don't have to go out and recruit.  Now I'll tell you, there are some people we wouldn't want.  They show up anyway.  Why?  Because people are just people.  So, we're here to say thank you for the advancements we've made.  We're not going back.  The closet door is open.  It's been taken off the hinges and it doesn't matter the rhetoric that people use, because once people know who their family members are they reject the stereotypes.

So thank you, Mr. Speaker.  I appreciate everybody's kind attention, and I hope that everybody has a very happy Gay Pride Month.

ACTING SPEAKER AUBRY:  Thank you.

Mr. Bronson.

MR. BRONSON:  Thank you, Mr. Speaker.  It is with pride that I rise and stand in support of this resolution brought by Assemblymember Deborah Glick, and I thank her for her leadership and thank her and Assemblymember Danny O'Donnell whose shoulders I stand on along with those shoulders of my late friend, Council Member Tim O. Mains.  These folks are trailblazers who in difficult times in our history were brave enough to stand up and say

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

who they are and to live authentically.  As the sponsor mentioned, we are seeing more and more folks in other states in particular who are using our community as a political wedge.  That is unacceptable.

Mr. Speaker, I live by and I legislate by a simple proposition:  That no matter who you are, what you look like, what your ability, where you come from, who you love or how you identify, we all have dignity.  And with that dignity we deserve full equality, justice and an opportunity to succeed.  Here in New York State we have a long history of fighting for equality for all.  And certainly that history includes my community, the LGBTQ community.  But we have work left to be done.  The fight will continue and we will forever struggle for that full equality here in New York and across this country.  But Gay Pride Month gives us an opportunity to look at that history.  It gives us an opportunity to celebrate living authentically.  It gives us an opportunity to shout out loud, *I am gay, I am proud and I love who I am*.  And I only ask our community and our society to see our community with the dignity that each of us have inside and treat us with the justice and the fairness and the humanity that every person, every person deserves.

Thank you, Mr. Speaker, and thank you Assemblymember Glick for bringing this forward.

ACTING SPEAKER AUBRY:  On the resolution, all those in favor signify by saying aye; opposed.  The resolution is adopted.

THE CLERK:  Assembly Resolution No. 1048, Rules

14

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

at the request of Ms. Reyes.

Legislative Resolution memorializing Governor

Kathy Hochul to proclaim July 25, 2022 as Afro-Latina --

Afro-American and Afro Diaspora Women's Day [sic] in the State of

New York.

ACTING SPEAKER AUBRY:  On the resolution, all

those in favor signify by saying aye; opposed, no.  The resolution is

adopted.

THE CLERK:  Assembly Resolution No. 1049, Rules

at the request of Ms. Rosenthal.

Legislative Resolution memorializing Governor

Kathy Hochul to proclaim June 2022 as Cytomegalovirus Awareness

Month in the State of New York.

ACTING SPEAKER AUBRY:  On the resolution, all

those in favor signify by saying aye; opposed, no.  The resolution is

adopted.

Ms. Walsh for the purposes of a introduction.

MS. WALSH:  Good morning, Mr. Speaker, and

thank you so much for allowing me to interrupt the proceedings to

introduce a couple of special guests to the Chamber today.  I'd like to

introduce Carter Cukerstein and his mother and father Alyssa and Josh

Cukerstein who are here in the Chamber today.  Carter is a member of

the Shenendehowa Varsity Track and Field Team that's located in my

district in Clifton Park, New York.  During this most recent indoor

track and field season, Carter was recognized among the top sprinters

15

**NYS ASSEMBLY**                                        **JUNE 1, 2022**

in the United States.  During the Millrose Games Trials in January he ran the fastest 55-meter dash in the country at this time, posting a 6.29- second finish.  Carter would then go on to be undefeated during the season in the 55-meter, winning the New York State championship in 6.28 seconds.  Carter also set the New York State all-time indoor 55- meter and 60-meter records during the Ocean Breeze Elite Invitational on Staten Island.  He's now a senior at Shenendehowa. He holds five all-time Shenendehowa records.  And just in case you don't know, Shenendehowa is an athletic powerhouse.  They -- they hold a lot of records.  So, to hold five all-time Shenendehowa records is pretty big, in the 55 meter, 60 meter, 4x200 meter, 100 meter and 200 meter distances, and he's been a part of numerous Suburban Council and Section 2 championship teams for the school.  He's graduating this year.  He's going to attend the University of Oklahoma, a Division 1 school this fall sprinting for the Sooners on a full athletic scholarship.

And I ask you, Mr. Speaker, to please recognize Carter and his proud parents Alyssa and Josh and welcome them to the Chamber.  Thank you so much.

ACTING SPEAKER AUBRY:  Certainly.  On behalf of Ms. Walsh, the Speaker all the members, we welcome you here to the New York State Assembly.  We extend to you the privileges of the floor.  We're in awe of the accomplishments as you have made as a runner, obviously with the support of your parents.  So important that you have that support as you proceed in life.  Looking forward to

probably seeing you in the Olympics if it looks good to me, and I will be watching intensely for you, sir.  Thank you so very much and good luck on your beginning career.

(Applause)

Page 37, Calendar No. 280, the Clerk will read.

THE CLERK:  Assembly No. A07926-A, Rules Report No. 280, L. Rosenthal, Meeks, Simon, Epstein, Zinerman, Galef, Fernandez, Burgos, Gottfried, Steck, Seawright, Niou, Zebrowski, Abinanti, Carroll, Paulin, Gallagher, Dinowitz, Fahy, Quart, Colton, Griffin, Hyndman, Pretlow, Burdick, O'Donnell, Glick. An act to amend the Penal Law, in relation to requiring semiautomatic pistols sold in this State be verified as a microstamping-enabled pistol; and to amend the Executive Law, in relation to requiring the Division of Criminal Justice Services to certify the viability of microstamping-enabled pistols.

ACTING SPEAKER AUBRY:  An explanation is requested, Ms. Rosenthal.

MS. ROSENTHAL:  This bill would amend the Penal Law to require the Division of Criminal Justice Services to examine the technological viability of microstamping-enabled pistols, and if such investigation deems the technology viable would require all semiautomatic pistols sold in New York State to be microstamping-enabled.

MR. SMULLEN:  Thank you, Mr. Speaker.  Would the sponsor yield for some questions, please?

17

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

ACTING SPEAKER AUBRY:  Ms. Rosenthal, will you yield?

MS. ROSENTHAL:  Yes.

MR. SMULLEN:  Well, thank you, Ms. Rosenthal. So thank you for that explanation.  But what is microstamping really about?  You as the sponsor of the bill, could you tell us what you mean by this bill?

MS. ROSENTHAL:  I can explain what microstamping is.  It's -- it is a forensic technology that imprints a microscopic array of characters on a cartridge casing to identify the make, model and serial number of the pistol.  So, each firearm has a unique code engraved into the gun's firing pin which is then stamped onto each cartridge case when the gun is fired.

MR. SMULLEN:  And what -- what is the purpose, then, of microstamping from a criminal justice perspective?

MS. ROSENTHAL:  The purpose is to track down those who have used that gun in -- in a crime.

MR. SMULLEN:  So the -- the ultimate purpose is to -- is to catch criminals, you would say?

MS. ROSENTHAL:  I would say that is so, and to, you know, help the families put closure on -- on the crime that happened to them.  It can improve law enforcement's ability to address gun violence, provide intelligence about multiple shootings carried out with the same gun, allow for more gun crimes to be easily traced, help -- help identify leads, solve shootings and bring closure to victims and

18

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

their families.  So it has a multitude of good purposes.

MR. SMULLEN:  So in this bill itself there's some discussion about the actual feasibility of the technology.  There's a provision in the bill that is going to give some responsibility to the State Police.  Can you tell me what the -- what the State Police's role would be under your bill?

MS. ROSENTHAL:  Well, the State Police would have to certify or decline to certify that microstamping-enabled pistols are technologically viable.

MR. SMULLEN:  So at this point we do not know if this technology is viable, and in doing so in writing the bill the first thing we must do is actually task our preeminent law enforcement organization to actually see if the technology will work?

MS. ROSENTHAL:  Well, there have been studies that show that it actually -- it has proven to be viable, but we just want to make sure DCJS --

MR. SMULLEN:  What -- what studies are you referring to?

MS. ROSENTHAL:  I can -- hold on a second.  The Coalition to Stop Gun Violence has a paper, *Microstamping Technology Precise and Proven*.  I can forward you the article.  Last -- this is last visited on May 10th, 2022.  So that's the most notable and most --

MR. SMULLEN:  So it's a study -- it's a --

MS. ROSENTHAL:  -- and most recent research on

19

microstamping --

         MR. SMULLEN:  The most recent research by mostly an anti-gun organization.  I -- I'll take that for what it is.  What other states have implemented microstamping here in the United States?

         MS. ROSENTHAL:  Well, California.

         MR. SMULLEN:  So California has an active microstamping program and a law that's on the books?

         MS. ROSENTHAL:  Well, that one has a long history including an attempt by manufacturers to get around the law, and they were not -- they did not work together with the state government.  So that -- that law talked about newly -- new models of semiautomatic guns.  And so the manufacturer said, *Well, we're just not going to make new models.*

         MR. SMULLEN:  So the --

         MS. ROSENTHAL:  They were trying to thwart the intent and the ability for microstamping to play a role in law enforcement.

         MR. SMULLEN:  So the -- the 2007 California law has been a failure is what you're saying.

         MS. ROSENTHAL:  Well, that's what you would call it.  I would call it a first attempt and they've done subsequent -- subsequent legislation.

         MR. SMULLEN:  And what -- you know, for that California law it's been 15 years.  Does California sell pistols now that

only have microstamps?

MS. ROSENTHAL:  Well, what they're doing in California, in 2020 they passed a new law to address the obstruction created by the manufacturers who refused to participate in law enforcement's efforts to identify criminals.  And they passed a new law to ensure that more handguns certified for sale and manufactured come equipped with basic lifesaving consumer safety features as well as microstamping mechanisms.  So, beginning on July 1st of 2022 the law will direct DOJ to remove three older less safe semiautomatic pistol models from its rosters, roster handguns certified for sale in California for every new certified microstamping model.  And eventually, slowly but surely, it will ensure that more commercially-available handguns become fully compliant with California's modern safety -- gun safety laws over time.

MR. SMULLEN:  So -- so it hasn't been implemented and we're -- we're still struggling with the technology in California.  Tell me a little bit about the actual technology itself.  Who owns it?  How many actual organizations or -- or corporations that work with these gun manufacturers own this technology?

MS. ROSENTHAL:  Well, we know at least two manufacturers that produce microstamping mechanisms for semiautomatic pistols and we also anticipate that other companies will follow.  The technology is not patented, and so the bill allows -- also allows time for this to occur.  But it is something that exists and we predict that more companies will participate in the microstamp

NYS ASSEMBLY                                    JUNE 1, 2022

technology field.

MR. SMULLEN:  But -- but at this point California
does not have a -- a valid verifiable viable microstamping technology
that's been implemented after 15 years?

MS. ROSENTHAL:  Well, this is New York State so
we do things differently.

MR. SMULLEN:  Okay.  Well, thank you.  I need to
move on to a different area of this proposed law.  There's an unlawful
sale provision that's in the law.  Does this affect -- does this take effect
immediately upon passage of this law if the Governor signs it?

MS. ROSENTHAL:  No, it doesn't and let me -- well,
ask the next question.

MR. SMULLEN:  Does this unlawful sale provision
prohibiting the sale of pistols without microstamping technology take
effect immediately upon signature by the Governor?

MS. ROSENTHAL:  No -- no, it does not.

MR. SMULLEN:  So it takes effect after the -- the
State Police's evaluation of the technology, their promulgation of
regulations, about four years is what -- what I think the law says?

MS. ROSENTHAL:  Up to four years.

MR. SMULLEN:  I'm sorry?

MS. ROSENTHAL:  Up to four years.

MR. SMULLEN:  Up to four years, right.  Fifteen
years in California, New York has four years to implement it for this
-- this particular technology.  So after that point, then, no pistols in

22

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

New York would be allowed to be sold without microstamping
technologies if all goes according to your plan.

        MS. ROSENTHAL:  Yes.

        MR. SMULLEN:  And -- and what does that mean
for the pistols that are all already lawfully licensed by people in New
York?  What -- what does that mean for those -- those law-abiding
citizens?

        MS. ROSENTHAL:  I mean this law applies to
pistols manufactured after this law goes into effect.

        MR. SMULLEN:  And how many pistols are licensed
in New York State?  How many lawful gun owners will this affect?

        MS. ROSENTHAL:  I'm not sure.

        MR. SMULLEN:  No -- no idea?

        MS. ROSENTHAL:  Well, I have some idea but
maybe you can tell me.

        MR. SMULLEN:  Well, if we're going to pass a law,
it would be incumbent to -- to know how many of our citizens that this
actual law is going to affect, at least in my --

        MS. ROSENTHAL:  Well we can't -- we don't know
because it's future purchases.

        MR. SMULLEN:  Right.  And -- and this would only
affect semiautomatic pistols --

        MS. ROSENTHAL:  Yes.

        MR. SMULLEN:  -- it wouldn't affect revolvers --

        MS. ROSENTHAL:  No.

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

MR. SMULLEN:  -- historical or any antique firearms?

MS. ROSENTHAL:  Correct.

MR. SMULLEN:  And so, you know, knowing that and knowing how many pistols are actually licensed in New York State, how will this actually do anything with stolen guns that are used by criminals?  What lawful gun owners who register their pistols with the State to not commit crimes because they're -- they're actually -- their -- their purposes of owning are for the -- the fundamentals of the Second Amendment.  For those criminals who can simply file off the microstamping device on the -- on the breech of the -- of the pistol or change the firing pin, how -- how is that going to stop a criminal from -- from evading this law?

MS. ROSENTHAL:  Well, one might ask the same question about every law we pass that criminals do not adhere to.  The fact about criminals removing the microstamp code, that would be prohibited and it would be a crime.  But criminals don't obey the law. So they're not going to obey any new laws, either, perhaps, but we hope they will.

MR. SMULLEN:  So --

MS. ROSENTHAL:  That's why we're all here, to pass laws that people will obey.

MR. SMULLEN:  But it -- but it's your estimate as the sponsor of the bill and by your own admission that criminals don't follow the law, that it's -- it's a much less crime to say, *Let's file off*

24

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

*this -- this breech marking and then put a firing pin in -- a different firing pin in*, and then the gun becomes untraceable in the commission of more serious crimes.  So --

                    MS. ROSENTHAL:  I mean, if you look up in the dictionary "criminal", criminal is someone who does not follow the law.  That applies to every law we pass here.  But there -- there are penalties, and this gives law enforcement another tool, which I think we all want to give them and that they want to have better ways to track down who -- who committed a crime connected with perhaps other crimes that were committed by the same individual.  This is what law enforcement needs to continue in its quest to protect society.

                    MR. SMULLEN:  But we're going to let the State Police decide whether the technology is viable?

                    MS. ROSENTHAL:  You don't trust the State Police?

                    MR. SMULLEN:  I -- I'm just -- I'm asking the question.

                    MS. ROSENTHAL:  Well --

                    MR. SMULLEN:  In this -- how this law is written --

                    MS. ROSENTHAL:  Yes.

                    MR. SMULLEN:  The State Police will decide.

                    MS. ROSENTHAL:  We -- DCJS will decide if the technology is viable.

                    MR. SMULLEN:  Very good.  Well, thank you for that.

                    So, a few follow-up questions regarding lawful gun

                                            25

**NYS ASSEMBLY**                              **JUNE 1, 2022**

owners.  What is your estimate of the cost, the additional cost that microstamping will have for lawful gun owners to buy new firearms going forward four years from now if this law is deemed viable by the State Police through DCJS?

MS. ROSENTHAL:  Right.  I mean, I've heard and I've read about it adds about $1.50, it could be $5 in cost per firearm.

MR. SMULLEN:  How much?

MS. ROSENTHAL:  It could be $1.50 to $5 in cost per firearm.

MR. SMULLEN:  Per firearm.  So what about the actual cost for maintaining the database and the actual system itself for -- for these look -- looking after these things?  If we're going to -- we're trying to use this to solve crimes.  We think that criminals don't -- are -- are going to evade it by avoiding the microstamping techniques.  But the actual application of the database itself, who's going to maintain that?

MS. ROSENTHAL:  Well, this bill does not create a new database.  A database already exists into which these -- these alphanumeric codes can be loaded.

MR. SMULLEN:  And about how many --

MS. ROSENTHAL:  No pun intended.

MR. SMULLEN:  And about how many crimes per year involve handguns where this microstamping technique would be useful to people trying to solve crimes?

MS. ROSENTHAL:  I mean, we do know that from

26

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

2019 to 2020, gun homicides increased 76 percent which is the highest rate in 15 years.  And data from 2021 from cities across the State suggest that gun homicides remain persistently high.  In Rochester, for example, from 2019 to 2021, shootings increased by 143 percent.  They doubled in New York City and in Buffalo, and in Albany they increased by 83 percent.

MR. SMULLEN:  Well, thank you very much for admitting that crime is off the charts since we've repealed many of the criminal justice laws.  In -- in my mind it would help --

MS. ROSENTHAL:  But I didn't exactly say that --

MR. SMULLEN:  -- remove those criminals from the street --

MS. ROSENTHAL:  -- you can infer what you want to infer.

MR. SMULLEN:  Thank you.  There was -- I didn't -- I didn't detect a number in there about how many cases this is -- this is actually going to help us solve and whether or not the juice is worth the squeeze here.  But my time is running short.

Mr. Speaker, on -- on the bill, please.

ACTING SPEAKER AUBRY:  On the bill.

MR. SMULLEN:  Unfortunately, this technology as a tool in -- in criminal justice matters is -- is largely unachievable.  For 15 years California has not been able to make a go at it.  It's going to only simply add to the cost for lawful gun owners.  And that's probably the real purpose of this bill, is to increase the cost of gun

27

**NYS ASSEMBLY**                              **JUNE 1, 2022**

ownership for those who lawfully, properly under the Second
Amendment exercising their rights have these particular kind of
pistols.  This is completely unfeasible when you think about how
many pistols there are that are lawfully owned, and then going
forward this will effectively preclude the sale after we go through this
charade of four years of evaluating whether or not the technology is
usable.  It's going to effectively preclude the sale of pistols in New
York State.  And it had a chilling effect in California.  It's certainly
going to have that effect here in New York.  And unfortunately, it
won't do anything to make our schools safer, which is I think the
purpose of this -- this debate that's going to go on this week as far as
gun control in New York.

                    (Buzzer sounds)

                    And this is really about controlling guns.  It's a bad
bill.  It's been here before and we should vote no.  Thank you, Mr.
Speaker.

                    ACTING SPEAKER AUBRY:  Thank you, sir.

                    Mr. Angelino.

                    MR. ANGELINO:  Thank you, Mr. Speaker.  Will
the sponsor yield for some questions?

                    ACTING SPEAKER AUBRY:  Ms. Rosenthal, will
you yield?

                    MS. ROSENTHAL:  Surely.

                    ACTING SPEAKER AUBRY:  The sponsor yields.

                    MR. ANGELINO:  Thank you, sir.  This will -- this

                                        28

**NYS ASSEMBLY**                                         **JUNE 1, 2022**

won't be as long as I expected because my learned colleague to my left

answered many -- asked many of my questions and I appreciate your

answers.  So, I -- I believe it was in 2010 California started their

microstamping.  Is that what you have in your notes?

            (Pause)

            It's been some time --

            MS. ROSENTHAL:  I just want to get the exact --

            MR. ANGELINO:  Yeah, it's -- it's been some time.

So we can say about a decade?

            MS. ROSENTHAL:  Yeah, definitely.

            MR. ANGELINO:  Are there any examples from

California of where microstamping has been successful in an

investigation and led to a prosecution?

            MS. ROSENTHAL:  It hasn't been implemented yet,

so we don't have information on that.

            MR. ANGELINO:  Okay.  The -- the microstamping,

just to name itself, micro means tiny.  Will the microstamp on the

firearm be visible to the naked eye or is this microscope things we're

talking about?

            MS. ROSENTHAL:  I mean, it's microscopic, one

would say, to get -- to get it on the, you know, the casing.

            MR. ANGELINO:  And I -- I did some research on

this and I -- there's different portions of the -- the handgun that can be

laser engraved.

            MS. ROSENTHAL:  Right.

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

MR. ANGELINO:  One is the breech, the other is the firing pin.

MS. ROSENTHAL:  It's just the --

MR. ANGELINO:  What does your bill propose?

MS. ROSENTHAL:  The pin.

MR. ANGELINO:  The firing pin.

MS. ROSENTHAL:  Yes.

MR. ANGELINO:  Okay.  The -- the firing pin is a moving part inside the weapon, and I -- I guess when the fire pin strikes the ammunition, microstamped --

MS. ROSENTHAL:  Yes.

MR. ANGELINO:  -- impression is left.

MS. ROSENTHAL:  On the casing.

MR. ANGELINO:  -- and the spent shell casing is ejected.

MS. ROSENTHAL:  On the casing, yes.

MR. ANGELINO:  Right.  And law enforcement is going to find the shell casing.

MS. ROSENTHAL:  Correct.

MR. ANGELINO:  Got it.  So there -- they'll be able to tie the casing that they find at the scene, maybe there's a gun left behind, I don't know, but they will know which pistol fired them.

MS. ROSENTHAL:  Yes, they should.

MR. ANGELINO:  And the -- a handgun -- you know, I don't think criminals go out and buy a brand-new handgun

30

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

specifically looking for microstamping because that's the newest
technology.  They -- they'll probably be using older firearms.  Once
microstamping takes place and that metal-on-metal contact happens
and it happens during an explosion, how many firings do the experts
say before that microstamp wears off?

        MS. ROSENTHAL:  Well, not for a very long time.
They've conducted tests where they fired thousands upon thousands of
rounds and the -- the technology stood up very well.

        MR. ANGELINO:  There was no obliteration or
degradation?

        MS. ROSENTHAL:  You know, even if there was a
little bit, there was enough there to help identify where it came from.

        MR. ANGELINO:  Well, that's amazing because I -- I
read a study here on my desk that said it's obliterated --

        MS. ROSENTHAL:  No --

        MR. ANGELINO:  -- after about a thousand firings.

        MS. ROSENTHAL:  No, no I -- that's not my
information.

        MR. ANGELINO:  Okay.  I'm sure we have biased
studies that we're each looking at, without a doubt.

        And this is only for semiautomatic handguns.

        MS. ROSENTHAL:  Yes.

        MR. ANGELINO:  Criminals generally don't want to
caught.  We can agree there, correct?

        MS. ROSENTHAL:  Yes.  Unless they do.

**NYS ASSEMBLY**                              **JUNE 1, 2022**

MR. ANGELINO:  Well, sometimes they're not the brightest --

MS. ROSENTHAL:  But that's a deeper psychological issue.  Yes.

MR. ANGELINO:  Yes.  But the -- generally speaking, criminals want to commit their crime and get away.

MS. ROSENTHAL:  Yep.

MR. ANGELINO:  Do you think there's going to be an increase in the use of revolvers that do not eject their casings?

MS. ROSENTHAL:  I mean, this hasn't happened yet so I can't predict the future.  But in any event, there were still be semiautomatic pistols out there that law enforcement can use the microstamping technology to pursue the people who committed crimes.

MR. ANGELINO:  So the new technology in the new pistols that will -- can only be purchased lawfully by a permitted gun owner, those are the ones that are going to be holding the microstamping unless they get stolen from the owner.

MS. ROSENTHAL:  Mm-hmm.

MR. ANGELINO:  So, again, I -- you know, criminals aren't dumb, they don't want to get caught.  I think we're going to switch to revolvers.

MS. ROSENTHAL:  Right.

MR. ANGELINO:  And in my experience there's many more revolvers than handguns because they've been around

**NYS ASSEMBLY**                                     **JUNE 1, 2022**

longer.  The --  I heard the -- I heard both.  State Police and DCJS is
going to certify the viability or is it -- or is that wrong?

    MS. ROSENTHAL:  DCJS.

    MR. ANGELINO:  DCJS.

    MS. ROSENTHAL:  Yes.

    MR. ANGELINO:  Okay.  I did hear --

    MS. ROSENTHAL:  And -- and also I just wanted to
comment what you said earlier is that just because someone buys a
gun lawfully and all that doesn't mean they won't commit a crime.

    MR. ANGELINO:  That's correct.

    MS. ROSENTHAL:  Yes.  So a microstamped
lawfully-bought semiautomatic can also be used in a crime.

    MR. ANGELINO:  And the same goes with anything,
any law that we have, though.  You know, I can buy a new --

    MS. ROSENTHAL:  Yeah.

    MR. ANGELINO:  -- car and be arrested for drunk
driving.

    MS. ROSENTHAL:  Yeah, but you were -- you were
saying only unlawful --

    MR. ANGELINO:  Right.

    MS. ROSENTHAL:  -- and some will be lawfully
bought.

    MR. ANGELINO:  I -- I think I asked about the
California and I read, too, that they've been doing this for quite a
while.

NYS ASSEMBLY                                    JUNE 1, 2022

MS. ROSENTHAL:  Mm-hmm.

MR. ANGELINO:  Do you envision that we're going to be more successful than California at this?

MS. ROSENTHAL:  Well, we always want New York to be more successful than any other state, but I think that we have learned from their experience and this bill has been drafted and -- and thought about and created to not meet some of the pitfalls of the California law.

MR. ANGELINO:  Well, the -- the firing pin is an easily removed item on a gun and can -- firing pins break.

MS. ROSENTHAL:  Mm-hmm.

MR. ANGELINO:  So what happens when a gun owner has a firing pin that does snap under the explosion?  Where do they get a new firing pin that's been microstamped?  At my home right now I have more than one firing pin for a couple of weapons just for that occasion.

MS. ROSENTHAL:  Yeah.  One sec.

(Pause)

So, if a microstamping component of a microstamping-enabled pistol when it's damaged or in need of replacement, then that can happen.  Lawfully, the -- the bill provides for that to be replaced for a legitimate purpose that is only used for that purpose.  So yes, it could be replaced.

MR. ANGELINO:  Okay.  The -- the firing pin, again, it's a delicate part, it's one of the smaller parts, and it -- it looks

34

NYS ASSEMBLY                                              JUNE 1, 2022

like a nail.  It's got a very small --

        MS. ROSENTHAL:  Yes.

        MR. ANGELINO:  So the -- there's other methods of
microstamping.  Did you consider microstamping the breech face?

        MS. ROSENTHAL:  I think we decided the -- the --
using the pin would be the best method.

        MR. ANGELINO:  Okay.  Again, I disagree because
the firing pin -- if you really want this to be successful, the firing pin is
easily replaced, modified and exchanged, where the breech has a
serial number on it.

        MS. ROSENTHAL:  Mm-hmm.

        MR. ANGELINO:  And it's basically where the bullet
explodes, and that can't be replaced without having another serialized
part.  And I was just -- is it more difficult to laser engrave the breech?
Because the firing pin is the -- the weak link in this.

        MS. ROSENTHAL:  Okay.  The technology that
exists right now has to do with the firing pin.

        MR. ANGELINO:  Okay.  Well, laser -- laser
engraving, anywhere you can shine a light a laser beam can get in
there and engrave it.  But the -- I'm just -- I guess I'm just saying that
the breech would be the better place to do this.

        MS. ROSENTHAL:  I mean, this bill talks about the
firing pin and perhaps down the line we can add more components,
too, that have to be getting -- you know, have to have the number put
on them.  But right now we're just doing it through the pin.

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

MR. ANGELINO:  Thank you, Madam sponsor. You can take a break.

Mr. Speaker, on the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. ANGELINO:  So, I contacted law enforcement agencies in California and the microstamping of semi -- semiautomatic handguns in their state has been a -- a boondoggle, was their word, because the technology ten years ago when they started wasn't what it is today.  But they've had zero cases of anybody in a decade of being caught from the scene of a crime because of a fired bullet and the casing left behind.  The -- the deal with microstamping is it -- their words were this is just to scare gun manufacturers away from the State of California, and I think we're going to do the same thing in our state.  And that's a viable manufacturing industry.  You know, with high technology and also skilled craftsmen taking blocks of metal and making it into a useful tool for hunting, sport -- sporting and I believe alls we're going to do here is just create another law that will make criminals out of who were once law-abiding citizens.

You know, in the 1950s automobiles were a relatively new device.  They'd only been around 25, 30 years.  And in the1950s the first generation of cars were becoming old used cars and young people were buying them.  And they were driving them with reckless abandon and they were killing themselves in those cars.  So, we realized that it was a problem with the automobile and we started teaching children in high school drivers education.  I took it and

36

learned a lot and I still use some of those techniques to this day.  In the 60s and 70s we had a lot of unwanted pregnancies.  Young teenage girls were finding themselves in a predicament and I think that's where in '73 the monumental decision was made.  But we also tried to educate the young people, boys and girls, about sex education in our schools.  When I was going to school we had a rifle team.  We had a -- a firing range on school property, and we didn't have the mass shootings.  The Second Amendment has been around for a couple of hundred years plus.  Yet, these mass shootings are something that is a phenomenon that has happened steadily in about the last 20 years.  So something changed in those 20 years.  There's always been a random shooting here or there, but the epidemic that we're looking at right now is something new.  And I think we ought to pick the scab off and realize that this is a mental health issue, not an inanimate object issue.  And if we really want to gain some respect and education in this, we ought to start considering teaching firearm safety to those who want to participate in it in a mentored adult setting with young people.  I sponsor a skeet team for a high school in my district, and it is Marksmanship, Fun and Safety.  And they stress the safety part of it every minute that they're doing it.  It's respect for the tool in their hand.  And I don't know if this microstamping is actually going to do anything.  California has been doing it for a decade now and I will probably be long retired from this Chamber and it will still be being debated.

Thank you, Mr. Speaker.

37

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

ACTING SPEAKER AUBRY:  Thank you, Mr. Angelino.

Mr. Lemondes.

MR. LEMONDES:  Thank you, Mr. Speaker.  Will the sponsor yield for a few questions?

ACTING SPEAKER AUBRY:  Ms. Rosenthal, will you yield?

MS. ROSENTHAL:  Yes.

ACTING SPEAKER AUBRY:  The sponsor yields.

MR. LEMONDES:  Thank you very much.  I'd like to take the conversation in a little bit different direction based on the technology readiness level of this particular technology that's being proposed that's the basis for this entire bill.  Could you state the technology readiness level of this technology?

MS. ROSENTHAL:  I believe it's -- it's ready.

MR. LEMONDES:  Everything I've done in my research and as we've heard from my colleagues, we believe that it is not ready.  There are generally nine technology readiness levels with level nine being proven technology.  So I think this lies some -- somewhere between one and eight.  Additionally, with respect to cost, could you address again the -- the cost that this would impose per weapon?

MS. ROSENTHAL:  As I -- I said earlier, it's commercially available, can be mass produced for a cost of between 50 cents to $5 per firearm, are the estimates I have.

38

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

MR. LEMONDES:  That's interesting.  I have information stating that it could raise the cost as much as $200 per part --

MS. ROSENTHAL:  Oh no, I've never seen that number.  I have seen 50 cents to $5.

MR. LEMONDES:  Sure.  I -- I understand we -- we are working off of different information.

Additionally, do you know how many jobs this could impact?

MS. ROSENTHAL:  In terms of adding jobs?

MR. LEMONDES:  In -- in terms of job loss.

MS. ROSENTHAL:  I don't think it would result in any job loss.  I would assume it would -- it could help increase the number of jobs available.

MR. LEMONDES:  Again, we disagree.  Thank you for your answer.

With respect to crime scenes, could you -- could you tell me the average number of rounds necessary to be recovered from a crime scene in order to piece together the signature of that particular weapon?

MS. ROSENTHAL:  I would say you need the casing from the gun that was -- that was used in the commission of the crime.

MR. LEMONDES:  That's what I'm asking --

MS. ROSENTHAL:  Yes.

MR. LEMONDES:  -- how many casings do you

39

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

need?

MS. ROSENTHAL:  You can get one casing.

MR. LEMONDES:  Again, we have -- we're working off of different information.  The -- the information I have says that in order to recover the code you can need up to ten rounds of ammunition.

MS. ROSENTHAL:  I have not seen that anywhere.

MR. LEMONDES:  That's the -- that's the information that I have.

MS. ROSENTHAL:  Okay.

MR. LEMONDES:  And the -- do you know how many -- how many rounds of ammunition are used in the commission of a typical crime with a firearm, with a handgun?

MS. ROSENTHAL:  It -- that varies.

MR. LEMONDES:  I'm sorry, I couldn't hear you.

MS. ROSENTHAL:  I said that varies.

MR. LEMONDES:  That's okay.  The number I have is four.  And the point is that if the average number of rounds of ammunition used in the commission of a crime is four, yet you may need as many as ten to piece together the code on the actual microstamp, in most crimes you won't have the information available.

MS. ROSENTHAL:  Well, your assumption is ten and my fact is one.

MR. LEMONDES:  I -- I would dispute the value of the fact because the firing pins themselves can be easily removed and

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

changed.  Any criminal that -- that committed a crime with a weapon that's microstamped could easily remove the firing pin, throw it away and -- and you would -- you would have quite a time piecing that weapon to that crime.

            MS. ROSENTHAL:  You know, I think what I have learned throughout this is that law enforcement needs more tools and this a tool that they want and that they can use.

            MR. LEMONDES:  Sure.  I -- I don't agree with you on that.

            All right.  Mr. Speaker, on the bill.

            ACTING SPEAKER AUBRY:  On the bill, sir.

            MR. LEMONDES:  Thank you.  I think the cart may be before the horse.  If we can't even state the technical readiness level of this technology and -- and demonstrate that it is proven when there's so much information that says some sources say it's workable, others say it's unproven, as my colleague just mentioned.  For over ten years in California it hasn't led to the -- to the solving of a single crime.  And so, therefore, due to unproven technical -- unproven technology and its -- and its limitations, this does not impact the -- the source of illegal weapons flow.  It will only impact law-abiding citizens.  If we really want to reduce crime from weapons, let's close the southern border.  Let's stop the elicit flow of weapons that are coming into our country every single day, probably by the thousands, that will be used in the hands of terrorists, that will accompany fentanyl that's killing 285 Americans a day.  Let's go after that.  The

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

additional considerable cost that this will impose on law-abiding citizens and the cost to State law enforcement agencies that have to buy the technology or learn how to -- learn how to use the technology and maintain the technology to do this, yet the person who commits the crime can simply remove the firing pin, throw it away, replace it with another one.  And by the way, it takes about two to three minutes to remove a firing pin.  That defeats the whole purpose of this.

So, for those reasons, I have to vote against this. Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you, sir.

Mr. Gallahan.

MR. GALLAHAN:  Thank you, Mr. Speaker.  Will the sponsor yield?

ACTING SPEAKER AUBRY:  Ms. Rosenthal, will you yield?

MS. ROSENTHAL:  Yes.

ACTING SPEAKER AUBRY:  Ms. Rosenthal yields, sir.

MR. GALLAHAN:  Thank you.  Can you tell me how this bill would differ from what we had several years ago during the Pataki Administration called CoBIS where up in my area, the 131st in Ontario and Seneca Counties, neighbors had to take their -- their firearms to Batavia for a firing and then they would register the cartridge and -- and it was what I see is almost the same identical bill that we're looking at here today.  Now, we -- we enacted that bill

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

during -- during the Pataki Administration, as did Maryland.  And over 71,000 rounds were registered and not one crime was ever solved.  Can you tell me how this is different from the previous bill that we had, and maybe why former Governor Cuomo disbanded the program and got rid of it?

MS. ROSENTHAL:  Well that is way beyond the scope of this bill.  I -- I -- I have no clue why the former Governor did much of anything in certain areas.  However, this bill we know will help law enforcement fight crime and identify criminals.

MR. GALLAHAN:  Can you tell me what the technology is in this bill versus the last law that we had on the books?  How do they differ?

MS. ROSENTHAL:  I'm familiar with the technology in this bill, so I believe I described it earlier.  I'm not familiar with that one, but I can repeat that a microstamped firearm has a unique code engraved into the gun's firing pin which is then stamped onto each cartridge case when the gun is fired.  So, law enforcement can match spent cartridge casings to a specific firearm in the same way license plates can be used to identify the make, the model and the registered owner of a car.

MR. GALLAHAN:  Okay.  Thank you.  I -- I understand that.

Another question that I have is, you know, bullets and cartridge cases are made of different materials.  And I've been in the -- in the cutting tool industry for 35 years and I've been selling to many

NYS ASSEMBLY                                      JUNE 1, 2022

firearms manufacturers and machine shops that produce these parts to
produce these -- these weapons here in New York.  There's firing
impressions.  And what happens is with the -- with the three materials
that we're talking about here -- soft material alloys, brass, nickel-
plated brass and steel.  Each one of those materials has a different
relative flexibility so that when the firing pin hits that material some
of it is -- will create a half-way decent image.  When you get into the
harder steels, especially ammunition that is bought overseas that's
brought to the United States, purchased here, that ammunition, the --
the primer in that ammunition, much of it is made of extremely hard
steel and it won't microstamp with any kind of regularity.  And in
California, the Department of Justice study, 50 firing -- 50 firing cases
from the Federal Cartridge Corporation working for the Department,
just in the same gun a microscopic examination by experts in
California - this was done by the Department of Justice - 38 percent
were missed.  When different cartridge makes were added to the mix,
all from the same gun, 62 percent were missed.  Obviously this
presents a serious problem with an only once-fired bullet (inaudible)
this -- this technology.  And -- and I don't understand how this is going
to affect solving cases in our State.  Maybe you have a different
opinion.  Maybe you can tell me how these hard steel primers are --
are -- are going to not be affected by this -- by the technology that we
have today.  Because I don't understand how it cannot be affected.

            MS. ROSENTHAL:  Well, that is why we leave it to
DCJS to certify or to decline to certify that the microstamping-enabled

44

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

pistols are technologically viable.  We -- we leave that in their learned hands.

         MR. GALLAHAN:  Okay.  Thank you for your answer.

         MS. ROSENTHAL:  Thank you.

         MR. GALLAHAN:  The last question I have is, firing pins are made from many different types of steel.  And we discovered that if you code a firing pin, that coding is anywhere from 89 to 95 percent Rockwell hardened.

         MS. ROSENTHAL:  Mm-hmm.

         MR. GALLAHAN:  So if you get a new firing pin and you coat it, it will last much longer than a standard firing pin.  So in competition shooting, which happens all the time, you get a broken firing pin, which my colleague alluded to earlier in his -- his debate.  So, my question is, how is this technology going to be effective when you take that firing pin from that weapon and you coat it with tin coating or chicken coating or titanium carbon nitrate coating?  How is that going to affect it, which is -- which is a common practice today to ensure that your firing pins last much longer on the line?

         MS. ROSENTHAL:  Well, thank you for your expertise in that matter.  I -- I believe that DCJS will take all of those factors and others into consideration when considering the viability of the technology.

         MR. GALLAHAN:  Okay.  My final question I guess would be if I'm at the firing range in a competition and I break my

**NYS ASSEMBLY**                                   **JUNE 1, 2022**

firing pin, if I replace that firing pin, which I can do within a matter of
minutes at the firing range with a standard firing pin that doesn't have
the microstamping technology in it to finish -- to finish my -- my
competition, does that make me a criminal?

      MS. ROSENTHAL:  No.

      MR. GALLAHAN:  I can do that?  I can change that
firing pin on the line, on the spot, and continue in my competition?

      MS. ROSENTHAL:  For sporting purposes it does
not apply.

      MR. GALLAHAN:  When -- well, if it doesn't apply
for sporting purposes, the firearms that I buy are strictly for sporting
purposes.  So they're -- they're exempt from this bill?

      MS. ROSENTHAL:  Let me get you the exact
language.  This is right near the end of the bill.  It says, *Any person
who modifies a microstamp-enabled pistol or microstamping
component with the intent to prevent production of a microstamp is
for a first offense guilty of a Class B misdemeanor*, et cetera et cetera.
*It shall not be unlawful to replace the microstamping component of a
microstamping-enabled pistol when the component is damaged or in
need of replacement with another valid microstamping component for
the safe use of the firearm or replacing such pin for a legitimate
sporting purpose that is only used for that legitimate purpose.*

      MR. GALLAHAN:  So I'm -- I'm still confused.  It
says that it has to be replaced with a microstamped firing pin.

      MS. ROSENTHAL:  Yes.

MR. GALLAHAN:  So when you buy a new -- a new handgun, are you going to be able to order eight or ten more firing pins for that particular weapon so that you have them on hand so that you're not breaking the law?  When you break a firing pin at the range and you have to replace that firing pin, it's a misdemeanor, which you just read to me, if I use a standard firing pin, but it's not a misdemeanor if I use a microstamped firing pin.  How do you acquire those microstamped firing pins and have those extra in your shooting bag so that when you break your firing pin you can replace it legally and not be breaking the law?

MS. ROSENTHAL:  You know, if it -- if it does break then you would have to replace it with a microstamped-enabled firing pin.

MR. GALLAHAN:  So how do you finish your competition if you have a broken firing pin?  What happens to the thousands of -- of incidents that happens across our State every year?

MS. ROSENTHAL:  It doesn't happen thousands of times.

MR. GALLAHAN:  It is quite -- quite frequent in -- in the sporting world to break a firing pin.

MS. ROSENTHAL:  Well, that -- you know.  That --

MR. GALLAHAN:  It's very common.  Very common.

MS. ROSENTHAL:  Okay.  Well that's the responsibility under the law.

47

MR. GALLAHAN:  So how would you -- you wouldn't be able to finish the competition.  Is that what you're telling me?

MS. ROSENTHAL:  If you didn't have the proper firing pin then I guess you wouldn't.

MR. GALLAHAN:  So, my next question -- I'm sorry, I thought I had the last question --

MS. ROSENTHAL:  Yeah, you said one.

MR. GALLAHAN:  But --

MS. ROSENTHAL:  Go ahead.

MR. GALLAHAN:  But apparently I can't count.  My next question would be, if you do break that firing pin and you have that useless weapon, how do you go about getting another firing pin for that weapon?  Do you have to send that weapon back to the manufacturer?  Will the manufacturer send you a firing pin because doesn't that have to be fired through the -- through the weapon in order to register that -- that cartridge?  So that would entail sending that weapon back to the manufacturer at an incurred cost to the -- to the shooter, shipping it all back, whatever the manufacturer -- they're not going to do it for free.  That's -- they're not going to do it for free, so it seems like a large inconvenience for a law-abiding citizen to have to go through to keep shooting in the -- in the sport that they -- they so dearly appreciate.

MS. ROSENTHAL:  Well, I think if you go to the gun dealer they could provide advice and direction and probably a

**NYS ASSEMBLY**                                              **JUNE 1, 2022**

firing pin.

           MR. GALLAHAN:  I'm sure the firing -- the -- the dealer is not going to have firing pins at their -- at their disposal at their -- at their shop.

           MS. ROSENTHAL:  Okay.  I mean DCJS I'm sure will consider all of these scenarios.

           MR. GALLAHAN:  Mr. Speaker, on the bill.

           ACTING SPEAKER JONES:  On the bill.

           MR. GALLAHAN:  This technology's been around for -- for decades.  New York participated in this technology for five years.  Never solved a crime.  Our former Governor recognized that this was a cost burden to the State, a severe cost burden to the State and disbanded the program.  I can't see where technology has advanced to the point -- the other states that are doing it certainly aren't successful with solving crimes with this technology.  I'm looking through the bill memos.  I don't see the support of any law enforcement agencies.  I see some no opinions but I see no support.  So I cannot -- I cannot support this bill.  The technology is not where it needs to be.  It is not successful in any other state.  Any kind of -- I don't even know that a crime has been solved with this technology in other states.

           So I will be voting in the negative.  I would encourage my colleagues to do the same.  Thank you, Mr. Speaker.

           ACTING SPEAKER JONES:  Thank you, sir.

           Mr. Lawler.

**NYS ASSEMBLY**                                        **JUNE 1, 2022**

MR. LAWLER:  Thank you, Mr. Speaker.  Will the sponsor yield?

ACTING SPEAKER JONES:  Will the sponsor yield?

MS. ROSENTHAL:  Yes, of course.

ACTING SPEAKER JONES:  The sponsor yields.

MR. LAWLER:  Thank you.  So I -- I want to start where my colleague just left off because I'm -- I'm a little confused by this.  So, the microstamping technology that you assert as available and functioning would be with respect to the firing pin, correct?  That's what this bill does?  It microstamps the firing pin?

MS. ROSENTHAL:  I mean it microstamp -- the casing is what is microstamped.

MR. LAWLER:  But the -- the actual engravement is on the firing pin?

MS. ROSENTHAL:  Yes.

MR. LAWLER:  Okay.  So when the firing pin breaks, as many of my colleagues explained -- and I would take their advice on this, they all seem to have quite a bit of knowledge about it -- when the firing pin breaks and you replace the firing pin, is the microstamp supposed to be the exact same microstamp that was on the broken firing pin, or is it a new microstamp?

(Pause)

MS. ROSENTHAL:  Well, each -- it's a unique code each time.  So I would then say that it is probably specific to -- and I'd

50

NYS ASSEMBLY                                    JUNE 1, 2022

also question how often the firing pin breaks.  I know you've said it

breaks a lot, but it is -- it's extremely hard to remove and I don't

believe it breaks that often.

          MR. LAWLER:  Well, can I you ask a question?  Do

you have firsthand experience with whether or not it breaks or you're

just surmising?

          MS. ROSENTHAL:  Do you?

          MR. LAWLER:  I -- I do, yes.  Do you?  I'm -- I'm

just asking.

          MS. ROSENTHAL:  I have consulted with many

experts in this field and what they tell me is that it doesn't break that

often as you allude to --

          MR. LAWLER:  Well, I didn't -- just to -- for clarity,

I didn't allude to, my colleagues walked -- walked through it and I'm

just following up.  So if --

          MS. ROSENTHAL:  If the dealer -- the dealer would

replace it with a new microstamped pin.

          MR. LAWLER:  With a new firing pin.  Would it be

the same microstamped engraving or would it be a new microstamped

engraving?

          MS. ROSENTHAL:  It would be a new

microstamped --

          MR. LAWLER:  Okay.  So once it's a new

microstamped engraving -- so you can only have -- there's only going

to be one firing pin with a microstamped engraving.  In other words,

NYS ASSEMBLY                              JUNE 1, 2022

you can't order ten of them with the same -- same engraving, correct?

          MS. ROSENTHAL:  Yeah, because they have to be, you know --

          MR. LAWLER:  It's got to be unique.

          MS. ROSENTHAL:  -- connected.

          MR. LAWLER:  You want it to be unique, like a fingerprint.

          MS. ROSENTHAL:  Yes.

          MR. LAWLER:  Right?

          MS. ROSENTHAL:  And you want it to be connected with the -- the gun --

          MR. LAWLER:  You don't want somebody to be able to take a firing pin and --

          ACTING SPEAKER JONES:  Mr. Lavine, why do you rise?

          MR. LAVINE:  Would the gentleman posing the questions please allow the sponsor to finish her statement before interrupting?

          ACTING SPEAKER JONES:  Okay.  Let's one talk, the other talk.  I'm going to try to do my -- my best Mr. Aubry up here.  So --

          MR. LAWLER:  Oh.

          ACTING SPEAKER JONES:  -- we'll ask questions and allow the sponsor to answer.

          MR. LAWLER:  Thank you.  Before I was rudely

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

interrupted, let me rephrase my question.

MS. ROSENTHAL:  I don't think you were rudely interrupted.

MR. LAWLER:  I was.  I'll rephrase my question.  If the microstamp is replaced with a new microstamp on the firing pin --

MS. ROSENTHAL:  Yes.

MR. LAWLER:  -- does that have to be reregistered somewhere?

MS. ROSENTHAL:  I think there -- there would be a new record of purchase.  So yes, it would have to -- you know, on -- on this document where -- on this document where all the vital information is recorded, that would have to be added to it.  So, yes.

MR. LAWLER:  Okay.  So it would be registered in a system that would be set up by --

MS. ROSENTHAL:  This is -- this is -- sorry.  The system is set up, we just have to add this additional information to it.

MR. LAWLER:  Okay.  So in the system that has already been set up under the SAFE Act?  Is that what we're -- what system are we referring to?

MS. ROSENTHAL:  There is a system, which I can -- if you hold on I can get it and describe, but it's... okay.  Okay, so, if you know anyone who wants to purchase a handgun must obtain a license, State law requires a copy of all the licenses to be filed with the county clerk, a duplicate copy of the license to be filed with the licensing officer of the State Police, and the State is supposed to

53

maintain a database of all permit records.  And so dealers also have to

keep records of licenses.  So within that.

MR. LAWLER:  Okay.  So every time the firing pin

is replaced it has to be registered.  So, in other words, would the gun

owner be able to replace the firing pin themselves or would they have

to go to a dealer to replace it so that it can be registered?

MS. ROSENTHAL:  A person would be able to

replace it but they have to purchase it and then they would have to

register it.

MR. LAWLER:  Okay.  So they could purchase -- for

instance, let's say they purchased five at a time.  When they purchase

it all five would be registered with that gun?  Is that how that would

work if they purchased multiple at a time because they needed to be

able to replace it?  It would be registered at the time of purchase?

MS. ROSENTHAL:  You know, the -- the bill doesn't

goes into details on that.

MR. LAWLER:  Okay.  What happens if DCJS

declines to certify?  What -- what would happen with this bill?

MS. ROSENTHAL:  Well, it would probably be

rendered unworkable and we'd have to go back and come up with

something else.

MR. LAWLER:  And this bill is modeled on

California's law or --

MS. ROSENTHAL:  No, it's -- it's -- it takes into

account what happened in California and avoids some of the pitfalls

that occurred in California because of the lack of cooperation from
gun manufacturers.  And as someone earlier pointed out, the
California law was 2007, so we've gained a lot of knowledge about
technology and -- since then.

        MR. LAWLER:  So in 15 years would you say
California's law is working?

        MS. ROSENTHAL:  I'm not a California resident so I
can't properly judge it.  However, I think New York's bill/law will
work because we've designed it to work.

        MR. LAWLER:  Okay.  So the idea behind
microstamping is to say if somebody purchases a gun and they commit
a crime, we should be able to trace the shell casing back to the gun
and potentially the owner; correct?

        MS. ROSENTHAL:  Mm-hmm.

        MR. LAWLER:  Okay.  Now, this would apply to all
those who legally purchase a gun and commit a crime.

        MS. ROSENTHAL:  Semi -- semiautomatics.

        MR. LAWLER:  Right.  What happens with 16- and
17-year-olds who use a gun in the commission of a crime?

        MS. ROSENTHAL:  This bill doesn't address that
particular situation.

        MR. LAWLER:  Well, this bill applies to anybody,
correct, who would use a microstamped gun in the commission of a
crime, right, or does something to change the microstamping on a gun,
correct?

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

MS. ROSENTHAL:  I mean, this bill applies to the sale and defacement.  So it doesn't --

MR. LAWLER:  I'm sorry, defacement?

MS. ROSENTHAL:  Defacement.  If somebody --

MR. LAWLER:  So if they -- if they alter the microstamping.

MS. ROSENTHAL:  Yeah.

MR. LAWLER:  Okay.  So if the 16- or 17-year-old uses a defaced microstamped gun what would happen to them?

MS. ROSENTHAL:  It depends.  If they defaced it -- hold on a sec.

MR. LAWLER:  Will they be charged criminally?

MS. ROSENTHAL:  I have to get back to you on that.  I'll get back to you on that.

MR. LAWLER:  So -- I mean, I think it's an important question to have an answer on because as we've seen across the State you have a lot of 16- and 17-year-olds that are committing crimes with guns.  And if we're trying to close some of the loopholes, if we're trying to address gun violence, shouldn't those who use a gun in the commission of a crime be held accountable in criminal court?  So if they alter a microstamped gun and use that in the commission of a crime shouldn't they be charged criminally?

MS. ROSENTHAL:  I'm sorry, can you repeat the last question?

MR. LAWLER:  Yes, no problem.  So if a -- if the

**NYS ASSEMBLY**                                              **JUNE 1, 2022**

objective here is to ensure that we give law enforcement a tool --

         MS. ROSENTHAL:  Yes.

         MR. LAWLER:  -- to go after criminals and that anybody who would alter the microstamping of a gun is held accountable for that, what happens when a 16- or 17-year-old uses a gun -- and this is not like some hypothetical, this is actually happening -- what happens to that 16- or 17-year-old?  Should they be held in -- -- in -- charged in criminal court based on this law?

         (Pause)

         MS. ROSENTHAL:  The laws governing 16- and 17-year-olds would -- would apply here and they would be misdemeanor offenses.  For the first violation, it would be a Class B, second would be a Class A if -- if they basically deface.

         MR. LAWLER:  So when you say the laws governing 16- and 17-year-olds would apply, that means they would be charged in family court?

         MS. ROSENTHAL:  Yes.

         MR. LAWLER:  Okay, so do you not see a problem with somebody who's 16 and 17 using a defaced gun in the commission of a crime?

         MS. ROSENTHAL:  What we're talking about here is defacement, not -- not used by a person of -- of a certain age.

         MR. LAWLER:  Well, in order to determine the defacement obviously it was used somewhere, correct?

         MS. ROSENTHAL:  Not necessarily.

**NYS ASSEMBLY**                                **JUNE 1, 2022**

MR. LAWLER:  Okay.  So if they just carry a
defaced gun how are you going to determine that it was defaced if
they're just carrying it?

MS. ROSENTHAL:  That would be up to law
enforcement.

MR. LAWLER:  Okay.

On the bill, Mr. Speaker.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. LAWLER:  It's clear based on this conversation
here today that there are a lot of questions unanswered and the
technology is not there.  The fact that we have to stipulate in the bill
that DCJS needs to certify or not certify, decline to certify whether or
not this technology is there and viable is disturbing.  So many of the
questions couldn't even be answered.  And when you look at the fact
that we're talking about microstamping a specific component that can
be easily replaced, obviously those people who would seek to do harm
and commit violent acts will do just that.  They will deface the gun.
Or as my colleague astutely pointed out they will use a revolver in
which the casing does not leave the gun.  So I think this bill has a lot
of work still left to do.  I think it continues to be deeply disturbing that
when this Body tries to address gun violence they refuse to address
16- and 17-year-olds who use guns in the commission of a crime.  If --
if we're trying to end gun violence, if we're trying to end the scourge
of people using guns to cause harm then there must be zero tolerance.
A16- or 17-year-old should be charged in criminal court if they were

58

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

to violate this law or any other provisions with respect to guns.  It is illegal for them to posses it and yet we want to charge them in family court.  This is happening all across the country where gangs are using 16- and 17-years-olds to commit crimes.  And so if we're going to crack down on illegal guns, on ghost guns, if we're going to try to microstamp guns then there has to be zero tolerance.  And the fact that my colleague said that --

(Buzzer sounds)

-- the current laws would govern 16- and 17-year-olds is everything you need to know.

ACTING SPEAKER AUBRY:  Mr. Lawler, thank you.

Mr. Manktelow.

MR. MANKTELOW:  Thank you, Mr. Speaker.  Would the sponsor yield for a couple of questions, please?

ACTING SPEAKER AUBRY:  Ms. Rosenthal, will you yield?

MS. ROSENTHAL:  Yes.

ACTING SPEAKER AUBRY:  Ms. Rosenthal yields, sir.

MR. MANKTELOW:  Thank you so much, ma'am.  Earlier -- earlier on the debate we -- this is a microstamping bill, of course, you talked about gun safety.  So -- so what does this bill do for gun safety?

MS. ROSENTHAL:  What this bill does is give law

59

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

enforcement a tool to -- to track down crimes and the people who

commit them.

        MR. MANKTELOW:  But isn't the goal is to create

no crimes, to stop the crimes from happening through different ways

of doing gun safety?  Isn't that the ultimate goal is to stop the crimes,

stop committing the crimes, stop using a gun.  Isn't that the ultimate

goal?

        MS. ROSENTHAL:  Well, I mean, obviously we

want that to be a goal of all of our -- our gun laws.  However, it makes

people have to be more accountable to the law because they are

required to use microstamped-enabled semiautomatic to buy it.

        MR. MANKTELOW:  Who does it make more

accountable?

        MS. ROSENTHAL:  I'm sorry?

        MR. MANKTELOW:  Who does it make more

accountable?

        MS. ROSENTHAL:  Who doesn't...

        MR. MANKTELOW:  Who -- you said it makes

individuals more accountable.

        MS. ROSENTHAL:  Yes.

        MR. MANKTELOW:  What individuals are you

talking about?  Who -- who does it make more accountable?

        MS. ROSENTHAL:  So if a person buys a

microstamped they know that if they use it in committing a crime, for

example, that it can be more easily traced.

NYS ASSEMBLY                                        JUNE 1, 2022

MR. MANKTELOW:  So you -- you -- so just to -- just to help me understand this.  So if I'm a bad guy or a robber or something, I'm going to know to check that pistol out and make -- to see if it's microstamped before I commit the crime so -- so I know I won't do it then because I know it's microstamped?

MS. ROSENTHAL:  You know, we -- we -- we enact laws and -- and we expect people to be law-abiding and follow the law.  In this case if a microstamped gun is used in the commission of a crime, law enforcement has another tool to help track down who -- who committed that crime.

MR. MANKTELOW:  So -- so if my gun is -- if my pistol is taken from my house and it's microstamped, somebody uses it in a crime will I be held liable?

MS. ROSENTHAL:  Is it what?

MR. MANKTELOW:  Will I be held liable because it was my pistol?

MS. ROSENTHAL:  Well, I -- I would hope if that happened to you that you would report it immediately that your gun was stolen.

MR. MANKTELOW:  Well, of course.  Absolutely the first thing I -- the first thing I would do, ma'am.

MS. ROSENTHAL:  Yes.

MR. MANKTELOW:  But if -- if the bad person gets my pistol and uses it to kill someone because it was my pistol --

MS. ROSENTHAL:  Right.

61

**NYS ASSEMBLY**                                            **JUNE 1, 2022**

MR. MANKTELOW:  -- he took it, he or she took it, is there a chance that I would be held liable?

MS. ROSENTHAL:  If someone stole your car and you hit somebody, would you be charged with killing that person?  It's the same system.

MR. MANKTELOW:  Okay.  So I -- so I would not be held liable.  That's what you're saying, right?

MS. ROSENTHAL:  If you did not do it and you reported that your gun is stolen then, you know, you will not be held liable.

MR. MANKTELOW:  So as long as I report it I should be in the clear.

MS. ROSENTHAL:  Well, you know how it is.  If your -- if your car is stolen and -- as I said earlier, your car is stolen, the person who stole it hits someone and kills them, they're not going go to you, they're going to track down -- in their development of the case they're going to track down who -- who actually did it.  And if you have a perfectly good explanation, then why would you be held accountable?

MR. MANKTELOW:  So -- so I still don't understand.  So if you tracked down my pistol that belongs to me in a crime, how does that help solve that crime?

MS. ROSENTHAL:  If you -- you know, it gives them a lead.

MR. MANKTELOW:  A lead to what?

**NYS ASSEMBLY**                                        **JUNE 1, 2022**

MS. ROSENTHAL:  The more information that law enforcement has the better that they can fit the pieces together.

MR. MANKTELOW:  Well, if they have the cartridge that has already been microstamped, they have all the information they're going to gain from that pistol.  I just -- I just really don't understand what more they're going to gain.

MS. ROSENTHAL:  You know, we -- well, I'm not law enforcement.  I don't develop cases, but --

MR. MANKTELOW:  Sure.

MS. ROSENTHAL:  -- very experienced detectives, et cetera, they know how to handle these kind of issues.

MR. MANKTELOW:  Okay.  Just another question.  You're talking about helping to solve crimes.  What kind of crimes are you talking about?

MS. ROSENTHAL:  Any crimes that are committed with these pistols.

MR. MANKTELOW:  So a robbery, a murder, anything.

MS. ROSENTHAL:  Whatever crimes are committed with the pistols.

MR. MANKTELOW:  Okay.  Are -- are we doing anything to address the individual that's actually pulling the trigger?

MS. ROSENTHAL:  The what?

MR. MANKTELOW:  Are we doing anything that actually addresses the individual that makes the decision to pull that

63

**NYS ASSEMBLY**                    **JUNE 1, 2022**

trigger?

MS. ROSENTHAL:  Well, that's beyond the scope of this bill.  But there -- we have other laws.  There are other bills coming up that perhaps deal with that, but this bill does not.

MR. MANKTELOW:  Okay.  So the way I look at it, gun safety would be used prior to someone using a gun, teaching them the right and wrong ways.  I guess that's where my confusion was.

I was doing a little research while we were debating here with some of the other members, and do you know how many of the -- what the makeup is of male versus female shooters?

MS. ROSENTHAL:  I do not have that number here.

MR. MANKTELOW:  It's about 90 to 95 percent male shooters, maybe even a little more in some situations.  I wonder why that is.  I wonder why it's male -- that many male versus female.  Why is it not 50-50, 65 -- 65-35?

MS. ROSENTHAL:  I'm not sure how -- what the relevance of that question is to this bill's content.

MR. MANKTELOW:  Okay.  Well, the bill is ultimately designed for gun safety to stop crimes, correct?

MS. ROSENTHAL:  No matter your -- your gender, how you identify, has nothing to do with that.

MR. MANKTELOW:  That has nothing to do with it?

MS. ROSENTHAL:  No, it has to do with the person who defaces or -- or buys it, sells it, and nothing to do with their

64

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

gender, if they're gay, if they're transgender, if they're straight, if they're non-binary.  None of that has any importance here when it comes to this bill.

           MR. MANKTELOW:  Okay.  So all this bill is going to do is identify the cartridge that was -- that was used coming out of the gun, the automatic pistol because of the microstamping, correct?

           MS. ROSENTHAL:  Yes.

           MR. MANKTELOW:  And -- and if we do that, that will help make our streets safer, create less -- less crimes?

           MS. ROSENTHAL:  You know -- and I'm going to make a pun here -- there's no magic bullet that will solve the problem of gun violence out there.  But we take steps.  And as I'm sure you've heard, the pleas of the mothers and fathers whose children were massacred in Buffalo or in Texas, they say, *Do something*.  We are doing something, and there are more bills in this package that will do something because it is imperative that if the Federal government is not going to take steps, we here in the State will do something to protect our society from gun violence.

           MR. MANKTELOW:  Okay.  I appreciate your time, madam.  And yes, you're exactly right.  There is no silver bullet that will fix anything of this.

           MS. ROSENTHAL:  Well, mine was "magic" but you can have a silver one.

           MR. MANKTELOW:  Well, I'm -- well, I thank you --

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

MS. ROSENTHAL:  Thank you.

MR. MANKTELOW:  -- for your time.

Mr. Speaker, on the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. MANKTELOW:  Thank you, sir.  I just asked a few questions and the sponsor did say something about the mass shootings.  Of course we're -- we're devastated for those families that lost those loves ones, and as the sponsor said, it's -- the Federal government is not going to do anything.  They're not going to address this.  Or at least not the way we think we should here in New York State.  But again, we are again looking at the gun.  The gun here is not the issue.  And I will give this example -- I'll give two examples, actually:  If a bad person uses a gun and kills someone, they -- they blame that person -- or they blame that gun, I'm sorry.  They blame the gun.  When our law enforcement, God forbid they have to use it to save somebody's life, who's on trial?  It's our law enforcement officials right off the bat.  It's not that gun, it's our law enforcement officials.  We have got to come together to come up with a solution.

So I was doing a little research, and as the sponsor had brought up again about the mass shootings not only recently here in New York and in Texas, which are horrific, but around -- around the United States, around -- around everywhere.  So when I was young -- my prior member here had talked about 16- and 17-year-olds.  What's the common thread?  If you do the math, if you look at everything going on, the common thread are -- is most of these

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

shooters are male shooters.  No doubt about it.  So what's driving those male shooters today?  I was a male.  I was a male back at 16 and 17.  I had lots of guns.  I never thought about shooting anybody, I never thought about committing a crime.  So I was doing a little research on this, and we have to stop it before it gets to the crime.  So what's driving these young men, these young male figures to do these crimes?  And looking at what one of the professors looked at, they're -- they're looking at video games.  The drastic aggressive solutions.  And I'll quote -- I'll -- I would like to read this, what Dr. Anderson said.  *Violent video games provide a form for learning and practicing aggressive solutions to conflict -- to conflict situations*, said Dr. Anderson.  *In the short-run, playing a video --a violent video game appears to affect aggressive (inaudible) primary and aggressive thoughts*.  And if you look -- if you look at the number of male or young men that play violent video games compared to young boys and men that create violent actions by shooting, there's definitely a tie.  There's a tie together.  So instead of again addressing the gun, let's help these individuals get help so they don't get to the point where they're using a gun.  We, as the State, should be looking at some of this instead of again addressing a gun that we all know if we're going to microstamp it's not going to stop a bad person from using it.  They're going to find ways around it.  We've heard that this morning hear on the floor.  We know they're going to get it from another state, we know they're going to file something down.  Let's really address the issue and get these young individuals help.  That is the most

67

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

proactive thing we can do, because as the sponsor says, it will help solve the crime.  Let's do the right thing and not allow it to be a crime.  Let's stop it before it becomes a crime.  Let's get the help for these individuals.  So Mr. Sponsor -- I'm sorry, Mr. Speaker, I apologize -- Mr. Speaker, this doesn't change anything.  This isn't going to slow anything down.  We have to get it done before they get the urge to want to shoot.  So let's work on that, and I'd be more than willing to help anyone do this.

So thank you for the time, Madam Sponsor, thank you for your time and taking the time to answer my questions.  I very much appreciate it.  Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you, sir.

Mr. DiPietro.

MR. DIPIETRO:  Thank you, Mr. Speaker.

On the bill, please.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. DIPIETRO:  Thank you.  First, I'd like to congratulate people on my side of the aisle.  They've shown that they're knowledgeable, expertise and they know this bill inside and out and they've done a great job.  I would like to start out with we all debate a lot of things up here some of us don't like.  You know, there's a lot of garbage up here, but for me personally this is probably the biggest dump -- dumpster fire of any bill that I've debated.  And I enjoy debating this because let's start out with technology.  Let's be very clear:  There is no technology out there today to microstamp.

68

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

Zero.  So you can talk about pie in the sky, we're going to do something, we're going to stop the criminals with microstamping. There's no technology.  Talk to Remington.  I have.  Talk to the leading scientists on microstamping out of California.  I have.  The technology is not there.  It's like saying, *We almost found Bigfoot.  We almost got him*.  It's not there.

Let me tell you a little something about technology. This -- the people here in 1998 I was in dry cleaning that changed the technology for a new dry cleaning machine that had to equal so many billions of parts for emissions.  There was no technology in the world at that time to do this.  Only in New York State.  But they enacted it anyway.  And you know what they said?  They said because the technology will be there in a few years.  So when 20 percent of the dry cleaners went out of business because they couldn't afford these new machines, which weren't -- weren't technically specific, they didn't have it, to this day 24, 25 years later the technology still is not there around the world.  The manufacturers still haven't found out a way to comply with only New York State's technology.  That's the junk we get here.  And we got it with electric.  There's no technology out there to make it worthwhile in 2024 and in 2030 and we're doing it today.

Let's talk about technology.  Let's talk about the firing pin.  Obviously a lot of people in this Chamber have no clue what a firing pin does or what it is.  The firing pin, if I'm a criminal - and some might think I am - but I'm just going to change the firing pin from another state.  How stupid is this?  We're going to pass up in

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

New York State whichever criminal is just going to go to another state.  Can you tell me?  I've talked to the sheriff in Buffalo and I talked to one of the troopers -- or sheriffs in Chicago last year.  Every weekend, how many murders do they have in New York City, Chicago?  Do you know how many legal guns are used in those murders?  Less than one percent.  Criminals do not use legal guns that can be traced.  And they're not going to use something as stupid as a microstamp that doesn't even work.  They're going to change the pin out, they're going to file it down.  And if you talk to the people, the scientists like I have, you don't have to file the whole thing down, you file one little part of it and they'll never trace it.  It doesn't work.  Let's talk about what they said, *Well, why don't you do a database*?  I heard this database.  Do you really trust a database?  What does that database do?  Well, if you weren't here ten years ago and debating it like I did and then every year after that, the database was when Governor Cuomo put $80 million in the SAFE Act over five years, $16 million a year for a database.  And an additional $3.2 million every year for five years for 16 -- we found out 16 State Troopers.  And you know what was ironic about that as I debated that every year is because the 16 troopers when I asked the Majority every year who they were, what they did, what their title was, where were they stationed, they would not give me an answer because Governor Cuomo told them they couldn't give any answers.  What they were were brown shirt secret police that worked only for the Governor.  That database that he put together was only to find law-abiding gun

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

owners, $80 million.  Where is that database, folks?  Have you heard

it?  That was ten years ago.  Where's the database?  Who are the 16

State Troopers that were working secretly for Governor Cuomo on the

SAFE Act?  Where are they?  Give me an answer.  No one has in ten

years.  So you expect us to sit here with this garbage legislation and

believe it and trust it like some of the other junk that comes up here?

Not a chance.  Look, faced with the facts about criminals the other

side of the aisle refuses and ignores the facts.  For some reason,

criminals are more important than law-abiding citizens and

law-abiding citizens who are legal gun owners are now criminals.

How upside down and crazy is that?  But that's what we have here.

Oh, you want an illegal gun, 16, 17-year-olds?  Oh, forget it, we're not

even going to touch that.  Really?  Why do you think Remington left?

It was an assault on gun manufacturers.  They said, *See you later,*

*sayonara.  We're gone*.  Three thousand jobs, poof.  But that's okay.

You know, I debated another one of these stupid gun

bills in the -- in the -- in the first part of this Session.  I asked a very

simple question of the sponsor.  *What does AR mean to you*?  Because

that's all we hear, *AR-15, AR, AR*.  And the answer from the Majority

was assault rifle.  (Indiscernible sound).  No.  AR stands for ArmaLite

Rifle Company.  It's the manufacturer which was broken down to AR.

It has nothing to do with assault rifle.  That's not what it means.  But

that's the ignorance of people who debate gun bills who don't know

anything about what they're talking about.  I can't wait to pass this bill

and watch the criminals go, *Boy, I was going to go shoot up somebody*

**NYS ASSEMBLY**                              **JUNE 1, 2022**

*in Chicago or New York City, but you know what?  I got to wait a week because I just don't have the right microstamped firing pin.  Boy, I'm going to have to wait on that.*  Give me a break.  We wasted two hours of our time in this Chamber on this junk.  This is a dumpster fire, it always has been.  I enjoy debating it, though.  And I'd like you to take that to heart very seriously about what I said about Governor Cuomo and the $80 million for a database that no one knows what it is, where it is, what it's used for.  And the $16 million or the $2. -- excuse me, $3.2 million for five years, about 16 million that went to a secret police force which you never can find out any data on and have never been able to.  That's very scary stuff, folks, and it happened right here in New York.

So with that, boy, I -- I urge a huge no vote on this on just one basic fact:  There's no technology.  It's not there.  It's not going to be there next year and it's not going to be there the year after.  And you can talk to the number-one scientist who is developing this in California and he will tell you that.  And if you don't believe it then go ahead.  Because you know what's going to happen?  Is they're just going to go to Pennsylvania or New Jersey and they're going to buy their firearms because 99 percent of all the murderers are not with legal firearms.  And criminals are very smart.  And they look at what we do up here on this stuff and they laugh.

With that, I appreciate you allowing me to vent my comments, Mr. Speaker.  I urge a no vote on this.  Thank you very much.

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

ACTING SPEAKER AUBRY:  Thank you, sir.

Mr. Reilly.

MR. REILLY:  Thank you, Mr. Speaker.  Will the sponsor yield for a few questions, please?

ACTING SPEAKER AUBRY:  Ms. Rosenthal, will you yield?

MS. ROSENTHAL:  Certainly.

ACTING SPEAKER AUBRY:  Ms. Rosenthal yields, sir.

MR. REILLY:  Thank you, Ms. Rosenthal.  So, California has had microstamping, as I heard earlier, and they've had it since 2007, they just redid a bill in 2020.  Do we know how many cases that involved illegal shootings, aggravated assault by a firearm, that were solved with the use of microstamping since 2007?

MS. ROSENTHAL:  As we've talked about before, the bill did not go into effect because the manufacturers refused to -- to issue new models.  So we can't use any data from California on the issues you're questioning me about.

MR. REILLY:  Is there -- is there any data that's available?

MS. ROSENTHAL:  Not from California.

MR. REILLY:  Is there any data from anywhere else besides studies?  I'm talking real-life practice.

MS. ROSENTHAL:  There -- there are plenty of -- there's plenty of evidence on the efficacy of microstamping and the

73

ability of law enforcement to use the casings to track the gun.

MR. REILLY:  Can you give me some examples of that?

MS. ROSENTHAL:  I don't have examples right here, but there's plenty of evidence I can get for you.

MR. REILLY:  Well, could you just rattle off a little bit of types of evidence that you may have?  Is there studies, how many -- how many studies are involved?  Maybe how many rounds were fired in each study, did they find any deficiencies.

(Pause)

Do we know if there -- as you're looking for that I just want to add this question to that.  Do we know if there's a number of rounds that would have to be fired to determine that they are accurately obtaining the microstamped number?

MS. ROSENTHAL:  Well, there have been many peer-reviewed studies that have found that microstamped-equipped firearms accurately marked thousands of rounds fired across a variety of different firearm models, and that the microstamped codes were legible on over 90 percent of cartridge cases tested.

MR. REILLY:  Can you tell me who do that study?  Was that the manufacturer of the microstamping?

MS. ROSENTHAL:  No, these are peer review studies.  I can get you who the author was at a later date.

MR. REILLY:  So peer-reviewed microstamping analysis.  Do we know how many microstamping experts there may be

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

in the world?

           MS. ROSENTHAL:  I fail to see the relevance of that.  We have tasked DCJS with determining the viability of this technology.

           MR. REILLY:  Okay.  So the reason why I asked that, I'm going to tie this into drug recognition experts that do DWI and driving under the influence.  I talked about that tremendously during a debate several years ago, and the reason why I bring that up is because drug recognition experts have a special talent and training to testify in court about how they obtain that information.  It costs roughly $60,000 to train each drug recognition expert.  To put that into perspective, the NYPD that has 35,000 police officers have 16 DREs.  The reason why I tie that in is if we are going to use experts to testify in court based on microstamping, how are they going to be certified as experts in the court of law if we do not have enough experts across the nation or the world to -- to -- to give that training and to certify those officers?  That's where we come into a conflict of if we even have microstamping, how can we prove it?  Because let's face it, this isn't going to be like CSI where we're going to solve a crime in 40 minutes.  We need to have the funding.  So is there funding in this bill for that training?

           MS. ROSENTHAL:  This bill does not have funding attached to it.

           MR. REILLY:  I'm sorry, can you repeat that?

           MS. ROSENTHAL:  I said this bill does not have

NYS ASSEMBLY                                    JUNE 1, 2022

funding attached to it.

MR. REILLY:  Okay.  So getting back to that question about how many experts we have in microstamping across the country, do we know how many and how many actually did the peer review of that study?

MS. ROSENTHAL:  You know, there -- there is a company called TACLABS, and in 2018 it began developing a machine to produce large numbers of firing pins equipped with microstamping technology and the tool was introduced to the market for firearm manufacturers.  Firearm manufacturers now have machines available to do exactly what this bill would require them to do.

MR. REILLY:  So the company that did the study, was that someone who invented or maybe sells microstamping equipment?

MS. ROSENTHAL:  What is your question?

MR. REILLY:  So, the company that did that study in 2018 --

MS. ROSENTHAL:  Well, it's TACLABS which develops a machine.

MR. REILLY:  So they -- so TACLABS, who -- who we're basing our study information on and data of 90 percent accuracy are the ones that make the machines and sell them to the gun manufacturers?

MS. ROSENTHAL:  You know I think you're trying

**NYS ASSEMBLY**                              **JUNE 1, 2022**

to impune the people who are trying to help this country get a handle on gun violence by questioning how many people there are.  There are people who are expert on this.  There are people who have verified.  There are peer studies that all show that microstamping technology works.  You can fire thousands upon thousands of rounds, and you could still trace -- even with partial of the alphanumeric code on the casing you can still trace it back.  So I think a lot of people take comfort in that knowledge because we're looking for solutions here.  We're not looking to tear apart tools that law enforcement have asked for.

MR. REILLY:  So I -- I agree with you 100 percent that we're not looking to tie and take away tools that law enforcement have, but unfortunately -- you know, I'm gonna -- Mr. Speaker, on the bill, please.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. REILLY:  So it is ironic that we just talked about taking away tools from law enforcement to combat gun violence.  I stand up here every day talking about the things that we write in this legislation that does not transition to the street the way it's supposed to.  Sixteen and 17-year-olds, we heard about it earlier, I've talked about ad nauseam.  We talked about it just a few weeks ago about selling guns.  The presumption, three firearms.  I gave a nice little scenario to everybody in this Chamber.  Sixteen and 17-year-olds with three firearms.  If he has them in his backpack it should be automatically a presumption that they're for sale now and he should go

to criminal court.  But no, he goes to family court.  Because a tool was
taken away from law enforcement, which includes prosecutors and
now it goes to family court.  We see 16- and 17-year-olds lighting up
our streets.  It's in the news every other day across our State, and we
had the opportunity to fix that.  I begged you to fix that.  The stuff
we're talking about today, microstamping, the technology's not there.
I said it before.  It's not CSI.  This isn't a CBS show.  We're not going
to solve it in 40 minutes.  I asked specifically, do we have case studies
of actual crimes that were committed and solved with microstamping.
We do not.  We do not.  So what that tells me is we cannot have the
experts to testify in court to actually prove that case.  The study you
just heard about in 2018 is done by the manufacturer of the
microstamping machine.  A real peer review?  Maybe the State should
have bought a microstamping machine and actually did the test
themselves and not rely on someone that might actually get a bid to
implement that.  I have been accused of trying to push away the issue
to something else just in this debate.  I'm not doing that.  I'm trying to
raise the issues that we can do to fix things that we send from this
Legislature.  That's all I ever do here is try and improve it, try and
make it work better.  Because I can tell you, the years that I spent on
the streets in New York patrolling, I wanted the Legislature to do the
right thing and help me protect our streets.  We've gone way past that
now.  We don't do that.  We actually make it more difficult.  But we
decide that we're going to pass legislation to feel good.  Let's stop
worrying about feeling good and actually accomplish -- accomplish

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

something.  How are we going to get our police officers trained as experts for this?  How are we going to get the labs, the technicians, to be certified?  It's not even addressed.  But you know what?  We can hit our green buttons, we can hit our red buttons, we can all walk out the door and said why we did that, why we don't want to support it, why we want to support it.  But we actually could maybe get to a place where what we put on paper really turns out to do the things it's supposed to on the street, in the courtroom.  But until that day I'm going to stand up here every time we discuss these things, because there is a time that I hope we will come to where we'll be able to have these discussions and fix the necessary changes.  But until that day, this is merely fluff.  So hopefully you'll all join me one day and say, *Listen, I think we can fix this.*  I think we can actually add some substance instead of worrying about a press release.

Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect January 1, 2023.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 7926-A.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  The Republican

79

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

Conference is generally opposed to this legislation.  Those who support it can certainly vote yes here on the floor or by contacting the Minority Leader.

                    Thank you, sir.

                    ACTING SPEAKER AUBRY:  Thank you.

                    Mrs. Peoples-Stokes.

                    MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker.  The Majority Conference will generally be in favor of this piece of legislation.  However, there may be some of our colleagues who would desire to be an exception.  They should feel free to contact the Majority Leader's Office and their vote will be probably recorded.

                    Thank you, sir.

                    ACTING SPEAKER AUBRY:  Thank you.

                    (The Clerk recorded the vote.)

                    To explain his vote, Mr. Englebright.

                    MR. ENGLEBRIGHT:  Thank you, Mr. Speaker.  So, I just want to compliment the sponsor.  I think this is an important bill and we need to, I think, place it in perspective as we prepare to vote. This is really about trace evidence.  A microstamp is simply a mark, and when metal hits metal, which is what happens when a gun is fired, there is a mark made.  The problem is that we have anonymous marks being made now because of all of the firing pins make the same mark. You can go into a forensics storage facility and most police stations and there are hundreds of shell cases that have been picked up from crime scenes, and if you look at the mark they're all the same.  What

                                  80

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

this bill is attempting to do is provide another tool.  We have trace evidence tools that are well-known; fingerprints, shoe prints, blood type, blood spatter.  These are all tools.  Bite mark patterns, fingerprints.  And yes, we should have unique marks being made.  It doesn't cost -- the cost is so trivial that it's ridiculous.  And to say that this is not a technology that is available is ridiculous.  When metal hits metal it makes a mark, and if you file it you make a new unique mark.

I vote yes.

ACTING SPEAKER AUBRY:  Mr. Englebright in the affirmative.

Mr. Lavine.

MR. LAVINE:  Thank you.  I want to dispel some of the odd myths that have been advanced.  I'm going to address just four of them.  It's not Mexican guns coming over the Mexican border that are killing our children, it's American guns smuggled over the Mexican border that are killing Mexicans.  Secondly, the firing pin is not going to last more than 1,000 rounds or so.  I never thought I'd get to rely on this reference point, but consider what Clemenza told Michael in *The Godfather*.  *Leave the gun, take the cannoli*. Criminals don't want to get caught with the guns.  Damn, that was good.  Certainly.  Why didn't this happen 20 years ago?  You're telling me Americans we're not as crazy 20 years ago as we are today?  I doubt that very much.  Twenty years ago was the before the proliferation and the marketing of tactical weapons in the United States, romanticizing to people who are young and people who do

81

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

have problems how important it is for them to stick up for their rights and get even by having the ability to fire many rounds at the same time.  Cost?  I will guarantee you any cost associated with microstamping is going to cost a whole a lot less than it costs to bury a child.

I'm pleased to report that just moments ago, 1,700 students at Plainview-Old Bethpage High School on Long Island marched out of their school and stood for 21 minutes.  Twenty-one minutes, one minute for each of our Americans dead in Uvalde.  What we are doing with these bills is we are trying our best to change the gun fetish culture in the United States.  And if anyone believes we don't have a gun fetish culture they could have listened to some of the arguments, the passionate, hyper-passionate arguments made.

(Buzzer sounds)

Let's do what we can to protect all of our children.  I vote in the affirmative.

ACTING SPEAKER AUBRY:  Mr. Lavine in the affirmative.

Mr. Angelino to explain his vote.

MR. ANGELINO:  Mr. Speaker, to explain my vote. We spent about two hours here debating this technology.  I've offered some tips on how do it better.  This is likely going to cost millions of dollars to manufactures, purchasers.  And all of these law-abiding citizens and gun manufacturers are going to have to adapt to this technology.  Again, millions of dollars, two hours of debate.  And as I

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

said earlier, criminals don't want to get caught, and all of the effort we've put into this bill can be defeated by a criminal picking up his brass and leaving the scene.  Or if he's a really cunning criminal he'll pick up his brass and he'll throw down somebody else's brass.

So, don't think those things don't happen because they don't want to get caught, and for those reasons and many, many others I will be voting no.

ACTING SPEAKER AUBRY:  Mr. Angelino in the negative.

Mr. Walczyk to explain his vote.

MR. WALCZYK:  Thank you, Mr. Speaker.  My intent is to rise to explain my vote in a way that may assist members of this Body in remembering their constitutional duty as I cast this vote here today and to support and defend the Constitution of the United States that you raised your right hand and swore to do.  This bill requires pistols sold in the State of New York to be microstamping-enabled.  It establishes fines for violations and requires the Department of Criminal Justice Services to certify a technology that doesn't yet exist.  We have a perfect example of this, if you remember back, the Combined Ballistics Identification System ran for a little while.  That was supposed to be the fingerprint on the rounds that went out of every round.  The New York State Police wasted millions of man hours and millions of tax dollars to solve exactly zero crimes with that program and prevented zero crimes with that program, and here we are today on a made-up technology in order

to try to institute the same exact thing.  The Second Amendment of the United States Constitution guarantees the other nine Bill of Rights.

Mr. Speaker, I vote no.

ACTING SPEAKER AUBRY:  Mr. Walczyk in the negative.

Ms. Simon to explain her vote.

MS. SIMON:  Thank you, Mr. Speaker.  I want to commend the sponsor for this bill, and I want to also thank others who have spoken in support.  The reality is that we have learned from California's experience.  That is what smart legislators do, they learn and they craft bills that will address those issues.  Last Sunday, the *New York Times* review had -- the front cover of the review section was 20 or so dates of mass shootings in this country.  And those 20 or so dates, following each one it said, *Police said that the gun or the weapon was legally purchased*.  So the reality is, these are not stolen weapons.  Every single one of these mass shootings, somebody bought that gun legally.  They used it for an illegal purpose, but they bought it legally.  So this nonsense that somehow or other it's just criminals and they don't buy guns legally and it's all law-abiding citizens that have guns and they are the only ones who have guns, that is just not true.  And I point out that one reason we have had a proliferation of mass shootings in the last 18 years, and I say 18 years because the assault weapons ban was not reauthorized in 2004.  And if you're looking for a reason, it's not mental illness, which has been with us since time and memorial, it's the assault weapons ban expiring.  That's what

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

prompted this.  That and the additional tactical equipment and fostered and engendered this love of greater and greater fire power. These guns -- these -- these weapons were made to kill people, and as many as possible.  That's what has happened.  We need to use every piece of technology to drive the demand to drive better technology to ensure that we're able to help law enforcement and help reduce crime and the number of unnecessary deaths due to firearms in this country.

I'll be voting in the affirmative.

ACTING SPEAKER AUBRY:  Ms. Simon in the affirmative.

Mr. Lawler to explain his vote.

MR. LAWLER:  Thank you, Mr. Speaker.  I started today's Session by introducing the mother of one of the victims in the Parkland shooting.  She is advocating for a bill to be taken up in this Body before we leave, whose technology actually works and would actually help prevent innocent children from being killed in schools by making sure that the law enforcement response time is as quick as possible.  For some bizarre reason, the staff in this place has blocked this bill.  That bill needs to come up for a vote.  That technology actually works.  As we've seen in this debate, this technology does not work.  The sponsor could not verify the technology and, in fact, the bill says we need DCJS to certify or not certify whether this is even possible.  Numerous examples of how the microstamping could be eliminated.  Not to mention the fact, obviously, that guns can be transported across state lines and used in the commission of crimes,

and not to mention the fact that 16- and 17-year-olds are using guns to commit crimes and are being treated in family court.  My colleague from Nassau talked about 21 minutes and students standing in protest to remember the 21 lives lost.  Twenty-one minutes?  Let's get the bill on the floor in 21 minutes and pass Alyssa's Law today.  We don't need to wait any further.  We can take action to actually help prevent senseless tragic deaths.

ACTING SPEAKER AUBRY:  Mr. Lawler -- Mr. -- stay on the bill, please.  No advocating for other bills while you're on this one.  Thank you.

MR. LAWLER:  Thank you, Mr. Speaker.  I vote no on this bill.

ACTING SPEAKER AUBRY:  Mr. Lawler in the negative.

Mr. DiPietro.

MR. DIPIETRO:  Thank you, Mr. Speaker, to explain my vote.  Over 30 people killed this past weekend in New York City and Chicago, do you know how many assault rifles were used in those deaths?  Zero.  Zero.  I heard someone say that it's the assault rifle ban, if we had that back all these deaths would go away.  You've got to be kidding me.  People with mental illness, people with problems, if they -- if there's an assault rifle ban, number one, they won't buy or find an illegal one or they won't use a different type of weapon?  That this is all going to magically disappear?  There will be no more school shootings?  You've got to be kidding me.  The last thing, what

happens every time -- going to the heart of the matter, every time there's a school shooting, every time there's a mass shooting, every time there's a murder of some sort, what do we all do?  We all pray. Ironic that every time something happens we all ask for prayer, yet we've taken prayer out of school.  Kids can't pray, teachers can't pray, you can't even mention God in school.

ACTING SPEAKER AUBRY:  Mr. DiPietro, same admission to you as to Mr. Lawler.  The bill is in front of us.

MR. DIPIETRO:  This is part of the bill.  So with that I'll be voting no and urge my colleagues to also because there's no easy answers, but this is not the answer.

ACTING SPEAKER AUBRY:  Mr. DiPietro in the negative.

Ms. Rosenthal to explain her vote.

MS. ROSENTHAL:  Thank you, Mr. Speaker, to explain my vote.  There have been more school shootings than days in the year 2022, and that should make every single person in this Body furious.  And after mass shootings we ring our hands, we send thoughts and prayers and we wonder what could we have done to prevent the killing.  Since Sandy Hook when 20 6- and 7-year-olds and six teachers were murdered and we said, *Never again*, but did very little on the Federal level to crack down on guns, we have taught our students, pre-K students as young as four to hide under their desks and stay quiet if a bad person with a gun comes into their classroom. To hold -- to hold their cries in in the hopes the gun -- the gunman

won't hear them.  School shootings have become a forgone

conclusion.  We can't prevent them, only prepare for them.  And as

policymakers we cannot throw up our hands in the face of so much

senseless violence and blame unlocked doors, video games, educators,

mental illness for the devastation and violence caused by this country's

obsession with guns.  We have a responsibility to take action.  Anyone

who could walk into a school filled with innocent babies and start

shooting indiscriminantly and without provocation is a madman, but

madmen --

ACTING SPEAKER AUBRY:  Ms. Rosenthal --

MS. ROSENTHAL:  Yes.

ACTING SPEAKER AUBRY:  Similarly to the

others, you have a bill in front you.  You need to speak to that bill.

MS. ROSENTHAL:  Okay, I will do that.  Thank

you.  We need to tighten our laws, ensure that law enforcement has

every single tool available to them to prevent and solve gun crimes to

make our streets safe for our children, and microstamping, despite

what others purport to know, is among one of the most powerful tools

available to law enforcement.  It is available, it's affordable, it's

effective and it will save lives.  We deserve to live without the fear of

preventable gun violence.

(Buzzer sounds)

I would like to thank Moms Demand Action, New

Yorkers Against Gun Violence, Brady Campaign Against Gun

Violence, Giffords Law Center, Every Town for Gun Safety, our

**NYS ASSEMBLY**                                            **JUNE 1, 2022**

former colleague Michelle Schimel for advocacy for this.  And in conclusion, histrionics and angry proclamations citing alternative facts will not work.  Our residents know --

ACTING SPEAKER AUBRY:  Ms. Rosenthal, how do you vote, please?

MS. ROSENTHAL:  Our residents know who is showboating and who wants to do something, and in that vein I vote in the affirmative.

ACTING SPEAKER AUBRY:  Ms. Rosenthal in the affirmative.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, would you please record our colleagues Mr. Stirpe and Mrs. Gunther in the negative on this piece of legislation?

ACTING SPEAKER AUBRY:  So noted.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Mr. Goodell for the purposes of an introduction.

MR. GOODELL:  Thank you, Mr. Speaker.  After that nice spirited debate it is my pleasure to introduce some distinguished guests, Dana Platin, who is the president of the New York State PTA, and her son Tyler.  They're members of the New York State PTA Leadership Team, and they're in our Assemblymember Doug Smith's Assembly District.  President Platin

89

and members from across the State are here in Albany celebrating the 125th anniversary of the New York State PTA which, of course, has a great and proud history supporting New York children.  President Platin is also a kindergarten school-related professional in the Sachem School District, and it is my great honor to introduce the President of the New York State PTA Association here visiting us on this auspicious 125th anniversary.  Please extend the cordialities of the House.

ACTING SPEAKER AUBRY:  Certainly.  On behalf of Mr. Goodell, Mr. Smith, the Speaker and all the members, we welcome you all here to the New York State Assembly.  We extend to you the privileges of the floor, hope that you've enjoyed your time with us.  Hope you enjoyed that spirited debate that goes on in the New York State Assembly.  Know that your government will fight for its -- its various concerns and allows an open and free discussion of issues.  You should be proud of that because that's what democracy is about.  And for you, for the -- as all part of the PTAs, I want to thank you for the work that you do to ensure that your schools work and that your schools have parents involved with teachers in order to make that institution work better.  Thank you again very much.

(Applause)

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, colleagues, there will be an immediate meeting of the Ways and Means Committee off the floor.  Those who are in their offices remotely can

**NYS ASSEMBLY**                                        **JUNE 1, 2022**

just stay there.  You will be switched to the room.  Those who are in the Chamber with us can go to Room 30.

ACTING SPEAKER AUBRY:  Ways and Means --

MRS. PEOPLES-STOKES:  Those who are in the room with us can go to Room 345 where the Ways and Means meeting will be held.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Room 345 for those of you are here in the Chamber.

On the A-Calendar, page 3, the Clerk will read the title of the Concurrent Resolution.

THE CLERK:  Rules at the request of Mr. Zebrowski, Assembly Resolution No. 953.

Concurrent Resolution of the Senate and Assembly concerning the rescission of all previous requests by the New York State Legislature or either House thereof for a convention under Article V of the United States Constitution.

ACTING SPEAKER AUBRY:  The resolution is laid aside.

THE CLERK:  Assembly No. A00146-A, Rules Report No. 515, Gottfried, Simon, Morinello, Cahill, J.M. Giglio, Colton, Thiele, Englebright, Cook, Gunther, McDonough, Dinowitz, Peoples-Stokes, Steck, Goodell, L. Rosenthal, Quart, Kim, Palmesano, Abinanti, Ra, DiPietro, Hyndman, Jean-Pierre, Benedetto, Galef, Weprin, Williams, Lavine, Woerner, Dickens, Bronson, Niou, Cusick, Norris, Carroll, Solages, Seawright, Zebrowski, Taylor, Sayegh,

Salka, McDonald.  An act to amend the Public Health Law, the Tax Law and the Social Services Law, in relation to support of living organ donation.

ACTING SPEAKER AUBRY:  On a motion by Mr. Gottfried, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect April 1st.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 1594.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Palmesano to explain his vote.

MR. PALMESANO:  Thank you, Mr. Speaker.  I just want to take a minute to explain my vote and thank the sponsor for bringing up this legislation.  He's certainly been a leader on the issue of organ donation over the years and during his career and I appreciate his leadership on this issue especially.  And I just want to remind my colleagues, it's legislation like this that helps us improve our numbers regarding organ donation and increase our numbers.  We've made a lot of progress over the past number of years but we still have a long way to go.  And just to remind you how far we have to go, right now still in New York we have 8,500 New Yorkers waiting for an organ transplant.  Thirteen have been waiting for more than five years.  Last year in 2021 we lost 450 men, women and children waiting for a

92

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

lifesaving organ transplant.  Right now in New York our organ donor

registration rate is 45 percent, the national average is 62 percent.

There are 52 registries across this country.  New York is number 50

out of 52.  We're only ahead of New Jersey and Puerto Rico.  We have

the third-highest need for organ donors, the third-worst registry.  So

we have a long way to go.  There's much more we can do.  We should

be looking at legislation like this that can increase the opportunity for

people to say yes.  We should be putting it on our tax forms, on public

assistance forms, college applications, asking people if they want to be

an organ donor.  Because I'm convinced that if we give them the

chance to say yes they will say yes.  But the most important statistic

that we all need to know is that one person donates at the time of their

death can save up to eight lives and impact the lives of 75 others.  So I

know when we talk about this issue a lot of people don't like to talk

about it because you're thinking of one's death.  But think of if your

loved one, your mom or dad, brother or sister or, God forbid, your son

or daughter were in need of a lifesaving organ transplant and you saw

those statistics numbers I just laid out here.  So let's improve -- let's

continue to improve the organ donation rate.  This legislation is

certainly a great piece of legislation to help encourage living donors --

living donors to do those donations, help our more successful and

have better viability.  There's -- and I know there's documentation on

that.

So again, I want to thank the sponsor for his

leadership on this issue and I encourage enthusiastically you to vote

**NYS ASSEMBLY**                                        **JUNE 1, 2022**

yes on this legislation.  Thank you, Mr. -- Madam Speaker.

ACTING SPEAKER WOERNER:  Mr. Palmesano in the affirmative.

Mr. Gottfried to explain his vote.

MR. GOTTFRIED:  Thank you, Mrs. Speaker.  This is presumably not my last bill, I certainly hope not.  I've got a few more.  But I think this is probably a good time to say a few words.  First I want to thank all the amazing staff who have worked with me all these years.  My staff, people on other staffs.  And thank you to the Speaker Heastie and the five Speakers I have served with before him.  And to all of you, my colleagues, and -- and those who have come before you.  We've done some pretty great work together.

You know, from time to time some Assemblymembers think of running for what they consider higher office, and that's understandable.  But I think we already hold a pretty high office.  The public may think mostly about City Hall or Washington, but most of the laws that affect our lives come from Albany.  So it's really important that smart, hardworking people with good hearts be committed to the Assembly.  It does take work and time to learn how to make this place -- this place work to advance your agenda.  And certainly after 52 years I'm still learning.  And our process is certainly often frustrating, but it's worth the time and effort.

And as Robert Kennedy said, *The future is not a gift, it is an achievement*.  Thank you all.  And I vote in the affirmative.

(Applause)

94

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

ACTING SPEAKER WOERNER:  Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker -- Madam Speaker, to explain my vote.  First of all, I want to honor Dick Gottfried as well.  There's no one here now or probably even in the past that served under five Speakers.  Not one, not two, not three, not four, but five Speakers.  And I really think that what he has to offer in terms of his experience can be helpful to us all.  And so if we have not had a change to engage with him before he leaves the next couple of days I'm just going to invite you to try and do that because right there is a lot of experience that we all absolutely need.

With that, I am pleased to vote in support of his bill.  As you all know, my daughter was a donor recipient and we were grateful when she was able to receive that donation.  But it is so much better for people to get healthier so much faster if there's more availability of donations.  And so I applaud him for his legislation and I'm personally, personally glad to vote yes.

ACTING SPEAKER WOERNER:  Mrs. Peoples-Stokes in the affirmative.

Mr. Goodell.

MR. GOODELL:  Thank you, Madam Speaker.  I speak on behalf of this bill.  I certainly want to support it.  Being a donor, a living donor, is a unique opportunity to save someone else's life.  My daughter donated a kidney to a person about the same age.  They were acquaintances.  She's done fine, he's done fine, but it's

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

really a life-changing opportunity, if you will.  I tried to donate a piece
of liver to a neighbor and unfortunately I was rejected.  I recovered
from that rejection and he went on to get a much better donation, also
from a living donor, and is living a productive life for a young guy
that, you know, was in horrific condition could now be healthy and
out enjoying life.  So what a tremendous opportunity.

       And I also want to extend my great appreciation to
the sponsor, Mr. Gottfried.  As you know, from time to time I ask
questions of members, and what I particularly appreciate about Mr.
Gottfried is I know when I'm asking questions to Mr. Gottfried he
knows more about the subject than I do.  And that is a great blessing
to everyone in this Chamber when we have someone who takes the
time and the effort to know their subject inside out and is
compassionate and fully committed to helping New York State
become a better state.  So to Mr. Gottfried, my hat's off to you.  Thank
you, sir.

       ACTING SPEAKER WOERNER:  Mr. Goodell in
the affirmative.

       And I would add to what Mr. Goodell just said that
Mr. Gottfried has indeed set a very high bar for all of us what it means
to be an effective member of the New York State Assembly.  Thank
you.

       Are there any other votes?  Announce the results.

       (The Clerk announced the results.)

       The bill is passed.

THE CLERK:  Assembly No. A00911-A, Rules Report No. 516, Jean-Pierre, Englebright, Dickens, Griffin, Stirpe, D. Rosenthal, Smith, DeStefano, McDonough, Thiele, Ra, Stern, Gottfried, Montesano, Woerner, B. Miller.  An act to amend the Navigation Law and the Penal Law, in relation to operating a vessel while intoxicated when a child who is 15 years of age or less is a passenger in such vessel.

ACTING SPEAKER WOERNER:  Read the last section.

THE CLERK:  This act shall take effect on the 180th day.

ACTING SPEAKER WOERNER:  The Clerk will record the vote on Rules Report No. 516, A.911 -- A.911 [sic].  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Ms. Walsh to explain her vote.

MS. WALSH:  Thank you, Madam Speaker, to explain my vote.  I just want to commend the sponsor of this piece of legislation and I'm very proud to be a cosponsor of it.  This basically takes Leandra's Law and applies it to the water so people who boat and are under the influence and have a child on board are going to face stiffer penalties, and I think that's only right.  The area that I represent includes areas of the Great Sacandaga Lake, Ballston Lake

and areas where there -- where there are boating accidents and where not everybody is responsible in the way that they operate their -- their boats and it can cause injuries to other people.  I really think that this is a very important piece of legislation.

I commend the sponsor and I'm thrilled to support it. And I can see from the board that it has -- it appears to be unanimous support and that's as it should be.  So thank you very much.

ACTING SPEAKER WOERNER:  Ms. Walsh in the affirmative.

MRS. PEOPLES-STOKES:  Madam Speaker, would you please record our colleague Ms. Mitaynes in the negative on this one?

ACTING SPEAKER WOERNER:  Ms. Mitaynes in the negative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A01023-A, Rules Report No. 517 was previously amended on Third Reading and is high.

Assembly No. A01773-C, Rules Report No. 518, Pretlow.  An act to amend the Racing, Pari-Mutuel Wagering and Breeding Law, in relation to State Gaming Commission occupational licenses.

ACTING SPEAKER WOERNER:  The bill is laid

NYS ASSEMBLY                                    JUNE 1, 2022

aside.

THE CLERK:  Assembly No. A02039-B, Rules
Report No. 519, Dilan, Hevesi, D. Rosenthal, Cook, Abinanti, Reyes,
Hyndman, McDonough, Williams, Glick, Fernandez, Colton, Hunter,
Dickens, Taylor, Braunstein, Seawright.  An act to amend the Labor
Law, in relation to modular construction work.

ACTING SPEAKER WOERNER:  On a motion by
Mr. Dilan, the Senate bill is before the House.  The Senate bill is
advanced and the bill is laid aside.

THE CLERK:  Assembly No. A03144-A, Rules
Report No. 520, Pretlow, Dickens, Reyes, McMahon, Simon,
Mamdani, Salka, Galef, Fahy, González-Rojas.  An act to amend the
Public Service Law and the State Finance Law, in relation to enacting
the Accessible Electronic Information Act.

ACTING SPEAKER WOERNER:  Read the last
section.

THE CLERK:  This act shall take effect on the 90th
day.

ACTING SPEAKER WOERNER:  The -- the Clerk
will record the vote on Rules Report No. 520, A.3144 [sic].  This is a
fast roll call.  Any member who wishes to be recorded in the negative
is reminded to contact the Majority or Minority Leader at the numbers
previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

99

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A03801-A, Rules Report No. 521, Abinanti, Weprin, Williams, Cruz, Smullen, Reilly, McDonough, Epstein.  An act to amend the Public Authorities Law, in relation to enacting the "Toll Payer Protection Act"; and providing for the repeal of certain provisions upon expiration thereof.

ACTING SPEAKER WOERNER:  Read the last section.

THE CLERK:  This act shall take effect on the 120th day.

ACTING SPEAKER WOERNER:  The Clerk will record the vote on Rules Report No. 521, A.3801 [sic].  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A04535-A, Rules Report No. 522, Cook, Hyndman, Vanel, Walker, Jackson, Dickens, Anderson.  An act to amend the Insurance Law, in relation to commuter van and ambulette or paratransit vehicles classification review.

100

ACTING SPEAKER WOERNER:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER WOERNER:  The Clerk will record the vote on Rules Report No. 522, A.4535 [sic].  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Read the last section -- oh, sorry, announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A04687-C, Rules Report No. 523, Peoples-Stokes, Meeks.  An act to amend the Executive Law, in relation to the Office of Special Investigation inspecting serious physical injuries that may have resulted in death.

ACTING SPEAKER WOERNER:  Read the -- laid aside.  The bill is laid aside.

THE CLERK:  Assembly No. A05278-B, Rules Report No. 524, Barrett, Burdick, Solages, Griffin, Otis.  An act to amend the Retirement and Social Security Law, in relation to discharged LGBT veterans.

ACTING SPEAKER WOERNER:  Read the last section.

101

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER WOERNER:  The Clerk will record the vote on Rules Report No. 524, A.5278 [sic].  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A05304-A, Rules Report No. 525, McDonald.  An act to authorize William Schumaker and Mark Hennessy to receive certain service credit under Section 384-d of the Retirement and Social Security Law.

ACTING SPEAKER WOERNER:  The Home Rule message is at the desk and the bill is laid aside.

THE CLERK:  Assembly No. A05337-A, Rules Report No. 526, McDonald, Jones, Santabarbara, Lupardo, Morinello, J.M. Giglio, Ashby, Darling, Fahy, Jacobson, Otis.  An act to amend the Real Property Actions and Proceedings Law, in relation to authorizing special proceedings to convey title to abandoned commercial and industrial real property to a city, town or village; and providing for the repeal of such provisions upon expiration thereof.

ACTING SPEAKER WOERNER:  The bill is laid aside.

THE CLERK:  Assembly No. A05623-A, Rules Report No. 527, Thiele.  An act to amend the -- to provide procedures relating to the adoption and submission of an annual budget by the Trustees of the Freeholders and Commonalty of the Town of Southampton.

ACTING SPEAKER WOERNER:  On a motion by Mr. Thiele, the Senate bill is before the House.  The Senate bill is advanced.  Home Rule message is at the desk.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER WOERNER:  The Clerk will record the vote on Rules Report No. 527, Senate Bill 5013 [sic].  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A05860-B, Rules Report No. 528, Reyes, Williams, Otis.  An act to amend the General Business Law, in relation to the price gouging of medicine.

ACTING SPEAKER WOERNER:  On a motion by Ms. Reyes, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER WOERNER:  The Clerk will record the vote on Rules Report No. 528, Senate Bill 3081 [sic].  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A05926-B, Rules Report No. 529, Ramos, Thiele, Englebright.  An act to amend Chapter 635 of the Laws of 1987, establishing the Oak Brush Plain State Preserve, located on Long Island, in relation to the acquisition of lands previously comprising Pilgrim State Hospital.

ACTING SPEAKER WOERNER:  On a motion by Mr. Ramos, the bill -- the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER WOERNER:  The Clerk will record the vote on Rules Report No. 529, Senate Bill 6142 [sic].  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the

numbers previously provided.

(The Clerk recorded the vote.)

ACTING SPEAKER AUBRY:  Are there any other
votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, thank you
for the opportunity for a brief interruption of our work on the floor to
introduce a guest of our colleague Mr. Gibbs.  She is none other than
the most recently-crowned Ms. New York.  She was crowned on
Sunday, April the 3rd, she's a resident of Harlem, born in Washington,
D.C., a Haitian immigrant.  Marie Charles was educated in both Haiti
and in the United States.  She's a graduate of the esteemed
Massanutten Military Academy where she upholds the values and
principles and resiliency and moral rectitude, leveraging these abilities
to improve both herself and others.  In 2004 she proudly graduated
from Baruch College with a degree in Business Administration.

Mr. Speaker, would you please welcome Ms. New
York to our Chambers?

ACTING SPEAKER AUBRY:  Certainly.  On behalf
of Mrs. Peoples-Stokes and Assemblymember Gibbs, we welcome
you here to the New York State Assembly.  We extend to you the
privileges of the floor.  Delighted that you will represent us as a State.
I can't even imagine how wonderful it must be to be crowned Ms.

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

New York State.  Thank you so very much for sharing with us.  We wish you all the luck in your year of reign.  It's a year, right?  You get a whole year?

MS. MARIE CHARLES:  (Inaudible)

ACTING SPEAKER AUBRY:  Oh, good.  Well, so we -- we look forward to you doing that and representing us.  Thank you so very much and you're always welcome and to your crown.

(Applause)

The Clerk will read.

THE CLERK:  Assembly No. A06150-B, Rules Report No. 530, Septimo, Mamdani, Anderson, Fernandez, Simon, Sillitti, Epstein, Gottfried, Solages, Forrest, Jackson, González-Rojas, Darling, L. Rosenthal, Kelles, Seawright, Thiele, Otis, Fahy, Englebright.  An act to amend the Environmental Conservation Law, in relation to emissions of toxic air contaminants.

ACTING SPEAKER AUBRY:  On a motion by Ms. Septimo, the Senate bill is before the House.  The Senate bill is advanced.  The bill is laid aside.

THE CLERK:  Assembly No. A06365-A, Rules Report No. 531, Abbate.  An act to amend the Retirement and Social Security Law, in relation to accidental disability retirement for uniformed court officers and peace officers employed in the Unified Court System.

ACTING SPEAKER AUBRY:  On a motion by Mr. Abbate, the Senate bill is before the House.  The Senate bill is

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 8399.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Ms. Walsh.

MS. WALSH:  Thank you, Mr. Speaker, to just briefly explain my vote.  As many of my colleagues know, I've been an attorney for 30 years and I have practiced a lot in various courts in mostly Saratoga County.  And I've had a chance over that time to get to know a lot of the people who are uniformed court officers in the court system.  And I really do support this bill.  I -- I'm not always completely on board with everything that the sponsor has in terms of retirement system changes.  This one I really do support.  I think that this bill provides a presumption that the uniformed court officers and peace officers in the Uniform [sic] Court System that are injured as a result of physical assault by an assailant, suffered in-service will be entitled to accidental disability retirement in most instances.  And I will say that particularly in family court that happens.  That -- that happens.  They -- they have protected me personally on a number of occasions.  It's getting increasingly more out of hand and -- and violent and without their assistance we would all be in a lot of trouble.

107

So they do become injured in the -- in the cause of protecting the rest of us.

I think that this is a fair and just piece of legislation and I'm very happy to -- to vote in the affirmative and to just thank them for their service.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Ms. Walsh in the affirmative.

Mr. Fitzpatrick.

MR. FITZPATRICK:  Yes, thank you, Mr. Speaker.  Just to explain my vote.  You know, we've seen a lot of these bills at this time of year, and it is a great benefit to have.  However, it can be and will more than likely be very expensive and, therefore, it is not unfair or unreasonable to ask that this be negotiated at the bargaining table rather than go through the Legislature.  That is what collective bargaining is for.  It needs to be used in instances like this.  And, again, this should not go through the Legislature and be mandated on the taxpayers.  It should be a negotiated item where the other side is asked to put something on the table to help offset the potentially tremendous cost of this.

With that said, we admire what they do, we respect them greatly.  But these types of benefits should be negotiated through collective bargaining.  Thank you, and I vote no.

ACTING SPEAKER AUBRY:  Mr. Fitzpatrick in the negative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A06724, Rules Report No. 532, Englebright, Otis, Thiele, L. Rosenthal, Aubry, Cook, Montesano, DeStefano, Jean-Pierre, Niou, Steck, Simon, Gallagher, Dickens, Dinowitz, Abinanti.  An act to amend the Not-for-Profit Corporation Law and the Education Law, in relation to the discovery and disposal of human remains and funerary objects; and to amend the Parks, Recreation and Historic Preservation Law, in relation to requiring certain notice and consultation prior to the undertaking of certain projects.

ACTING SPEAKER AUBRY:  On a motion by Mr. Englebright, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect January 1st.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 5701.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Ms. Walsh.

109

NYS ASSEMBLY                                    JUNE 1, 2022

MS. WALSH:  Thank you very much, Mr. Speaker, for allowing me to interrupt these proceedings on behalf of our colleague Assemblywoman Jodi Giglio, who has an introduction that I'm going to make for her.  Joining with us today in the Chamber are two esteemed guests, Manny Vilar, the retiring President of the PBA of New York State, and also Dixon Palmer, the Vice President of Police Conference for New York State.

Would you please, Mr. Speaker, offer the cordialities of the House to these two visitors to our Chamber?

ACTING SPEAKER AUBRY:  Certainly.  On behalf of Ms. Walsh, Ms. Giglio, the Speaker and all the members, sir, we welcome you here to the New York State Assembly, extend to you the privileges of the floor.  Thank you for the work that you do to ensure and keep our public service employees well and taken care of.  Continue that great work.  Know that you will always be welcome here.  Thank you.

(Applause)

The Clerk will read.

THE CLERK:  Assembly No. A07006-B, Rules Report No. 533, Fahy, Lupardo, Magnarelli, Glick, Gottfried, Bronson, L. Rosenthal, Steck, McDonald, Dickens, Reyes, Simon, Gunther, Seawright, Pheffer Amato, Niou, Colton, Griffin, Fall, Galef, Zinerman, Burke, Hunter, Woerner, J. Rivera, Mamdani, Jackson, Forrest, Thiele, B. Miller, Clark, Hevesi, Blankenbush, Jean-Pierre, Kim, Wallace, Carroll, Lunsford, Burdick, Gallagher, Jacobson,

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

Burgos, Gibbs, Kelles, González-Rojas, Zebrowski, Englebright, Stern.  An act to amend the General Business Law, in relation to the sale of digital electronic equipment and providing diagnostic and repair information.

> ACTING SPEAKER AUBRY:  The bill is laid aside.

> THE CLERK:  Assembly No. A07079-C, Rules Report No. 534, Burdick, Thiele, Dickens, Gunther, Fernandez, Otis, Clark, Jackson, González-Rojas, Kelles, Epstein, Woerner.  An act to amend the Penal Law, in relation to Sexual Conduct Against a Child in the Third Degree.

> ACTING SPEAKER AUBRY:  Read the last section.

> THE CLERK:  This act shall take effect on the 30th day.

> ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 7079-C.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

> (The Clerk recorded the vote.)

> Mr. Burdick to explain his vote.

> MR. BURDICK:  Thank you, Mr. Speaker, to explain my vote.  This bill fills a gap in the definition under the Penal Law of the offense of Sexual Conduct Against a Child in the Third Degree.  With this amendment it expands the definition to include use of a finger which, sadly, case law has held does not constitute such an

**NYS ASSEMBLY**                                        **JUNE 1, 2022**

offense.  The bill came about through the sexual assault of a

9-year-old girl, the daughter of a resident of my district, who in tears

came to me years after the offense and asked me if something could

be done to change the law.  This amendment will not change what

occurred, but will provide some closure and peace for the victim and

her parents.  While I recognize that clarifying the law does not

necessarily deter such action -- assaults, at least it will provide some

recourse for future victims.

        I am grateful for the bipartisan support for this

measure and the tremendous help which staff provided in significantly

improving the bill.  I also wish to thank Codes Chair Jeff Dinowitz

and the Speaker for finding the path to enactment of this bill.  I vote in

the affirmative.  Thank you, Mr. Speaker.

        ACTING SPEAKER AUBRY:  Mr. Burdick in the

affirmative.

        Are there any other votes?  Announce the results.

        (The Clerk announced the results.)

        The bill is passed.

        THE CLERK:  Assembly No. A07436-A, Rules

Report No. 535, Abbate.  An act to amend the State Finance Law, in

relation to the direct deposit of certain salaries.

        ACTING SPEAKER AUBRY:  On a motion by Mr.

Abbate, the Senate bill is before the House.  The Senate bill is

advanced.

        Read the last section.

**NYS ASSEMBLY**                                             **JUNE 1, 2022**

THE CLERK:  This act shall take effect January 1, 2023.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 6617-A.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A07747-B, Rules Report No. 536, Magnarelli, Woerner, Jones, Stirpe, Buttenschon.  An act to amend the Vehicle and Traffic Law and the Parks, Recreation and Historic Preservation Law, in relation to fees for snowmobile trail development and maintenance.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on 7747-B.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

113

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

THE CLERK:  Assembly No. A07805-D, Rules Report No. 537, Cymbrowitz, Fall, Benedetto, Burdick, Cook, Tapia, J. Rivera, Seawright, Dinowitz, Eichenstein, Davila, D. Rosenthal, Hyndman, Hevesi, Taylor, Nolan, Bichotte Hermelyn, Williams, Carroll, Rajkumar.  An act to amend the Public Housing Law and the Administrative Code of the City of New York, in relation to establishing the New York City Public Housing Preservation Trust for properties owned or operated by the New York City Housing Authority and providing for the issuance of certain bonds, notes or other obligations of the New York City Housing Development Corporation.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect on the 60th day.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 7805-D.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Mr. Anderson to explain his vote.

MR. ANDERSON:  Thank you, Mr. Speaker, to explain my vote.

ACTING SPEAKER AUBRY:  Sir.

MR. ANDERSON:  Thank you.  So, you know, today

114

**NYS ASSEMBLY**                              **JUNE 1, 2022**

is a very disappointing day with this bill that's in front of us.  We had a real opportunity to make sure that the New York City Housing Authority that has been neglected from having funding for over 40 years a true opportunity for public housing to remain public.  We had an opportunity for 40 years to do the right thing.  This bill represents the wrong thing.  This bill represents us trading pennies for gold.  Section 9 is gold and it provides true and real affordable housing to many working-class families in perpetuity.  This bill harms many aspects of that ability to add and allow for true affordable housing to exist.  We understand the conditions of our residents, of our neighbors, are impacted to them and at this time I feel that we're turning our backs on them by voting on this trust.  It's hard to trust a trust when there's no collective bargaining.  It's hard to trust a trust when there's no voting threshold, rules and regulations to ensure that just five people in a very voter-apathetic public housing development situation and scenario have an opportunity to truly determine their future.

So I strongly encourage all my colleagues across the aisle and here in this Conference to vote no on this particular piece of legislation, and I hope that everybody will do that as well.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Mr. Anderson in the negative.

Mr. Epstein to explain his vote.

MR. EPSTEIN:  Thank you, Mr. Speaker.  I rise to

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

explain my vote.  So, I represent 13 public housing developments in New York City, and I have met with my NYCHA leaders numerous times around this and they are uniformly opposed to this trust bill. One, they're really deeply concerned around losing their Section 9 protections and moving to Section 8, concerns around the default provisions.  If the trust fails to pay, what's owed when they borrow funds, and through this bonding authority what the risk will be to those residents who through -- through whoever (inaudible) bonded the money.  Their voting rights.  Ensuring that they ensure that the majority of the residents who live in those developments can choose the path that they want.  Time and time again we've said to public housing authorities, like, *Listen to our residents*.  And this is what we're doing.  We're listening to our residents who are telling us to vote no.  We are listening to our residents who care deeply about what they -- where they live and want us to do something responsible for it. This bill doesn't get there.  This bill doesn't do what we need.  This bill doesn't have the support of our communities.  So time and time again there's our obligation to stand up for our residents.  Standing up for our residents means voting against this bill.  Standing up for our residents means telling NYCHA to do a better job engaging with our communities, engaging with our residents, ensuring that they have a plan that works for them.  This is their home.  They are -- many of them in my community were born and raised in these public housing developments.  They have raised their kids there and their grandkids there.  They believe in this development.  They want to fight for their

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

public housing and it is our obligation to fight with them.

I'm going to vote against this bill and I encourage my colleagues to do the same.

ACTING SPEAKER AUBRY:  Mr. Epstein in the negative.

Ms. Niou.

MS. NIOU:  Thank you, Mr. Speaker, for allowing me to explain my vote.  I stand here today on behalf of public housing residents in 45 Allen Street, 17 Eldridge Street, the Hernandez, Houses, the LaGuardia Houses, Lower East Side I, Meltzer Tower, the Rutgers Houses, Seward Park Extension, the Smith Houses, the Two Bridges Development and the Vladeck Houses, all 11 NYCHA developments in my district, to firmly oppose this legislation and any other attempt to transform Section 9 public housing into Section 8 units.  I oppose this bill on procedural grounds, that it was crafted without sufficient input from residents and on substantive grounds that it ultimately puts units at an intolerable level at risk.

First and foremost, my opposition is owed to community opposition by NYCHA residents in every development in my district.  Beyond just my district, nine of the ten representatives on the CCOP, a board of tenants elected to represent their neighbors, oppose the trust.  I am disappointed in my colleagues who say this scheme is best for NYCHA residents.  Tenants have boldly and loudly declared that they do not believe that this is best for them.  And they are broadly distrustful of many of this plan's implications and would

rather work to solve the issues with Section 9 rather than turn to Section 8.  We cannot make decisions for public housing residents without public housing residents.  They must have a seat at the table in drafting any proposed NYCHA overhaul, and they have been regularly excluded and ignored in the process of creating this bill.

I will be registering all of my comments officially for the record.  Thank you, and I vote in the negative.

ACTING SPEAKER AUBRY:  Ms. Niou in the negative.

Mr. Lawler to explain his vote.

MR. LAWLER:  Thank you, Mr. Speaker.  Two of the biggest authorities that we have in this State are the MTA and NYCHA, and both are abject failures.  They're horribly run.  The amount of money that goes into them and is wasted, mismanaged, misused.  You have people living in NYCHA housing who have holes in their ceilings.  Literally water pouring down as they go to the restroom, having to hold an umbrella.  It's shameful, it's disgraceful, it's disgusting.  This bill simply shifts the blame, shifts the problem, moves the costs, allows for more borrowing, and no real plan to fix the problems.  I don't know how in good conscience we could continue down this path and just throw more money at it, allow for more borrowing, more debt and a new name.  This is not a plan.  This is not going to fix a thing.  It is nothing more than window dressing, and I think the residents of NYCHA housing deserve far better than what they've received and what this bill would even do.

This is a money grab and we should not be in favor of it.  We should be voting against it.

ACTING SPEAKER AUBRY:  Mr. Lawler in the negative.

Ms. Weinstein to explain her vote.

MS. WEINSTEIN:  Mr. Speaker, I stand in support of this legislation.  I'm just listening and heard a number of colleagues who talked about their NYCHA residents opposing this measure.  In my district in the Sheepshead-Nostrand Houses, the President of the Nostrand Houses is a very strong proponent of this legislation, this -- this concept of trust.  And the residents in my community believe that this will be a tremendous benefit for them over the long-term. So I just wanted to bring that perspective.  There's not uniformity in how residents of NYCHA view this proposal.  And having listened to it and spoken with the NYCHA leadership I believe that it will be a tremendous benefit to many residents of NYCHA and I'm proud to vote in the affirmative.

ACTING SPEAKER AUBRY:  Ms. Weinstein in the affirmative.

Ms. Septimo to explain her vote.

MS. SEPTIMO:  I represent the South Bronx.  My district is home to more than 15 NYCHA developments.  My district is also home to the poorest congressional district in the nation.  We know that the Federal government has completely abandoned its responsibility to our tenants, to NYCHA tenants across the City, to

**NYS ASSEMBLY**                                           **JUNE 1, 2022**

public housing tenants across the nation.  Ultimately, these tenants
deserve better.  The NYCHA trust blueprint is not the process that is
going to get them to better, and we know that because whether you are
fighting on the substance of the bill and how these vouchers come to
be and how they get funded or the process, at every single point there
are too many questions and too many flaws that remain.  This process
has been one that has failed to consider tenant voice and tenant rights
from start to finish.  Today we know that there are scores -- thousands
of tenants across New York City who are feeling vulnerable about
their rights going into this piece of legislation.  And right now we are
saying that we are not concerned with these genuine moments of
pause.

        I will be voting in the negative on this piece of
legislation because ultimately, any piece of legislation that is aiming
to help people has to consider the perspectives of those people and
ultimately the blueprint fails to do that.  There are questions as it
relates to how developments will opt into the blueprint.  There are
questions as to what will make elections that put properties into the
blueprint legitimate.  There are questions that remain about how many
people will have to participate in decision-making for developments
that will affect thousands of people's lives and that we know will
affect the housing stock for years to come.  Because of these questions
and so many others that have been -- have remained unanswered and
because of the wholesale disregard of tenants throughout the City who
are in opposition to this project, I will be voting in the negative and I

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

hope that we can all restore our commitment to these tenants and respecting their voice moving forward.  Thank you.

ACTING SPEAKER AUBRY:  Ms. Septimo in the negative.

Mrs. Peoples-Stokes to explain her vote.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker.  I rise to explain my vote.  I understand that public housing across the nation is a Federal government responsibility, and in many ways I -- I -- I resent the way that they abdicated their responsibility consistently over the decades.  And -- and what we have done in New York and I would suspect in other states as well is to try and take care of our residents in spite of what the Federal government was or was not doing.

ACTING SPEAKER AUBRY:  Can we get a little quiet, please?  Shh.

MRS. PEOPLES-STOKES:  And so I think, Mr. Speaker, in many ways what the Chair of the Committee and the sponsor of this legislation is trying to do is to say to New York State residents who are NYCHA tenants and most likely the responsibility of Federal government, that we're not just going to keep waiting on the Federal government to do their responsibility for you.  We're going to try and help you and help them help you.  So I think this bill is worth the effort.  I'm glad that the sponsor has introduced it.  And albeit not everything everybody wants, but when do we ever get everything that everybody wants?  We're not there yet, but we are in a

121

**NYS ASSEMBLY**                              **JUNE 1, 2022**

good place where I think this could be beneficial to the tenants both in the short-term and in the long-term.

So I'm voting yes.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Mrs. Peoples-Stokes in the affirmative.

Ms. Jackson to explain her vote.

MS. JACKSON:  Thank you, Mr. Speaker, for allowing me to explain my vote.  I have the pleasure of -- I have the pleasure of speaking up for over 20 NYCHA developments in my district, and from the beginning of this bill when I learned about it before I even became an Assemblymember it was problematic because of how and which NYCHA decided to roll out this piece of legislation.  The tenant leaders have had issues with the rollout since the beginning, they have been explaining to leadership for the longest that there are things in here that they are afraid of for their -- their living environment.  They want to protect public housing.  My tenant leaders would love to see that public housing stay public, and what this bill does for them scares them.  And so it is my responsibility to speak up and to be the voice since they cannot be here on the floor and express their vote to say that I will not be voting for this piece of legislation.  And I respect people that live there.  I don't live there nor does anyone in this Body that I know of lives in public housing, so it's hard for us to tell them what -- what is best for them.  We are supposed to listen to the people and allow the people to have say on their living environments.  We know how bad it is.  We don't need a

**NYS ASSEMBLY**                                              **JUNE 1, 2022**

crash course in that because we know.  But at this point we're asking

that --

           ACTING SPEAKER AUBRY:  One minute, Ms.

Jackson.

           Ladies and gentlemen under the eave, you're going to

have to tone it down.

           MS. JACKSON:  We're asking -- thank you, Mr.

Speaker.  We're asking that their -- that the amendments that they're

asking for, the rules that they're asking for be -- be adopted as such.

So I am a no vote.

           ACTING SPEAKER AUBRY:  Ms. Jackson in the

negative.

           Ms. Davila to explain her vote.

           MS. DAVILA:  Thank you, Mr. Speaker, for

allowing me to explain my vote.  Well, I -- I definitely understand that

there might be some members that are extremely concerned about

NYCHA and the way it has been treated for decades and decades.

There's no doubt that there is -- the trust fund, not too many people are

trustworthy of it, so to speak.  But I -- in my district I have five, six

different developments and I know that they have been suffering for

decades and decades.  This is probably one of the better plans that I

have seen that can give these tenants an opportunity to live in a

habitable environment and to also maintain their housing status as

public housing development.  The thing is that they are going to have

to choose.  This is something that was -- that has never happened

123

NYS ASSEMBLY                                    JUNE 1, 2022

before.  So we -- we are going to have to take that step one way or another to ensure that our tenants are treated with dignity and respect and that they can live in a habitable environment and that they are no longer targeted as a low-income development or have to feel like they have to walk around rats and -- and roaches and -- because we are not doing what we need to do on our part.

So with that said, Mr. Speaker, I vote in the affirmative.

ACTING SPEAKER AUBRY:  Ms. Davila in the affirmative.

Ms. Frontus on Zoom.

MS. FRONTUS:  Thank you so much, Mr. Speaker, for allowing me to explain my vote.  I hope that everyone can hear me.  There is a bit of a delay here.  I represent the 46th District, Southern Brooklyn, my home neighborhood of Coney Island which has some nine NYCHA developments.  Some of them are as large as 15 buildings.  Some of my leaders are for the trust, some are against it.  But I can tell you that last night I had a three-hour town hall meeting and most of the people there told me that they are against this piece of legislation.  What I find the most troubling, to be honest with you, is that the average resident in my community was hearing the words "blueprint for change", was hearing about RAD, was hearing about the Preservation Trust for the very first time.  If we are going to ask people to trust us, we are members of government, we have to behave in a manner where people can take us seriously.  And I, frankly, just

don't think that this is a way to earn trust with people who have been disappointed for decades and decades.  Some of the families at NYCHA are second-generation, some are third-generation.  They're used to broken promises.  They're used to people not keeping their word.  If we are trying to turn over a new page, if we are trying to turn over a new leaf, then what NYCHA should have done is meet with all of the tenants, as they said they would, because when they first came out with this plan they met with members like myself in the Legislature and the first question we asked them is, *Are you going to have town hall meetings and meet with the residents to make sure they are informed?*  They told us that they would, and much to my chagrin, much to my chagrin, when I started asking around people knew absolutely nothing.

(Buzzer sounds)

And so my negative vote today is not really against the trust or the piece of legislation.

ACTING SPEAKER AUBRY:  Ms. Frontus, how do you vote?

MS. FRONTUS:  I vote in the negative.  Thank you so much.

ACTING SPEAKER AUBRY:  Ms. Frontus in the negative.

Ms. Reyes to explain her vote.

MS. REYES:  Thank you, Mr. Speaker.  This bill is very troubling for me because like so many of my colleagues have

mentioned, resident engagement has been very lacking around this issue.  And yes, residents of NYCHA deserve investment.  Nobody should be living in the conditions that NYCHA residents are living in.  But the reality is that NYCHA has also squandered lots and lots of money, lots of resources.  They've had time and time opportunities to do right by tenants and they haven't done that.  So it's ironic that we see a bill that creates a trust in which the residents are supposed to now trust that NYCHA is going to do right by them.  We've seen RAD PACT conversions and other iterations of a NYCHA plan with shotty renovations that are failing currently, and with it we also saw some of the highest eviction rates in our City.  That, to me, is problematic.  The fact that we are passing this without true discussion and true conference and debate on a litany of issues in the language of this trust is also problematic.  One piece is that -- the reality is that Section 9 is the last bastion of affordable housing in our country, and this would be doing away with Section 9 vouchers in the State of New York.  Some of the few that are left.  But also there's a labor component to this, and this language literally gives the option to NYCHA, either participate or not, if they wish, in collective bargaining, possibly doing away with good-paying labor union jobs that the very people who live in NYCHA need to survive and the people who live in our City depend on as well.

For that and many other reasons I'm going to be voting in the negative.  Thank you.

ACTING SPEAKER AUBRY:  Ms. Reyes in the

**NYS ASSEMBLY**                                        **JUNE 1, 2022**

negative.

Ms. Walsh for exceptions.

MS. WALSH:  Thank you, Mr. Speaker.  Would you please record Mr. DeStefano in the negative on this legislation.  Thank you.

ACTING SPEAKER AUBRY:  So noted.  Thank you.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Please record our colleagues Mr. Barnwell, Ms. Mitaynes, Mr. Mamdani and Ms. Gallagher in the negative.

ACTING SPEAKER AUBRY:  So noted.  Thank you.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A07837-C, Rules Report No. 538, Norris.  An act in relation to authorizing the County of Niagara to transfer ownership of certain parkland to the Town of Lockport.

ACTING SPEAKER AUBRY:  On a motion by Mr. Norris, the Senate bill is before the House.  The Senate bill is advanced.  Home Rule message is at the desk.

Read the last section.

THE CLERK:  This act shall take effect immediately.

127

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 6313-C.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

MRS. PEOPLES-STOKES:  Mr. Speaker, would you please record our colleague Mr. Dinowitz in the negative on this one?

ACTING SPEAKER AUBRY:  So noted.  Thank you.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A07876-A, Rules Report No. 539, Carroll, Walker, Gallagher, Barnwell, Jones, Anderson, Stern, Rozic, Quart, Paulin, Cymbrowitz, Gottfried, Dinowitz, Griffin, Nolan, Abinanti, Santabarbara, L. Rosenthal, McDonald, Lavine, Thiele, Otis, Hevesi, Davila, Seawright, D. Rosenthal, Lupardo, Jacobson, Fernandez, O'Donnell, Cusick, Kelles, Burdick, Fahy, Galef, Steck, Magnarelli, Woerner, Barrett, Stirpe, Simon, Hunter, Durso, Gandolfo, Niou, Cruz, Mikulin, Montesano, Englebright, Gibbs, Colton.  An act to amend the Real Property Law, in relation to requiring disclosure of information concerning flood insurance on residential leases.

ACTING SPEAKER AUBRY:  On a motion by Mr. Carroll, the Senate bill is before the House.  The Senate bill is

advanced and the bill is laid aside.

THE CLERK:  Assembly No. A07919-A, Rules Report No. 540, Bronson, Wallace, Byrnes, Burke, Jensen, Dinowitz, Barnwell, Lunsford, Rozic, McDonald, Otis, Dickens, Gottfried, Lupardo, Griffin, Darling, Solages, Joyner, Hawley, Gallahan, Morinello, Mikulin, Lawler, J.M. Giglio, DeStefano, Gandolfo, Walczyk, K. Brown, Durso.  An act to amend the State Finance Law, the General Municipal Law, the Public Authorities Law and the Highway Law, in relation to enacting the New York State Buy American Salt Act.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 7919-A.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Ms. Byrnes to explain her vote.

MS. BYRNES:  Thank you.  Thank you.  Thank you, Mr. Speaker.  I know this is a fast roll call and I'll be very brief.  I just wanted to indicate and to thank Mr. Bronson, although he's not here.  I represent in my district one of the largest salt -- actually, the largest salt mine in the entire United States of America.  And American Rock Salt and its predecessor had mined salt under Livingston County for

over 100 years.  It is the economic driver of Livingston County, which is my district.  It supports 7- to 800 families.  Not just miners, but also truck drivers, railroad personnel, and also farmers because in the wintertime when farmers would normally put their trucks in storage now they're able to use them in order to transport salt in the wintertime.  So this is just an economic boom for my area.  The salt mine plays by old rules, it follows the regulations, it pays the right wages and benefits.  All the miners wanted was a chance to have a level playing field.  We have talked a lot in this House about foreign substandard mining on foreign soil and potential human rights concerns.  And no, we're not talking about cobalt.  Now we're talking about salt.  And as a result it's very important that our New York State local people who are supporting our own families in our own neighborhoods be able to work and thrive, and that is why I'm supporting this bill.

Thank you, sir.

ACTING SPEAKER AUBRY:  Ms. Byrnes in the affirmative.

Mr. Byrne.

MR. BYRNE:  Thank you, Mr. Speaker.  I vote -- yes, thank you, Mr. Speaker.  With all due respect to my colleague, and I understand that like many pieces of legislation there are certain policies that we embrace and support that are very favorable to some portions of the State and not so favorable to other portions of the State.  And while I -- I certainly respect her position and understand

130

**NYS ASSEMBLY**                                            **JUNE 1, 2022**

why she's fighting for it, I have gotten phone calls and letters, communications from a number of my highway superintendents, raising their concerns about the cap -- the capacity to attain enough salt, the negative consequences that this could have on them being able to obtain the salt they need for their operations.  Just as recently as two days ago I spoke with the highway superintendent of Putnam Valley who is a registered Democrat and who told me, *Please, Kevin, do not support this bill.*  And that is why I will be voting in the negative.

Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Mr. Byrne in the negative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A07952, Rules Report No. 541, Lalor.  An act to amend Chapter 476 of the Laws of 1957 relating to authorizing the board of commissioners of the Land Office to grant certain easements in lands of the State University Agricultural and Technical Institute at Farmingdale to Central Hudson Gas and Electric Corporation in in relation to the description of lands for which the Commissioner of General Services is authorized to grant an easement to the Central Hudson Gas and Electric Corporation.

ACTING SPEAKER AUBRY:  On a motion by Mr. Lalor, the Senate bill is before the House.  The Senate bill is

NYS ASSEMBLY                                    JUNE 1, 2022

advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 9288.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A08098, Rules Report No. 542, Cymbrowitz.  An act to amend the Private Housing Finance Law, in relation to rental assistance and legal regulated rents in affordable housing projects.

ACTING SPEAKER AUBRY:  On a motion by Mr. Cymbrowitz, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 7235.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

132

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A08151, Rules Report No. 543, Sillitti.  An act in relation to authorizing St. Francis Hospital, Roslyn, New York, to file an application for exemption from real property taxes.

ACTING SPEAKER AUBRY:  On a motion by Ms. Sillitti, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 7265.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A08169-A, Rules Report No. 544, Cruz, Anderson, Solages, Jackson, Simon, Mamdani, Fernandez, Hevesi, Dinowitz, Seawright, Sayegh, J.D. Rivera, Williams, Joyner, Tapia, Burgos, Barnwell, Colton, Glick, González-Rojas, Forrest, Ramos, Aubry, J. Rivera, Carroll, Burdick, Bichotte

**NYS ASSEMBLY**                          **JUNE 1, 2022**

Hermelyn, Epstein, Gallagher, Jacobson, Septimo, De Los Santos, Kim, Jean-Pierre, Dickens, Niou.  An act to amend the Insurance Law, in relation to certain prohibited contract provisions.

ACTING SPEAKER AUBRY:  On a motion by Ms. Cruz, the Senate bill is before the House.  The Senate bill is advanced and the bill is laid aside.

THE CLERK:  Assembly No. A08331, Rules Report No. 545, B. Miller.  An act to authorize John Raftery of the Town of Shawangunk to take the competitive Civil Service examination for the position of police officer and be placed on the eligible list for employment as a full-time police officer of the Town of Shawangunk Police Department.

ACTING SPEAKER AUBRY:  On a motion by Mr. Miller, the Senate bill is before the House.  The Senate bill is advanced.  Home Rule message is at the desk.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 7490.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

THE CLERK:  Assembly No. A08425, Rules Report No. 546, Burke, Taylor, Stirpe, Epstein, Simon, Aubry, Galef, Zebrowski, Magnarelli, Sillitti, Hevesi, Braunstein, Dickens, Gottfried, Glick, McMahon, O'Donnell, McDonough, Jean-Pierre, Otis.  An act to amend the Education Law, in relation to requiring nonpublic schools to follow the same rules and regulations as public schools regarding a pupil who suffers a concussion.

ACTING SPEAKER AUBRY:  On a motion by Mr. Burke, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect July 1st.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 973.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A08455-A, Rules Report No. 547, Byrne.  An act to amend the Highway Law, in relation to designating a portion of the State highway system as the "Putnam Valley First Responders Bridge."

ACTING SPEAKER AUBRY:  Read the last section.

135

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 8455-A.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Ms. Walsh to explain her vote.

MS. WALSH:  Thank you, Mr. Speaker.  Yes, I definitely will support this piece of legislation.  I also just wanted to note for my colleagues that this is our colleague Kevin Byrne's last bill during his time here in the New York State Assembly.  Kevin is a classmate of mine.  We both came to the Assembly in 2017.  He is a friend and he has been an amazing colleague in the Chamber and as our Health Committee Ranker.  He really brought his experience and background in emergency services, his respect for the fire service.  And he really -- I -- I think he just really -- I've really watched him grow as a legislator and I'm -- I'm very sad that he's going to be leaving us.  But I'm sure that his wife, Briana, and son will be very happy to have him a little bit closer to home in the coming years.

So I just wanted to wish him very well, and of course I'll support this bill as well.  Thank you, Mr. Speaker.

(Applause)

ACTING SPEAKER AUBRY:  Mr. Byrne, in my time you've been the first to ever wear kilts on the floor.

(Laughter)

Hopefully you won't be the last.

Mr. Byrne to explain his vote.

MR. BYRNE:  Well, I wasn't sure if I was going to explain my vote, but now I will.  Thank you to our Assistant Minority Leader Pro Tem for those very kind words.  A little bit about this bill, it's fitting that it could be one of my last bills or the last bill.  What we're renaming is an overpass, Pudding Street overpass over the Taconic State Parkway.  And a lot of our colleagues that commute up to Albany or drive up to Albany, this was a very dangerous intersection on the Taconic State Parkway where we actually had a school bus traveling over the Taconic, stopping in the median and then going back over the northbound.  We actually had a town hall forum.  It was before I was elected and I was present with my predecessor Steve Katz in attendance.  Senator Terry Gipson was there, trying to advocate for this capital project to happen.  Former Congressman [sic] Sue Kelly, who I interned for many years ago, brought back Federal dollars for this project.  It never happened. Finally, about four years ago the project moved.  It was a $28 million project, and it happened.  The -- the overpass opened up about a year or so ago.  I missed the groundbreaking, but here in time to at least rename it after somebody.  We were initially trying to dedicate it after two prominent Putnam Valley people, Jim Gordon and Joe Marra, both first responders, both U.S. service members, both public servants in the Town of Putnam Valley, but we had to shorten the name.  So

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

we decided to consolidate it as Putnam Valley First Responders because few people know more about how valued that bridge is than the first responders because it now connects that community (inaudible) with the rest of Putnam Valley and it's going to be a tremendous asset.  And I want to thank all my colleagues for supporting it.  It's been an honor serving in the Assembly and having all the productive debates.

Thank you, Mr. Speaker.  I vote in the affirmative.

ACTING SPEAKER AUBRY:  Mr. Byrne in the affirmative.

(Applause)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A08535-A, Rules Report No. 548, Jensen, Seawright.  An act to amend the Highway Law, in relation to designating a portion of the State highway system as the "Specialist Jason Hasenauer Memorial Highway."

ACTING SPEAKER AUBRY:  On a motion by Mr. Jensen, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 8681-A.  This is a fast roll call.  Any member

who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A08549-C, Rules Report No. 549, Burdick, Gallagher, Meeks, Seawright, Santabarbara, Englebright, J.M. Giglio, Hevesi, Sayegh, Lawler, Woerner, González-Rojas, Sillitti, Stern, Ra, DeStefano, J.A. Giglio, Simon, Epstein, McDonald.  An act to amend the State Finance Law, in relation to preferred source status for entities that provide employment to certain persons; and providing for the repeal of certain provisions upon the expiration thereof.

ACTING SPEAKER AUBRY:  On a motion by Mr. Burdick, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 7578-C.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Mr. Burdick to explain his vote.

139

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

MR. BURDICK:  Thank you, Mr. Speaker, to explain my vote.  This bill updates a provision in the New York State Finance Law known as the Preferred Source Program which provides that New York State agencies provide a preference in the award of contracts to firms that provide employment for people with disabilities.  The bill updates and modernizes this 45-year-old tradition not just by replacing archaic terms, but by adjusting work ratios and thresholds for review to make it easier both for State agencies and firms doing business with them.  The bill came about from testimony presented at Assembly hearings last fall on barriers to employment for people with disabilities held by the Labor Committee, the Committee on People with Disabilities and the Subcommittee on Employment Opportunities for People with Disabilities, which I have the honor of chairing.  I'm grateful for the bipartisan support for this measure and the help which staff provided in significantly improving the bill.  I also wish to thank Tom Abinanti, Chair of the Committee on People with Disabilities; Ken Zebrowski, Chair of the Government Operations Committee and staff, and each -- each second along the way they pitched in.  And of course, Speaker Heastie for allowing this bill to come to the floor. Finally, I wish to thank Maureen O'Brien, the Executive Director of the non-profit New York State Industry [sic] for the Disabled.

I vote in the affirmative.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Are there any other votes?  Announce the results.

(The Clerk announced the results.)

140

**NYS ASSEMBLY**                                                    **JUNE 1, 2022**

The bill is passed.

THE CLERK:  Assembly No. A08630-A, Rules Report No. 550, Reyes, Thiele, Forrest.  An act to amend the Environmental Conservation Law, in relation to prohibiting cosmetic products and personal care products that contain mercury.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect July 1, 2023.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 8630-A.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A08681, Rules Report No. 551, Cruz, Jackson, Dilan Burgos.  An act to amend the Criminal Procedure Law, in relation to rules of evidence concerning the admissibility of evidence of a defendant's creative expression.

ACTING SPEAKER AUBRY:  On a motion by Ms. Cruz, the Senate bill is before the House.  The Senate bill is advanced and the bill is laid aside.

THE CLERK:  Assembly No. A09046-B, Rules Report No. 552, Gallahan.  An act to amend the Highway Law, in

141

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

relation to designating a portion of the State highway system as the "Ralph Calabrese Memorial Highway."

ACTING SPEAKER AUBRY:  On a motion by Mr. Gallahan, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 8085-C.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09068-B, Rules Report No. 553, Angelino.  An act to amend the Highway Law, in relation to designating a portion of the State highway system the "1LT Stephen H. Doane Memorial Bridge."

ACTING SPEAKER AUBRY:  On a motion by Mr. Angelino, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

the vote on Senate print 7903-B.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

     (The Clerk recorded the vote.)

     Are there any other votes?  Announce the results.

     (The Clerk announced the results.)

     The bill is passed.

     THE CLERK:  Assembly No. A09099-A, Rules Report No. 554, Cusick, Simon.  An act to amend the Social Services Law, in relation to providing for the automated identification of affordability program participants.

     ACTING SPEAKER AUBRY:  Read the last section.

     THE CLERK:  This act shall take effect immediately.

     ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 9099-A.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

     (The Clerk recorded the vote.)

     Are there any other votes?  Announce the results.

     (The Clerk announced the results.)

     The bill is passed.

     THE CLERK:  Assembly No. A09215, Rules Report No. 555, McDonald, Englebright, Buttenschon, Lupardo, Woerner, Seawright, Thiele, Colton, Gottfried, Aubry, Galef, Simon, Jacobson,

**NYS ASSEMBLY**                                         **JUNE 1, 2022**

Glick, Brabenec, J.A. Giglio, Angelino, Byrne, Sillitti, O'Donnell, Steck, Fahy, Dickens.  An act to amend the Civil Service Law, in relation to ensuring identical health benefits for skilled nursing care for public retirees.

ACTING SPEAKER AUBRY:  On a motion by Mr. McDonald, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 8192.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09255-A, Rules Report No. 556, Lemondes.  An act to amend Chapter 996 of the Laws of 1965 relating to incorporating the Fairmount Volunteer Exempt Firemen's Benevolent Association and providing for its powers and duties, in relation to its purpose and the use of foreign fire insurance premium taxes.

ACTING SPEAKER AUBRY:  On a motion by Mr. Lemondes, the Senate bill is before the House.  The Senate bill is

144

advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 8344-A. This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09325, Rules Report No. 557, Abbate, Jones, Cusick, McDonald, Wallace, Englebright, Burdick, Rozic, Tapia, Griffin, Lavine, Woerner, Zebrowski, Barnwell, Sillitti, Gunther, Stern, Cymbrowitz, Thiele, Solages, Fahy, Lupardo, Clark, Conrad, Aubry, Ramos, Fall, Colton, Barrett, DeStefano, Durso, Pheffer Amato, Abinanti, Darling, Jean-Pierre, J.A. Giglio.  An act to amend the Retirement and Social Security Law, in relation to establishing a 20-year retirement plan for members or officers of law enforcement.

ACTING SPEAKER AUBRY:  On a motion by Mr. Abbate, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 8477.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09326-A, Rules Report No. 558, Sillitti.  An act in relation to authorizing the County of Nassau assessor to accept an application for a real property tax exemption from the Nassau Cemetery Association.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 9326-A.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09334-B, Rules Report No. 559, J.A. Giglio.  An act in relation to authorizing the

146

County of Suffolk to transfer ownership of certain parkland to the Town of Southold.

ACTING SPEAKER AUBRY:  On a motion by Ms. Giglio, the Senate bill is before the House.  The Senate bill is advanced.  Home Rule message is at the desk.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 7739-C.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09335-B, Rules Report No. 560, Fitzpatrick.  An act authorizing the County of Suffolk and the Town of Smithtown, located in the County of Suffolk, to exchange certain parklands.

ACTING SPEAKER AUBRY:  Home Rule message is at the desk.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 9335-B.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

ACTING SPEAKER PHEFFER AMATO:  Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09343-B, Rules Report No. 561, Magnarelli.  An act to amend the General Business Law, in relation to vehicle cost recovery fees.

ACTING SPEAKER PHEFFER AMATO:  Read the last section.

THE CLERK:  This act shall take effect on the 60th day.

ACTING SPEAKER PHEFFER AMATO:  The Clerk will record the vote on A9343-B.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Mr. Montesano to explain his vote.

MR. MONTESANO:  Thank you, Madam Speaker, to explain my vote.  It's just, you know, always being pro-business and understanding the overheads and costs that businesses have, sometimes they need to pass things over to the consumer.  And this

particular bill allows now rental car companies to pass on to the consumer when they calculate additional pricing for the car, what it cost the car rental agency to pay for title, registration, inspection, et cetera, to be additional charges.  And I think what happens is in the car rental agencies, they have advertised low prices, you know, to get the consumer to come in and rent the car, and then they lay on top of them all these extra charges that inflates the price of the rental, you know, as separate and apart from the initial rental fee.

I think it's a little bit deceptive and I think also that these rental car companies have to incur the cost of doing business. They buy a new car, they put it on the road to rent out, they got to pay for the registration and everything else that goes with it.  I don't think it needs to be the renter's expense.  If they want to pass on all these expenses to the renter, then it should be all included into the price that they advertise, you know, for the rental of the car so people know up front what it's costing them, and then they compare between different rental car agencies.  So likewise, I'll be voting in the negative.  Thank you.

ACTING SPEAKER PHEFFER AMATO:  Read the last section -- I'm sorry.  I apologize -- are there any other votes? Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09418-A, Rules Report No. 562, Cruz, Fernandez, González-Rojas, Hevesi, Reyes,

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

Quart, Epstein, Fahy, Taylor, Simon, Solages, Gottfried, McDonald, Glick, L. Rosenthal, De Los Santos, Forrest, Seawright.  An act to amend the Public Health Law and the State Finance Law, in relation to enacting the Lorena Borjas Transgender and Gender Non-Binary (TGNB) Wellness and Equity Fund.

ACTING SPEAKER PHEFFER AMATO:  On a motion by Ms. Cruz, the Senate bill is before the House.  The Senate bill is advanced.  The bill is laid aside.

THE CLERK:  Assembly No. A09435, Rules -- Rules Report No. 563, Solages, Darling, Zinerman, Aubry, Dickens, Pretlow, Williams, Walker, Peoples-Stokes, Cook, Vanel, Hyndman, Cahill, Jean-Pierre, Bichotte Hermelyn, Taylor, Dilan, Joyner, Benedetto, Epstein, Frontus, Reyes, Nolan, O'Donnell, Cruz, Jackson, Burgos, Forrest, Anderson, González-Rojas, J. Rivera, Gibbs, Otis, Gallagher, Ramos, Gottfried.  An act to acknowledge the fundamental injustice, cruelty, brutality and inhumanity of slavery in the City of New York and the State of New York; to establish the New York State Community Commission on Reparations Remedies, to examine the institution of slavery, subsequently de jure and de facto racial and economic discrimination against African-Americans, and the impact of these forces on living African-Americans and to make determinations regarding compensation; and providing for the repeal of such provisions upon expiration thereof.

ACTING SPEAKER PHEFFER AMATO:  The bill is laid aside.

150

THE CLERK:  Assembly No. A09456, Rules Report No. 564, Magnarelli, Hunter.  An act to amend the Public Authorities Law, in relation to commuter passes on the New York State Thruway in the Syracuse area; and providing for the repeal of such provisions upon expiration thereof.

ACTING SPEAKER PHEFFER AMATO:  The bill is laid aside.

THE CLERK:  Assembly No. A09623, Rules Report No. 565, Abbate, Aubry.  An act to amend the Retirement and Social Security Law, in relation to modifying the retirement program for Triborough Bridge and Tunnel members.

ACTING SPEAKER PHEFFER AMATO:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER PHEFFER AMATO:  The Clerk will record the vote on 9623.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers provided -- previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09756-A, Rules Report No. 566, Jean-Pierre.  An act in relation to establishing the

NYS ASSEMBLY                                          JUNE 1, 2022

"Wyandanch Health and Wellness Center Design-Build Act"; and
providing for the repeal of such provisions upon expiration thereof.

ACTING SPEAKER PHEFFER AMATO:  On a
motion by Ms. Jean-Pierre, the Senate bill is before the House.  The
Senate bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER PHEFFER AMATO:  The
Clerk -- the Clerk will record the vote on 9756-A.  This -- and Senate
Bill S8531-A.  This is a fast roll call.  Any member who wishes to be
recorded in the negative is reminded to contact the Majority or
Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09893, Rules Report
No. 567, McDonald.  An act in relation to permitting the Oakwood
Community Center to file an application for a real property tax
exemption.

ACTING SPEAKER PHEFFER AMATO:  On a
motion by Mr. McDonald, the Senate bill is before the House.  The
Senate bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER PHEFFER AMATO:  The
Clerk will record the vote on Senate 8818.  This is a fast roll call.

152

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09907-A, Rules Report No. 568, Kelles, Mitaynes, Fahy, Englebright, Otis.  An act to amend the Local Finance Law, in relation to providing a period of probable usefulness for broadband and related telecommunications infrastructure.

ACTING SPEAKER PHEFFER AMATO:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER PHEFFER AMATO:  The Clerk will record the vote on A9907 [sic].  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A09968, Rules Report

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

No. 569, Paulin, Zinerman, Otis.  An act to amend Chapter 154 of the Laws of 1921, relating to the Port Authority of New York and New Jersey, in relation to the operation of a youth service unit within the Port Authority Police Department.

ACTING SPEAKER PHEFFER AMATO:  On a motion by Ms. Paulin, the Senate bill is before the House.  The Senate bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER PHEFFER AMATO:  The Clerk will record the vote on Senate 8907.  This is a fast roll call. Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10002-A, Rules Report No. 570, Darling.  An act in relation to authorizing the Village of Freeport, County of Nassau, to alienate and discontinue the use of certain parklands.

ACTING SPEAKER PHEFFER AMATO:  Home Rule message is at the desk.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER PHEFFER AMATO:  The

154

Clerk will record the vote on 10002-A.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

ACTING SPEAKER AUBRY:  Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10028, Rules Report No. 571, Pretlow.  An act to amend the Racing, Pari-mutuel Wagering and Breeding Law, in relation to allowing New York sire stakes eligibility for foals sired by New York State stallions.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 10028.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10041-A, Rules

155

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

Report No. 572, Sillitti, Ra.  An act to authorize the Village of
Mineola, County of Nassau, to alienate certain parklands for use in the
Village of Mineola public water supply system and replace such
alienated parkland with a new, dedicated parkland.

ACTING SPEAKER AUBRY:  On a motion by Ms.
Sillitti, the Senate bill is before the House.  The Senate bill is
advanced.  Home Rule message is at the desk.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record
the vote on Senate print 8895-A.  This is a fast roll call.  Any member
who wishes to be recorded in the negative is reminded to contact the
Majority or Minority Leader at the number previously provided.

(The Clerk recorded the vote.)

Mr. Ra to explain his vote.

MR. RA:  Thank -- thank you, Mr. Speaker.  I just
quickly want to thank the sponsor for her partnership in -- in getting
this done for the Village of Mineola, as well as our Chair of Local
Governments for their assistance.  It's going to help the village move
forward with a project, so I'm glad it's getting done.  I cast my vote in
the affirmative.  Thank you.

ACTING SPEAKER AUBRY:  Mr. Ra in the
affirmative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

156

THE CLERK:  Assembly No. A10072, Rules Report No. 573, Dickens, Bichotte Hermelyn.  An act to amend the Insurance Law, in relation to establishing a captive insurance program for commuter vans.

ACTING SPEAKER AUBRY:  The bill is laid aside.

THE CLERK:  Assembly No. A10095, Rules Report No. 574, Otis.  An act to amend the Vehicle and Traffic Law, in relation to implementing a residential parking system in the City of Rye.

ACTING SPEAKER AUBRY:  On a motion by Mr. Otis, the Senate bill is before the House.  The Senate bill is advanced. Home Rule message is at the desk.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 8939.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10113, Rules Report No. 575, McDonald, Fahy.  An act to amend the Real Property Actions and Proceedings Law, in relation to requiring a petition in a summary proceeding to recover possession of real property in the City

157

of Albany to allege proof of compliance with local laws requiring
rental residential property registration and licensure.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect on the 90th
day.

ACTING SPEAKER AUBRY:  The Clerk will record
the vote on Assembly print A10113.  This is a fast roll call.  Any
member who wishes to be recorded in the negative is reminded to
contact the Majority or Minority Leader at the numbers previously
provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10140, Rules Report
No. 576, Lunsford.  An act to amend the Mental Hygiene Law, in
relation to replacing an instance of the Office of Alcoholism and
Substance Abuse Services with the Office of Addiction Services and
Supports; and to amend Chapter 378 of the Laws of 2019 relating to
creating a public education initiative designed to eliminate stigma and
misinformation about mental illness and substance use among military
service members, in relation to the effectiveness thereof.

ACTING SPEAKER AUBRY:  On a motion by Ms.
Lunsford, the Senate bill is before the House.  The Senate bill is
advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 9408.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10168, Rules Report No. 577, Committee on Rules (Pretlow).  An act authorizing the alienation of certain parklands required to support the redevelopment of the historic Glenwood Power Plant, uniquely located on the Hudson River in the City of Yonkers, which site lacks any land for parking, and which project was contemplated in the approved May 2009 City of Yonkers Alexander Street Master Plan with a new road network connecting Alexander Street to the south past the Glenwood Power Plant through John F. Kennedy Marina and Trevor Park north to provide increased public access to the Hudson River and enhance said parks through the development of a new sustainable riverfront, transit-oriented project by enhancing the existing parks with new amenities; and to amend Chapter 125 of the Laws of 2013, relating to authorizing the alienation of certain parkland required to support the redevelopment of the historic Glenwood Power Plant, uniquely located on the Hudson River in the City of Yonkers, which site lacks

159

any land for parking, and which project was contemplated in the

approved May 2009 City of Yonkers Alexander Street Master Plan

with a new road network connecting Alexander Street to the south

past the Glenwood Power Plant through John F. Kennedy Marina and

Trevor Park north to provide increased public access to the Hudson

River and enhance said parks through the development of a new

sustainable riverfront, transit-oriented project by enhancing the

existing parks with new amenities, in relation thereto.

ACTING SPEAKER AUBRY:  On a motion by Mr.

Pretlow, the Senate bill is before the House.  The Senate bill is

advanced.  Home Rule message is at the desk.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record

the vote on Senate print 9111.  This is a fast roll call.  Any member

who wishes to be recorded in the negative is reminded to contact the

Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10176, Rules Report

No. 578, Committee on Rules (Thiele).  An act to amend the

Alcoholic Beverage Control Law, in relation to licenses to sell liquor

at off-premises catering establishments.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 10176.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10205, Rules Report No. 579, Committee on Rules (Galef).  An act to amend the Tax Law, in relation to permitting the Village of Cold Spring to impose a hotel and motel tax; and providing for the repeal of such provisions upon expiration thereof.

ACTING SPEAKER AUBRY:  Home Rule message is at the desk.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 10205.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Mrs. Peoples-Stokes.

161

**NYS ASSEMBLY**                                              **JUNE 1, 2022**

MRS. PEOPLES-STOKES:  Mr. Speaker, we have a few exceptions:  Ms. McMahon, Mr. Barnwell, Mr. Stirpe, Ms. Barnett [sic], and Mr. Ramos.

ACTING SPEAKER AUBRY:  So noted.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  Please record my colleague Mr. Reilly in the negative.  Thank you.

ACTING SPEAKER AUBRY:  So noted.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10216-A, Rules Report No. 580, Committee on Rules (Paulin, Dinowitz, Englebright, Burdick, Abinanti, Cusick, Taylor, Fall, Glick, Quart, Fernandez, Niou, Burgos, Reilly, Sayegh, Seawright, Carroll, Jean-Pierre, Dickens, Reyes, Aubry, Epstein, Sillitti, Joyner, L. Rosenthal, J. D. Rivera, Jacobson, Septimo, Thiele, Clark, Buttenschon, McDonald, McMahon, Stern, Pretlow, Ramos, Vanel, J. Rivera, Rozic, Otis, Durso, Morinello, González-Rojas, Tannousis, DeStefano, Griffin, Solages, Woerner, Galef, Mikulin, Burke, Bronson, Gallagher, Cruz, Forrest, Simon, Lupardo, Hyndman, Lavine, Gandolfo, Smith, Cook, McDonough).  An act to amend the Public Service Law, in relation to protecting collective bargaining agreements between public service companies and their employees.

ACTING SPEAKER AUBRY:  On a motion by Ms.

162

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

Paulin, the Senate bill is before the House.  The Senate bill is
advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record
the vote on Senate print 8919.  This is a fast roll call.  Any member
who wishes to be recorded in the negative is reminded to contact the
Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10244, Rules Report
No. 581, Committee on Rules (J. D. Rivera).  An act to amend the
Alcoholic Beverage Control Law, in relation to a license to sell liquor
at retail for consumption on certain premises.

ACTING SPEAKER AUBRY:  On a motion by Mr.
Rivera, the Senate bill is before the House.  The Senate bill is
advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record
the vote on Senate print 9371.  This is a fast roll call.  Any member
who wishes to be recorded in the negative is reminded to contact the
Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

**NYS ASSEMBLY**                                        **JUNE 1, 2022**

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10271, Rules Report No. 582, Committee on Rules (Woerner).  An act to amend the Private Housing Finance Law, in relation to increasing the timeline for completion and amount spent on emergency home repairs for low-moderate income senior citizens through the RESTORE Program.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 10271.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10280, Rules Report No. 583, Committee on Rules (Stern).  An act in relation to establishing a Caumsett State Park fire readiness study.

ACTING SPEAKER AUBRY:  On a motion by Mr. Stern, the Senate bill is before the House.  The Senate bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

164

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 9019.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10393, Rules Report No. 584, Committee on Rules (Cahill).  An act to amend the Navigation Law, in relation to Hudson River pilotage fees.

ACTING SPEAKER AUBRY:  On a motion by Mr. Cahill, the Senate bill is before the House.  The Senate bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect January 1st, 2023.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 9128-A.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10427, Rules Report

No. 545, Committee on Rules (Paulin, Galef, Burdick, Sayegh, Abinanti, Otis).  An act to amend the Judiciary Law, in relation to residency requirements for stenographers in the County of Westchester.

ACTING SPEAKER AUBRY:  On a motion by Ms. Paulin, the Senate bill is before the House.  The Senate bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 8985.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Mr. Lawler to explain his vote.

MR. LAWLER:  Thank you, Mr. Speaker.  Seeing the word "stenographer" seems like a very appropriate time to thank our two stenographers who do a great job day in, day out, keeping track of all the wonderful things that we say on the floor of the New York State Assembly.  Seems very relevant to the bill, so I just wanted to take the opportunity to thank our stenographers for all of their hard work.

(Applause)

ACTING SPEAKER AUBRY:  And you may delete any of Mr. Lawler's statements at your will.

(Laughter)

166

Mr. Goodell.

MR. GOODELL:  Presumably the transcript will say raucous, standing ovation.

ACTING SPEAKER AUBRY:  No doubt.  Deserved ovation, too.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10440, Rules Report No. 586, Committee on Rules (Braunstein, Pheffer Amato).  An act to amend the Real Property Tax Law, in relation to a rebate against real property taxes for certain owners of real property in the City of New York for the fiscal year commencing on the 1st of July, 2021.

ACTING SPEAKER AUBRY:  On a motion by Mr. Braunstein, the Senate bill is before the House.  The Senate bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 9399.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

167

THE CLERK:  Assembly No. A10442, Rules Report No. 587, Committee on Rules (Weprin).  An act to amend the Real Property Tax Law, in relation to the determination of adjusted base proportions in special assessing units which are cities.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 9372.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10444, Rules Report No. 588, Committee on Rules (Quart).  An act to amend Chapter 538 of the Laws of 2013, amending the Tax Law relating to the estate tax treatment of dispositions to surviving spouses who are not United States citizens, in relation to extending the expiration of the provisions thereof.

ACTING SPEAKER AUBRY:  On a motion by Mr. Quart, the Senate bill is before the House.  The Senate bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 9398.  This is a fast roll call.  Any member

**NYS ASSEMBLY**                                              **JUNE 1, 2022**

who wishes to be recorded in the negative is reminded to contact the

Majority or Minority Leader at the numbers previously provided.

        (The Clerk recorded the vote.)

        Are there any other votes?  Announce the results.

        (The Clerk announced the results.)

        The bill is passed.

        THE CLERK:  Assembly No. A10450, Rules Report

No. 589, Committee on Rules (Fahy).  An act to amend the Executive

Law, in relation to the purchase or lease of zero emission vehicles for

State-owned vehicle fleets.

        ACTING SPEAKER AUBRY:  On a motion by Ms.

Fahy, the Senate bill is before the House.  The Senate bill is advanced

and the bill is laid aside.

        THE CLERK:  Assembly No. A10455, Rules Report

No. 590, Committee on Rules (Barrett).  An act to amend the

Alcoholic Beverage Control Law, in relation to authorizing the

manufacture of beer, spirits, cider, wine and mead at the Culinary

Institute of America; and to repeal certain provisions of such law

relating thereto.

        ACTING SPEAKER AUBRY:  On a motion by Mrs.

Barrett, the Senate bill is before the House.  The Senate bill is

advanced.  Read the last section.

        THE CLERK:  This act shall take effect immediately.

        ACTING SPEAKER AUBRY:  The Clerk will record

the vote on Senate print 8989-A.  This is a fast roll call.  Any member

who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10459, Rules Report No. 591, Committee on Rules (Bichotte-Hermelyn).  An act to amend the New York City Charter, in relation to opportunities for businesses owned by women and minorities.

ACTING SPEAKER AUBRY:  On a motion by Ms. Bichotte-Hermelyn, the Senate bill is before the House.  The Senate bill is advanced and the bill is laid aside.

THE CLERK:  Assembly No. A10461, Rules Report No. 592, Committee on Rules (Dinowitz, Weprin).  An act to amend the New York City Civil Court Act, in relation to monetary jurisdictional limits.

ACTING SPEAKER AUBRY:  On a motion by Mr. Dinowitz, the Senate bill is before the House.  The Senate bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 9377.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10470, Rules Report No. 593, Committee on Rules (Dinowitz).  An act to amend the Judiciary Law, in relation to making technical changes to provisions providing for certification for service as a retired judge of the Court of Appeals or a retired justice of the Supreme Court.

ACTING SPEAKER AUBRY:  On a motion by Mr. Dinowitz, the Senate bill is before the House.  The Senate bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 9341.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10476, Rules Report No. 594, Committee on Rules (McMahon).  An act to amend the Social Services Law, in relation to medical assistance to certain disabled individuals.

171

NYS ASSEMBLY                                    JUNE 1, 2022

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 10476.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

THE CLERK:  Assembly No. A10491, Rules Report No. 595, Committee on Rules (Cook).  An act to amend the Penal Law, in relation to assaults upon certain employees of a transit agency or authority.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect on the 90th day.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 10491.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

The Clerk will read.

THE CLERK:  Assembly No. A09193-B, Calendar No. 560, Rozic.  An act to amend the General Business Law, in relation to fraud in connection with an abnormal disruption of the market.

ACTING SPEAKER AUBRY:  On a motion by Ms. Rozic, the Senate bill is before the House.  The Senate bill is advanced.

An explanation is requested, Ms. Rozic.

MS. ROZIC:  Thank you, Mr. Speaker.  This bill amends the General Business Law, and the General Business Law's 349 New York's Deceptive Acts Law, protect consumers and others from deceptive acts and practices.  It's one of the States's primary and most-often used consumer protection laws.  Unlike the price gouging law, which is General Business Law Section 396R, the Deceptive Acts Law does not treat deceptive conduct differently if it is done during a time of emergency, and we have seen during this pandemic -- or we saw during this pandemic unscrupulous businesses trying to take advantage of consumers or other businesses because of the difficult economic and public health circumstances.  But the State does not have the authority to impose elevated fines associated with the price gouging law, so this bill will change that.  It helps ensure that any business that engages in deceptive conduct during a time of

173

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

emergency will be subject to stronger penalties, similar to the State's price gouging law, and the penalty will be up to 15,000 per violation, or three times the actual restitution needed, whichever is greater.  It also gives the Attorney General authority to make regulations reasonably necessary to implement this act.

ACTING SPEAKER AUBRY:  Mr. Mikulin.

MR. MIKULIN:  Thank you.  Will the sponsor yield?

ACTING SPEAKER AUBRY:  Ms. Rozic will yield.

MS. ROZIC:  Yes.

MR. MIKULIN:  Just a few very short questions here. First, we talk about abnormal changes in -- or disruption of the market.  Can you explain that further?

MS. ROZIC:  Sure.  So for the purpose of this bill, the phrase "abnormal disruption of the market" as defined in the bill shall mean any change in the market, whether actual or imminently threatened resulting from stress of weather, convulsion of nature, failure or shortage of electric power or other source of energy, strike, civil disorder, war, military action, national or local emergency, or other cause of an abnormal disruption of the market which results in the declaration of a state of emergency by the Governor.  It is similarly reflective of the price gouging law.

MR. MIKULIN:  And when we talk about state of emergency, what specifically -- could it be a local emergency as well, or would that just apply to the local locality?

MS. ROZIC:  This bill just says that the declaration

174

**NYS ASSEMBLY**                                **JUNE 1, 2022**

of a state of emergency by the Governor.

MR. MIKULIN:  Okay.  And when we talk about State of emergency, we're talking about the pandemic, correct?

MS. ROZIC:  A pandemic would be included in that.

MR. MIKULIN:  So isn't it true that we're in a state of emergency right now because of the pandemic?

MS. ROZIC:  As long as the Governor has declared it a state of emergency, it would be covered by this.

MR. MIKULIN:  So we could particularly have a continued state of emergency in this State, correct?

MS. ROZIC:  Say that a little louder, I couldn't hear you.

MR. MIKULIN:  We could have a continued state of emergency then?

MS. ROZIC:  We are still currently in a state of emergency according to the Governor.

MR. MIKULIN:  With -- according to -- with almost no means to -- we don't know when this is even going to end, this could go on for years.

MS. ROZIC:  That's not up to me.  That's not spoken for in this bill, but I can tell you without an actively declared state of emergency, there would be no abnormal disruption in the market required to trigger the bill.

MR. MIKULIN:  Thank you so very much.

On the bill.

175

**NYS ASSEMBLY**                              **JUNE 1, 2022**

ACTING SPEAKER GIBBS:  On the bill.

MR. MIKULIN:  I think this bill is very
well-intentioned, but unfortunately as we've seen over the past two
years, we are in a continued state of emergency, especially when it
comes down to COVID.  Now, in the beginning there was more of a
disruption of the market as we all saw, but now we have come to a
since of normalcy and I do believe that this is giving too much power
to the Governor and for that reason, I'm going to be in the negative
and I hope my colleagues do the same.  Thank you.

ACTING SPEAKER GIBBS:  Read the last section.

THE CLERK:  This act shall take effect on the 30th
day.

ACTING SPEAKER GIBBS:  The Clerk will record
the vote on Assembly Bill -- - excuse me, Senate Bill 4954-C.  This is
a Party vote.  Any member who wishes to be recorded as an exception
to the Conference position is reminded to contact the Majority or
Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, Mr. Speaker.  The
Republican Conference is generally opposed to this legislation.  Those
who support it are certainly encouraged to vote yes on the floor or by
contacting the Minority Leader's Office.  Thank you.

ACTING SPEAKER GIBBS:  Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, sir.  The
Majority Conference is going to be in favor of this piece of legislation;

however, there may be a few that would like to be an exception.  They should feel free to contact the Majority Leader's Office, we will make sure their vote is properly recorded.  Thank you, sir.

(The Clerk recorded the vote.)

ACTING SPEAKER GIBBS:  Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 8, Rules Report No. 270, the Clerk will read.

THE CLERK:  Assembly No. A10188-A, Rules Report No. 270, Committee on Rules (Pheffer Amato).  An act to amend the Environmental Conservation Law, in relation to the filling of borrow pits in Jamaica Bay; to amend Chapter 288 of the Laws of 2014 amending the Environmental Conservation Law relating to the filling of borrow pits in Jamaica Bay, in relation to making the provisions of such chapter permanent; in relation to directing the Department of Environmental Conservation to conduct a study on ecological restoration needs in Jamaica Bay; and providing for the repeal of certain provisions upon expiration thereof.

ACTING SPEAKER GIBBS:  On a motion by the Senate bill is before the House -- oh.  On behalf of Member Pheffer Amato, the Senate bill is before the House.  The Senate bill is advanced.  An explanation has been requested.

MS. PHEFFER AMATO:  Thank you, Mr. Speaker. This bill will raise the standards of fill that is put into Jamaica Bay, an

177

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

18,000 square acre of beautiful natural resources located within my
community.

        ACTING SPEAKER GIBBS:  Mr. Goodell.

        MR. GOODELL:  Thank you, Mr. Speaker.  Would
the sponsor yield?

        ACTING SPEAKER GIBBS:  Will the sponsor
yield?

        MS. PHEFFER AMATO:  Absolutely.

        ACTING SPEAKER GIBBS:  The sponsor yields,
sir.

        MR. GOODELL:  Thank you very much.  I see that
this bill has been vetoed several times -- passed this Assembly several
times and been vetoed by the Governor several times, including in
2014, '16, looks like '18 and '20.  Has the language of the bill been
amended or have the Governor's concerns been addressed?

        MS. PHEFFER AMATO:  The bill has been amended
from the times it was vetoed.  It's actually having a sunset, it would
expire at the end of this month, and we have amended the bill to
include a study to look at long-term plans for the Jamaica Bay area, in
addition to raising the level of checking on the contaminants that
would be in the fill that goes into the borrow pits.

        MR. GOODELL:  And am I correct that under the
current version --

        MS. PHEFFER AMATO:  I'm sorry, can you...

        MR. GOODELL:  Am I correct that under the current

version if the dredged material tests relatively clean that it would qualify for unlimited ocean deposition, doesn't have any high levels of contamination and wouldn't cause any short-term or long-term pollution issues it can be used; is that correct?

MS. PHEFFER-AMATO:  Correct.  In the last 100 years, the Bay, with its local stewards, have made the waters in the Bay the cleanest it's been in 100 years.  We've actually had our first seal this year.  So you know, it's a wetland, it's growing, it's vibrant, it's an economical engine for our community, and the goal is to make it as clean as possible.  We understand there could be borrow pits and they do put dredge in, but we want the highest level of testing for the least amount of contaminants.

MR. GOODELL:  Thank you very much, and I appreciate those clarifications.

On the bill, sir.

ACTING SPEAKER GIBBS:  On the bill.

MR. GOODELL:  Thank you.  As is often the case with legislation that we address here in the House, we're doing a balancing act.  The Jamaica Bay area from time to time needs to be dredged for navigational purposes, and there are some deep pits in Jamaica Bay that were created a long time ago when people took fill material out of the Bay and used it on land.  It's much less expensive to use the dredged material that's nearby to fill those pits some than it is to take it out into the ocean.  And so if you're only looking at the cost of the dredging to maintain navigation, you'd say, *Well, let's fill in*

*these pits that are nearby*.

The sponsor correctly, I believe, strikes the right balance by saying, *Yeah, you can do that, but you first have to establish that the dredged materials we're putting in there meet environmental standards, are not highly toxic, won't cause either short-term or long-term environmental issues*. And so I think it's the right balance and for that reason, I would recommend it to my colleagues, and I would also recommend it to the Governor. Thank you.

ACTING SPEAKER GIBBS:  Ms. Pheffer Amato.

MS. PHEFFER AMATO:  On the bill.

ACTING SPEAKER GIBBS:  On the bill.

MS. PHEFFER AMATO:  Jamaica Bay is an 18,000 thousand acre wetland estuary surrounded by the Rockaway Peninsula; to the South, Brooklyn -- and South to Brooklyn and Queens to the East.  It is a beautiful jewel of New York City.  You have to -- you have to come see what it looks like.  It has, you know, water sports, families, fish life is going, there's diving in the water, it's just beautiful.  Unfortunately, previous administrations have not recognized the fact that we must preserve our natural habitats, that we must preserve areas in our communities that we allow dumping for and to a reason.  And thank you to my colleague for pointing out the balance that we need to have.

But after all, in this State we've invested so much money to make our waters clean that in our local communities, we

have to acknowledge that the work that we've done as local environmentalists, stewards of our own backyards, that the State has to recognize that we have to limit the amount of contaminants that are literally in our backyard.  So I want to thank you for the opportunity to speak on this bill and ask everyone for their support.  Thank you.

ACTING SPEAKER GIBBS:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER GIBBS:  The Clerk will record the vote on Senate 886 -- excuse me, 8816-A.  This is a fast roll call. Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Mr. Englebright to explain her vote.

MR. ENGLEBRIGHT:  Thank you, Mr. Speaker.  I want to commend the sponsor.  Jamaica Bay is the largest of all of the semi-restricted bays around Long Island.  It was the original settlement of Long Island by the Dutch who looked at it and saw the beautiful marshes there and said this is just like where we came from in Holland in the 1600s.  Unfortunately in the early part of the last Century, Jamaica Bay was just spoiled by dredge and fill operations. We lost 25,000 acres of fringing marsh.  Much of that was due to extraction from the Bay bottom and placed the sediments upon the living marsh.

This measure is very thoughtful.  It will improve the

water chemistry of the harbor.  The main reason for that is that the deep borrow pits will be leveled.  The anoxic conditions at the bottom of the pits will be removed, and the resident's time of pollutants entering the estuary will be reduced.  This is a very wise and thoughtful measure.  It's good for the environment, it's good for the people of the City of New York who are the main constituents who will be benefitting.  I congratulate, again, the sponsor, and I vote aye.

ACTING SPEAKER GIBBS:  Mr. Englebright in the affirmative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 10, Rules Report No. 313, the Clerk will read.

THE CLERK:  Assembly No. A07865-A, Rules Report No. 313, Fahy, Wallace, Otis, Griffin, Sillitti, Lupardo, McDonald, Paulin, O'Donnell, Jacobson, Woerner, Abinanti, Stirpe, McMahon, Lunsford, Thiele, Zebrowski, Conrad, Burdick, Carroll, Glick, Solages, L. Rosenthal, Stern, Ramos, Cymbrowitz.  An act to amend the General Business Law, in relation to requiring social media networks to provide and maintain mechanisms for reporting hateful conduct on their platform.

ACTING SPEAKER GIBBS:  An explanation has been requested.

MS. FAHY:  On the bill, Mr. Speaker, is in 7865, again, and this is a bill that would -- actually originated a year ago

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

after the insurrection in the Capitol and given a number of issues with the social media networks and the problems that we have seen with people conduct and violence being portrayed and posted on social media.  It would now -- this bill would require a clear and concise policy regarding how social media platforms or networks would respond to incidences of hateful conduct on their platforms, as well as have them -- require them to maintain an easily accessible mechanism for reporting that conduct on the platforms.  It doesn't tell them how, it just lays out that they -- they must have one.  And let me just add that part of this is we need help.  We have seen the Governor talk about setting up a task force and turning -- a task force and turning to the AG for assistance with better monitoring and warning signs on social media, but we also are reminded that an estimated 4.75 billion, 4.75 billion posts are made every day on social media and that's just an estimate.  So we need help.  We need these -- these networks helping us to monitor and providing individuals a vehicle for recording hateful and violent intended conduct.

                    Thank you.

                    ACTING SPEAKER GIBBS:  Mr. Durso.

                    MR. DURSO:  Thank you, Mr. Speaker.  Thank you, Mr. Speaker.  Would the sponsor yield?

                    ACTING SPEAKER GIBBS:  Will the sponsor yield?

                    MS. FAHY:  Sure.

                    ACTING SPEAKER GIBBS:  Yes.

                    183

NYS ASSEMBLY                                    JUNE 1, 2022

MR. DURSO:  Thank you, Ms. Fahy.  I just have a couple of questions for you.  So, going towards the bill it says -- really what does the bill define as social media network?  So will it just be something like a Facebook, Instagram or will it also include private messaging apps such as WhatsApp or Signal or any other private messaging applications?

MS. FAHY:  It -- it could include -- it really is the -- the providers.  And we -- we do include a definition, it's very brief.  I'll just -- I'll just read it.  A network is a provider for profit-making purposes that operates internet platforms that are designed to enable users to share content with other users or to make that content available to the public.  So I think one of your examples may not apply here.

MR. DURSO:  Okay.

MS. FAHY:  It would be -- it would be those that are shared with the public.

MR. DURSO:  So -- so not so much a private messaging app between me and someone else, but anything that could be viewed by the public.

MS. FAHY:  Yes.

MR. DURSO:  So would that include our Assembly website, for instance?

MS. FAHY:  If the website, where you can post on it, I don't think --

MR. DURSO:  Well, on our -- I'm sorry, go ahead.  I

184

apologize.

MS. FAHY:  I don't -- I'm not sure the public can access our website.  We make posts on there but I don't know if our actual website would be applicable here since it's -- it's not -- well, it's available to -- well, I guess -- oh, I don't know, I think the -- a website, it's -- it's not an exchange, that's just a website.  But I -- I --

MR. DURSO:  Well, I think I can ask you a more specific question about it, if that's okay.

MS. FAHY:  Yeah, sure.

MR. DURSO:  So, on -- on our Assembly website, so if you look up, say, for instance, my Assembly page there'll be things posted up there from certain events that we do, whether they're here in the Capitol or in the district.  Would then the website from the Assembly, whether my -- you know, my specific page, yours, anybody else in the Chamber, would that constitute a social media website?

MS. FAHY:  I don't think it meets this type of definition on social media conduct, but a social media network. However, I will say our website is already closely monitored, just as our newsletters are.  All of those are vetted before any of our video clips are put up.  Everything is vetted.  So we -- we do monitor.  We certainly have a recording mechanism since all of our contact information is available, but -- but I'm not sure we meet the definition of a social media network.

MR. DURSO:  Okay.  All right.  Well, I'm sure I'll come back to that.

185

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

MS. FAHY:  Sure.

MR. DURSO:  So just in regards to in the -- the summary of the bill, there's parts -- the term "hateful conduct" is defined to mean the use of social media network, vilify, humiliate, incite violence against a group or class or persons on the base of race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression.  I just wanted to get through all the pieces.  The -- the first two that I want to specifically jump on are "vilify" and "humiliate."  Could you explain to me in regards to the bill what those mean specifically?  Because they may have a different meaning to you or to me than they may have to somebody else.  So, in regards to this bill, what does vilify, humiliate mean?

MS. FAHY:  Again, we have it in as -- it's -- it's an explanation of what hateful conduct would be.  So I think it would mean vilify or humiliate as a part of a hateful conduct against any of the groups or classes of persons that are listed.  So I think, again, it is -- it is intended with that type of conduct, and as you see in that same phrase it says "or incite violence."  So it's all along that same trajectory, if you will, of hateful conduct which -- which is done by vilifying, humiliating or inciting violence.  So it's -- it's somewhat modifying violence term there as well.

MR. DURSO:  Got it.  All right.

MS. FAHY:  Against any of those groups listed.

MR. DURSO:  And -- and -- and listen, I -- I want to

186

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

say this up front.  I totally agree with you when it comes to social media networks, anybody inciting violence or against a group or class of persons or anybody because of their race or gender, sexual orientation, I 100 percent agree.  So I'm not disagreeing with you on that portion.  My -- my concern is with those two words because again, what might humiliate me or might humiliate somebody else may be different to each person.  So if I have my website up or -- or my social media or my Facebook or my Instagram and I'm wearing a shirt that says "Vote Republican", right, and -- and somebody -- I'm -- I'm just throwing it out there, some might -- might think that that's humiliating or vilifying me.  Somebody else may be vilifying people in general and they could hit a report button, which we'll get into in a moment.  Would that constitute someone hitting a report button and then what would be the answer to that?

        MS. FAHY:  Again, I don't think that would fall under the -- the primary definition which is hateful conduct and, you know, we have an explicit provision in here that this is not intended to hinder or violate any free speech rights that -- that one has.  And again, keep in mind that this is against a group or class of persons.  So I -- I think some of these things will get defined in the regs, but keep in mind it really is hateful toward that violent conduct.  That's what we're after.  With 4.7 billion posts a day, a day, you know, we need help, and certainly it is the most egregious ones that we unfortunately too often find out about after the fact.  So the intent here is to be proactive, not -- not as reactive as -- as has been the case in too many

horrific incidences of -- of violence.

MR. DURSO:  And I would -- I would totally agree with you and I understand.  My -- my concern with that is it's very broad language and that -- and again, totally agree with you when it comes to great groups, hate speech, inciting any type of violence.  Just with the words humiliate and vilify, again, everybody could take those, you know, it -- how they define them, how they feel.  What, again, might humiliate you may not humiliate me, so if someone reports it and let's just say Facebook was to take it down because you reported saying that you're humiliated by my actions or something that I'm doing upsets you, that is hindering my free speech even though it is nothing that is attacking a group, a race, anybody upon their sexual orientation or gender or anything like that.

But let me move on to a couple of more questions.

MS. FAHY:  Sure.

MR. DURSO:  As far as the social media outlets that are out there now, most of them do have a report button or -- or some way to report these types of behaviors, correct?

MS. FAHY:  Most have gotten better.  Some of the more traditional ones that we've known of, certainly, to use Twitter as an example, they have gotten better at least until maybe Elon Musk buys it.  But -- but so far they've -- they've I have noticed a change in the last couple of years.  But as came to light after one of the most recent horrific massacres, there is a whole host of social media platforms, it seems as if there's a new one every day and it's very hard

NYS ASSEMBLY                                    JUNE 1, 2022

to keep up with those.  So -- so yes, I think we've seen some efforts,

and certainly Facebook, as you know, has been taken to court a

number of times on this.  So -- so we're seeing progress there.  But this

makes sure it is a clear and concise policy that is noted and a

recording mechanism.  So it's really -- it -- it's laying out something a

-- a little more, again, in a -- in a proactive manner and charging the

AG with this.  The Governor, as you know, has just assigned a task

force on this.  But it's -- it's too monumental.  We need the private

sector working with us on this.

        MR. DURSO:  Okay.  Understood.  So -- so going

back to what you just said, the mechanism and the report button.  So if

there's a report button on every social media website and there's

hateful conduct or something that may incite violence or be

humiliating, they will report it.  Now, New York State, right, we're

here.  If a social media site is ran out of another state, so you say

California or Oklahoma or Florida, how are we going to regulate what

they do with their social media company that's in another state?

        MS. FAHY:  If they're conducting business here, if

they have a footprint here, my sense is they will fall under this.  Some

of that will have to be determined.  But we ran into this with the net

neutrality bill a number of years ago when the FTC was threatening to

eliminate net neutrality and -- and there are ways to make sure that if

they're doing business here that they have to comply by our rules.  So,

again, this is something that will have to be worked out.  But certainly,

most of the major companies have a -- if not a physical footprint, they

                                    189

certainly are being used by residents here.  So we -- we think it would be applicable and some of this will have to be hashed out, some of this may end up in the courts as -- as our gun liability bill did from last year.

MR. DURSO:  Okay.  So, as -- as of right now, right, so -- I'm -- I'm not going to sit here and act like I know about all of these social media companies, I'm not --

MS. FAHY:  Right.

MR. DURSO:  -- as tech savvy as I probably should be.  But a company that is based out of California right now, we put these regulations in place, right, saying they have to have a report button, they have to have a -- a mechanism in place to be able to report this type of conduct and they don't do it.  How can New York State find them if they're not here?

MS. FAHY:  You know, again, that will be up to the Attorney General.  She's -- she is granted the enforcement authority here and -- and if need be to issue -- the ability to issue subpoenas. What she can do across state lines, you used California as an example, she's -- she's worked very closely with -- with the Attorney General there, and certainly most of these platforms are available around the world.  So, you know, those are issues that are going to have to be worked out.  I would hope in conjunction with other states, but that -- that -- again, they may be challenged and if so, the courts will -- will settle it.  But we think that if they -- if they have a presence, if it's being used here and they have paying customers or paying advertisers

on those platforms, they have a -- a base here in this State.  So I'd like to think, you know, our -- our understanding is it will have a reach.

MR. DURSO:  Okay.  And then that will just bring me into one of my final questions because you actually brought it up.  So if there's a company that's based outside of the United States.  Does the Attorney General really have the authority to go that far with it or should this be more of a Federal issue?  Maybe we should be lobbying Congress at this point to maybe take over a bill somewhat like this.  I mean, it -- it -- do we have that far-reaching effect here in New York State?

MS. FAHY:  To be perfectly, you know, realistic here, obviously that's harder, right?  And again, just trying to keep up with Facebook, if you just think of Facebook, again, with billions, billions of posts every day, this is a monumental task.  So I think this is just the start, and clearly we'll be -- we will be relying on the cooperation of -- of the social media networks to set up that policy and to -- to begin to better monitor.  And then we don't have a -- a bashful Attorney General and we recognize the -- the correlation.  Estimates are that 80 percent of mass shooters have shown signs of crisis, and about one-half of that 80 percent have estimated to have revealed their plans ahead of time by a social media post.  So we know we have an issue.  We know we need more tools to address it.  Overseas will clearly be -- harder platforms that are operated overseas will -- will clearly be a more challenging task.  But certainly -- certainly we know we have a problem and it's not just -- it -- it's not just confined to New

191

York.

MR. DURSO:  Okay.  Thank you, Ms. Fahy.  I
appreciate all your time.

MS. FAHY:  Thank you.

MR. DURSO:  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Mr. Ra.

MR. RA:  Thank -- thank you, Mr. Speaker.  Will the
sponsor yield?

ACTING SPEAKER AUBRY:  Ms. Fahy, will you
yield?

MS. FAHY:  Sure.  Happy to.

ACTING SPEAKER AUBRY:  Ms. Fahy yields, sir.

MR. RA:  Thank you very much.  And certainly I
appreciate your -- your effort with regard to, you know, this issue and
it's something that I think -- it's tricky, right?  It's -- we're trying to
address something that has, you know, some Federal law, obviously,
potentially triggering constitutional provisions, and different states are
different -- doing different things and -- and that's I think one of the,
you know, concerns.  But I was just reading one of the -- the memos
from the NYCLU regarding this, and, you know, I think we all know
that like we have a First Amendment right to speak and all that, but
there's a level at which, you know, you cause danger or -- or
something like that.  So I guess really the -- the question is, you know,
with this -- this language that's in the bill, how do we ensure that we
don't have, you know, the unintended consequence that, you know, a

social media entity now regulates past what we're trying -- you know,

we're trying to get at that really dangerous, hateful conduct that can

incite violence, all of that.  But how do we make sure that they don't

use this as an opportunity to say certain, you know, speech may be

political in nature on one side or the other and -- and cut down on that

type of speech?

        MS. FAHY:  Again, we agree this is tricky.  This is

an area that, you know, we are -- we are venturing into territory that --

that has been tried before, and I think there's been some hesitancy

because all of us value the -- the right of free speech.  We do, again,

add in here that nothing is intended to hinder that.  At the same time,

we know -- and -- and nothing is intended to increase the liability of

these social media platforms.  But we know we have an issue.  We

know violent offenders are too often posting, and again, we are trying

to keep this focused on hateful conduct leading to or is trying to incite

-- we have the word incite violence there -- and it is against a group or

class of persons based on the -- the definition that was read earlier, so

based on a whole host of -- of categories you -- you're quite familiar

with.  And so there is an effort to draw that fine line, yet we've got to

have these social media companies working with us.  You know, the

-- the Attorney General could hire a thousand investigators tomorrow,

and without the cooperation of these platforms and without better

transparency we will not be able to get at this -- these violent

intentions or these violent incidences that are being posted.

        MR. RA:  And thank you.  And -- and I know that,

obviously, you know, we've had social media entities testify before Congress and, you know, trying to get at the heart of this issue and I and I -- and I really think that ultimately that's maybe where some solution lies if, you know, they can get themselves together.  We know getting anything in agreement in Congress is -- is tough these days.  But, you know, otherwise you end up with kind of like a shish kabob of all these different state laws.  They're all different.  You know, you have Texas who did something that is like very much I think can lead to great unintended consequences of just kind of anything goes.  But then you have obviously something like this that -- that I think could also lead to unintended consequences.  But I want to get to maybe the specifics there.  So, you know, they make a policy accessible to the user, right, and -- and I would think any major entity is just going to have to do this because obviously they're reaching New York just like they're reaching really worldwide, most of these platforms.  So to -- I mean, how detailed does this have to be?  Does it have to say something like, you know, once reported, where you will verify this within 24 hours, 48 hours and have it removed?  Does it have to go to the extent of we will follow-up with the person who has reported this?  Can -- can you give me like an idea of how detailed a policy we would expect under this?

MS. FAHY:  Sure.  Again, here a couple -- in a couple of places we do note that they -- they are required to have this policy but it is -- it is to be clear and concise.  And I think it -- the conciseness is important because we want it -- we don't, you know,

194

want ten paragraphs of policy that everybody just checks off and --
and doesn't read again as they're accessing -- as they're purchase -- as
they're purchasing things online.  So this is intended to be clear and
concise and readily available, as well as accessible on the website as
well as the ability to report.  We also include a provision that says that
the -- the social media networks themselves need to show how they
plan to respond.  But we have left this purposely open, if you will,
because we are leaving it up to them.  And as is often the case, the
larger providers, as were talked about earlier, Twitter and Facebook
have spent the last few years trying to navigate this, trying to better
monitor.  And we saw with the massacre in Buffalo -- I -- I don't know
if it was 4chan, I forget what platform that that massacre was being
filmed on -- it was taken down.  One took it down in ten minutes, the
others spent hours before they took down those videos and I'm sure
some are still out in the etherland.  So we know we've had mixed --
mixed success, and that's why we -- we contend we need to be more
assertive here and we've got to get them working with us and working
with the Attorney General.

          MR. RA:  Okay.  And then in terms of, you know, the
-- the civil penalty section, so is that civil penalty triggered -- the
violation would be not having a policy.  Could an entity have that, you
know, penalty triggered by their lack of action to something reported
to them or would it just be that they have to the proper mechanisms in
place for these things to be reported?

          MS. FAHY:  It -- it also includes a lack of action.  A

**NYS ASSEMBLY**                                              **JUNE 1, 2022**

failure to comply could trigger that.

MR. RA:  Okay.  So -- so theoretically, and -- and this I guess might be or is one of my concerns, is that, you know, somebody could -- well I guess it would -- the Attorney General would be the one enforcing this, correct?

MS. FAHY:  I'm sorry?

MR. RA:  The Attorney General would be the one enforcing it?

MS. FAHY:  Yes.

MR. RA:  So, you know, I -- I -- so, if the Attorney General say -- say something gets reported, the social media entity goes through their process, they say, *You know, we don't think this is, you know, violative of our -- of our policies.  We're -- we're okay with this.  It maybe pushes -- pushes the line but it doesn't quite cross it*, and they allow it to stay, potentially the -- the Attorney General could say, *No, I think this does go past that* and bring an action for violating this; is that correct?

MS. FAHY:  I think, again, in an effort to be proactive if that policy is published at the front end, that clear and concise policy and where it's agreed to, I think it -- it would presumably prevent some of that, you know, second guessing -- second guessing afterwards.  You know, so there's -- there's no penalty involved here for not reporting at this point.  It's, you know, we're not telling them what -- what the policy should be nor if -- if it's reported.  This is -- in so many ways these are just the first steps of really trying

196

to tackle -- tackle a -- a monster item with 4.75 billion posts every

day.  So these are -- you know, quite frankly, I think they're -- they're

small steps but we are wading into, as discussed, tricky territory with

trying to be respectful of free speech and trying to -- and trying to get

the assistance of the private sector because there is -- there -- we are

hindered.  We know from so many other violent incidences that were

online beforehand, Buffalo was far from the first, we know we need

more cooperation, we need better policies.  It's -- it's like the New

York City issue of *See Something, Say Something*.  It's -- we're trying

to encapsulate that but with social media.

MR. RA:  Thank you very much --

MS. FAHY:  Thank you.

MR. RA:  -- I appreciate your efforts with regard to --

to this issue.

Mr. Speaker, on the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. RA:  Just quickly, you know, we -- we do

certainly need to find ways to look at this issue.  A lot of, you know,

the Federal laws date back to the earlier days of the internet.  I don't

know when, you know, the first time people were using some of those

old search engines or doing whatever they were doing online, going to

these basic websites we ever contemplated the social media world we

live in now.  So certainly we're in a different day and -- and our laws

should -- should reflect that.  And -- and I think appropriately, you

know, a Federal policy that requires, you know, really neutral policies

by -- by social media operators I think would be more effective.  But -- but the whole point of that Federal law way back then was to kind of just allow the internet to kind of flourish and give kind of safe harbor so that operators weren't held liable for -- for things people posted.  And I think some way here where we need to get is that if the entity is making a good faith effort that there's not that potential for them to be second-guessed.  The problem is at the end of the day some human being, you know, they -- they're going to have their algorithms and things try to catch things which they all have.  And as any of us should realize when you go on any of these social media platforms there's -- there's an algorithm trying to make sure you see what they want -- what they want you to see, and -- and unfortunately in a lot of ways it ends up creating social media echo chambers because they're sending content that they think you're going to like and not necessarily that you think you're not going to like.  But my concern is that at some point there's going to be some person making a -- really a subjective determination about something, and -- and that's where we get into a really tricky area.

So I -- I know this is not an easy area to legislate, so I certainly appreciate you bringing this bill before us and I'm sure a lot of work went into getting this language before us.  And -- and I hope that it's a continued conversation because social medial outlets can be wonderful, but they can be absolutely awful at times, too, in terms of just people saying things that they would never say to somebody's face and certainly inciting, you know, hate and violence as well.  So, I -- I

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

thank the sponsor for answering my questions.  Thank you, Mr.
Speaker.

                    ACTING SPEAKER AUBRY:  Thank you.

                    Mr. Jensen.

                    MR. JENSEN:  Thank you very much, Mr. Speaker.
Will the sponsor yield for a few questions?

                    ACTING SPEAKER AUBRY:  Ms. Fahy, will you
yield?

                    MS. FAHY:  Sure.

                    ACTING SPEAKER AUBRY:  The sponsor yields.

                    MR. JENSEN:  Thank you very much.  I just want to
go in a little bit of a different direction than my -- my two colleagues
previously.  End of last week I was in a -- a community meeting trying
to address violence in the Greater Rochester area.  And representatives
from faith-based, community-based organizations who act as violence
interceptors in the community mentioned that they're seeing over the
past few years more and more individuals in the community using
social media, Facebook, as a way to threaten violence against other
people.  And they don't fall into the protected classes that you
mentioned in the bill, but yet they're still trying to incite violence and
incite hate because they're in a rival gang, a rival organization.  And
we've seen that with, you know, waving firearms, threatening people
directly, threatening witnesses.  There was a donnybrook in a Walmart
parking lot where somebody suffered gunshot wounds.  And I guess
my question is, would this cover those types of hateful conduct?

NYS ASSEMBLY                                        JUNE 1, 2022

Because I think if you're threatening to kill a witness to a crime, that's

pretty hateful.  Would that be covered even -- even though they're not

a protected class?

        MS. FAHY:  My reading of this -- yeah, that's an

excellent question.  Certainly, you know, this is targeted at groups or

classes of persons as were read before and I won't reread them.

        MR. JENSEN:  Yep.

        MS. FAHY:  If it's to purposely target a witness, to

take out a witness, if you will, of another crime, that is -- that is -- my

reading would say it's not covered here.

        MR. JENSEN:  It's not.

        MS. FAHY:  But maybe that's another bill.

        MR. JENSEN:  Yeah.

        MS. FAHY:  But certainly I -- I see your point.

Again, I'm -- I'm trying to be as frank as I can be.  This is -- these are

small steps to get at what is a monumental but difficult problem.  And

but we -- you know, again, this was initiated last year after January

6th.  Certainly we've had incident after incident.  We know we have to

begin somewhere.  But you raise an excellent point.  So -- but -- but if

the policy were there, nothing would preclude the social media

platform or network from adding that in.  You know, again, it's back

to the New York City version of *See Something, Say Something*, but

we're trying to do it online.

        MR. JENSEN:  Right.  And I -- and I think, you

know, one of the questions with that is I know Twitter has a much

more maybe stringent inciting violence and actual threat.  And so I guess, you know, Mr. Ra talked about this a little bit, that because of the vagueness of this legislation that we could have a cornucopia of different social media platforms having different rules for constituting what they have to have a policy for.  And while they may have to address taking it down or removing it from their platform, is there anything that would make them have to report those types of threats to law enforcement in the relevant jurisdiction rather than just removing the content from their platform?

MS. FAHY:  As -- as noted, we're -- we're not even telling them -- because we are just starting here, we're not even telling them what to do.  We're just saying that they -- they need to state how they would respond, we're not saying or address.  But we're not telling them how they would do that.  And again, I think these are the types of things, one, that are worked out in regs, but also worked out by the -- the bigger networks who have already spent the last few years trying to be more aggressive on this because of previous incidences.  And I think that will set the tone and lay out -- lay out some paths forward on this.

MR. JENSEN:  Okay.

MS. FAHY:  Is my sense.

MR. JENSEN:  Well, thank you very much.  I appreciate you answering my questions.

Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you, sir.

Mr. Otis.

MR. OTIS:  Thank you.  I'm going to speak on the bill and --

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. OTIS:  -- and I'm going to congratulate the sponsor of the bill for having the foresight to bring a concept that is a very important issue that we need to address.  But a lot of the discussion has been about things that are actually not in the bill.  This is a very simple bill.  This is a bill that basically raises the standard for social media sites to have a -- and I'll read the language -- *easily -- easily accessible mechanism to report hateful material*.  That's all the bill really does.  It -- it would have to report on they handle the complaints.  But what the bill does not do is the bill is not about the First Amendment, we don't tell the social media sites what they do, what -- what judgments they make.  It is not about the government telling social media sites what to keep up or what to take down.  And it's not very complicated.  What it does do is it sets up -- it doesn't -- doesn't tell them what their role should be.  What the bill does is basically say we want speed in getting hateful material down.  The site's going to figure out what material on their own policies they're going to take down or they're going to keep up.  But as the sponsor alluded to, in the evil that occurred in Buffalo, it was posted live by the killer and then reposted on other sites, sometimes for hours and hours, and the sponsor speculated that maybe it's still up in some places.  And so what we want to do is we want to make it as easy as

202

possible for people that see this to report it to the site, and at a certain point these sites are going to have to look at their own morality and their own conscience and -- and decide what their policies are going to be.  And maybe some of these other more complicated judgments and issues are going to be handled in other legislation or by the Federal government, but that's not what this bill does.  This bill simply says we have to have a clear, quick way that the public can report stuff that they -- they think violates their sense of what hateful speech is.

So compliments to the sponsor.  She came up with -- with this bill a while ago, but we've seen it in real life in -- in Buffalo and other places around the country.  This is a bill everybody should support.  Some of these other issues, they're for arguments about other bills that aren't before us today.

Thank you.  I'll be voting aye.

ACTING SPEAKER AUBRY:  Thank you, sir.

Mr. Lawler.

MR. LAWLER:  Thank you, Mr. Speaker.  Will the sponsor yield?

ACTING SPEAKER AUBRY:  Ms. Fahy, will you yield?

MS. FAHY:  Sure.

ACTING SPEAKER AUBRY:  Ms. Fahy yields, sir.

MR. LAWLER:  Thank you.  So, former Supreme Court Justice Antonin Scalia in talking about the First Amendment basically said that the principal role of the Court in the area of civil

liberties is to prevent the government from backsliding in its
protections of long-recognized personal liberties.  Obviously, this
dynamic is in many respects a very new front in the -- in the First
Amendment fight.  And -- and I think as we've seen, the First
Amendment is not absolute.  There are certain things that you cannot
say or do that -- and especially in threatening violence or -- or harm to
others.  And I think when we look at that I think obviously it's
incumbent upon not just social media companies, but across the
spectrum to ensure that those types of hateful rhetoric do not occur.
Where I do get concerned is that we're seeing in other states kind of
the -- the converse here where they're saying that social media
companies cannot try to sensor predominantly political speech and
political thought.  And certainly it appears at times that certain
political parties and/or elected officials are more regulated or looked
at than others.  The Supreme Court has basically upheld -- allowed
Texas' law to go forward.  Isn't this something that maybe needs to be
dealt with Federally as opposed to a state-by-state-by-state basis given
obviously the fact that the internet is global and not just operating in --
in one little area of the world?

                MS. FAHY:  As with so much legislation we do here,
as with so many bills especially this week and talking about a number
of gun measures, we absolutely would like to see more work done at
the Federal level.  I mentioned the net neutrality bill I had a few years
ago.  Certainly -- certainly we would like to see more done there, but
we know no secret of the paralysis as well in Washington and -- and

we can't wait, right?  This was our backyard.  And -- and Buffalo was far from the first where 180 pages were posted on social media with lots of violence posted within those 180 pages, and yet, you know, could a law like this or a bill like this have prevented that?  We don't know.  But we know we need to do more and we need more transparency.  And so it's a matter of do we wait or do we not for the Feds and I say we don't.  We've got to start.  And quite frankly, I think we're going to have more -- more cooperation given the -- the horrors of the last two weeks, let alone of almost daily violence.  And -- and the use, the explosive -- in 2020 the U.S. State Department issued -- issued a -- a study saying racist violence is both on the, quote, "on the rise and spreading geographically", end quote, as White supremacists increasingly target minority groups like immigrants, ethnic minorities, LGBTQ and other, quote, "perceived enemies".  So, you know, we've -- we can't wait is the simple answer.

MR. LAWLER:  I think all of us probably in this Chamber have some social media accounts, whether we're active or not.  But I'm -- I'm sure everybody here has an account.  And, you know, as -- as Liza Minelli once saying, you know, *If I can make it here I can make it anywhere*.  Obviously, New York is rough and tumble.  It is -- you know, politics can be -- can be rough.  All of us, I'm sure, have gotten notifications of some of the most outrageous things that have been said about each of us.  And I think the -- the question that I have is, you know, look, obviously anyone who is a racist or bigoted or homophobic or attacking somebody else because

**NYS ASSEMBLY**                                        **JUNE 1, 2022**

of who they are, that is a -- that is a problem.  It's a societal problem

that we have to -- to continue to combat.  But I guess the question is,

you know, many of us, I'm sure at times, like I said, have been called

some of the worst things.  I've been called a fascist.  I didn't know that

-- that my views were so reprehensible, but, you know, does that incite

hate?  Does that incite violence?  Like, who is supposed to regulate

this?  Who is supposed to make the determination?  And I know as my

colleague said that this bill is not saying what they should do, but like

where's the line in your mind as to what should be regulated versus

what should be not?  Should -- should people on social media be

allowed to say things about their elected officials?  You know, we've

seen elected officials be compared to -- to Hitler, to, you know, et

cetera.  I mean, where -- where is that line that you're looking for to

stop that hatred, stop that violence from occurring?

        MS. FAHY:  It -- first of all, you know, we're, again,

and being as frank as I can be, we are -- we are taking some very small

steps here, right, to try to be proactive.  Once again, government is

trying to catch up with technology.  And -- and we're -- what we're

asking in this case, we're asking those technology companies, in this

case social media networks, to assist us.  We cannot -- we could not

with a thousand enforcement officers tomorrow assigned to this, there

is no way we could do this through -- through government.  We need

that assistance with that reporting and the -- the mechanism -- well,

sorry -- the monitoring on the part of the -- the company itself and

then the mechanism for making it easily reportable.  We're not telling

them what the next step is.  We don't say they be fined if -- we're not saying what they have to do with it other than to show us how they would respond and address it.  So these are small steps.  But it is an effort because I -- because of that recognition.  So regulation, it's a -- we're not regulating at this point, we are -- we are empowering, however, the Attorney General to -- to follow through and make sure that companies are complying.  Or -- or enabling her to fine where they are not complying.

MR. LAWLER:  But if we're saying that they need to come up with some mechanism to report and they need to let us know how they may respond to hateful conduct, what if their response is, you know, that they're not going to remove it?  That's a response.  I mean, so the Attorney General is going to be able to go after them for not removing what she deems hateful?

MS. FAHY:  This does not empower her in that regard.  Again, that may be other legislation, but -- but this does not -- unfortunately, does not empower her.  But I think some of this is the morality of -- of the situation.  What we are trying to go after here, again, with billions of posts every day, we really are trying to target this on inciting violence.  The -- the hateful conduct moving toward that inciting of violence, right?  So it's a -- it's a -- it's a higher threshold than just calling you a name or calling me a name.  We've all been called names here.  But it's -- it's moving toward that inciting of violence, the hateful conduct --

MR. LAWLER:  Well --

MS. FAHY:  -- moving toward violence toward targeted classes of people.

MR. LAWLER:  I -- I think where some of the concern is and -- and the New York Civil Liberties Union raised, obviously, the issue of this be -- this bill being preempted by Federal law and potentially presenting a First Amendment problem, but really the definition of hateful conduct being quite vague, and where we say vilify, humiliate or incite violence.  So it's not just the violence part, it's vilifying and humiliating.  So the -- the -- it's not and, it's or.  So I guess the question becomes who's coming up with the definition of vilify or humiliate, which is part of what my colleague was asking at the beginning.  This is, you know, your definition of what it is to vilify somebody, you know, let's say I posted a picture of somebody wearing a fanny pack and -- and, you know, made a joke about it, right?  Like, that may be vilifying somebody or -- or humiliating them.  But what is kind of the -- what's the definition?  Who -- who is going to decide that?

MS. FAHY:  Again, this would be -- you know, this would be a -- laid with the Attorney General.  And I -- the way this is read it really is, in my view, it's -- it's the -- the whole phrase of -- it's -- it's hateful conduct using social media networks to vilify, humiliate or incite violence.  I still think it's all -- it's all -- you could read it as modifying violence, hateful conduct modifying the violence is one read of it.  Humiliating somebody -- again, with billions of posts every day, I don't think the Attorney General is looking for posts that may

hurt your feelings or humiliate -- you know, different people may be humiliated with different things.  It really is leaning toward that hateful conduct and leading toward violence.  I mean, that's what -- that's what we're really trying to get at.  That's the pattern that we are seeing all too repeatedly, repeatedly with the -- the profiles that have been done of mass murderers.

     MR. LAWLER:  So -- so the intent is not so much to go after political speech, but just --

     MS. FAHY:  No.

     MR. LAWLER:  -- but to go after those who would use social media platforms to suggest that others, you know, commit violent acts or -- or suggest that they are going to commit violent acts?

     MS. FAHY:  That's more how I read it.  Again, I think that word inciting violence is -- is probably the key word here. And I think we need a high threshold, right?  We want -- we want these networks working, cooperating.  We want them having that clear and concise policy of -- of what they're monitoring, but we also want that reporting mechanism.  Again, we -- what I've read, *See Something, Say Something* in New York City has been somewhat effective, right?  The airports use it.  It's -- it's -- it's been -- so this is -- in my view, this is similar to that.  We are looking for that assistance. In New York City it's from the public, here it is from the social media platforms because there is no way any government entity can monitor billions upon billions of posts every day.

     MR. LAWLER:  Oh, I -- I agree with that.

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

MS. FAHY:  So I see it as a high threshold.

MR. LAWLER:  I agree with that.  I think some of the concern really as we've seen over the last couple years, I mean, I -- I -- personally, I think social media is generally toxic.

MS. FAHY:  Yes.

MR. LAWLER:  It -- it is -- there's very few positive things on it.  You know, people are just keyboard warriors.  You know, they're -- they're happy to attack.  Many of the things that people would say on social media they'd never say to your face.

MS. FAHY:  Yes.

MR. LAWLER:  So it -- it's -- I think generally speaking it -- it -- it's become a very toxic component to our political discourse.  I don't think there's many intelligent discussions on social media.  It is a lot of echo chambering group thinking and people just wanting to reinforce their own perspectives.  And frankly, I think the way the social media companies have operated with their algorithms, they feed into that.

MS. FAHY:  Yes.

MR. LAWLER:  So that I think is something that does need to be looked at and -- and regulated from a Federal perspective.  I do have concern about state-by-state-by-state trying to regulate something that really crosses state boundaries.  And I think also there is a problem where some of these social media companies are not consistent in how they apply their own internal rules with respect to vilifying, humiliating or inciting violence.  They seem to be

210

okay when things are said about certain people or groups and obviously not when things are said about others.  We should be consistent in having zero tolerance for anyone inciting violence in any way, whether it's storming a capitol, whether it is taking control of a Federal courthouse for, you know, nearly 100 days.  There should be no tolerance for any of it.  And I -- and I think that's where there has been --

(Buzzer sounds)

-- a lack of consistency across the board on this.

ACTING SPEAKER AUBRY:  Mr. Lawler, you have expended your time.

MR. LAWLER:  Happily.

ACTING SPEAKER AUBRY:  Thank you.

MS. FAHY:  If -- if I could just add on -- on the bill and in response.  We fully agree on everything you mentioned, and yes, social media has become quite toxic.  I would make one exception to that, and that is I don't believe we can wait on the Federal government anymore before we can more proactively require the media companies themselves to do this and begin to work to monitor them.

ACTING SPEAKER AUBRY:  Mr. Angelino.

MR. ANGELINO:  Thank you, Mr. Speaker.  Will the Madam sponsor yield for a couple of questions?

ACTING SPEAKER AUBRY:  Ms. Fahy, will you yield?

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

MS. FAHY:  Sure.

ACTING SPEAKER AUBRY:  Ms. Fahy yields.

MR. ANGELINO:  Thank you, sir.  Thank you very much for indulging me with a couple of quick questions.  I have some grave concerns about First Amendment rights with this, and I think many in my Caucus do.  Maybe you can help alleviate some of that because I agree this is sometimes, as my colleague in front just said, it can really get inciteful at times.  I'm reading paragraph A -- excuse me, -- yes, it's paragraph A, the classes of people based on race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender or gender expression.  Would this include -- a buzz thing happening right now is gender pronouns.  Would that be something that -- is that inciteful or humiliating (inaudible) this bill?

MS. FAHY:  I'm not the Attorney General, but I don't -- I don't read it as -- that as hateful conduct nor as any ability to lead toward inciting violence.

MR. ANGELINO:  We -- we've seen recently a lot of that is being used right now for -- against -- the big case was a high school student who refused and said it was his right to use a different pronoun.  But another case, and it's not covered on here and it can get quite -- quite heated is debate on sports teams, and that language can sometimes turn into, *We're gonna -- we're gonna murder you* or things like that.  These aren't going to trigger some sort of algorithm on a website page and say, *Oh, my gosh, you know, red flag this guy.*

MS. FAHY:  Quite frankly, again, since they -- many

212

social media platforms have become quite sophisticated and quite proficient at creating algorithms.  I would think if somebody is talking about the murder of any group or class of individuals that it would trigger a minimum reporting mechanism.

MR. ANGELINO:  I know I have been on veterans' chat groups we were talking about the problem of suicide amongst veterans, and all of a sudden we all have been flagged and we get the crisis hotline number directed to us through a direct message.  So I'm just concerned that the classes in there, it's not going to be like employment.  Like, we're not going to be protected here.  We're supposed to have thick skin and take this.

MS. FAHY:  We're supposed to have what?  I'm sorry.

MR. ANGELINO:  Thick -- we're supposed to have thick skin and take these threats?

MS. FAHY:  Well, again, I think depending upon the group or -- or class of persons, again, if it is to incite violence we would want something like that reported.  But generally -- generally, again, this is targeted at -- at the groups or classes of persons based on, again, their race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression.  So it is -- but -- but -- but that is a next step for -- for individuals.  So the case earlier where it's targeting a gang member for murder, that is not -- that's not something covered under this bill.

MR. ANGELINO:  Thank you very much.

213

Mr. Speaker, on the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. ANGELINO:  Well, earlier this year in my position as Assemblymember somebody threatened me, and the BCI downstairs got involved.  It didn't really bother me too much, but I know the -- the HR staff here was concerned about it.  But I'm kind of used to that from my previous life, which brings me to a real group of people who have been humiliated and vilified, and that's the class of people who are our law enforcement officers.  That's real hatred there that's being directed at them, particularly a couple years ago in the heat of the -- the George Floyd murder.  And we're not just talking sour grapes, we're talking real hatred.  You know, I -- the NYPD comes to mind pretty quickly because we saw videos down there that turned into a cottage industry of people pulling water bottles out of a fanny pack right up to five-gallon buckets of water being poured on those NYPD officers.  And I --  if you've ever saw the video you would definitely agree they were humiliated and they really had no course of action after that.  I don't know exactly.  I'm listening to the debate.  I hope there's more because I'm undecided in this, but I want to thank the sponsor for trying to do something in light of what's been going on.

Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you, sir.

Ms. Glick.

MS. GLICK:  Thank you, Mr. Speaker.  Briefly, I

214

would like to make a few comments.  First, thank the sponsor for bringing this forward, but I would like to say that not everything (inaudible) our world on social media is coarse and maybe a little over aggressive in -- in some instances.  But not all social media is like that.  There are a whole range of folks on, whether it's Facebook or Twitter, that focus on things like nature.  And they're really quite specific and very soothing.  I like to re-tweet some stuff around birds. Some of the people who follow me because of my political invective took exception to the fact that there were just too many birds, which I thought was their problem, not mine.  But as you may know, as elected officials we are not supposed to actually block people on Twitter.  There was a court case, and at the highest level, President Trump, and so we cannot block people.  But what we can do on our own Twitter feed, and I presume -- I'm not on Facebook, but I presume there, too -- that you can set up a criteria for blocking.  And if you administer it in an even-handed way you cannot be, I presume, sued for blocking someone.  So I don't think it's rocket science, and I think we would expect that the geniuses who can program and develop algorithms could figure out a way, a more efficient way than they have thus far to do that.  So I unpinned that tweet with my blocking criteria so anybody who goes to my site sees it.  Posting of mistaken of facts, unsavory comments about personal lives, threats of harm, posts or people engaged in or affiliated with child or revenge porn -- that was to get at somebody who was actually threatening to sue me.  Posts or people engaged in or affiliated with sexual assault,

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

using abusive, scatological or inappropriate language.  It has cleaned up some of the comments, but I don't think that it is anything that these tech companies couldn't figure out how to do a better job of.  And they really owe it to society because it has been pernicious and it has been used to organize violent activities.  And so they have a responsibility because they're making money selling ads, selling private information as they track us in our searches online.  They owe it to society to be more responsible.  And I want to thank the sponsor for her effort to require them to do a better job of removing the poison that is undermining our confidence in facts, in reality, creating division and undermining our ability to get along with each other.

So I want to thank the sponsor.  I think it's a measured approach.  As she has said, a first step, but it is a signal to these platforms that they actually have some responsibility.  They like to say, *We're a tech company*, and there's nothing -- you know, they're not responsible for anything.  But they're making money and they're using your information and selling it to data brokers.  So they are, they are -- part of their work is to be more responsible and to stop creating a vehicle for division, misinformation, disinformation and violence and division amongst us.

So I appreciate your time, Mr. Speaker, and I want to thank the sponsor for bringing this forward.

ACTING SPEAKER AUBRY:  Thank you.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

On the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. GOODELL:  First, I think it should be really clear that this bill doesn't -- isn't really aimed at conduct at all.  It's aimed at speech.  Someone says hateful conduct, but what we're really talking about is hateful speech on social platforms.  And it regulates three types of speech:  Speech that vilifies, speech that humilifies and speech that incites violence.  The First Amendment has always been very clear that speech that involves humiliation or vilification is generally protected.  And if you want to see an example of that you can see how MSNBC treats Republicans or Fox News treats Democrats, and it seems like it's their sport to try to vilify or humiliate the opposite party.  That speech is protected.  Always has been.  The third category is speech that incites violence.  That speech has never, ever been protected.  And we already have actionable causes of action here in New York State which have been around for decades if you're a victim of speech that's incited violence.  As my colleagues mentioned, the problem when we try to pass legislation that regulates speech, we know that we have to be very careful to be consistent with the Constitution.  And so what we're really trying to regulate is speech that's on a platform that in most cases is outside of New York State.  It's maintained by companies that are either national or international.  So if you look at some of the examples -- this, by the way, doesn't regulate speech that incites violence against anyone, it has to be violence that's incited against certain people based on religion, race,

217

**NYS ASSEMBLY**                                     **JUNE 1, 2022**

color, creed, ethnicity, national origin.  Which is something --

somewhat interesting because I would guess if you got on the internet

right now you'd find a lot of articles that are very incite -- aimed at

inciting violence toward Russians or Ukrainians or whatever group

may be in a violent situation right now.

        So I just urge my colleagues, make no mistake about

it, this is a bill that purports to regulate speech and in doing so it needs

to be narrowly tailored to meet a strong legitimate interest of

government or it's invalid.  So nobody here in this room -- I don't

think anyone here in this room supports hateful speech.  I hope

nobody intentionally uses speech that humiliates or embarrasses

anyone else or -- or vilifies anyone else.  I think that's inappropriate.

But I also recognize, as all of us do as politicians, that we're the

subject of that speech on a regular basis, and that's -- that's one of the

natures of our -- of our democracy that we allow uncomfortable

speech and we don't leave it to some foreign corporation to decide

what speech is too uncomfortable or too humiliating or too vilifying.

That's not a role for us to do as a state to appoint private companies to

be automatic censors of language that we ourselves feel

uncomfortable with.

        So I very much appreciate the sponsor's desire,

absolutely support you with efforts to curb language that incites

violence.  I would point out it has been on our books for decades and I

continue to support that language and expanding it in different

mediums makes sense to me.  But I think this bill needs to be

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

narrowed so that we meet constitutional objectives while recognizing
that our country has been built on a foundation that encourages robust
and sometimes uncomfortable speech.

   Thank you, sir.  And again, thank you to the sponsor
for her efforts.

   I almost forgot.  You know, I've been wrestling with
this.  I think my Caucus is generally going to be in the negative, sir.
Part of the challenge when we deal with subjective words is that it
creates the potential for a donnybrook because there's no general
accepted meaning of what's meant by humiliate or vilify.  And while
we all agree that violence and genocide, those types of activities, are
clearly outside of the appropriate scope, we want to make sure that we
stay away from subjective terms recognizing that some things that
some of us love, whether it's speech or in life, others absolutely hate.
So we try to strike that balance, sir, and again, thank you for allowing
me to comment.

   ACTING SPEAKER AUBRY:  Read the last section.

   THE CLERK:  This act shall take effect in 180 days.

   ACTING SPEAKER AUBRY:  The Clerk will record
the vote on Assembly print 7865-A.  This is a Party vote.  Any
member who wishes to be recorded as an exception to the Conference
position is reminded to contact the Majority or Minority Leader at the
numbers previously provided.

   Mr. Goodell.

   MR. GOODELL:  Thank you, sir.  As you mentioned,

**NYS ASSEMBLY**                                        **JUNE 1, 2022**

this is a Party vote.  The Republican Conference is generally opposed over our concerns on freedom of speech and the First Amendment.  But certainly we are opposed to hateful speech that incites violence and we do support red-flag efforts to identify people and help them address their issues.  But those who support this can certainly vote yes on the floor or call the Minority Leader's Office.

Thank you, sir.

ACTING SPEAKER AUBRY:  Ms. Hyndman.

MS. HYNDMAN:  Mr. Speaker, I would like to remind my colleagues that this is a Party vote.  Any member wishing to vote in the negative is welcome to call the Majority Leader's Office at the number previously provided.

Thank you.

(The Clerk recorded the vote.)

ACTING SPEAKER AUBRY:  Ms. Fahy to explain her vote.

MS. FAHY:  Thank you, Mr. Speaker, to explain my vote.  Again, this bill would require social media networks to provide a clear and concise policy regarding how they would respond to incidences of hateful conduct leading toward this inciting of violence on their -- their platforms as well as easily accessible mechanisms for reporting this and responding to it.  It does not tell them how to do this, it simply says they must have one.  This is cutting edge, as you heard a lot about tonight.  Cutting edge legislation.  We're chartering some new territory here in an effort to be proactive given the repeated,

220

repeated incidences of where, again, the profile of mass shooters that 80 percent are showing a crisis in advance, and of those an estimated one-half are estimated to have revealed their plans ahead of time on some type of social media.  We need to be proactive.  There are roughly five billion posts, social media posts, done daily, daily.  We need the help.  We need the help of those social media companies. We know just from the horrors of the Buffalo shooter that -- that massacre just two weeks ago, there was a 180-page document filed online before that massacre.  Enough is enough.  In 2020, well before this the State Department said that racist violence is on the rise and spreading, increasingly targeting minority groups such as immigrants, ethnic minorities, LGBTQ and other, quote, unquote, "perceived enemies."  We need a multi-pronged attack.  That's much about what New York has been about these last few days.

And with that, Mr. Speaker, I -- I thank my Senate sponsor, I thank the Speaker and I thank the Chair of the Senate -- sorry, the Science and Technology for helping to move this bill forward.  And with that I vote in the affirmative.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Ms. Fahy in the affirmative.

Mr. Lavine to explain his vote.

MR. LAVINE:  Thank you.  Very, very briefly, I just want to correct the record.  I think during the colloquy there was -- someone made a reference to the fact that the Supreme Court had

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

upheld the Texas law.  The Texas law is HB20.  The Texas law punished platforms for removing offensive speech.  So it seems to me what this bill does is really just the opposite.  It requires a set of policies and it provides individuals with the ability to communicate with the social platform company in order to lodge concerns about content and conduct.  Yes, it's a dangerous new world we're all involved in.  Nothing new there, I think that's been the story of our lives.  But I think that this is a step in the right direction and I'm going to be very pleased to vote for it.

Thank you.

ACTING SPEAKER AUBRY:  Mr. Lavine in the affirmative.

Mr. Durso to explain his vote.

MR. DURSO:  Thank you, Mr. Speaker, to explain my vote.  I want to agree with the sponsor and thank you because, again, I applaud your efforts on this and I do agree with you that we need to do something.  The problem is, this bill in the end is going to do nothing and that's my concern.  I'm worried that it may lull us into a false sense of security.  Having a report button on social media websites is a great thing and I agree with it.  And we can't have hateful conduct going, inciting violence against protected classes and I completely agree with you.  The problem is there's no mechanism in place at the current time for the Attorney General to move forward and do something about the conduct that goes up on a social media site that maybe began in a different state.  So until we get that in place

222

-- again, we're putting a bill in place before we figure out how to enforce it.  And again, I just -- I'm concerned with the unintended consequences that could come out of it.  I agree, something needs to be done.  I appreciate the efforts to do something.  But again, I just -- I -- I more fear that once again we're going to put together a task force or a bill or put something forward, no one's going to meet, nothing's going to get done with it, and I feel that there could be more harm than good with that.  I would love to help you sponsor something later that will actually lead to something and that we could do something, maybe write a letter to the Federal government, have them do it.  They could do it throughout the States -- the United States.  But New York State, once again, as one of my colleagues said, we're always rushed to be the first, but let's be the best.  Let's do it right.  Let's do something to actually effect change and maybe we could help some of our kids that do go on social media sites.  And social media, to me, is disgusting.  I can't stand it.  I never have until I ran for office.  I still don't want it.  I think it's -- it's just horrible.  But until we can do that and someone can actually effectuate the change and have that mechanism in place, I just feel it's going to do nothing.  So I'm going to vote no on this bill.

Thank you, sir.

ACTING SPEAKER AUBRY:  Mr. Durso in the negative.

Ms. Wallace to explain her vote.

MS. WALLACE:  Thank you, Mr. Speaker, for

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

giving me the opportunity to explain my vote.  I want to commend the sponsor for putting forth this legislation which, to be clear, just requires the social media companies to have a policy.  It's not telling them what that policy should be, it's not forcing them to -- to apply their own policy.  It is just telling them that they should have a policy. And because we're not telling social media companies what that policy should be, it does not, I do not believe, implicate the First Amendment.  Personally, I wish we would go further.  I wish we would hold social media companies accountable for their failure to better police themselves and police their content.  We know for a fact that the Buffalo terrorist was inspired and radicalized by hateful conduct that he read on the internet.  And we also know that he recorded the massacre for all to see.  Doing nothing is no longer an option.  Social media companies are making billions of dollars off of their platforms with zero, zero accountability.  Unfortunately, as has been said, we are limited in what we can do because Congress in its infinite wisdom, or I would suggest maybe lack thereof, has failed -- has chosen to give social media companies complete immunity. While that might have made sense when the internet was first starting, I think given the Goliath position that these companies have in our society right now and the harm that they are causing, we -- Congress should revisit that issue.  But in the meantime I applaud the sponsor for trying to nip the edges and encourage social media companies to start policing themselves.

So I proudly vote in the affirmative.  Thank you.

224

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

ACTING SPEAKER AUBRY:  Ms. Wallace in the affirmative.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  Please record my colleague Mr. Smith in the affirmative.  Thank you, sir.

ACTING SPEAKER AUBRY:  So noted.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 10, Rules Report No. 318, the Clerk will read.

THE CLERK:  Senate No. S05356, Rules Report No. 318, Senator Breslin (A08159, Bronson, Fahy, Colton, Reyes, Steck, Lunsford, McDonald).  An act to amend the State Finance Law, in relation to the cost effectiveness of consultant contracts by State agencies and ensuring the efficient and effective use of State tax dollars.

ACTING SPEAKER AUBRY:  An explanation is requested, Mr. Bronson.

MR. BRONSON:  Yes, Mr. Speaker.  This bill would require State agencies to conduct a cost comparison before entering into contracts for consulting services if that contract is anticipated to cost in excess of $1 million within a 12-month period, and the analysis would be for the purposes of determining whether such services can be performed at an equal or lower cost by utilizing State employees. The objective of the bill is to ensure the efficient and effective use of

State taxpayer dollars.

          ACTING SPEAKER AUBRY:  Mr. Goodell.

          MR. GOODELL:  Thank you.  Would the sponsor yield?

          ACTING SPEAKER AUBRY:  Mr. Bronson, will you yield, sir?

          MR. BRONSON:  Yes, I will, Mr. Speaker.

          ACTING SPEAKER AUBRY:  The sponsor yields.

          MR. GOODELL:  Thank you very much, Mr. Bronson.  As you know, this bill has been vetoed several times by the former Governor who decided that the cost of doing this analysis and the delay would actually overall increase the cost to the taxpayers rather than reduce cost.  And of course you and I both want to keep cost as efficient as possible.  That's the whole purpose of your bill.  Has this bill been changed since then to address those concerns?

          MR. BRONSON:  Actually, I think the veto messages indicated that the Governor in his belief indicated that agencies were already doing this analysis, which I disagree with, and also that there may be a delay in going forward with letting out contracts.  I don't believe the Governor indicated in his various veto messages that the cost of performing the analysis would be prohibitive.

          MR. GOODELL:  You indicated that the Governor, who is of course the head of the Executive Branch, thought the Executive Branch was already doing it.  You didn't think the Executive Branch was doing it.  How would you know whether or not

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

they're doing it?

MR. BRONSON:  Well, because in his veto message the Governor indicated in all of his veto messages that the analysis, one, establishes and documents the need for services; two, ensures that the cost is reasonable; and three, analyze the existence of needed resources available at an agency.  Those three items are included in this analysis, but this analysis requires much more.  So I would argue to the Governor in his veto messages that that is not the same analysis that would be required if this piece of legislation were to become law.

MR. GOODELL:  I guess my question remains, though, how would you know whether this bill is being implemented assuming we passed it and the new Governor signs it?  How would you know that?

MR. BRONSON:  If -- if it's being implemented?  Because we would know if -- there's two criteria.  If it's ten percent or more there's a requirement to do a business plan.  That business plan would be reviewed by the Comptroller.  If it is ten percent or less more, then there is a permissive ability to do a business plan that would also be sent to the Comptroller.  So we would know whether or not it's being done when we're reviewing contracts and whether the Comptroller is issuing reports related to those analysis.

MR. GOODELL:  So you would look at the Comptroller to do audits of the Executive Branch to verify whether or not they were complying with the cost analysis that would be called for under this bill?

227

**NYS ASSEMBLY**                                        **JUNE 1, 2022**

MR. BRONSON:  The -- the Comptroller would be required to issue a report regarding the information received from the Second Floor on their analysis.

MR. GOODELL:  Thank you very much, Mr. Bronson.  I appreciate those comments.

On the bill, sir.

MR. BRONSON:  Thank you.

ACTING SPEAKER AUBRY:  On the bill.

MR. GOODELL:  Certainly I share the sponsor's concern and a desire that we operate safely and as efficiently as possible.  The Governor indicated that at least some level of review is already being performed as a matter of routine amongst the State agencies in evaluating whether they should do work in-house or contract it out.  This bill takes that process and makes it more formal, and provides an independent verification through the Comptroller, as the sponsor yield -- or mentioned.  One of the challenges we always wrestle with when we're dealing with government is whether or not the process that we use to make sure that we're efficient itself creates us an inefficient situation.  And that's exactly the concern that's been expressed by the American Council of Engineering Companies.  They said this bill is unnecessary and burdensome and that it will serve only to increase bureaucracy and inefficiency within the State contracting process.  The Business Council also wrote there's no justification for this legislation, as it would only further burden the State by expending revenues to perform a task that they're already doing.  That was

228

echoed by the American Institute of Architects who said the requirement would add several months to the front end of a project and divert staff from their core of duties.  And so in every situation where we're all striving - the sponsor, myself, everyone else in this room - to operate State government as efficiently as possible, we just want to make sure that the review process itself doesn't cost more than it saves.  And I'll just point out one simple example.  When I was working for the county we had an audit.  And when the audit was done one of our departments discovered a half-a-million-dollar error that had been missed by the auditing company.  And I was very thankful that our own internal auditors caught it.  Our external auditors said, *You know, based on that error we should audit every single one of your accounts*.  And I said, *That's great.  How much would it charge and how much do you think you're going to save us?* And the answer is it would cost several hundred thousand and we'd be lucky to save a few thousand and the study itself exceeded any savings.  And for that reason I think you'll find that the Republican Caucus is going to be split.  Many of us, ironically, may believe the Governor that this process is already being conducted as a matter of commonsense and good government on a routine basis and a more expensive and formalized procedure won't be cost-effective.  There's others of us who might not believe the Governor's protestations in the past and think a more formal procedure is justified.  And so I expect the Republican Caucus to be somewhat split, reflecting that question of whether or not the cost of the study will exceed the benefit.

Thank you, sir, and again, thank you to my colleague.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect in 90 days.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 5356.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Mr. Bronson to explain his vote.

MR. BRONSON:  Yes, Mr. Speaker.  I abstain for the purposes of explaining my vote.  This bill is intended to save taxpayer dollars and finding efficiencies.  In New York State we spend over $2 billion a year on consultant contracts, and in many cases these consultants performed work that could be done easily by the professional and qualified individuals we have in the State workforce.  By some estimates the State spends 32 percent more on State contracts and consulting today than it did a decade ago.  Over the years various comptrollers, both Republican comptrollers and Democrat comptrollers, have indicated we could save hundreds of millions of dollars if we did an analysis to determine whether or not we could in-source this work versus out-source this work.  Indeed, the folks who are opposed to this bill are folks who get these contracts, so they have a self interest, a monetary interest, to suggest that somehow this is going to cost delays and be more costly when, in fact, analysis by comptrollers, analysis by an Assembly task force, analysis by the

230

**NYS ASSEMBLY**                                   **JUNE 1, 2022**

Senate have all concluded that if we do this comparison before letting out contracts we're going to be saving taxpayer dollars, and those dollars in turn could be used to spend on the important programs that we provide as a State.

Mr. Speaker, I withdraw my request and I will vote in the affirmative.

ACTING SPEAKER AUBRY:  Mr. Bronson in the affirmative.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  Please record my colleague Mr. Simpson in the negative.

Thank you, sir.

ACTING SPEAKER AUBRY:  So noted.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 11, Rules Report No. 366, the Clerk will read.

THE CLERK:  Senate No. S02903-A, Rules Report No. 366, Senator Kavanagh (A09877-A, Cruz).  An act to amend the Criminal Procedure Law, in relation to requiring the court, prior to accepting a plea, to advise the defendant of the risk of deportation if he or she is not a citizen.

ACTING SPEAKER AUBRY:  Mr. Morinello.

(Pause)

Mr. Morinello?

**NYS ASSEMBLY**                                              **JUNE 1, 2022**

MR. MORINELLO:  An explanation, please?

ACTING SPEAKER AUBRY:  Oh.  Use the mic, Mr. Morinello.  My ears are getting a little worse.

MR. MORINELLO:  I'm sorry.  An explanation, please.

ACTING SPEAKER AUBRY:  Ms. Cruz, an explanation has been requested.  Thank you.

MR. MORINELLO:  It's getting late, Mr. Speaker.

MS. CRUZ:  Thank you.  This is a court notification bill, an act to amend the Criminal Procedure Law in relation to requiring the court, prior to accepting a plea, to advise a defendant of their risk of deportation if he or she is not a citizen.  This bill would amend the Criminal Procedure Law to require the court, prior to accepting a guilty plea, to advise every defendant of the risk of deportation, denial of naturalization or exclusion from the country if he or she is not a U.S. citizen and is convicted of any offense.  This change would require judges in all cases, felony as well as misdemeanors, to give the following notice to defendants orally and on the record at arraignment and prior to accepting a guilty plea.  If you're not a citizen of the United States you may become deportable, ineligible for naturalization or inadmissible to the United States based on a conviction by plea or verdict.

MR. MORINELLO:  Thank you.  Will the sponsor yield for a couple of questions?

ACTING SPEAKER AUBRY:  Ms. Cruz, will yield?

232

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

MS. CRUZ:  (Inaudible)

ACTING SPEAKER AUBRY:  The sponsor yields, sir.

MS. CRUZ:  Certainly.

MR. MORINELLO:  Is there a requirement for a notification of the admonishment currently?

MS. CRUZ:  Yes, there is.

MR. MORINELLO:  All right.  And who has that obligation?

MS. CRUZ:  Can you -- can you say that a little bit louder?  I'm sorry.

MR. MORINELLO:  I'm sorry.  Who has that obligation?

MS. CRUZ:  The judge has an obligation to provide notification on when there is a felony involved and when someone's taking a plea for a felony.

MR. MORINELLO:  No, my question was who currently has that obligation?

MS. CRUZ:  The judge.

MR. MORINELLO:  The judge currently has the obligation?

MS. CRUZ:  Yes.  The judge has that obligation when it's a felony case as well as the attorney.  The defense attorney.

MR. MORINELLO:  All right.  So then what is the change in this one if the judge already has the obligation?

233

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

MS. CRUZ:  We're expanding it to also include misdemeanors and we're standardizing the language that is used because currently while we are requiring a judge to make a notification, we are not specifically saying what language the judge should use and it has resulted in -- in certain defendants taking pleas that they perhaps would have not taken, as well as defense attorneys not being able to represent their clients to the best of their ability.

MR. MORINELLO:  But currently that admonishment is given to prevent someone from taking a plea so that they wouldn't be deported; am I correct?

MS. CRUZ:  Currently -- I would frame it differently. It's not to prevent someone, but it's to ensure that someone has enough information when they're making the decision to take the plea.  The problem is that because we don't have standardized language you can have a judge in one county saying it one way and having one outcome, versus a judge saying it in a completely different way in another county and having a different outcome.

MR. MORINELLO:  But the purpose is to prevent or acknowledge -- to have someone acknowledge that they could be subject to deportation.

MS. CRUZ:  Correct.

MR. MORINELLO:  Correct.  So this is to ensure that someone who has broken the law in this country who may not have legal status in this country does not get deported, correct?

MS. CRUZ:  That is incorrect.  This is to ensure that

234

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

someone who has been accused of a crime and not yet actually found guilty or taken a plea has enough information to assert their rights that have been recognized by the Constitution in the Supreme Court.

MR. MORINELLO:  Okay.  But that -- that exists only for noncitizens?

MS. CRUZ:  That is correct.

MR. MORINELLO:  Okay.  So this bill now forces a judge or compels a judge to give that admonishment to citizens also who are not subject to deportation?

MS. CRUZ:  That is correct.

MR. MORINELLO:  Okay.  Under the existing law they can inquire as to the status, correct?

MS. CRUZ:  Let me verify that.  Give me one second.

(Pause)

MR. MORINELLO:  Sure.

MS. CRUZ:  My understanding is that that is correct.

MR. MORINELLO:  Okay.

MS. CRUZ:  That is not what is triggered by this particular piece of legislation.  There could be in other circumstances where a judge may be able to ask that question.  But when advising someone of the consequences of the plea, what we are saying is provide the statement and move forward -- and move on with the rest of the trial.

MR. MORINELLO:  All right.  But -- but the issue is,

235

that statement is only to benefit someone who does not have status in this country, subject to deportation, correct?

> MS. CRUZ:  Incorrect.  That statement is to protect the constitutionally-recognized right of someone who has been accused but not found guilty of a crime but happens to not have immigration status in this country.

> MR. MORINELLO:  Right, but --

> MS. CRUZ:  Or actually, if I may, Mr. Morinello, may actually have immigration status because they may be a permanent resident or may be someone with a different kind of non-permanent status that could face immigration consequences if they take that plea.

> MR. MORINELLO:  But that does not apply to a lawful citizen of this country, correct?

> MS. CRUZ:  That's correct, yes.

> MR. MORINELLO:  Okay.  So what is the purpose of having that admonishment given to a lawful citizen who has no possibility of deportation?

> MS. CRUZ:  Well, the current law already recognizes that everyone who's taken a plea needs to be told that statement.  What we are simply doing is expanding that to ensure that it's not just in cases of felonies but it's also in case of misdemeanors.  So the court has already recognized that.  And we are saying here specific language, it's about a 30 second statement, and then the person can move forward with their case.

NYS ASSEMBLY                                      JUNE 1, 2022

MR. MORINELLO:  I appreciate that answer, but it did not answer my question.  What is the purpose of giving that admonishment to a U.S. citizen who has no ability or is subject to deportation?

MS. CRUZ:  Well, I would argue the purpose is to inform every single person, regardless of immigration status, who steps into a court and is accused of their crime of what their rights are under the Constitution and they're recognized by the Supreme Court regardless of immigration status.

MR. MORINELLO:  All right.  So, we recognize that.  But the question is, why do we have to give it to a lawful citizen of the United States rather than just be an inquire of the status of the defendant?

MS. CRUZ:  Well, we're not inquiring as to the status of a person, so we wouldn't know if the person -- if the judge -- if I am the judge and I'm required to provide that statement, I'm not inquiring, *Are you a citizen or are you not a citizen* in order for me to know if I should give that statement or not.  We are just requiring that every defendant before they take a plea should -- and at arraignment needs to be told that statement.

MR. MORINELLO:  But currently they're allowed to inquire as to the status.  The question is, why are we eliminating the ability to inquire as to the status and -- and putting it on U.S. citizens, also.  That's -- it's a simple question.

MS. CRUZ:  Well, I -- I think what we are trying to

237

do here is ensure that every single person that walks through the courthouse is treated with the same rights regardless of immigration status or lack thereof.

MR. MORINELLO:  Well, you're ensuring that.

MS. CRUZ:  Yeah.  And I think one of the other things that happens is we don't always know who's a citizen and who isn't.  The judge may be able to inquire, but we don't always know who is and who isn't.

MR. MORINELLO:  No, but currently you can inquire.  So you're changing that ability to inquire.

MS. CRUZ:  Only in relation to the specific statement.  We're not saying at any other point during the trial that may not come up.  We're saying when you are required to give the statement you are at -- you are given the statement and you're not moving beyond that piece.

MR. MORINELLO:  If you'll bear with me for one moment.

MS. CRUZ:  Take your time.

(Pause)

MR. MORINELLO:  Well, I'll move on.  It is -- just so you know, it is currently in the statute that you can inquire as to the status.  Now, this also says you have to give that admonishment in the language of the individual.  But you're not -- can you inquire as to the language necessary so that they can give the admonishment?

MS. CRUZ:  Well, yes.  And -- and -- in -- in practice

238

what generally happens is when -- when a defendant goes to court there's going to be an interpreter provided.  So that -- that goes beyond the scope of what this bill -- this particular bill does, but that's something that already happens in practice.

MR. MORINELLO:  Well, no, no, no.  The bill specifically provides, your bill, that it will be given in the language that the defendant can speak or understands.

MS. CRUZ:  Well, the language they speak does not have to do with the immigration status, but the language they speak has to do with their ability to understand the admonishment.

MR. MORINELLO:  Correct.  Correct.

MS. CRUZ:  If I may finish the answer.  And so what happens in practice is there's an interpreter in court, and that interpreter is just going to say whatever the judge is saying and, therefore, meeting the requirements of the bill.  We're not asking the judge to go and learn a new language and be able to give the admonishment.

MR. MORINELLO:  I never said that.  There's 62 counties.  Not every county has an interpreter in the courtroom.  So, I don't know if you are aware of, there is a central repository that you can call and they will attempt to determine if they can find someone with that language.  Now, if there's a delay in finding it because it's an obscure language, what happens to that particular defendant?  Are you allowed to hold him even though it may be a charge that is non-bailable?

239

(Pause)

MS. CRUZ:  Yeah.  I think that piece goes a little bit beyond the scope of this bill, but I would argue that the judge can, in fact, inquire about the language.  Most of those services that you're describing have -- I have used it myself and I've been able to find the kind of language that you couldn't even pronounce or -- or think of.  So I would argue that, if in fact, the person is able to -- to actually get that statement in their own language.

MR. MORINELLO:  I've been -- I was on the bench 14 years.  There were many times because I was in a border town that we had defendants that we could not find through the central repository a ready interpreter to be able to take care of that particular function, and sometimes it would take a day or two because of the languages.  So my question is, because the bill says it must be in that language, which means if the judge doesn't speak it you have to have an interpreter, are you allowed to hold that person during that period of time?  Mindful of the fact that the issue here is to protect him from deportation so that you really have the potential risk of flight.

MS. CRUZ:  So, there are other parts of -- of the Penal Law that make certain requirements about how long you can hold someone or if they are out on -- on -- on bail.  I'm sure that's a favorite word around here lately.  And so those would be the considerations that actually determine how long you can hold someone.  You still have to, as -- as a judge, and -- and as you mentioned, you were in a border town so I'm sure you're very familiar

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

that often immigrants, because of these same pressures that our system
has put on them - lack of interpretation, lack of available attorney,
lack of a number of things - have been forced into pleas that they
probably shouldn't have taken that then implicate their ability to stay
in the country.  So we are trying to pass a bill that takes that into
account and protects people's constitutional rights.  A completely
separate part of our -- our State's law handles whether they can stay
and -- and how long.

       MR. MORINELLO:  I commend the sponsor on this
bill, but still, I do not feel the answers to the questions, which were
very specific, were satisfied.

       On the bill, Mr. Speaker.

       ACTING SPEAKER AUBRY:  On the bill, sir.

       MR. MORINELLO:  I have no problem with
protecting the constitutional rights of all individuals.  I have no
difficulty in protecting the constitutional rights and advising those that
could be subject to deportation for -- with -- with those rights.  I, in
fact, have had that obligation and had that opportunity.  Currently, it is
not the judge's obligation, it's the obligation of the attorney.  I think
that part of the bill is admirable.  But to have to put the burden on
every single defendant that takes the plea in every single court in the
State of New York where if that admonishment is not given to
someone not even subjected to deportation is subject to vacatur, which
means that that plea is gone.  Again, this Body is looking at not the
victims, but the defendants.  Not the victims and not the citizens.

241

They're looking to protect those that are not here and that are not watching out for those that have -- that belong here.

There is also one last point.  People are not being responsible for the consequences of their actions.  We are forgetting that little premise that I grew up with and almost everyone in this Body grew up with.  Our young people think they can get away with anything and we change the laws.  With that being said I will be in the negative and I urge my colleagues to vote no on this bill.

ACTING SPEAKER AUBRY:  Mr. Lawler.

MR. LAWLER:  Thank you, Mr. Speaker.  Will the sponsor yield?

ACTING SPEAKER AUBRY:  Ms. Cruz?

MS. CRUZ:  I'd like to say no.  Go ahead.

ACTING SPEAKER AUBRY:  Ms. Cruz yields, sir.

MR. LAWLER:  You know you enjoy the banter. That's okay.  So, I want to make sure I understand this correctly.  The -- and -- and my colleague just I think did a very nice job summing this up, but the Court of Appeals ruled in November of 2013 that due process compels a trial court to apprise a defendant that if the defendant is not an American citizen, he or she may be deported as a consequence of a guilty plea to a felony.  So this bill would expand it to all guilty pleas or verdicts?

MS. CRUZ:  It would -- yes.  It would expand it beyond felonies to also include misdemeanors.

MR. LAWLER:  To include misdemeanors.  Would it

also include violations?  So, for a traffic violation?

          MS. CRUZ:  Yes.

          MR. LAWLER:  Okay.  So if somebody, for instance, gets a traffic violation and they get the ticket handed to them, will the ticket now have this verbiage on it?  Because a lot of times people will plead guilty or not guilty, but they'll plead guilty potentially on the ticket or they will go on line and plead guilty.

          MS. CRUZ:  No, it's only upon the court.

          MR. LAWLER:  Okay.  So if somebody chooses to plead guilty because they fill out the form, the ticket that they were given, they send it in and the court accepts that as a guilty plea, does the court have any obligation to tell them about this?

          MS. CRUZ:  Can you hold that thought for a second?

          MR. LAWLER:  Yes.

          (Pause)

          MS. CRUZ:  If it's a Penal Law violation, but if it's a traffic court violation it does not.  And generally --I -- I know which tickets you're speaking of, and generally those particular tickets are traffic court violations and traffic law violations, not Penal Law violations.

          MR. LAWLER:  Okay.  So -- so then traffic law violations would not fall under this?

          MS. CRUZ:  That is correct.

          MR. LAWLER:  Okay.  I appreciate that clarification.  This applies to -- when we say non-U.S. citizens, this

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

applies to Green Card holders, those here on a visa and those who are
undocumented, correct?

        MS. CRUZ:  Yes.  If you have a deferred action for
childhood arrival, if you're an (inaudible), anything that's not -- that
doesn't grant you U.S. citizenship, if you will.

        MR. LAWLER:  Okay.  What are the rules -- what --
what is the law currently with respect to deportation if you violate the
law?  If you plead guilty to a felony or a misdemeanor, are you -- are
you automatically, you know, going to be deported?  What -- what is
the actual current Federal law?

        MS. CRUZ:  Well, you're asking for a very long
explanation.  But the summary is --

        MR. LAWLER:  We -- we have time.

        MS. CRUZ:  Oh, no, we don't.  The -- the gist of it is
that there are certain offenses, both misdemeanor as well as felonies
that make you removable from the country - generally, they're called
crimes of moral turpitude - and they could in turn into an immigration
court case and immigration removal proceeding, et cetera.

        MR. LAWLER:  So what would be an example of a
crime of moral turpitude?

        (Pause)

        MS. CRUZ:  So, I'm not exactly sure what this has to
do with the bill, so if you can elaborate?

        MR. LAWLER:  Well, if somebody is -- if somebody
commits a crime of moral turpitude, let's say they commit a rape.

**NYS ASSEMBLY**                                                **JUNE 1, 2022**

Would that constitute a crime of moral turpitude?

MS. CRUZ:  Well, I'm -- I'm going to really back up a little bit because I think you're going beyond the scope of what this bill does.  We are not asking the judge that wants -- the person hasn't been found guilty, which is when immigration proceedings and immigration consequences would kick in, to make the admonishment. We're asking them to do it before, when someone, under the Constitution, is still deemed innocent, to be able to receive that information so that they have all the tools and information to determine if to take the plea, if not to take the plea.  If what their attorney is saying sounds about right or it doesn't.

MR. LAWLER:  Well, I guess the -- the question becomes if some -- if somebody is guilty of an offense and they would like to plead guilty -- I mean, I think most of our criminal convictions are the result of a guilty plea as opposed to a trial verdict -- most people do end up pleading guilty either for a lesser offense, shorter sentence, et cetera.  I mean, there are reasons why people would do it. I -- I do -- I do have concern that if we are using this, the -- the threat of deportation, to try and prevent guilty pleas, potentially, that it -- it will open up a -- a serious situation where victims of, say, sexual offenses, are going to be put in harm's way having to testify, you know, before a trial, relive the assault.  And it seems like we're trying to in some way prevent guilty pleas by doing this.

MS. CRUZ:  As much as I appreciate your examples in this situation, arguably what we're trying to do is to protect

245

everyone involved in the case, both the defendant and arguably the -- the victim.  What we don't want is someone -- because the Constitution protects everyone until it doesn't except -- you know, I'm not going to get into that part because that's beyond here.  But what we want is every single person in our State - and I wish it was an entire country - before they take a plea, if they happen to have anything other than a citizenship status should have the right to determine how that citizenship or non-citizenship status or their ability to stay in the country is going to be affected by whatever happens in their criminal case.  Because at the point when the admonishment is given they're still presumed innocent.  They haven't gone through trial, we haven't seen all of the evidence.  And what has happened in practice is actually a travesty and the complete opposite of what you're describing.  We have people taking pleas for crimes that they didn't commit because they got erroneous advice, misunderstood the advice, and end up being removed from the only country they know as home when they could have gone through the entire trial and possibly prove that they were innocent.

                MR. LAWLER:  So, if this bill takes effect and the court does not provide this admonishment or does not provide it in full, then the guilty plea would be automatically vacated?

                MS. CRUZ:  They can apply to have it vacated.  It's not automatic.

                MR. LAWLER:  And who would make that determination?

246

MS. CRUZ:  Whoever their attorney is at that time, and they would have to go in front of a judge.

MR. LAWLER:  Sorry, I -- who would they apply to? They apply to the trial court judge or would they go to another judge? Who would -- who would they be --

MS. CRUZ:  The Appellate Court.

MR. LAWLER:  They -- they -- okay, they would take the conviction to the Appellate Court.

MS. CRUZ:  Yes.

MR. LAWLER:  Okay.  And the Appellate Court would be bound to throw it out or they can make a determination based on the individual's circumstances?

MS. CRUZ:  So, if -- if it's determined that it was not provided on the record and the way that it's required in the language that the person speaks -- and actually, let me read to you.  *Potential actual immigration consequences for the defendant would render the plea unknowing to voluntary intelligence and require vacatur where it's determined that it would -- that the way that they were provided the admonishment or they weren't provided the admonishment did not comply with the requirements we're seeing here today*.  That's one of the reasons why we're literally spelling out the language that we will require the judge to say on the record.

MR. LAWLER:  Okay.  And right now based on that Court of Appeals ruling this is required in all felony pleas.

MS. CRUZ:  Yes.

247

MR. LAWLER:  Has any -- has any felony plea been thrown out since 2013 based on the failure to do this?

MS. CRUZ:  I don't know the answer to that question.

MR. LAWLER:  Okay.  So you're simply -- this -- this bill is --

MS. CRUZ:  Can you hold on for a second?

MR. LAWLER:  Yes.

MS. CRUZ:  I'm sorry, I can't hear.  We're good over there?  All right.  Go ahead.

MR. LAWLER:  So this bill is simply seeking to codify the 2013 Court of Appeals ruling into law, expand it to misdemeanors, and add a provision that if this admonition is not given in the individual's native language that it can be vacated -- it -- it shall be vacated by the court?

MS. CRUZ:  I -- I'm going to edit that a little bit.

MR. LAWLER:  Please.

MS. CRUZ:  Right now it's in State law as well as in the decision by the Court saying that a defendant has to be told that statement.  But we are not telling a judge exactly what to say, we're just saying in general nature they should be advised of X, Y and Z. And what we're doing with this bill is saying this is the specific language that we need to give every defendant when they're going through -- through -- before they take a plea and when they're going through -- why is the word escaping me now -- an allocution.  Sorry, I had a brain freeze there for a moment.  An allocution.  And we are

saying if that does not happen, then an individual can apply to have

their -- their plea vacated and it would be vacated if -- if that statement

was found to not meet those certain requirements.

        MR. LAWLER:  If it's not part of the record.

        MS. CRUZ:  Yes.  If it's not part of the record, it was

not in the language, if it is not the specific language that we're giving

them.

        MR. LAWLER:  And even if the -- just a hypothetical

-- if the defense attorney did inform the client or if the prosecutor did

inform the client when negotiating and offering the -- sorry, the

defendant negotiating and offering the plea deal as opposed to the

court, would that constitute sufficient notification to avoid vacating of

the --

        MS. CRUZ:  I would cherish the day when a DA

would do something like that.  A defendant -- a defendant's attorney is

already required by -- by the Supreme Court under the case of

(inaudible) to do such a thing, to advise or to get advice from an

immigration attorney and inform their client of the consequences of

taking a plea or whatever is happening in their case.  What we have

here is a requirement on the judges.  One does not do away with the

other.

        MR. LAWLER:  Okay.  So as -- as -- regardless of

what the defense attorney may do, regardless of, hypothetically, a

prosecutor doing, the judge must do it and if they do not the court --

the Appellate Division must vacate the decision assuming it is found

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

on the record that they did not do it.

MS. CRUZ:  That's correct.

MR. LAWLER:  And that applies to misdemeanors and felonies, but not to violations.

MS. CRUZ:  That's correct.

MR. LAWLER:  Okay.  Thank you.

MS. CRUZ:  Thank you.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect on the 90th day.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 2903-A.  This -- this is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  The Republican Conference is generally opposed.  Those who support it can certainly vote so in the Chambers here or by calling the Minority Leader.

Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, Majority colleagues are generally going to be in favor of this piece of legislation.  However, there may be some who decide to be an

**NYS ASSEMBLY**                                             **JUNE 1, 2022**

exception.  They should feel free to contact the Majority Leader's
Office and we'll make sure their vote is properly recorded.

    Thank you, sir.

    (The Clerk recorded the vote.)

    ACTING SPEAKER AUBRY:  Thank you.

    Ms. Cruz to explain her vote.

    MS. CRUZ:  Thank you, Mr. Speaker.  The Supreme
Court has already determined that under the Constitution immigrants
have the right to receive immigration advice from counsel when
they're facing criminal charges.  This is because of a plea or
conviction either for a misdemeanor or a felony can carry additional
consequences under immigration law which can lead to mandatory
detention or even deportation.  In New York currently the law requires
that all judges notify people of the risk of taking a plea, but only in
felony cases in order to ensure that they're making an informed
decision.  The New York Court of Appeals found that judicial
notification is legally required under the State Constitution in felony
cases, and it's also memorialized in New York State law.  However,
our current law does not apply to misdemeanors, and importantly, the
language or the form used for notification is not standardized in our
statute.  So judges provide notification that can be more harmful than
helpful and can conflict with the defense counsel's duty to provide
accurate legal defense.  Our bill today, which follows actually
(inaudible) 15 other states around the country will provide uniform
(inaudible) consistent script for judges to use during this process and

**NYS ASSEMBLY**                                         **JUNE 1, 2022**

will further facilitate meaningful constitutional consultation between clients and their attorney.  I have several constituents who have taken pleas for crimes with -- that with proper notification could have resulted in a different outcome, and years later they're facing immigration consequences because they were not aware of their rights.  This bill is an important step to change this for so many others.

I want to thank the advocates and the Speaker for always prioritizing the rights of immigrant New Yorkers.  I'll be voting in the affirmative and I urge others to do the same.

ACTING SPEAKER AUBRY:  Ms. Cruz in the affirmative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 11, Rules Report No. 369, the Clerk will read.

THE CLERK:  Assembly No. A09895, Rules Report No. 369, Thiele.  An act to amend the Environmental Conservation Law, in relation to the prohibition of hunting wild deer on State lands adjacent to a licensed wildlife rehabilitation facility.

ACTING SPEAKER AUBRY:  An explanation is requested, Mr. Thiele.

MR. THIELE:  Well, thank you, Mr. Speaker.  It is local bill season, and of all the local bills this may be the most local of all.  It applies to one piece of property, one piece of State property in -- in my Assembly District.  To give a little bit of background about

252

how this bill came about, I have a -- a Suffolk County park in -- in my district.  It's called Munn's -- Munn's Pond County Park, and it's on the edge of the Pine Barrens and Hampton Bays.  And about 25 years ago the County of Suffolk gave a permit to what is now called the Evelyn Alexander Wildlife Rehabilitation Center.  And that rehabilitation center has been there, they're licensed by the State Department of Environmental Conservation.  They've been doing their work there for the better part of 25 years.  Subsequent to that there's -- there's a piece of State property that is adjacent to this property.  And after the Wildlife Rehabilitation Center had been established, the -- the State decided through the DEC to allow hunting on that adjacent property.  But there's no direct access to the property, so the -- the parking, there's three parking spaces for hunting.  It's a rather modest facility, and they -- they need access to go across the county property to be able to get to the State property.  Now, there have been -- because of -- of this configuration and the situation there -- there have been a number of issues with hunting in this particular area.  The -- the directors of the Wildlife Rehabilitation Center make complaints periodically through the years about (inaudible), et cetera.  You know, seeing hunters in the buffer area where they're not supposed to be on any.  Reporting to the DEC, not a lot was done.  But what happened in January of this year kind of crossed the line, and that is that a hunter was on the adjacent property, shot a deer on the property of the Rehabilitation Center and apparently wasn't that great a shot because in addition to finally shooting a deer, a couple of stray bullets blew

**NYS ASSEMBLY**                                 **JUNE 1, 2022**

right through the -- the -- the Rehabilitation Center, missing workers
at the Rehabilitation Center by a couple of feet.  So this was a big
issue in my district.  The county legislator who I work with who
shares the area because it was county land and State land, we worked
together -- in essence, we were at the time trying to seek and get the
establishment of a greater buffer to get away from the Wildlife
Rehabilitation Center.  And we did get a meeting, we did try to work
with the DEC.  Their response basically was simply to just put up
more signage.  And that really was the genesis of this bill.  You know,
we really weren't able to get the attention of the Department of
Environmental Conservation.  So, this bill in essence would in this
one location because of this particular configuration of the property
and the adjacent land use which was there before would -- would
prohibit hunting on this one parcel adjacent to the Wildlife
Rehabilitation Center.  And that's what the -- the bill does.  We drew it
very tightly.  It only applies to properties that are in the Town of
Southhampton and the County of Suffolk where there is a
rehabilitation center on a county parcel and there's a State property
next door.  So, you know, we certainly weren't trying to impact
hunting in any -- any way.  In fact, you know, I've sponsored measures
here that have opened up thousands of acres of areas of hunting in my
district on the east end.  But this is more of a public safety matter, and
that's why we put in the bill in.

                    ACTING SPEAKER AUBRY:  Mr. Smullen.

                    MR. SMULLEN:  Thank you very much, Mr.

Speaker.

On the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. SMULLEN:  I really appreciate the -- the sponsor's very clear and thoughtful explanation of the nature and -- and genesis of this bill and the safety concerns that are -- that are expressed amongst the local citizenry.  However, this seems to be a special case bill that has some worrisome implications.  One of the things that's in the Environmental Conservation Law is a 500 foot prohibition.  And it sounds to me like there have been lots of signs posted but they've been repeatedly violated.  Now when I -- when I look at a situation like this, it's evident to me -- can I get some quiet in the Chamber, please, Mr. Speaker?

ACTING SPEAKER AUBRY:  Gentlemen, a colleague is talking.  He doesn't need to compete with you.  Thank you.

MR. SMULLEN:  Thank you, Mr. Speaker.  And -- and -- when I looked at this situation, it seemed to me that the -- this was a special case, and like -- as I said, I -- I understand the nature of it.  But with the -- the 500 foot prohibition that's already in the Environmental Conservation Law, it seemed to me now hearing the sponsor's explanation that there's actually a crime was committed here, that there is an endangering thing, you know, I wonder if we're -- we're headed down the wrong track with what I call micro legislation.  And -- and what that is is when there's -- there's something that needs

255

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

to be fixed but a department doesn't necessarily react the way they should, in this case the Department of Environmental Conservation. And if -- if it were -- to me, I would -- I would ask the Department much more strongly that they would intervene in this case and -- and provide not only signage but enforcement to be able to make sure that people were not put in danger in their place of work or that the -- the Wildlife Rehabilitation Center was well outside the buffer and that it was -- it was not only clearly marked but -- but also adhered to. Because what this is going to do, it's going to provide a very dangerous precedent when it comes to hunters' rights to recreate on State lands.  The land that -- that's out there that's -- that's owned by the people of the State of New York, when it's there for the express purpose in this case of hunting, that has a very high priority in terms of how we should view the usage of that land and whether or not it's up to the Department to properly regulate it.

               For that reason and -- and understanding all the safety concerns, you know, I -- I can't vote for this legislation although I completely understand the nature of the -- of the idea behind it and what we should or shouldn't do.  But because of how things are going in this Chamber and how this Body often looks at legislation that affects hunters, that affects the -- the ability of people to use guns that are protected under the Second Amendment, I urge all my colleagues to very carefully consider this and vote no when you think about the what's -- what's good -- the most good for the most people here.  There are 800,000 hunters in -- in New York State that don't need to be

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

prohibited from hunting in a micro area when that would set a dangerous precedent for other legislators around the State who don't like hunting, who want to go ahead and then foist what is really contrary to New York State's laws on -- on the people through this type of legislation.

So thank you very much, Mr. Speaker.  I urge all of my colleagues that are so inclined to vote no on this bill to send a strong message to the Governor and to the Department of Environmental Conservation to do their job.  Thank you.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 9895.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  The Republican Conference will be generally opposed for the reasons mentioned by my colleague, although we are sympathetic to this unique situation.  Those who wish to vote yes should do on the floor or by contacting the Minority Leader's Office.

Thank you, sir.

ACTING SPEAKER AUBRY:  Ms. Hyndman.

MS. HYNDMAN:  Mr. Speaker, the Majority

257

Conference will be in the affirmative on this piece of legislation.  If there are any members who wish to vote in the negative they can contact the Majority Leader's Office at the number previously provided.

Thank you.

ACTING SPEAKER AUBRY:  Thank you.

(The Clerk recorded the vote.)

Ms. Giglio.

MS. GIGLIO:  Thank you, Mr. Speaker, to explain my vote.  While I respect my colleague and his position on this matter and I'm very familiar with the wildlife facility that he's talking about and they do do great things.  However, we have a very severe deer problem on the North and the South Fork of Long Island.  The deer management permit plan by the New York State DEC for the 2020-2030, what their recommendations are not even being considered.  We are being -- having our constituents hospitalized with tickborne illnesses.  We are really in a bad state.  Car accidents every day from deer running out into the road, farmers putting up deer fences.  I come from a very large agricultural district and I just feel that this is setting a bad precedent.  There's very few properties to hunt and there are many deer.  So as far as I'm concerned that hunter, his license should've been taken away if he was too close where his bullets were coming close to actual -- to people.  So -- and the markers should be out that it's private property and that they need to stay away from there.  But the deer problem, and I'm sure he could

258

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

agree, is rampant.  And we are working together -- the legislator on the North Fork of Long Island has been working closely with me and I do have a bill filed to allow for leniency on hunting because the deer problem is so bad.

So, where I respect my colleague and I understand why he's doing this because he represents his constituents well, I will definitely be a no on this bill.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Ms. Giglio in the negative.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  Please record my colleagues Mr. Durso and Mr. Gandolfo in the affirmative.

Thank you, sir.

ACTING SPEAKER AUBRY:  So noted.

ACTING SPEAKER LUNSFORD:  Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 11, Rules Report No. 389, the Clerk will read.

THE CLERK:  Senate No. S09184, Rules Report No. 389, Senator Sepulveda (A10215, Committee on Rules, Braunstein, Colton).  An act to amend the Local Finance Law, in relation to the sale of bonds and notes of the City of New York, the issuance of bonds or notes with variable rates of interest, interest rate exchange agreements of the City of New York, the selling of bonds at private

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

sale, the refunding of bonds, and the down payment for projects financed by bonds; to amend the New York State Financial Emergency Act for the City of New York, in relation to a pledge and agreement of the State; and to amend Chapter 142 of the Laws of 2004, amending the Local Finance Law relating to interest rate exchange agreements of the City of New York and refunding bonds of such city, in relation to the effectiveness thereof.

ACTING SPEAKER LUNSFORD:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER LUNSFORD:  The Clerk will record the vote on Senate bill 9184.  This is a fast roll call.  Any member who wishes to be recorded in the negative -- oh.  I apologize.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank -- thank you, Madam Speaker.

ACTING SPEAKER LUNSFORD:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER LUNSFORD:  The Clerk will now record the vote on Senate bill 9184.  This is a Party vote still.  Any member who wishes to be recorded as an exception to the

260

Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, Madam Speaker, for giving me a second opportunity to announce that the Republican Conference is generally opposed to this legislation for the reasons I will explain in a moment.  After the explanation I hope my colleagues wait at least that long. Those who wish to vote yes, can do so certainly here on the floor or by contacting the Minority Leader's Office.

ACTING SPEAKER LUNSFORD:  Ms. Hyndman.

MS. HYNDMAN:  Madam Speaker, the Majority Conference will be in the affirmative on this piece of legislation. Should any members want to wish to vote in the negative please contact the Majority Leader's Office at the number previously provided.

(The Clerk recorded the vote.)

ACTING SPEAKER LUNSFORD:  Mr. Goodell to explain his vote.

MR. GOODELL:  Thank you, Madam Speaker.  This bill allows the City of New York to sell its bonds, its debt, at a private sale rather than through a competitive bid process that applies to almost all of the other municipalities throughout the State of New York.  So if you live in Suffolk County or Nassau County or Westchester or almost any of the other counties with the exception of Erie, those bonds are put out for a competitive bid.  And are three

important reasons why we use competitive bidding:  First, competitive bidding has been proven over history to give you the best price.  Or in the case of a bond the lowest interest rate.  Second, competitive bidding ensures that everyone has a fair and equal opportunity to bid on it.  There aren't the insiders or the outsiders, there aren't the winners or the losers.  Open competitive bidding gives everyone a fair opportunity.  And third, competitive bidding helps avoid collusion and favoritism and corruption, whereas if you're negotiating directly with a person on a multimillion or billion-dollar bond transaction, there are a dozen ways to Sunday where that person can reward you for your private negotiations, whether it's campaign contributions or support in any number of other ways.  So the reason why every -- almost every other municipality competitively bids its bonds is to get the best price for the taxpayers, to be fair for everyone and to avoid the potential of fraud, collusion or corruption.

Now, the City of New York receives special authorization to sell their bonds at a private sale.  In 1978 there was a temporary authorization, temporary, 44 years ago in 1978 because the City of New York was on the edge of bankruptcy.  Do you remember that?  And they couldn't sell them.  And every year since then for 44 years we've allowed them to continue.  New York City is no longer in bankruptcy, there's no longer any justification and, therefore, we should not extend this to an extension of 46 years.

Thank you, Madam Speaker.

ACTING SPEAKER LUNSFORD:  Thank you.

262

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 11, Rules Report No. 390, the Clerk will read.

THE CLERK:  Senate No. S08902, Rules Report No. 390, Senator Breslin (A10227, Committee on Rules, Cahill).  An act to amend the Insurance Law, in relation to extending certain provisions relating to medical malpractice insurers.

ACTING SPEAKER LUNSFORD:  An explanation is requested.

MR. CAHILL:  Yes, thank you, Madam Speaker. This bill would merely extend the provisions of the Insurance Law into 2025 to exempt medical malpractice insurers from certain risk-based capital requirements.  I think that was a little shorter than Mr. Thiele's explanation of the bill two -- about two ago.  That's it.  That's the whole explanation.

ACTING SPEAKER LUNSFORD:  Mr. Blankenbush.

MR. GOODELL:  Madam Speaker, if I may.

ACTING SPEAKER LUNSFORD:  Mr. Goodell.

MR. GOODELL:  Thank you.  You know, Madam Speaker, sometimes we go just like clockwork and sometimes we throw a few curve balls.  Thank you for recognizing me.  Would the sponsor yield?

MR. CAHILL:  No.  Yes, of course.

263

**NYS ASSEMBLY**                                                   **JUNE 1, 2022**

MR. GOODELL:  I'm happy either way.

MR. CAHILL:  I'm so happy, Mr. Goodell.

MR. GOODELL:  Mr. Cahill, this is really designed to help physicians deal with some of their malpractice insurance; is that correct?

MR. CAHILL:  Yes, that's indeed correct.  These are two medical malpractice insurance companies that several years ago were registering in very significant capital deficits.  They were basically put into rehabilitation and over the past several years have been able to go from a deficit situation to a minor surplus.  But the Department of Financial Services believes with another three years to go, these two companies can be fully rehabilitated and be vital parts of the medical malpractice insurance product that's available in the State of New York.

MR. GOODELL:  But in -- in the process it also adjusts the capital requirements for an insurance company, correct?

MR. CAHILL:  It adjusts the capital requirements for the insurance companies temporarily, yes.

MR. GOODELL:  And what it does is it eliminate -- or reduces, significantly reduces the normal capital requirements that an insurance company would have for this type of coverage?

MR. CAHILL:  Yes, it temporarily reduces the capital requirements that these companies would be required to maintain.

MR. GOODELL:  And what is that reduction?

MR. CAHILL:  Well, it's -- it's -- it's preventing them from having to meet the minimums, which I believe is a determination that is made by the Department of Financial Services.

MR. GOODELL:  Thank you very much.  I appreciate your comments.

On the bill, Madam Speaker.

ACTING SPEAKER LUNSFORD:  On the bill.

MR. GOODELL:  There's no doubt that those who are engaged in delivering babies face extraordinarily high liability costs because a small error can have lifetime consequences.  And so in an effort to help them we implemented this program to provide assistance, if you will, for that particular category of insureds.  Several of my colleagues, though, have considerable concerns on this because it, as the sponsor noted, substantially reduces the capital reserve requirements and that dramatically increases the risk that an insurance company won't have enough cash to actually make the payments that would be required.  And that's why we have those capital reserves.  And so, for example, the New York State Insurance Association wrote, *The measure represents extremely dangerous public policy because it would eviscerate the current strong statutory accounting rules for insurance companies that require adequate reserves and surplus based on actual financial assets and instead would replace it with a cash accounting methodology*.  And so while we are very sympathetic for the objectives of this will -- of this bill, we are very concerned about the reduction in capital requirements and the danger

it poses for this type of insurance policy which could very have very serious ramifications if the cash accounting method proves to be inadequate.  And for that reason, the last time this came up for a vote there were 38 no votes.

Thank you, Madam Speaker.

ACTING SPEAKER LUNSFORD:  Mr. Goodell.

MR. GOODELL:  Thank you, Madam Speaker.  The Republican Conference will be generally opposed to this legislation.  And so actually call for the vote.  Those who are in the Republican Conference that want to vote for it can certainly do here in the Chamber or by calling the Minority Leader's Office.

Thank you, Madam Speaker.

ACTING SPEAKER LUNSFORD:  We're all eager.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER LUNSFORD:  The Clerk will record the vote on Senate bill 8902.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Madam Speaker, the Majority Conference is going to generally be in favor of this piece of legislation.  However, there may be some of our colleagues who would choose not to do so.  They should feel free to contact the

Majority Leader's Office so that their vote may be properly recorded.

Thank you, ma'am.

ACTING SPEAKER LUNSFORD:  Thank you.

(The Clerk recorded the vote.)

Mr. Blankenbush to explain his vote.

MR. BLANKENBUSH:  Thank you, Madam Speaker.  As my colleague has -- has just spoken, the -- this measure I think is extremely dangerous for public policy.  Right now, the insurance companies currently have strong statutory accounting rules for insurance companies that require adequate reserves and surpluses based on actual financial assets and replace it with cash accounting is a scheme for medical malpractice insurers.  They can count potential but not actually existing surcharges and assessments as admitted assets of the medical malpractice insurer.

For those reasons, I will be -- I will be voting no and hope my colleagues would follow suit.  Thank you.

ACTING SPEAKER LUNSFORD:  Mr. Blankenbush in the negative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Madam Speaker, colleagues, we are actually doing pretty well.  We could go a little faster, but we're doing good.  We're doing good.  So let's just keep

going here.  Mr. Anderson has not made it back to the building yet, so we are going to go to Rules Report No. 472, Rules Report No. 473, Rules Report No. 477 and Rules Report No. 478.  These are not debatable -- they're -- well, they could be debatable but I don't think they will be, sir -- ma'am.  Thank you.  Then we're going to Rules Report No. 405 by Mr. Gottfried, followed by Rules Report -- actually, Calendar -- was it Rules?  Yes, it is Rules Report -- it's 514, it's by Ms. Fahy.

Thank you.

ACTING SPEAKER LUNSFORD:  Page 16, Rules Report No. 472, the Clerk will read.

THE CLERK:  Senate No. S08129, Rules Report No. 472, Senator Kennedy (A09365, Peoples-Stokes).  An act to amend the Local Finance Law, in relation to the sale of municipal obligations by the County of Erie.

ACTING SPEAKER LUNSFORD:  Read the last section.  Oh, Home Rule message is at the desk.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER LUNSFORD:  The Clerk will record the vote Senate bill 8129.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

268

MR. GOODELL:  Thank you, Madam Speaker.  The Republican Conference will be generally opposed to this for the reasons I will explain shortly.  Those who wish to vote in favor of it can certainly do so here on the floor or by calling the Minority Leader's Office.

Thank you, Madam Speaker.

ACTING SPEAKER LUNSFORD:  Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Madam Speaker.  The Majority Conference is still going to be in favor of local people making local decisions.  However, should some colleagues desire to be an exception they are certainly welcome to contact the Majority Leader's Office and we'll make sure their vote is properly recorded.

(The Clerk recorded the vote.)

ACTING SPEAKER LUNSFORD:  Mr. Goodell.

MR. GOODELL:  Thank you, Madam Speaker.  As with the bill that we talked about a moment ago dealing with the City of New York, this bill would authorize the County of Erie to sell its debt or its bonds in a private sale.  And I would note that all the other counties outside of the City of New York including Suffolk and Nassau sell their bonds at public auction.  And they do that to get the best price for the taxpayers, to avoid favoritism and give everyone a fair and equal opportunity to bid, and to avoid the potential for any corruption or abuse.  And we initially authorized this for the County of

269

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

Erie at a time when they were facing very severe financial stress. Thankfully, through the leadership of that county they've made dramatic improvements in their financial strength, and for that reason I think we should revert back to the same process used by all the other counties in the State of New York with the exception of those in New York City and have an open competitive bid that's fair, open, transparent, focused on getting the best price for everyone in the City of -- or the County of Erie.

For that reason, I'll oppose it and recommend against it to my colleagues.  Thank you, Madam Speaker.

ACTING SPEAKER LUNSFORD:  Mr. Goodell in the negative.

ACTING SPEAKER AUBRY:  Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 16, Rules Report No. 473, the Clerk will read.

THE CLERK:  Senate No. S08253, Rules Report No. 473, Senator Kennedy (A09367, Peoples-Stokes).  An act to amend the Local Finance Law, in relation to facilitating the marketing of any issue of serial bonds or notes of the City of Buffalo issued on or before a certain date.

ACTING SPEAKER AUBRY:  Home Rule message is at the desk.

Read the last section.

270

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 8253.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, Mr. Speaker.  The Republican Conference is generally opposed to this legislation for the reason that we've discussed in the last two bills.  Again, it's a private sale of bonds using a -- a buyer that's been hand-selected rather than through an open competitive bid process.  And for that reason the Republican Conference will generally oppose this and instead recommend an open competitive bid available to everybody, designed to get the lowest price.

Thank you, sir.

ACTING SPEAKER AUBRY:  Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker.  The Majority Conference is generally going to be in favor of this piece of legislation.  However, there may be some who would choose not to.  They can feel free to contact the Majority Leader's Office, we'll be happy to record your vote.

Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

Are there any other votes?  Announce the results.

271

(The Clerk announced the results.)

The bill is passed.

Page 17, Rules Report No. 477, the Clerk will read.

THE CLERK:  Senate No. S08497, Rules Report No. 477, Senator Kaminsky (A09465, Lavine).  An act to amend the Real Property Tax Law, in relation to base proportions in assessing units in Nassau County.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 8497.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  The Republican Conference is generally opposed to this legislation.  There will be members that will be supporting it, for sure.  So those members who are supporting it, make sure you vote yes on the floor or contact the Minority Leader's Office.

Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker.  Majority colleagues are -- will generally be in support of this

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

one.  However, there may be a few that would choose not to.  They should feel free to contact the Minority Leader's Office.  We'll make sure their vote is properly recorded.

> (The Clerk recorded the vote.)

> ACTING SPEAKER AUBRY:  Thank you, ma'am.

> Mr. Goodell to explain his vote.

> MR. GOODELL:  Thank you, sir.  The County of

Suffolk has a tax -- taxing system, real property tax system that's a little bit unique in that they put properties in different classifications.  So you can have a residential classification or a commercial classification or other classifications.  And what this bill does, it says basically the residential base will not increase by more than one percent in the -- over the prior year.  Now, not surprisingly this is a very, very popular provision for residents who don't want to pay more in property taxes.  And who does, right?  And it's equally very unpopular with everyone else who has to pay a lot more because they pick up the difference.  So many of us Upstate who are not living in the County of Suffolk think a fair and equitable approach is to tax everyone based on fair market value.  But I certainly recognize that my colleagues from Suffolk County whose residents are affected by this -- by this bill will want to probably vote in favor of keeping the residents who vote -- in Nassau County, my colleagues in Nassau County want to be paying attention to the bill that we're actually on so that they can vote appropriately.

> Thank you, sir.  Same situation in Nassau and Suffolk

273

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

County, but thank you, sir, for pointing that out.

ACTING SPEAKER AUBRY:  Ms. --

(Pause)

Mr. Goodell.

MR. GOODELL:  Please record the following colleagues voting for Nassau County's proportional assessing unit system:  Mr. DeStefano, Mr. Durso, Mr. McDonough and Mr. Mikulin.

Thank you, sir.

ACTING SPEAKER AUBRY:  So noted.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 17, Rules, Report No. 478, the Clerk will read.

THE CLERK:  Senate No. S08387, Rules Report No. 478, Ms. -- Senator Stewart-Cousins (A09490, Pretlow).  An act to amend the Local Finance Law, in relation to bonds and notes of the City of Yonkers.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act --

ACTING SPEAKER AUBRY:  Home Rule is at the desk.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record

274

the vote on Senate print 8387.  This is a Party vote.  Any member who wishes to be to recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  The Republican Conference will be generally opposed to this legislation for the reasons I'll mention.  But those who support it can certainly vote yes on the floor or by contacting the Minority Leader's Office.

Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you.  Again, Mr. Speaker, I want to -- generally, Majority Conference members will be in support of the local decisions so they'll be voting in favor of this one.  However, there may be a few that would like to be an exception. We will welcome their vote by calling the Majority Leader's Office.

Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you, ma'am.

Mr. Goodell to explain his vote.

MR. GOODELL:  Thank you, sir.  In 2007 this Assembly authorized the City of Yonkers to sell bonds at a private sale because they were struggling financially.  And thankfully, the City of Yonkers has dramatically improved its financial situation, yet unlike almost every other city in the State of New York it still wants

275

to sell its bonds at a private negotiated sale, picking a winner and losers on those who can profit from the sale of its bonds. And the Republican Conference generally supports open, competitive bidding designed to get the best price, to be fair and equal to everybody and to reduce the likelihood of favoritism or any corruption.

For that reason most of my colleagues, if not all -- most of my colleagues will be voting against this. Thank you, sir.

ACTING SPEAKER AUBRY: Thank you.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES: Mr. Speaker, would you please record our colleague Mr. Englebright in the negative on this one?

ACTING SPEAKER AUBRY: So noted.

Are there any other votes? Announce the results.

(The Clerk announced the results.)

Page 13, Rules Report No. 405, the Clerk will read.

THE CLERK: Assembly No. A07230-B, Rules Report No. 405, Gottfried, Hevesi, Dinowitz, Braunstein, McDonald, Thiele, Stirpe, Simon, Steck, Fernandez, Solages, L. Rosenthal, Seawright, Glick, Bronson, Jean-Pierre, Colton, Walker, Pretlow, Woerner, Reyes, Burgos, Aubry, Galef, Zebrowski, Griffin. An act to amend the Public Health Law, in relation to establishing the Primary Care Reform Commission.

ACTING SPEAKER AUBRY: An explanation is requested, Mr. Gottfried.

276

NYS ASSEMBLY                                    JUNE 1, 2022

MR. GOTTFRIED:  Yes, Mr. Speaker.  This bill would create a Commission on Primary Care Spending to develop recommendations on increasing spending on primary care, strengthening primary care infrastructure and avoiding any increase in costs to patients or total healthcare spending.

ACTING SPEAKER AUBRY:  Mr. Ra.

MR. RA:  Thank you, Mr. Speaker.  Will the sponsor yield?

MR. GOTTFRIED:  Yes.

ACTING SPEAKER AUBRY:  Mr. Gottfried yields, sir.

MR. RA:  Thank you, Mr. Gottfried.  So just a few questions on this.  I think the goal of the bill is a laudable one and one that I think we've talked about often on the Health Committee and this Chamber.  But, you know, it does have requirements that some on the insurance side have viewed as being onerous and perhaps duplicative of -- of existing costs.  So I -- I want to start with just, you know, my understanding is all the insurers would have to submit information for the prior five years; is that correct?

MR. GOTTFRIED:  It requires information for the prior five years and then annually going forward, yes.

MR. RA:  Okay.  And in terms of the detail of this information and how it differs from the all-payer database that was previously established, what additional information is this bill going to require be disclosed?

277

MR. GOTTFRIED:  I don't know that it's additional information.  It would -- it would have the information provided in the -- in the aggregate by two major categories.  One is primary care spending, the other is everything else.  I don't -- so it's, you know, it's not information that every third-party payer doesn't have readily available at the push of a button.

MR. RA:  So, I mean, I do think this would be a large amount of data but you're saying it's data that they're largely already disclosing?

MR. GOTTFRIED:  Any insurance CEO that doesn't have this information readily available before lunchtime on any given day is an insurance company that is probably already bankrupt.

MR. RA:  Okay.  Now, what -- what about, you know, proprietary data?  Pricing information, proprietary information.  Would they be required to disclose that as well?

MR. GOODELL:  The bill does not speak to anything resembling that.  Although information that comes that is similar to that is arguably already in the all-payer claims database.  But actually this bill does not speak in those terms.

MR. RA:  Okay.  Now, one of the other issues that has been expressed and -- and I think there's concerns about what ultimately would come out of this information and recommendations that may come forward.  So, they're -- they're concerned with the plan's ability to minimize consumer cost-sharing and high quality of care --

**NYS ASSEMBLY**                                        **JUNE 1, 2022**

MR. GOTTFRIED:  Could you hold -- hold on for just a second?

MR. RA:  -- and its ability to negotiate terms.

MR. GOTTFRIED:  Could you folks keep it down?  I can't hear him.

I'm sorry.  Yes.

MR. RA:  So in terms of the plan's ability to negotiate terms, that's one of the objections or concerns that has been raised that this would -- may result in limits to their ability to negotiate terms.

MR. GOTTFRIED:  They must be thinking of a different bill.  I'm -- you and I have I assume both read the bill.  There's nothing resembling that in this bill.  Among other things, this bill doesn't -- this commission doesn't have the authority to order anything.  All it can do is make recommendations.

MR. RA:  Correct.  And I -- and I think their -- their concern there is being raised in terms of that that may be a goal or something that comes about after this information is analyzed and recommendations are made.  And, you know, you're correct, that would I guess really be up to this Body in the future to decide what to do with that information and perhaps going down that road.

MR. GOTTFRIED:  Right.  And remember that the bill also talks about calling on the Commission to avoid recommendations that would increase total spending on healthcare.  So, for third-party payers the recommendations may call for shifting money towards primary care, which I think any insurance company

279

worth its salt recognizes is the way to go if you're going to be
improving the quality of care and ultimately saving money.  This
should not be an issue for -- for the insurance industry.

MR. RA:  All right.  Thank -- thank you, Mr.
Gottfried.

MR. GOTTFRIED:  You're welcome.

MR. RA:  Mr. Speaker, on the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. RA:  Let me just quickly before I speak about
the bill quickly, thank you to the sponsor.  This may be the last chance
I have the opportunity to ask the sponsor questions on healthcare
issues, so I wish him well.  I've learned a lot about this topic from --
from serving on the Health Committee for many years.  So thank you
for, you know, for the opportunity to ask some questions on this bill.

As -- as I said, I think the goal of increasing the use
of primary care is one that we've talked about a lot on the Health
Committee, in this Body, and obviously in terms of just utilizing the
healthcare services that are out there and using them efficiently.  The
concern that has been raised with regard to this bill is -- is really
twofold.  It's -- one is that the requirements may be duplicative of
other prior pieces of legislation, prior laws that -- that they're
complying with.  It is a lot of data, but on top of that where this
ultimately leads us.  And I just want to quickly read the point I was
making about the ability to negotiate terms and -- bear with me.  So
they said, *Implementation of any recommendation resulting from this*

*bill that struck this critical function would be unprecedented and*
*significantly hamper the insurance efforts to offer affordable*
*premiums with minimal cost-sharing responsibilities*.  Now, we're
talking obviously about the spending on primary care, total spending
by these providers.  Like I said, the ultimate goal is a very good one,
but getting there in a way that allows the providers to do the things
that they do to provide care efficiently is really I think where -- where
the crux of the issue is here.

So I just wanted to raise those concerns and I thank
the sponsor for answering my questions.  Thank you.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record
the vote on Assembly print 7230-B.  This is a Party vote.  Any
member who wishes to be recorded as an exception to the Conference
position is reminded to contact the Majority or Minority Leader at the
numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  The Republican
Conference is generally opposed to this bill, but those who support it
can certainly vote yes on the floor or by calling the Minority Leader's
Office.

Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

Mrs. Peoples-Stokes.

281

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker.  The Majority Conference is generally going to be in favor of this piece of legislation from someone who's probably the best Chair of the Health Committee this House has ever seen, Mr. Gottfried.  However, there may be some of our colleagues that would choose to be an exception.  They're welcome to call the Majority Leader's Office and we'll be pleased to record their vote.

ACTING SPEAKER AUBRY:  Certainly.

(The Clerk recorded the vote.)

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  I think everyone here in the room agrees that primary care should be considered primary and that there is a great deal of wisdom in making sure that individuals have access to high-quality primary care, and that high-quality primary care can have long-term physical benefits.  The concern that many of my colleagues and I have is that this legislation can also be used in an effort to promote other approaches to healthcare that we find difficult to reconcile, including a single-payer system that would eliminate competition throughout the marketplace and result the government takeover of healthcare.  So we're very concerned about where this study ultimately go -- goes, but we are certainly supportive of primary care.  And I'll -- I'll just mention one quick instance.  Back before many of you were ever thinking about ever being involved in politics I had the good fortune of working in the County of Chautauqua and we had a brilliant Commissioner of Health.

282

And this is in the early '90s.  And he realized that our Medicaid patients who were unable to get a doctor for primary care because the Medicaid reimbursement rate was so low and the paperwork was so high that most physicians with a primary care practice simply could not see a lot of Medicaid patients and still pay their own bills.  And as a result the Medicaid patients were going to the emergency room, which cost us so much more money and the quality of care was so much lower and there's no continuity of care.  And so my Health Commissioner put together a physician case management program and he worked with some of the primary care practitioners and they set up a program where they paid a flat fee for every Medicaid patient that practice accepted, and in return that practice agreed to see the patient for all non-emergent primary care.  They completely eliminated all the paperwork.  You got a flat rate.  How many patients did you have times the fee, flat rate.  All that auditing, all that paperwork, all that overhead.  The practice made money and my county saved a bundle.  We cut our -- our cost by like 60 percent.  But it doesn't fit the mindset that seems to have government focused on fee for service or some variation.  So if the study goes forward I hope they look at completely different approaches and how we can restructure it to improve care and reduce costs.

Thank you, sir.

ACTING SPEAKER AUBRY:  Are there any other votes?  Announce the results.

(The Clerk announced the results.)

283

The bill is passed.

Page 18, Rules Report No. 514, the Clerk will read.

THE CLERK:  Senate No. S09405, Rules Report No. 514, Senator Parker (Committee on Rules, Fahy--A10439).  An act to amend the Energy Law, the Executive Law and the State Finance Law, in relation to establishing the "Advanced Building Codes, Appliance and Equipment Efficiency Standards Act of 2022."

ACTING SPEAKER AUBRY:  An explanation is requested, Ms. Fahy.

MS. FAHY:  Sure.  This bill, as it is entitled, is the - it's a long one - it establishes the Advanced Building Codes, Appliance and Energy Efficiency Standards Act for this year.  And essentially, the legislation would align the Energy Code with clean energy and climate policy goals the State adopted a few years ago, as well as increase the State's efficiency standards for appliances.

ACTING SPEAKER AUBRY:  Mr. Palmesano.

MR. PALMESANO:  Yes, Mr. Speaker.  Will the sponsor yield for a few questions?

ACTING SPEAKER AUBRY:  Ms. Fahy, will you yield?

MS. FAHY:  Sure.

ACTING SPEAKER AUBRY:  The sponsor yields.

MR. PALMESANO:  Thank you, Ms. Fahy.  I know we went through a longer debate last time, I don't think we need to do

that this time.  I just kind of want to just ask a couple questions.  Can you maybe -- I know this bill is amended, can you run us through some of the amendments that you made from this bill from the last bill that we passed earlier this year?

MS. FAHY:  Yes.  A couple of primary ones, were ones that we actually talked about the last time and that was the Building Code Council itself.  We had left that alone in the last version, and in this version we have authorized the DEC, Department of Environmental Conservation, as well as NYSERDA, could be appointed -- may be appointed to the Council.  The other one authorizes NYSERDA, with the approval of DEC, to establish these energy efficiency standards for water-related appliances and fixtures that use a result and not -- the consumption of energy.  One other small one was on historic preservation.  It made that language a little clearer and slightly broader.

MR. PALMESANO:  Okay.  So as far as some of the changes you made, really, nothing addressed the cost concerns that we brought up in the last budget debate, or the last bill debate relative to retrofit costs and New York construction costs because of the change from a 10-year pay back to a lifecycle cost.  None of this -- none of the changes address those issues; those still remain intact, correct?

MS. FAHY:  No.  And it doesn't address that directly, but it is intended, the estimates are that it would save billions in efficiency savings over the next -- less than ten years.

MR. PALMESANO:  Those billings that you referred

285

**NYS ASSEMBLY** JUNE 1, 2022

to, those take into account societal benefits, not just cost-savings that are through the efficiency process, correct?

MS. FAHY:  You mean the lifecycle cost?

MR. PALMESANO:  Right.  Life -- because -- societal benefits are included in those lifecycle cost benefits that you're talking, when you're talking --

MS. FAHY:  Yes, yes.

MR. PALMESANO:  Okay.  Great.  Now, you mentioned about historic preservation.  I know during the last debate we mentioned concerns that we had relative to previously historic buildings were exempt from the code, now they have to provide, go through like an application process with -- with the -- was it through the -- they have to go through an application process to get that exemption now; is that correct, under the new -- under this new bill -- new law?

MS. FAHY:  No.  It just removes the existing energy code exemption, but it doesn't -- let's see, it -- it just removes the current one and authorizes the Code Council to provide a more generic exemption.

MR. PALMESANO:  So we removed the -- previously they had a flat out exemption.  Now with the passage of this bill and the previous bill and these changes, now they don't have the exemption, but they have to basically apply and have to get that from the Codes Council, dealing with that building that they have if they want to try to get some relief from this, or how does that work

exactly?

MS. FAHY:  They don't have to apply necessarily. The Council can go ahead and just give that exemption.

MR. PALMESANO:  But they do it on a case-by-case basis as far as someone --

MS. FAHY:  No.  That's not the intent, to do a case-by-case basis.

MR. PALMESANO:  So how does the Council make the determination if you're talking about, you know, the number of historic preservation buildings we have, how are they going to make that determination throughout this process?

MS. FAHY:  They can make a number of those decisions up front and do that as a part of adopting these new standards.

MR. PALMESANO:  So would it be just a blanket almost, like, exemption, for historics or not?  I just -- I'm just kind of confused on it, because if they had a blanket exemption before, now they're saying the Code Council can offer that to them, but I'm really just -- I'm kind of confused on the specifics on how that would work, that's all.

MS. FAHY:  It could be.  It does give them that flexibility.

MR. PALMESANO:  Okay.  Well, thank you for your time, I appreciate it.

Mr. Speaker, on the bill.

287

**NYS ASSEMBLY**                                   **JUNE 1, 2022**

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. PALMESANO:  Yeah, this legislation really is -- is really going to eliminate consideration by the Code Council to what are costs of materials and insulation will result in present value energy savings in ten years to a lifecycle cost methodology, and this also expands the mandate of the Energy Code to promote clean energy climate agenda.  And from my perspective, this is just another step in the playbook to dismantle our State's economy to ensure that the affordability and reliability of our energy supply system is not -- is not taken into consideration, it will ultimately lead to -- certainly lead to increased costs for families, farmers, seniors, small businesses and manufactures with, in my opinion, very little benefits.  I know they talk about societal benefits, I'm concerned about this lifecycle change from the 10-year payback to lifecycle.  This legislation, the original had it and now this bill has like some 60 to 70-plus definition changes.  Some are very broad, they are listed, and basically gives the authority to NYSERDA to act on that.  I think, you know, providing that authority to NYSERDA to basically adopt regulations dealing with establishing energy efficiency, but when you have all these definitions and some not defined, I think that's concerning.

And changing to the code as it relates to the lifecycle changes are concerning instead of going to a 10-year payback analysis I think is something that needs to be taken into consideration.  Code changes that have significant cost impacts on construction, both new and rehabilitation costs, when we talked about in the future, the march

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

towards electrification with geothermal installations, which would require building shell upgrades -- upgrades to our electric circuits and panels.  This all needs to be recognized in the code to be fair and transparent.  It doesn't, just like the other policies that come out of this House when it comes to the CLCPA and their implementation that's being talked about by the Climate Action Council.

By eliminating the 10-year payback, you're basically removing affordability and cost as a consideration for new code changes in New York.  And even that 10-year payback didn't require it to be acted upon, it just asked for that to be a consideration.  But unfortunately, business as usual in New York, cost and affordability are not being taken into consideration as we advance these policies down the pipeline with tremendous upfront costs to consumers, senior citizens, our farmers, our families, small businesses, manufactures and the like.

We talk about affordable housing in this Chamber time and time again.  The problem continues to grow and the need continues to grow.  We know about the families and individuals who are backdated on rents, landlords who haven't received payments, mortgages that were in distress.  This is just going to increase costs and now cost -- these cost increases will not be considered to help create more affordable housing.  It's going to be more problematic for our homeowners, for the tenants, for our families.  Like I said, the tenants in the buildings and then -- which is going to increase -- you know, require additional costs for landlords which will be passed on

to tenants through rent increases.  Is that something you want to see happen?  I don't think so.

You have the NYCHA public housing, which I have toured and visited, which is a disaster that needs assistance and needs improvements, and upgrades are going to cost a tremendous amount of money.  How is that going to be paid for with the public housing in all those areas?  I have very strong concerns about the historic building aspect of this bill.  We previously had exemptions in place. Now supposedly the bill -- the building codes are going to be able to put in place some sort of exemption, but just really doesn't seem to be defined here.  And I think it's also going to be almost like a new bureaucratic lengthy -- possible lengthy process.  And then, you know, there are many older homes that aren't going to be qualified for historic, you know, older farm homes that might not be able to get that eligibility.  They're going to be significant cost improvements for them to make that needs to be taken into account in this consideration, as well, which I do not think is being done.

And as we talk about this, you know, this is all part of the march towards electrification, these changes with the building code, cost to fully -- come 2030, your constituents, my constituents, our constituents are faced with a runaway freight train because come 2030 if you heat your home with natural gas and a natural gas boiler or a natural gas furnace, if that natural gas boiler or furnace goes, you will not, based on the policies being adopted by the CAC and the CLCPA to get the zero emission goals, you will not be able to convert

**NYS ASSEMBLY**                                        **JUNE 1, 2022**

that home to provide -- excuse me, to buy a natural gas boiler or furnace.  At that point in time, you will have to fully convert your home to full electric come 2030, which means buying a geothermal heat pump, tens of thousands of dollars, which also means improving the shell of your property, tens of thousands of dollars.  Improving your circuits and your electrical equipment, tens of thousands of dollars.  The estimates show that it would cost the average family homeowner $35,000 to convert their home over to electrification.  Even the Climate Action Council has estimates in their plans being $25- to $50,000.  These are significant, upfront costs that the public has no idea that's coming their way, all in the need to say that we're going to meet our climate goals and I think that's just very, very concerning to me from the perspective this is really something that I have been concerned about because your constituents, my constituents, they really don't know what's happening with this area.  This is one of the main -- and we're not talking about our electric bill prices, we're talking about these conversion costs.

And listen, when I have talked about this issue, I have never said we shouldn't invest in renewable energy, our side has never said we shouldn't do that.  We just said we want it to be balanced and we just don't want to do it alone.  The problem is when we try to -- our march to zero net emissions, New York right now only contributes 0.4 percent of the total global emissions in the world -- .4.  China is 29 percent, India is 7 percent, Russia is 4 percent.  China continues to build coal plants, they have over 1,000 coal plants, they continue to

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

build more.  India doesn't have electricity, they want to use coal to provide electricity.  Russia is investing in $110 billion Arctic oil port. All these things are -- these groups, do we expect them going to help us with our march to try to get to zero net emissions?  No.  We're putting this all on the back of our -- of our taxpayers, our ratepayers because no one is going to participate with us in this goal.  So we can get to 0 percent, but at the same time, we're going to jeopardize our reliability in our energy system, which NYSERDA has already said by 2040 we have a huge gap that needs to be met, and met soon.  It's not identified -- the Climate Action Council can't identify that.  There's going to be carbon leakage when we -- we can be zero here, our New York State doesn't know boundaries when it comes to climate and carbon emissions.  Again, if China's emitting at 29 percent, India at 7 percent -- and China in the first quarter of 2021 increased their carbon emissions by 14.5 percent.  Even President Biden said if China's not on board, we're wasting our time.  I agree with President Biden, we're wasting our time.  And that's the problem with the CLCPA.  I understand the goals and the initiatives to try to get the clean energy, but we're going at a pace that is not sustainable, that is not affordable and certainly not reliable.  How great is it to be at 0 percent if we can't keep the heat and the lights on when we're talking about fully powering your home with heat if you're in the North Country or in Western New York by solar and wind which is not reliable, which we know is intermittent.

          I know I'm talking about a lot of things here, but this

is all relatable to this bill because it's all part of a package that climate activists continue to push.  But my concern, and a number of the concerns on my side of the aisle, the business community and the families is this is not being done in a fair and balanced approach. Affordability and reliability continues not to be taken into account, and that's unfortunate because that's going to be very, very problematic for your constituents, for my constituents, for this entire State.  What are we going to send to -- what kind of message are we sending to our business community if they can't -- our manufactures and our small businesses can't operate if they don't have a reliable source of energy and if the energy is too expensive that they're receiving?

One other point, energy security.  You know, with the march, when we talk about electric vehicles and, you know, all those supplies that they use, China controls 87 percent of the marketplace when we talk about those rare Earth -- the metals and the elements that go into production of electric vehicles, go into the production of batteries, 87 percent of that is processed by China.  They control that market.  So we're turning our whole energy security over to China while, at the same time, when they do process that, what are they using?  They're using coal power to process.  So what kind of impact are we making on our environment as we work towards these goals here in New York State when no one else is joining us, no one else is going to follow us, and I know when we talk about this issue on your side of the aisle you say we're going to lead.  We're going to lead, all

293

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

right, we're going to lead with businesses, families, manufacturers, farmers leaving our State while we bankrupt those who are still here and can't move because they can't afford it.  It's challenging and there's a lot more we need to do.

So as we continue this march to zero net emissions and these CLCPA goals that continue to be pushed, I'm just concerned.  I wish your side of the aisle would be a little bit more concerned about the financial costs and impact, because we're not going to make the true impact overall when New York only contributes 0.4 percent of the total carbon emissions in the world, and China's running rampant and not helping us and continuing their march to dominate the energy market, whether it's building coal plants and controlling the rare Earth materials that are needed for full electrification along the way.  So for that -- these many reasons, Mr. Speaker and my colleagues, I'm going to vote no and I urge my colleagues to continue to do the same.  Thank you.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 9405.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  The Republican

294

Conference is generally opposed to this legislation for the reasons mentioned by my colleague and others.  Those who support it can certainly vote yes here on the floor or by contacting the Minority Leader's Office.  Thank you.

ACTING SPEAKER AUBRY:  Thank you.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker.  The Majority Conference is generally going to be in favor of this piece of legislation; however, there may be some who choose to be an exception.  They can either select that option here in the Chambers or they can call the Majority Leader's Office and we will make sure their vote is properly recorded.  Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

(The Clerk recorded the vote.)

Mr. Goodell to explain his vote.

MR. GOODELL:  Thank you, sir.  Obviously here on the floor of the Legislature, we believe in the importance and value of legislation, and the power and the strength of the State through mandates, backed by law, to accomplish objectives.  But there's an even stronger and more effective way to promote efficiency and that's through the marketplace.  And so if more efficient appliances cost consumers less money, either in the short-term or long-term, we don't need to pass legislation, do we, because our residents are smart people.  And our residents will vote with their pocketbook.

And so rather than passing mandates that some of our

295

residents won't be able to afford, it would be helpful if we focus on how we make energy efficiency more affordable rather than more expensive.  And to the extent we're successful in making energy efficiency more affordable, our smart residents won't move in that direction without State legislation.  And for that reason, I don't think this legislation is the right approach, and although I certainly support my colleague's desire to improve energy efficiency, the best way to do it is through the marketplace by making it more cost-effective rather than mandating it.  Thank you, sir.

ACTING SPEAKER AUBRY:  Mr. Goodell in the negative.

Ms. Fahy to explain her vote.

MS. FAHY:  Thank you, Mr. Speaker.  I just want to briefly note that this bill, again, it establishes Advanced Building Codes, Appliance and Equipment Efficiency.  It builds upon the climate goals that we adopted in 2019 and I think will help us with moving toward more efficient appliances, as well as buildings.  Buildings are the single largest user of energy in the State of New York and account for most of the energy consumed by the end use in -- in -- in the State.  These new codes would help govern new buildings, as well as existing buildings and build us towards a lesser carbon footprint.

I should add that one analysis shows that energy efficiency in product standards have the potential to reduce 36 million metric tons of carbon dioxide, the equivalent of those emissions over

NYS ASSEMBLY                                    JUNE 1, 2022

lifetime of measures by 2030, or the equivalent of removing the

energy of half a million cars from the road each year.  This new

product and appliance standards also has the ability to deliver a

projected $15 billion in utility savings by 2035, which also includes 6

billion of that 15- in utility savings for low- to moderate-income

households.

          This is overdue, it will help us meet our goals and

help increase efficiency.  And with that, Mr. Speaker, I vote in the

affirmative.  Thank you.

          ACTING SPEAKER AUBRY:  Ms. Fahy in the

affirmative.

          Mr. Englebright to explain his vote.

          MR. ENGLEBRIGHT:  Thank you, Mr. Speaker.  I

just want to compliment the sponsor.  Her initiative, I think, is

farsighted and necessary.  We have just heard during the debate some

prerequisites that have been surmised to be appropriate before we take

action in New York.  I would point out that New York is a leader and

that the entire part of the Earth that we call civilization needs to move

in the direction that this bill points us toward.  We shouldn't impose

prerequisites for our own action to wait for China to catch up with the

reality that atmosphere changes and -- atmospheric changes and

changes in the global ocean are imperiling the global ecosystem.

Again, this is a very appropriate, farsighted initiative.  Thank you to

the sponsor for putting it before us.  I vote aye.

          ACTING SPEAKER AUBRY:  Mr. Englebright in

297

**NYS ASSEMBLY**                                        **JUNE 1, 2022**

the affirmative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr.
Speaker.  We're going to go now back to Mr. Anderson, who is ready.

Mr. Anderson.  That's Rules Report No. 391,
Anderson.

ACTING SPEAKER AUBRY:  Page 12, Rules
Report No. 391, the Clerk will read.

THE CLERK:  Senate No. S09297, Rules Report No.
391, Senator Kavanagh (Committee on Rules, Anderson--A10228).
An act to amend the Private Housing Finance Law, in relation to
increasing the bonding authority of the New York City Housing
Development Corporation.

ACTING SPEAKER AUBRY:  An explanation is
requested, Mr. Anderson.

MR. ANDERSON:  Thank you, Mr. Speaker.  Thank
you, Mr. Goodell.  This bill would essentially increase the bonding
authority of the New York City Housing Development Corporation,
also known as HDC, by $1 billion for a total cap of $18 billion.
Thank you.

ACTING SPEAKER AUBRY:  Mr. Goodell.

MR. GOODELL:  Thank you.  Would the sponsor

298

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

yield?

ACTING SPEAKER AUBRY:  Mr. Anderson, will you yield?

MR. ANDERSON:  For Mr. Goodell, I will yield.

ACTING SPEAKER AUBRY:  Mr. Goodell, the gentleman yields.

MR. GOODELL:  Thank you, Mr. Anderson.  And you'll be glad to know there are more Andersons in Jamestown that I represent than any other municipality of its size.

MR. ANDERSON:  Wait a minute, is it the cool Anderson with the O, or the E?

MR. GOODELL:  S-O-N.

MR. ANDERSON:  Ahh, there we go.  So they've done it correct.

MR. GOODELL:  And so you'll feel right at home in my district.

MR. ANDERSON:  I'm excited.

MR. GOODELL:  Am I correct that these bonds are backed by the taxpayers of the State of New York if they're not paid for by the proceeds of the bonds?

MR. ANDERSON:  I'm sorry, Mr. Goodell, can you repeat?

MR. GOODELL:  Am I correct that the -- these bonds are backed by the State of New York?

MR. ANDERSON:  No, Mr. Goodell, these bonds are

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

not backed by the State of New York.  This is a public authority so these bonds are done separately from that process.

MR. GOODELL:  I see.  And does the State of New York have any, what we call "moral obligation" to pay these bonds based on any appropriation from the State?

MR. ANDERSON:  No.  No more obligations on these bonds, Mr. Goodell; in fact, and I know you studied Constitutional Law, the Public Authorities and, in this case, corporations, are allowed to issue debt.  So that's what this corporation does, HDC, issued debt and that's upheld by the *Schulz v. New York* case in 1994.

MR. GOODELL:  And we're -- just a few months ago we passed a budget bill, we include several billions dollars in debt and interest payments.  Were any of the funds in the budget bill that we passed just a few months ago used to pay down the debts of this organization?

MR. ANDERSON:  No, Mr. Goodell.  This is, again, a private sort of entity, public corporation, if you will, rather.  So that -- that -- that piece doesn't apply.  So I want to just make sure that we're clear.  And I also want to -- I know that you referenced earlier in relation to a separate bill, but the legislative history on this bill is very clear.  It's passed 2010, 2013, '18, '19, '21, and it's because, again, we're just giving HDC the authority to borrow more.

MR. GOODELL:  And looking at the legislative history, and you're correct, it appears as though every year for the last

19 years we have increased their bond limit.  Has their --

        MR. ANDERSON:  Bonding authority.

        MR. GOODELL:  Bonding authority.  Has their debt ever gone down?

        MR. ANDERSON:  But I want to remind you that, Mr. Goodell, these are revenue bonds so they can always borrow and pay down, you know, as -- as time passes.  Again, these are revenue bonds.  I don't want you to think that these are bonds which, you know, in the traditional sense.

        MR. GOODELL:  Thank you very much, Mr. Anderson.  I appreciate your comments and clarification.

        MR. ANDERSON:  Thank you.

        MR. GOODELL:  On the bill, sir.

        ACTING SPEAKER AUBRY:  On the bill, sir.

        MR. GOODELL:  New York has the dubious distinction of having some of the highest debt per capita in the nation, and our public authorities, including this authority, lead the way in terms of adding more and more debt every year.  And indeed, this bill adds $1 billion, $1 billion in additional debt.  Now, no doubt this additional debt will be very helpful for this organization, and no doubt someone, somewhere is going to have to pay it back.  And that's going to be our kids or our grandkids or someone else.

        And so just speaking from my perspective, in my private life I do everything I can to reduce my debt and the restructure of my operations saw that my revenues meet or exceed my expenses,

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

and that's the process that I would recommend for our authorities, as well.  Some practical, common sense economic theory that suggests that we should and can keep our spending in line with our revenues rather than borrowing more and more and more for 19 years in a row.

So for that reason, I and many of my colleagues will be opposing this bill, but I recognize that as with many of my colleagues, they do great work with all the money they borrow. Thank you, sir, and thank you to my colleague for those comments.

ACTING SPEAKER AUBRY:  Mr. Anderson on the bill.

MR. ANDERSON:  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Sir, you've got to get that mic on.

MR. ANDERSON:  Sorry.  I just didn't know if the mic was working.

Thank you, Mr. Speaker.  So I just want to be clear that most households balance their households on debts and deficits, and I think if we do so responsibly we're able to ensure that there's successful use in that.  And HDC, again, is requiring that cap to be lifted so that it can produce the thousands of affordable homes and apartments across the City of New York to ensure that we address the exacerbated homelessness crisis that's impacting, and housing insecurity crisis that's impacting many, many New Yorkers.

So it's very critical that we pass this piece of legislation, and I encourage my colleagues to vote in favor of it.  I will

be, as well, and I thank my colleague, Mr. Goodell, for his questioning.  It's very important, again, that we look at this from a holistic sense of what we're actually producing with these debts and deficits.  Thank you.

ACTING SPEAKER AUBRY:  Thank you, Mr. Anderson.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 9297.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  The Republican Conference is generally opposed to the $1 billion increase in debt for the New York City Housing Development Corporation, but certainly we have members that appreciate all the great work they do with all that fund -- all those funds.  And so in general, we'll be voting no, but historically there have been several members that vote yes and I would encourage them to continue to do so here in the Chamber or by calling the Minority Leader's Office.  Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr.

NYS ASSEMBLY                                             JUNE 1, 2022

Speaker.  Majority colleagues are generally going to support our
colleague in this legislation to improve housing and affordable
housing in the City of New York; however, there may be some who
would choose to be an exception.  They should feel comfortable in
contacting the Majority Leader's Office and we will be happy to
record your vote.  Thank you, sir.

    ACTING SPEAKER AUBRY:  Thank you.

    (The Clerk recorded the vote.)

    Are there any other votes?  Announce the results.

    (The Clerk announced the results.)

    The bill is passed.

    Mrs. Peoples-Stokes.

    MRS. PEOPLES-STOKES:  Mr. Speaker, colleagues,
we're going to keep going here because we're doing so well.  So we're
going to go to Rules Report No. 139; Rules Report No. 429.  I'm
sorry, let me just say Rules Report No. 139 is the sponsor, Lupardo;
Rules Report No. 429 is sponsored by Mr. Magnarelli; Calendar No.
44 is sponsored by Ms. Rosenthal; Calendar No. 160 is sponsored by
Ms. Buttenschon -- Bichotte Hermelyn, I'm sorry; and Calendar No.
365 is by Mr. Weprin, and 474 is by Mr. Weprin as well.  Those --
479, Mr. Weprin as well.

    Mr. Speaker, those will be straight votes and then
we're going to go back to actual debates and that's going to be
Calendar No. 24 by Mr. Jacobson; Rules Report No. 513 by Mr.
Abbate; Calendar No. 163 by Mr. Abbate; Calendar No. 29 by Ms.

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

Paulin; and Calendar No. 194 by Ms. Joyner.  In that order, Mr.

Speaker, thank you.

ACTING SPEAKER AUBRY:  Page 6, Rules Report

No. 139, the Clerk will read.

THE CLERK:  Assembly No. A09328-B, Rules

Report No. 139, Lupardo.  An act to amend the Public Authorities

Law and the State Finance Law, in relation to requiring certain funds

received by the New York State Energy Research and Development

Authority that are related to renewables development on viable

agricultural lands to be used for farmland protection programs.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record

the vote on Assembly print 9328-B.  This is a fast roll call.  Any

member who wishes to be recorded in the negative is reminded to

contact the Majority or Minority Leader at the numbers previously

provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 14, Rules Report No. 429, the Clerk will read.

(Pause)

THE CLERK:  Senate No. S08956-C, Senator

Mannion.  An act to amend the Public Authorities Law.

305

ACTING SPEAKER AUBRY:  No, we're going to have to -- it has --

THE CLERK:  My apologies.

Assembly No. A09966-C, Rules Report No. 429, Magnarelli.  An act to amend the Public Authorities Law, in relation to the Syracuse Regional Airport.

ACTING SPEAKER AUBRY:  On a motion by Mr. Magnarelli, the Senate bill is before the House.  The Senate bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 8956-C.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 23, Calendar No. 44, the Clerk will read.

THE CLERK:  Assembly No. A00715, Calendar No. 44, L. Rosenthal, Weprin.  An act to amend the Public Health Law and the Education Law, in relation to authorizing emergency medical service personnel to provide basic first aid to cats and dogs under certain circumstances.

ACTING SPEAKER AUBRY:  Read the last section.

306

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

THE CLERK:  This act shall take effect on the 365th day.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 715.  This is a fast roll call.  Any member who wishes to be recorded in the negative should contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Mr. Goodell to explain his vote.

MR. GOODELL:  Thank you, sir.  This bill allows EMTs to provide basic first aid to dog and cats before transporting them to a licensed vet.  And I love dogs and cats, and I'll be supporting the bill, but I would point out that this is not quite as straightforward as you might think, so let me just give you some things to think about.

So your dog or cat gets hurt, you're going to call the local EMTs and hope they show up with an ambulance and transport your dog or cat to the vet.  Well, this bill will allow them to do it without being sued.  What happens if your dog, in pain, bites the EMT?  Well, the EMT can sue you, you just can't sue the EMT; that's what this bill says.  Now, what if he takes your aged dog or cat to the vet and the vet bill is a couple thousand dollars?  And you said, you know, *I love Spot, but not that much*.  This bill doesn't address that issue.

So before people start calling EMTs to rush over and take care of their dog or cat, you might want to give some thought to

some of these other issues and make sure, by the way, that they send a spare ambulance because if your neighbor has a heart attack, you surely don't want the ambulance that's transporting your dog to the vet to have to stop and dump your dog on the side of the road so they can pick up your neighbor and save his life.  I'm just saying, you know, I support the bill, I love the concept, love dogs and cats, but it's, you know, it's a little bit more challenging than what it might first appear, that's all.

So I urge my local volunteer firemen to be compassionate, but remember their first mission is to rescue humans in that ambulance and render first aid to dogs and cats as a secondary obligation.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 29, Calendar No. 160, the Clerk will read.

THE CLERK:  Assembly No. A04947-B, Calendar No. 160, Bichotte Hermelyn, Reyes, Griffin, Meeks, Colton, Zinerman, Simon, Frontus, J. A. Giglio, González-Rojas.  An act to amend the Penal Law, in relation to crimes involving the death or injury of a worker.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect on the 30th day.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 4947-B.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Ms. Bichotte Hermelyn to explain the bill [sic].

MS. BICHOTTE HERMELYN:  Thank you, Mr. Speaker, for allowing me to explain my vote.  This bill seeks to protect workers from corporations and their agents that fail to comply with safety protocols by amending the Penal Code to create new offenses and substantially increasing the fines that can be imposed upon a corporate defendant convicted of certain crimes that lead to an injury or death of a worker.

This bill is not a punitive bill, but a deterrent to have corporations pay attention to safety and stop having workers killed.  Construction is a dangerous business, and there's a difference between a worker dying in an accident and a worker being killed by actions undertaken by their employer.  This bill would issue a fine for convicted misdemeanor, 300,000 to 500,000, and for convicted of felony, 500,000 to 1 million.

Carlos' Law is named for 22-year-old Carlos Moncayo, an Ecuadorian immigrant who was buried alive at a construction site in New York City, Meat Packing District in April 2015 while working in an un-reenforced 14-foot-deep trench that had

been cited by safety inspectors.  The walls of the trench collapsed on Carlos, who was pronounced dead on the scene.  The safety violations that led to Carlos' death was Harco Construction in conjunction with Sky Materials.  He was working to achieve the American Dream, and all of that has ended.  And I can tell you from firsthand as a Haitian immigrant, as the daughter of a Haitian immigrant, my brother, too, had experienced almost dying, falling off seven stories of a scaffold, and never been able to recover.  He's disabled and unemployed.

The current $10,000 penalty for workers being killed or injured is not sufficient, it's not sufficient for my brother and certainly not sufficient for the death of Carlos Moncayo.  In the last decade, there has been over 500 deaths, construction workers, death-related cases; 263 since the bill was first introduced by Francisco Moya.  Mr. Speaker, again, this is not a punitive bill; instead, it's a bill that would deter corporations, employers for being negligent and reckless, causing workers to be killed at these construction sites.  I will be voting in the affirmative and encourage my colleagues to do so as well.  Thank you.

ACTING SPEAKER AUBRY:  Ms. Bichotte Hermelyn in the affirmative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Calendar No. 365, page 38, the Clerk will read.

THE CLERK:  Assembly No. A08190-A, Calendar

No. 365, Weprin, Gibbs.  An act to amend the Correction Law, in relation to allowing a telephone call prior to an incarcerated individual's transfer.

ACTING SPEAKER AUBRY:  On a motion by Mr. Weprin, the Senate bill is before the House.  The Senate bill is advanced.  Read the last section.

THE CLERK:  This act shall take effect on the 30th day.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Senate print 402-B.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  This will be a Party vote with the Republican Conference generally in the negative.  Obviously those who want to vote in favor can do so on the floor or by calling the Minority Leader's Office.  And I will explain in a moment why many of my colleagues will be opposed to this legislation.  Thank you, sir.

ACTING SPEAKER AUBRY:  Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker.  The Majority Conference is going to pretty much be in favor of this legislation; however, there may be a few that would choose to be an exception.  They should feel free to contact the Majority

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

Leader's Office.  We will make sure their vote is properly recorded.

Thank you, sir.

(The Clerk recorded the vote.)

ACTING SPEAKER AUBRY:  Thank you.

Mr. Weprin to explain his vote.

MR. WEPRIN:  Thank you, Mr. Speaker.  This bill

may seem like a simple bill, but as Chair of Correction, I'm often

contacted by families of incarcerated individuals who cannot locate

their loved one because they were transferred and no one from DOCS

had notified them that the individual was being transferred, and there

was a certain secrecy with it.  So it seems to be a very reasonable

request to allow the incarcerated individual to make a phone call to

their loved ones to let them know where they're being transferred to.

It provides, you know, sanity, state of mind to the families and it's a

reasonable accommodation.  And I withdraw my request and proudly

vote in the affirmative.

ACTING SPEAKER AUBRY:  Mr. Weprin in the

affirmative.

Mr. Goodell to explain his vote.

MR. GOODELL:  Thank you, sir.  Under current law,

an incarcerated individual who is transferred to a different facility is

entitled to a phone call within 24 hours after arriving at the new

facility.  This bill would require DOCS to provide the opportunity for

a phone call before the transfer except under exceptional

circumstances where there's an unacceptable risk to the safety and

312

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

security of the staff.  And then when there is such an exceptional circumstance, it has to be immediately documented.

Well, our correctional staff have a really difficult and challenging job and it's absolutely critical to the health and safety of our correctional staffs that we minimize all their risk.  And the number of assaults on our correctional staff continue to go up, and it's really, really troublesome.  And so this bill doesn't say that you don't get a phone call if there's a risk, it has to be an unacceptable risk and it has to be exceptional circumstances.  And that's not the correct standard for us to apply when we're looking at the life and safety of our correctional officers.  And when a prisoner is transported from one facility to another, there are inherent risks because you're outside the confines of that prison, you're in a vehicle.  The likelihood that the vehicle could be stopped or attacked or ambushed, or an inmate could escape is dramatically higher.

And so for most of my colleagues, we want to put the life and safety of our correctional officers first recognizing, as the sponsor did, that it's important to notify the families immediately, and the current law has the correct balance by requiring that that phone call be made and available within 24 hours after the arrival rather than before where some inmates will tip off their relatives when they're moving.  For that reason, I will not be supporting this.  Thank you, sir.

ACTING SPEAKER AUBRY:  Mr. Goodell in the negative.

Mr. Meeks to explain his vote.

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

MR. MEEKS:  Thank you, Mr. Speaker, for an opportunity to explain my vote.  I think -- I rise in the affirmative.  I support this bill.  And I think we have to realize that these are incarcerated individuals.  They are the family members, they are the loved ones of others.  And in this process, you also have to consider the fact that the current system is set up in a manner which people travel across the State in order to visit loved ones who may be incarcerated.  So you have may have an instance where a family member has saved resources to visit someone across the State and go to the facility to find out that they're no longer there.  And it is also a safety measure for individuals to know where their family members are and where they're being transferred to.  So I rise in the affirmative.  Thank you.

ACTING SPEAKER AUBRY:  Mr. Meeks in the affirmative.

Mr. Gibbs.

MR. GIBBS:  Thank you, Mr. Speaker.  I rise in the affirmative as well, and I want to thank the sponsor for the bill -- and I want to thank the sponsor for the bill.  It's necessary that we notify the individual's families for the individual incarcerated, whether it be prior to being transferred, because like Member Meeks said, there are family members who are traveling far, and in many cases I went to a prison and the incarcerated individual was not there.  It's a lot of resources, it costs a lot of money and since taking this seat, I visited nine prisons and these are one of the situations where no family

314

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

members are notified about being transferred or other incarcerated
individuals no longer at that facility.  So I rise in the affirmative and I
thank Assemblymember Weprin for the bill.

                ACTING SPEAKER AUBRY:  Mr. Gibbs in the
affirmative.

                Mr. Giglio.

                MR. GIGLIO:  Thank you, Mr. Speaker, to explain
my vote.  The most important thing that's here is safety and security.
And when those phone calls are made after they arrive at their
destination, they're assured they get there safe and secure.  The second
part of this is when we did chapter corrections about why those phone
calls might not have been made, a lot of our incarcerated person's
choice on who they're going to call, and it's not always their family.
So we can't legislate who they're going to call, but we can keep them
safe and that's why I will be voting no.

                ACTING SPEAKER AUBRY:  Thank you, sir.

                Mrs. Galef to explain her vote.

                MRS. GALEF:  Yes, I'd just like to explain my vote.
I had a really interesting experience this weekend.  I spent all Sunday
at Greene County Correctional Facility.  I have a friend who had a
foster child, or adopted a child who ended up there and I, frankly,
because I wanted to take my friend who actually had cancer and was
on a breathing tube and everything else, there so I could allow her to
experience that hug that she had for her foster child.  But it was so
interesting for me to see people that had come from Rochester, they

315

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

had spent three hours to get to the prison.  We had spent two hours to

get there.  There were probably other people that had spent many

more hours to be able to come and take care of their loved ones.  We

sat in the visitor room, you could see people hugging and chatting and

so on.  And it is terrible that people are there, but at the same time we

want to be sure that when you go there as a visitor that you can get in.

Just think of traveling three hours and finding out that your loved one

is somewhere else and you don't know it?

So I think it's only right that we allow connections

between the correctional facility or the prison as to where that

individual is.  And this is just a good bill, it just makes sense.  And I

think it makes sense for the correction officers that are there, too, that

are trying to do their job and they know that when people are engaged

with individuals that they care about that hopefully they will be better

residents of the facility.  It was a very interesting experience.  I would

suggest -- I have been at Sing Sing, you know that, for many, many

times, but not to visit an individual, and I was very, very -- it was

difficult to do.  Thank you.  I will be voting yes.

ACTING SPEAKER AUBRY:  Mrs. Galef in the

affirmative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 42, Calendar No. 479, the Clerk will read.

THE CLERK:  Assembly No. A08902, Calendar No.

316

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

479, Weprin, O'Donnell, Aubry, Walker, Gibbs.  An act to amend the Correction Law, in relation to certificates of relief from disabilities.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect on the 90th day.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 8902.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  The Republican Conference will be generally opposed to this.  Those who support it can vote here on the floor or by contacting the Minority Leader's Office.  And I will provide a brief explanation why many of my colleagues are opposed to this in a moment, sir.

ACTING SPEAKER AUBRY:  Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker.  This, again, is a vote that generally Democrats are going to be in support of; however, there may be some colleagues who choose to be an exception, and they should feel free to either push their button in the Chambers and/or contact the Majority Leader's Office and I will make sure their vote is properly recorded.  Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

(The Clerk recorded the vote.)

317

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  If an individual is convicted of various offenses, there are some positions they cannot then occupy; for example, you can't get a liquor license if you have certain convictions, or certain other licenses or privileges.  And the only way you can get such a license is to get a certificate of relief from disabilities.  That certificate of relief from disabilities can be issued by the Department of Correctional Services or by a court upon a finding that you have completed your sentence and that you are an eligible offender, and that the granting of the certificate is consistent with the rehabilitation and helpful, and consistent with public safety.

Under current law, the issuance of that certificate of relief of disabilities is discretionary.  This bill would make it mandatory.  And I think it's important to recognize that sound discretion can ensure that the certificate of relief from disabilities is only issued to those who qualify and are safe for those occupations that they'll then be applying for and not automatically granted upon completion of their prison sentence.  For that reason, I will be voting against this because I think some discretionary review is appropriate in this situation.  Thank you, sir.

ACTING SPEAKER AUBRY:  Mr. Goodell in the negative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

318

Page 21, Calendar No. 24, the Clerk will read.

THE CLERK:  Assembly No. A00349-B, Calendar No. 24, Jacobson, Otis, Sayegh.  An act to amend the Municipal Home Rule Law, in relation to the definition of "population" for purposes of providing substantially equal weight for the population of that local government in the allocation of representation in the local legislative Body.

ACTING SPEAKER AUBRY:  Mr. Goodell.

MR. GOODELL:  An explanation, please.

ACTING SPEAKER AUBRY:  An explanation is requested, Mr. Jacobson.

MR. JACOBSON:  Thank you.  This is a very simple, but important bill.  This bill codifies existing case law with respect to redistricting and makes it clear that the definition of "population" for purpose of redistricting for local governments and counties shall mean residents.  This bill modifies Section 10 and Section 34 of the Municipal Home Rule Law.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 349-B.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the number previously provided.

Mr. Goodell.

319

MR. GOODELL:  Thank you, sir.  The Republican Conference is generally opposed for the reasons I will explain in a moment, but those who support it should vote in favor here on the floor or by contacting the Minority Leader's Office.  Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker.  The Majority Conference is going to be in favor of this piece of legislation.  There may be some of our colleagues who would choose to be an exception.  They should contact the Majority Leader's Office, I will make sure their vote is properly recorded.  Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

(The Clerk recorded the vote.)

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  This legislation removes any reference to citizens in terms of determining how election districts on the local level should be reapportioned.  I point out that our New York State Constitution in Article II, so you don't have to read too far into it, the first section refers to, *Every citizen shall be entitled to vote*.  Now, I recognize that in some areas the number of people who are not citizens can be significant; in fact, I saw that the City of New York was trying to pass legislation to enable not only non-citizens, but illegal immigrants, or undocumented immigrants, to vote and they had estimated there were as many as

320

800,000 who were there.  But I think the first and primary function of the New York State Legislature should be to represent New York State residents who are citizens and lawful residents here in our State. And likewise, that if you focus on one person/one vote concept and your mission is to represent citizens who are lawfully in your community, we should not eliminate the reference to citizenship in terms of local redistricting.

And for that reason, I will not be supporting it both because I think it's inconsistent with the letter and spirit of our own State Constitution, but also inconsistent with the concept that representation in local government should be based on equal representation of those who are lawfully here and are citizens.  Thank you, sir.

ACTING SPEAKER AUBRY:  Mr. Jacobson to explain his vote.

MR. JACOBSON:  The current state of the law follows a number of cases that have come from the Supreme Court and in 1964 in the case of *Reynolds v. Sims*, the Court held that the Equal Protection Clause requires that both seats -- that the seats in both Houses of a bicameral State Legislature, such as we have - we have an Assembly and a State Senate - must be apportioned on a total population basis.  That's what we do.  We, before we redistrict, we use all of the population of the entire State.  And that's -- and we do that and that's what the law is now.

And it's important to realize that we represent

321

**NYS ASSEMBLY**                                                    **JUNE 1, 2022**

everyone who lives in our respective districts.  We represent adults

and children, those who are voting age and those who are not.  We

represent those who are eligible to register to vote, but choose not to,

and of those who are registered to vote, we represent those who some

will vote and some who do not vote.  We represent citizens and

non-citizens.  In short, we represent all the residents in our districts

and when it comes to redistricting of the State Legislature, we use the

number of residents in the State.  This bill makes sure that local

governments do the same and use all the residents in their

municipality.

So with that, I vote in favor of the bill.  Thank you.

ACTING SPEAKER AUBRY:  Assemblyman

Jacobson in the affirmative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 18, Rules Report No. 513, the Clerk will read.

THE CLERK:  Assembly No. A10425, Rules Report

No. 513, Committee on Rules (Abbate, Sillitti, Englebright, Thiele,

Braunstein, Jones, Colton, Gunther, Otis, Burdick, Santabarbara,

Abinanti, Dinowitz, Griffin, Lavine, Woerner, Stern, Jean-Pierre,

Stirpe).  An act to amend the Civil Service Law and the Labor Law, in

relation to clarifying the vesting of retiree health insurance within

collective bargaining agreements.

ACTING SPEAKER AUBRY:  Mr. Goodell.

MR. GOODELL:  Thank you, sir.

On the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. GOODELL:  The courts have almost universally, for going back decades or centuries, held that when there's a written contract between parties, you have to look at the four corners of the contract to decide what the parties intended to do.  And as long as a contract is reasonably clear, the courts would not allow people after they signed a contract to go to court and say, *Hey, that's not really what I meant*, or, *There should be more things covered by this contract*.  And that rule which said if you want to be clear, you have a written contract, write it down and we will not consider extrinsic verbal evidence to change what's in the writing.  And it's called a parol evidence rule, parol meaning verbal.

So in 2020, the New York State Court of Appeals applied that longstanding rule of contract interpretation to collective bargaining agreements as they related to lifetime health insurance for retirees.  And they said you have to read the collective bargaining agreement, it's a written agreement, the words were negotiated, the parties were almost always represented by competent lawyers, and they said -- the Court of Appeals said you don't get lifetime health benefits as a retiree unless the contract says you do.  And the only time you can have oral testimony that goes beyond the contract terms is if the contract was, quote, "sufficiently ambiguous as to require additional testimony."

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

And what this bill says is no, even if it's not ambiguous, even if it's not clearly covered, you can introduce oral testimony.  And the problem with it is that it removes the confidence that the parties have that their written agreement actually defines the written terms and conditions, and in this area of lifetime retiree health insurance, it opens a possibility that people can claim that even though the contract didn't cover it, they meant to have lifetime health insurance.

Now, many of my colleagues and I have received lobbying efforts from people that are looking at retirement because having lifetime retiree is a huge benefit, of course.  The older I get, the more valuable it looks.  But we also have to remember it's a huge cost to our local governments and schools and others, and in my particular district, this lifetime retirement benefit almost drove the City of Jamestown into bankruptcy.

So I think we should stick with standard contract interpretations, require and expect the parties who are represented by attorneys to put what they mean and mean what they say when they write the contract, and to allow parol evidence, or verbal evidence, only when there's an ambiguity that needs that additional evidence.  For that reason, I will be voting against it, but I recognize that many of my colleagues will want to support it.  Thank you, sir.

ACTING SPEAKER AUBRY:  Mr. Goodell.

Read the last section.

THE CLERK:  This act shall take effect immediately.

324

NYS ASSEMBLY                                         JUNE 1, 2022

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 10425.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 30, Calendar No. 163, the Clerk will read.

THE CLERK:  Assembly No. A05108, Calendar No. 163, Abbate, Colton, Barnwell, Lawler, Sillitti, Sayegh, J. A. Giglio, Zebrowski, Tannousis.  An act in relation to affecting the health insurance benefits and contributions of certain retired public employees.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  The Clerk will record the vote on Assembly print 5108.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  The Republican Conference will be generally opposed to this legislation for the

325

reasons I'll explain in a moment.  Those who wish to support it can certainly vote yes here on the floor or by contacting our Leader's Office.  Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, the Democratic Conference is generally going to be in favor of this piece of legislation to assure that people have access to health insurance; however, there may be a few of us who want to be an exception.  They should feel free to either vote in Chambers and/or call the Majority Leader's Office and we will make sure their vote is properly recorded.  Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you, ma'am.

(The Clerk recorded the vote.)

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  This bill makes it illegal for public employers to diminish the health insurance benefits provided to retirees after the effective date of this law.  And this creates tremendous problems because a lot of municipalities are being -- seeing those costs escalating way beyond what they had ever planned for and, as a result, many municipalities are negotiating with their retirees to have them leave a 100 percent locally-funded retiree plan or health plan -- rather, a health plan and instead go into a Medicaid supplemental plan.  And as I mentioned earlier, these retiree health benefits brought the City of Jamestown right to the edge of

bankruptcy, and they addressed it by providing their retirees with a supplemental Medicaid plan, or Medicare plan, so they ended up with the equivalent coverage at a fraction of the cost.

This bill would make it illegal for municipalities to implement those types of innovative cost-cutting measures that shift the cost from the local taxpayer on to Medicare and would, therefore, result in much higher taxes for a lot of our municipalities with no corresponding benefit for the retirees.  For that reason, I can't support it and recommend against it to my colleagues.  Thank you, sir.

ACTING SPEAKER ZEBROWSKI:  Mr. Goodell in the negative.

Mr. Goodell.

MR. GOODELL:  Thank you, Mr. Speaker.  Please record my colleagues Mr. Durso, Mr. Gandolfo, and Mr. Ra in the affirmative.  Thank you, sir.

ACTING SPEAKER ZEBROWSKI:  So noted.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  Also record my colleagues Mr. Smith -- Mr. Schmitt and Mr. Brabenec.

ACTING SPEAKER ZEBROWSKI:  So noted.

MR. GOODELL:  And Jodi Giglio, and let's not forget Mr. Mikulin.

ACTING SPEAKER ZEBROWSKI:  Thank you, Mr. Goodell, so noted.

MR. GOODELL:  Thank you, sir.

ACTING SPEAKER ZEBROWSKI:  Ms. Walsh to explain her vote.

MS. WALSH:  Actually, Mr. Speaker, I'm not going to explain my vote, but I would like you to please record Mr. Tannousis in the affirmative on this bill.  Thank you.

ACTING SPEAKER ZEBROWSKI:  So noted.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 22, Calendar No. 29, the Clerk will read.

THE CLERK:  Assembly No. A00382, Calendar No. 29, Paulin, L. Rosenthal, Jacobson, Colton, Quart, Gottfried, Vanel, Hevesi, Fahy, Lupardo, Kelles, Wallace, Lunsford, Forrest, Gallagher, Stirpe, González-Rojas, Cymbrowitz, Reyes, Sayegh, Lavine, Mamdani.  An act to amend the Not-for-Profit Corporation Law, in relation to the creation, operation, and duties of natural organic reduction facilities as cemetery corporations.

ACTING SPEAKER ZEBROWSKI:  Ms. Paulin, an explanation has been requested.

MS. PAULIN:  Of course, I'd love to.  The bill provides for the cremation -- a creation, operation and duties of natural, organic reduction facilities by a cemetery corporation.  Just so you know what natural organic production is, it's the contained accelerated conversion of human remains to soil over roughly a 30-day period.

**NYS ASSEMBLY**                                **JUNE 1, 2022**

ACTING SPEAKER ZEBROWSKI:  Mr. Lemondes.

MR. LEMONDES:  Thank you, Mr. Speaker.  Will the sponsor yield for a few questions?

ACTING SPEAKER ZEBROWSKI:  Ms. Paulin, will you yield?

MS. PAULIN:  I'd be happy to.

ACTING SPEAKER ZEBROWSKI:  The sponsor yields.

MR. LEMONDES:  Thank you, I appreciate that at this late hour.  Could you describe the process in a little more detail just so -- just so I understand exactly what's happening to the human body in this situation?

MS. PAULIN:  Sure.  So essentially the remains are placed in an above ground capsule containing a mixture of alfalfa leaves, wood chips and brass, and gently and naturally convert to soil over a period of 30 days.  It's similar to burial except once you put formaldehyde on the body, it takes longer to decompose.

MR. LEMONDES:  So what -- what is the purpose of this?  I'm struggling with the -- to me that -- that seems as if it's desecrating the human body --

MS. PAULIN:  Um, in fact --

MR. LEMONDES:  -- depending on what one's -- what one's faith might be.

MS. PAULIN:  Well, let's take the three -- the two options that are allowed by law.  One is putting the body in a coffin

329

**NYS ASSEMBLY**                                        **JUNE 1, 2022**

with a lot of chemicals and burying it, and then it decomposes over a
period of time and the formaldehyde creates a lot of pollution
underground.  The requirement of a casket is a lot of man hours and a
lot of natural resources, and it's a lot of land.  The second option is
cremation.  Cremation you essentially burn the body, which requires a
lot of fossil fuels and is very detrimental to the environment.  This
third option is similar to burial except without the formaldehyde and
it's above ground.  So it's -- it's -- I think if you watch old movies you
can think of the tomb that you put the body in and it decomposes, but
it's very similar to underground except without the chemicals and
without the land space.

    MR. LEMONDES:  So -- and thank you for that.  If
you don't mind, I'm going to keep going on this.  If I understand you
correctly there is no formaldehyde, no embalming fluid used
whatsoever in this.

    MS. PAULIN:  That's correct.

    MR. LEMONDES:  Okay.  Would this be a
requirement or an option for those families?

    MS. PAULIN:  All -- this would be an option.  It
would just be a choice of the family who certainly could use any of
the other two methods.  Both are -- we're not making any of them
illegal, we're just legalizing this one.

    MR. LEMONDES:  So is the -- is the primary driver
space, or environmental concerns or both?

    MS. PAULIN:  I think it's both.  And to give families

**NYS ASSEMBLY**                                         **JUNE 1, 2022**

another option.  When this bill passes, which we expect it will in the

Senate as well and signed into law, we would be the fifth state to

allow this, so it's a growing trend in the United States.

MR. LEMONDES:  I disagree on the space

component of that.  We lost 319,000 people in New York last year, we

lost 1.2 million over the last decade, our population is decreasing, it's

not increasing, and the main religions as far as I have information on,

the Catholic Conference, the Jewish faith and the Orthodox Christian

groups view this as desecration of the body.

MS. PAULIN:  Well, I've only received one negative

memo from, you know, a religious organization and that is the

Catholic Conference.  And the Catholic Conference says that a

process whereby human remains are composed and scattered in a

designated scattering garden or area in a cemetery fails to sufficiently

respect the dignity due the deceased.  So the question I wondered,

because I'm not Catholic, is does the Catholic faith object to

cremation?

MR. LEMONDES:  I can't answer that, I'm not -- I'm

not Catholic.

MS. PAULIN:  I don't -- I don't think they do.  And

the words that are in the law for cremation and for what we're

proposing are identical.  So I don't know why one type of burial or,

you know, one type of dealing with human remains would be contrary

to a religious belief when the law is identical for the other type.  But

again, it's a choice.  So if somebody wants to use this as their option

**NYS ASSEMBLY**                                          **JUNE 1, 2022**

they can, and if somebody doesn't they don't have to.  If I want to be

able to take some of the remains and plant a tree with my remains so

that my family could cherish that tree forever and remember my

memory, then that would be some option that I could use.  If someone

believes that, you know, this is contrary to their religious beliefs, then

they do not have to do this option and they can go with either

cremation or -- or burial as we have in the law currently.

       MR. LEMONDES:  Thank you for answering that.

Do you think that this would impact jobs at all, perhaps, in the funeral

industry across our State?

       MS. PAULIN:  The -- you know, there has to be a

type of -- we have to deal with the human remains so as long people

die, you know, at the same rate as we, you know, we have people --

you know, there's -- you know, we're going to keep those jobs.  So I

don't know that it's really a job issue.

       MR. LEMONDES:  Thank you for answering those

questions.

       Mr. Speaker, on the bill.

       ACTING SPEAKER ZEBROWSKI:  On the bill.

       MR. LEMONDES:  Thank you.  Due to the

opposition of the Funeral Directors Association, the Catholic faith,

and I will speak only on my own faith as an Orthodox Christian, this is

not something that we would do.  I can't support this.  I would also put

forward if the -- if the concern is of burial and space, there are --

cremation is still a viable option.  They use wool caskets as is done in

other countries which is completely biodegradable without any chemicals is also an option as well.  For those reasons, I would not support this and urge my colleagues not to as well.  Thank you.

ACTING SPEAKER ZEBROWSKI:  Read the last section.

THE CLERK:  This act shall take effect on the 90th day.

ACTING SPEAKER ZEBROWSKI:  The Clerk will record the vote on Assembly Bill 382.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  Based on our prior Committee votes, the Republican Conference is primarily in the negative on this, but there may be some colleagues that support this option.  And they are certainly welcome to use it themselves provided it passes and is signed into law, and they should vote yes here on the floor or by contacting the Minority Leader's Office.  Thank you, sir.

ACTING SPEAKER ZEBROWSKI:  Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker.  The Majority Conference is going to be in favor of this piece of legislation; however, there may be some of us who would choose to be an exception.  They should feel free to do so by calling the

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

Majority Leader's Office and/or pressing their button in the Chambers. Thank you, sir.

ACTING SPEAKER ZEBROWSKI:  Thank you.

(The Clerk recorded the vote.)

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, would you please record our colleagues Mr. Eichenstein, Mr. Barnwell and Mr. Colton in the negative on this item.  Thank you, sir.

ACTING SPEAKER ZEBROWSKI:  So noted.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 32, Calendar No. 194, the Clerk will read.

THE CLERK:  Assembly No. A05891-C, Calendar No. 194, Joyner, Simon, Dickens, Carroll, Aubry, O'Donnell, Dinowitz, Forrest, Jackson, Hevesi, Mitaynes, González-Rojas, Otis, Epstein, Kelles, Cruz, Reyes, Zinerman, Seawright, Pretlow, Anderson, Burdick, Burgos, Quart, L. Rosenthal.  An act to amend the Family Court Act and the Criminal Procedure Law, in relation to the custodial interrogation of juveniles by law enforcement.

ACTING SPEAKER ZEBROWSKI:  Ms. Joyner, an explanation has been requested.

MS. JOYNER:  Sure.  This bill -- this bill would provide for additional protections and procedures when a youth is taken into custody by law enforcement during youth interrogations.

334

ACTING SPEAKER ZEBROWSKI:  Ms. Walsh.

MS. WALSH:  Thank you, Mr. Speaker.  Will the sponsor yield, please?

ACTING SPEAKER ZEBROWSKI:  Ms. Joyner, will you yield?

MS. JOYNER:  Yes.

ACTING SPEAKER ZEBROWSKI:  The sponsor yields.

MS. WALSH:  Thank you so much.  So I'd like to get -- I have -- I have a number of questions actually, about this, it's very interesting.  First of all, I noticed that this bill is in a C print.  Can you just talk a little bit about any changes that were made in the bill along the way?  Because some of the -- some of the people that -- some of the organizations that have weighed in one way or the other have commented that the bill appears to be improved from earlier versions in their views, so I'd just like to hear that from you.

MS. JOYNER:  I mean, yes.  We took in feedback from different groups and we landed on the language that we're discussing today.

MS. WALSH:  Okay.  So basically the way I read the bill is that it does, you know, a few different things.  The first has to do with notifying a parent or person legally responsible for the juvenile defendant at the moment preceding the arrest or questioning of the juvenile defendant.  Can you just talk about what that process is going to be under -- under this legislation?

335

MS. JOYNER:  Right.  It clarifies what immediate notification is.  Right now, it's ambiguous.  The bill makes it clear that immediate notification is before there's any transport of the child to another location.

MS. WALSH:  Okay.  And -- so if the police reasonably believe that there's going to be a parent or person legally responsible at the juvenile defendant's home, they're required to take the juvenile defendant to their home and see if a parent or person legally responsible comes to the door; is that correct?

MS. JOYNER:  Yes.  Presumption is to release to the parent.

MS. WALSH:  Okay.  So -- and then when they -- say they go there and there's a parent or, and I'll just say PLR, person legally responsible, is available, they come to the door.  If it is a felony charge, then what happens in that case?

MS. JOYNER:  If it's a designated felony, you know, they have different options.  They can take the child to the police station, family court, or magistrate.

MS. WALSH:  Or, what was the last?

MS. JOYNER:  Magistrate.

MS. WALSH:  Oh, magistrate, okay.  Now, if it's something that's not a designated felony, they're directed to issue an appearance ticket and allow the juvenile defendant to remain at their home with their parent or PLR, right?

MS. JOYNER:  Yes.

336

MS. WALSH:  Okay.  So what happens -- okay.  So is there any determination that's being made by law enforcement?  Let's say they get to the juvenile defendant's home and a parent comes to the door who is obviously intoxicated, is obviously impaired in some way or is, you know, for a variety of reasons an unsuitable person to leave the juvenile defendant with.  Under this legislation, must they still do that if it's a -- if it's a non-felony?  Do they still need to release with an appearance ticket in that instance?

MS. JOYNER:  Right.  So if it's an unsafe condition, police will retain discretion as to whether or not it's appropriate to release the youth at their home.

MS. WALSH:  Okay, that's good.  So let's say then that -- let's say it's a felony, a designated felony and instead of -- so in that instance, do they -- does law enforcement have to take the juvenile defendant to the home first or may they take them directly to the police station?

MS. JOYNER:  Right.  So if it's a designated family act -- felony, sorry.  If it's a designated felony, yes, the presumption is to either take to the family court or the magistrate.

MS. WALSH:  But before they do that, must they still make attempts to notify the parent or PLR?

MS. JOYNER:  Yes.

MS. WALSH:  Okay.  And if there is no response or if there is a response, would the parent come to the -- would the understanding be that they would come to the station to join the

337

juvenile defendant at the station during processing?

MS. JOYNER:  Right.  The pres -- you know, we would be presuming that the parent or the PLR would show up but, yes, this bill is just clarifying the timing of notification and giving the parents, you know, awareness that they are -- the child is in custody.

MS. WALSH:  An awareness that this has happened and an opportunity to appear.  Is there any consequence if that parent or PLR says, *You know what, this is the empteenth time that this kid has been in trouble, I'm working, or I'm busy, or I'm not coming down there*.  Does that change anything as we look through the sequence here of what happens?

MS. JOYNER:  No.

MS. WALSH:  Okay.  So they get to the station.  At that point, what happens at that point, what happens next?

MS. JOYNER:  It depends.  If it's just for questioning, it's an invest -- you know, an investigatory process they can, you know, ask questions, but if it's a custodial process, that's where, you know, Miranda Rights are required to be read and the consultation with an attorney must be provided to the -- to the child.

MS. WALSH:  Okay, that's interesting.  So the consultation with the attorney then only takes place if there's going to be a custodial result.

MS. JOYNER:  Yes.

MS. WALSH:  Okay, that's good to know.  I did not get that from the bill, I appreciate that.  So let's talk about that

338

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

consultation with the attorney.  It can be by video conference, it can

be by telephone, it can be in person.

MS. JOYNER:  Correct.

MS. WALSH:  Okay.  Depending upon the time of

the night, whether it's a weekend or a weekday, is it envisioned that

there would be attorneys for the children that would be available or

on-call or on staff to be able to provide these types of services, or...

MS. JOYNER:  After consultation with OCA and

Legal Aid, yes, this -- they feel like the need will be met.

MS. WALSH:  Okay.  Because, you know, we have a

big state here and some areas are pretty rural and I know speaking as

an attorney for the child myself that, you know, it's -- it's -- the candle

is dwindling right now.

MS. JOYNER:  And that's why, you know, we made

this expansive list of options.  So again, phone, video, or in person.

So we, you know, made it enough that it's flexible where options are

available to, you know, take into consideration the, you know, the

issues you're bringing up.

MS. WALSH:  Is there -- is there -- what if there just

isn't anybody immediately available, an attorney immediately

available to confer with the juvenile defendant; what happens then?

MS. JOYNER:  Then statements cannot be taken at

that point.

MS. WALSH:  Okay.  And -- okay.  So let's say that

they're able to patch in through video conference, say, an attorney for

339

the child, and that attorney has a consultation.  Is that a private consultation with the juvenile defendant or is it in the presence of law enforcement?

MS. JOYNER:  Private, yes.  Private.

MS. WALSH:  Okay.  So let's say that that occurs and let's say that the attorney advises the juvenile defendant, *Do not make any statements*, that is -- *I don't want you making any statements at all*.  And they complete the consultation and then the juvenile defendant says, *Yeah, I know that the attorney said that, but I, having been given my Miranda Rights*, and everything that has been met on the Miranda Rights, *I want to make a voluntary statement*.  Can they -- can that defendant do that and still have that admissible later?

MS. JOYNER:  Yes.  If it's a knowing and voluntary waiver, it's admissible, and especially after a consultation with an attorney.

MS. WALSH:  So it's still appropriate -- it could be appropriate for the juvenile defendant to reject any advice through the consultation, the important thing is that the consultation did occur.

MS. JOYNER:  Yes.

MS. WALSH:  All right.  And if -- okay.  So let me just -- I know I'm throwing these at you pretty quickly, let me just get back to my notes here.  All right.  Now, I noticed that in the law itself, and this wasn't a portion that was changed by the -- by the bill, there's a section that deals with kind of factors to be considered.  I'm looking at page 3 starting around line 22, about -- in determining the

340

**NYS ASSEMBLY**                                             **JUNE 1, 2022**

suitability of questioning.  You're going to consider the presence or

absence of parents, the reasonable period of time for questioning, do

you see that section?

        MS. JOYNER:  Yes.

        MS. WALSH:  What -- what is the relevance of those

determinations?  Because doesn't the bill really have to do with

whether a statement is going to be suppressed as a matter of law?  I

mean, are you really going to be doing like a Huntley Hearing as far as

whether a statement is going to be suppressed or not suppressed?

        MS. JOYNER:  So Huntley Hearings are still

permissible and, you know, we put this language in for the judges to

decide, you know, how the interrogation went with the child.

        MS. WALSH:  So is it fair to say that a judge at a

Huntley Hearing will say, *All right, first of all, has there been -- must I*

*suppress as a matter of law because there was no attorney*

*consultation?  If there was attorney consultation and there's still a*

*statement, then I take a look at these other factors to see whether or*

*not it was -- whether or not rules were followed that make it a*

*reasonable -- reasonably obtained statement that I'm going to find*

*does not need to be suppressed*.

        MS. JOYNER:  So this doesn't change anything

that's, you know, currently happening.  It's basically laid out in this

way to reassert, you know, factors that the judges can look at in terms

of looking at the interrogation process.

        MS. WALSH:  Okay.  All right.  So -- hold on a

second.  Okay.  So one of the things -- one of the groups that has

concerns with the legislation even in its C print where we are here is

the New York State Sheriff's Association.  So I just want to review

what they're saying.  They're saying, *This version is better than the*

*original because the original would have prohibited police from even*

*talking to an arrested juvenile unless it was necessary to prevent the*

*immediate death or injury of a third-party*.  So that was maybe some

of the feedback that you received, you changed the bill, that's great.

But they say -- they say, *No defense attorney will ever tell their client*

*to speak with the police so in virtually all cases, the juvenile's*

*culpability for a crime would have to be proven another way*.  What --

what is your response to that concern from the Sheriff's Association?

          MS. JOYNER:  Right.  So you know, basically this

bill is just ensuring that Constitutional protections are actually a

reality.  So you know, I hear the arguments, that's why we need the

bill, we made additional changes to the bill in terms of narrowing the

scope.  But, you know, data is that 90 percent of adolescents are

waiving their Miranda Rights, so again, we feel like this is a very

important issue and this bill best addresses that goal.

          MS. WALSH:  And you just reminded me of a

question I forgot to ask you earlier when we were talking about

Miranda Rights.  Let's say that there is a parent or PLR that comes --

say comes to the station with the juvenile defendant.  May the juvenile

defendant him or herself waive Miranda Rights?

          MS. JOYNER:  It's a non-waiveable right for a child.

**NYS ASSEMBLY**                                        **JUNE 1, 2022**

The parent cannot waive this right on behalf of the child, no.

      MS. WALSH:  So they parent cannot waive it --

      MS. JOYNER:  No.

      MS. WALSH:  -- only the juvenile defendant him or herself could waive it.

      MS. JOYNER:  Correct.

      MS. WALSH:  Okay, thank you for that.  So one of the other things that the Sheriff's Association points out is they say, *The big question is what about voluntary statements made to officers before the juvenile is brought to a station or to their home*.  Would these be admissible?

      MS. JOYNER:  Right.  So again, if it's during the investigation process, statements are, you know, allowed.  It's only after a custodial -- custody arrest where consultation within an attorney is, you know, mandated.

      MS. WALSH:  Okay.  So for example - and I'm not a criminal lawyer so I don't know the answer to this - when they are transporting the juvenile defendant, say, to the home to see if the parent is there and in the car, in the squad car on the way over to the home the juvenile defendant is making admissions.  Is that -- is that considered to be custody where those statements would not be okay, or would we back it up further to, say, at the scene of the crime, or alleged crime if there are statements made there by the juvenile defendant where that defendant is not currently in custody?  I mean, where do we draw the line as far as those earlier statements prior to,

343

**NYS ASSEMBLY**                              **JUNE 1, 2022**

say, being at the station?

        MS. JOYNER:  Custody is defined as whether the person feels they can leave or not.

        MS. WALSH:  Okay.  Okay.  So I don't know the answer to that.  Did you happen to know if that means that if they're in the scenario where they're in the police car on the way to the home?  Does it depend on whether the car door is locked?

        MS. JOYNER:  You know, this would be up to a judge to look at --

        MS. WALSH:  Okay.

        MS. JOYNER:  -- whether or not, you know, again, with the factors we laid out in the bill would a child feel like they have the ability to leave or not.

        MS. WALSH:  Okay, very good.  Now, one of the concerns that was raised by -- a memo of actual support that I thought was interesting was from Safe Horizon and although they were overall supportive of the legislation, they raised what I thought was kind of -- kind of an interesting concern.  They say, *First, it's important to acknowledge that we do have concerns about this bill.  Treatment and counseling for children exhibiting problematic sexual behaviors is often accessed through a criminal justice process.  This must change, of course, but if children who cause harm are likely going to be extracted from police interrogations that currently -- that current existing path to treatment may be closed.  Additionally, when law enforcement is unable to obtain statements from those suspected of*

NYS ASSEMBLY                                          JUNE 1, 2022

*causing harm, more pressure is placed on the victim of the crime in*

*question whose statement is all law enforcement may have.  We do not*

*want to unintentionally harm victims and survivors of violence and*

*abuse, especially children.*  And I think in that instance they were

talking specifically about perhaps youth-on-youth sexual crime.  I

think that they were specifically referring to that.  How would you

respond to that concern expressed by Safe Horizon?

             MS. JOYNER:  There's nothing in this bill that would

prohibit any youth that feels unsafe to be, you know, transported to a

safe location.  But again, if, you know, they are in custody and they

are allowed -- this bill is going to allow an attorney to be present.

             MS. WALSH:  Very good.  All right.  Thank you

very much, Ms. Joyner, I appreciate your answers.

             Mr. Speaker, on the bill.

             ACTING SPEAKER ZEBROWSKI:  On the bill.

             MS. WALSH:  Thank you so much.  I think that my

initial 15 minutes is almost expired so I will save my -- I'll speak on

the bill -- or I'll explain my vote later is what I'm saying.  I think that

there are other people who have questions.  Thank you so much.

             ACTING SPEAKER ZEBROWSKI:  Thank you.

             Mr. Reilly.

             MR. REILLY:  Thank you, Mr. Speaker.  Will the

sponsor yield?

             MS. JOYNER:  Yes.

             ACTING SPEAKER ZEBROWSKI:  The sponsor

345

NYS ASSEMBLY                                    JUNE 1, 2022

yields.

MR. REILLY:  Thank you, Ms. Joyner.  I apologize,
I'm behind you, so -- you don't have to turn around, don't worry about
it.  I have a question.  During the -- I know in the bill it states that
when the police arrive on the scene and there's an incident where the
juvenile, whether that's anybody under the age of 18, it says, *They
shall immediately, before transporting the child to the police station,
have to contact the parent*.  Now, is that accurate?

MS. JOYNER:  Yes.

MR. REILLY:  Is there any exceptions to that?

MS. JOYNER:  Right.  So there's still -- the public
safety exception is still applicable.  If there's an emergency situation,
that's also still applicable.  So existing exceptions are still permissible.

MR. REILLY:  Is there a reason why we use "shall,"
then, because shall would mean that they have to do it and there's no
exceptions.

MS. JOYNER:  Right.  So shall immediately is
current law.  This bill doesn't change current law on that issue --

MR. REILLY:  Okay.

MS. JOYNER:  -- in terms of "shall," "must."  The
current law still says shall.

MR. REILLY:  So -- but the current law, because I
see the new green highlighted, underlined, it says "before
transporting."  The current law doesn't say before transporting,
correct?  It was in a reasonable amount of time you contacted the

346

parents; is that accurate?

MS. JOYNER:  So the purpose of that section is basically to clarify and fully lay out that immediate notification is before a child is transported to any other location.  That's the purpose of the provision.

MR. REILLY:  So if you have a scenario, say at 42nd Street and Broadway in Times Square, there's a big movie theater, right, in Manhattan.  Large fight, 100 juveniles, they get into an argument, they have a fist fight, police arrive, they're making arrests for misdemeanor assaults.  There's a large crowd there.  Can they transport those kids, those offenders, to the precinct without having to contact the parents?

MS. JOYNER:  Current exceptions are still applicable.  So if it's an emergency, an exigent situation, as you, you know, laid out, these exceptions in terms of transporting the child are still permissible.

MR. REILLY:  Okay.  Is there anything in the bill that would actually clarify that to make sure that those exigent circumstances --

MS. JOYNER:  I mean, case law already lays out, you know, those protections and that ability to transport children in those circumstances.

MR. REILLY:  Okay, thank you.  So during the previous -- my colleague asked some questions and talked about what would equate to a spontaneous utterance.  So if you're doing, in that

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

scenario, right, that scenario 42nd Street and Broadway, and I'm on patrol with my partner and we arrive and we make the arrest and it's a 14-year-old and we handcuff them and we put them in the backseat of the RMP, the radio motor patrol car, and we're driving back to the precinct because there's exigent circumstances, right, the sheer amount of people, and that 14-year-old says, *I had a gun and I had it on the sidewalk and I placed it there*. Would that be considered a spontaneous utterance and admissible even though they did not have that consultation with an attorney and their parent wasn't notified?

MS. JOYNER: So under the facts you presented, I think the court would look at, you know, all of the relevant circumstances that you said. Was there questioning of the police or was this is a voluntary statement, and that would be up for the judge to decide in terms of, you know, was this is a voluntary statement or not. But again, this law is going to mandate that once the child is in custody, consultation with an attorney is mandated.

MR. REILLY: Okay. Is there any, I guess, clearinghouse of juvenile attorneys that will be on-call when police officers in -- throughout the State are going to have to, you know, provide an opportunity for that consultation? And if there's none available, what happens?

MS. JOYNER: Again, you know, this bill is mandating that consultation with an attorney must have happen. OCA believes that they can fulfill this obligation so yes, in all of these circumstances where an attorney must be present and, again, we lay

348

out, you know, different options for attorneys presence to be allowed.

You know, we -- there will be funding to support this initiative.

MR. REILLY:  Okay.  And another -- in line 7 in Sub

B in here it says, *When the officer does not reasonably believe the*

*parent or other person legally responsible for the child's care will*

*appear for the child*.  When we say "reasonably believe," are -- what

standards are we using?  Does it have to be a certain amount of phone

calls?  Is that based on case law?  How many attempts, what would we

use for that?

MS. JOYNER:  I guess, you know, it would be based

on would a reasonable officer believe that a parent would appear or

not.  So that's open.  If the parent doesn't pick up or, you know, seeing

that they're working, that -- that I believe would be on the discretion

of the police officer as to whether or not the parent would appear.

MR. REILLY:  Okay, all right.  So earlier during the

debate with our colleague, there was a conversation about can the

juvenile waive their right to through Miranda after they've had a

consultation with the attorney.  I believe, if I'm not mistaken, you said

that they could?

MS. JOYNER:  Yes.

MR. REILLY:  So the reason why I ask that is

because I thought once they invoke the right to an attorney, as a law

enforcement agent right there questioning had to stop and at that

point, if their attorney was not present, they could not withdraw that

right.  So is there anything that -- can you recite any, because aren't

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

they invoking the right to an attorney there with that consultation?

MS. JOYNER:  So yes, the bill doesn't change any current Constitutional protections so yes, you have the right to an attorney.  This is also adding the provision that you have the right to consult an attorney.  After consultation, it's up to the youth whether or not they want to waive their rights and continue speaking or, you know, they want to -- they want to invoke their right to remain silent.

MR. REILLY:  Okay.  And I just want to clarify, before, you said the parents can't waive their right.

MS. JOYNER:  No, they cannot.

MR. REILLY:  All right.  Thank you, Ms. Joyner.

MS. JOYNER:  Thank you.

MR. REILLY:  Thank you, Mr. Speaker.

ACTING SPEAKER ZEBROWSKI:  Mr. Goodell.

MR. GOODELL:  Thank you, sir.  Would the sponsor yield?

ACTING SPEAKER ZEBROWSKI:  Does the sponsor yield?

MS. JOYNER:  Yes.

ACTING SPEAKER ZEBROWSKI:  The sponsor yields.

MR. GOODELL:  Thanks, Ms. Joyner.  I'm looking at the top of page 3.  As I understand this, it says that an officer normally can't question a child about a crime unless they contact the child's parents or go through that process that you described earlier; is

350

**NYS ASSEMBLY**                                            **JUNE 1, 2022**

that correct?

MS. JOYNER:  Right.

MR. GOODELL:  And that applies even if the child
is not considered a suspect?

MS. JOYNER:  If they're not considered -- what do
you mean?

MR. GOODELL:  A suspect, they're just a witness.

MS. JOYNER:  If they're not in custody and they're
just a witness, yes, questioning can happen.

MR. GOODELL:  And then at what point does that
change?

MS. JOYNER:  When the -- the child feels like they
cannot leave.

MR. GOODELL:  I'm sorry?

MS. JOYNER:  When they are in custody and they
feel like they cannot leave.

MR. GOODELL:  When they're in custody?

MS. JOYNER:  Yes.

MR. GOODELL:  So let me just give some quick
examples, maybe you can help me out.  Police respond to a shooting
in New York City, they arrive, there's a dead person on the street and
there are a couple of young teenagers, clearly witnesses, could be
suspect, but officers obviously arrive and don't know, and the officers
question the kids.

MS. JOYNER:  Okay, yeah.  So if they are a witness,

351

**NYS ASSEMBLY**                                        **JUNE 1, 2022**

questioning is permissible, which is already allowed under current law.  Once they are a suspect or, you know, transitioned into their -- they cannot leave and they're in custody, that's when all of these other additional safeguards and protections would be implicated.  So this doesn't interfere with any investigatory process that happens in the beginning.  It's only after the child is a suspect or held in custody that then these additional rights are mandated.

MR. GOODELL:  Well, the reason I'm a little confused is if you're looking at page 3, say starting on line 9, it says, *The child shall not be questioned pursuant to this section unless or until A, the child and the person required to be notified, if present, have been advised*, right?  The child's been advised of the right to remain silent, right?  You have basically a Miranda Warning, a statement made by the child may be used by the child, a child's right to have an attorney present, a child has consulted and B, the child has consulted with legal counsel in person, by telephone, by video conference.  This consultation may not be waived, correct?

MS. JOYNER:  That's correct.

MR. GOODELL:  All right, so now with those things in mind, including the absolute right for a child to have legal counsel in person before they can be questioned, if you get a call on a school shooting and you show up and you have a room full of 15-year-old kids who witnessed a school shooting, am I correct that you can't question them until you give all the children a Miranda Right and give them the opportunity to have a lawyer?

352

MS. JOYNER:  No, that's not correct.

MR. GOODELL:  Well, what do you mean then by page 7, line 20?  It says, *A child may not be questioned unless or until*, on paragraph B on line 20, *the child has consulted with legal counsel in person*.

MS. JOYNER:  Right.  So this -- the sections you're reading kick in only after there's been an identifiable child that has been taken into custody.  That's the reading of this piece of legislation.  So it's not taken in isolation, it's after the child is already in custody, then these provisions kick in.

MR. GOODELL:  But isn't it true that the courts consider a child in custody whenever the child cannot freely leave?

MS. JOYNER:  Section 305 of the Family Court Act lays out, you know, when a child is in custody or not.

MR. GOODELL:  I'm sorry?

MS. JOYNER:  Section 305 of the Family Court Act, it lays out the factors to determine whether a child is taken into custody.

MR. GOODELL:  But a child is consider in custody if the child is not free to leave.

MS. JOYNER:  Correct.

MR. GOODELL:  And so if an officer shows up at a place and crime scene, you know, like in Texas, and the police officers say, *We want to question you, and no, you can't leave until we've had a chance to talk to you*.  Then the children are considered in

353

custody, correct?

MS. JOYNER:  So at that point, they're all witnesses so questioning can be permissible, but once there's an identifiable person that is going to be held in custody, that's when all these other provisions kick in.

MR. GOODELL:  And so the police arrive, they have all these kids, it's absolute chaos, they say, *Don't let anyone leave until we have a chance to talk to you*, they talk to one of the kids and the kid said, *Yeah, I shot everyone else*.  Now, that statement under this isn't inadmissible because he wasn't given his Miranda Rights, he wasn't given an opportunity to have a lawyer, right?

MS. JOYNER:  If it's voluntary and before custody, it's permissible.  And the current law of allowing exigent circumstances and emergency circumstances still allow the police officers to ask questions.

MR. GOODELL:  Okay.  So now the officers say, *Well, we'd like you to come to the station and give a statement*, right.  They can't take the child to the station, correct, without -- they have to take instead to the child's home, correct?

MS. JOYNER:  No, that's not correct.  Yes, parental notification, but if it's an exigent circumstance they can transport the child but, you know, hopefully they would notify the parents that are transporting the child from the location.

MR. GOODELL:  But before they take the child to the police station for questioning or for videotaping, right, because we

354

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

all want these videotaped, they must immediately and before

transporting the child notify the parents, correct?

                    MS. JOYNER:  Yes.

                    MR. GOODELL:  Okay.  So you have police -- so we

know you have to videotape these, right, that's part of the law now.

                    MS. JOYNER:  Yes.

                    MR. GOODELL:  And of course the police don't

come with a mobile video van, right, they do that in the police station

where they have the proper equipment, correct?

                    MS. JOYNER:  I'm sorry, can you repeat the

question?

                    MR. GOODELL:  Certainly.  I mean, the police don't

drive around with large mobile video conferencing rooms, right, so

they would have to, under existing law, take them to the station in

order to videotape the in-question, correct?

                    MS. JOYNER:  That's correct.

                    MR. GOODELL:  And so you show up to school,

there's been a mass shooting, you want to get all the kids' statements

down on the record, you want to videotape them.  Number one, you

can't take them to the station without notifying their parents, correct?

                    MS. JOYNER:  Right.  So parental notification is

required, but the exceptions of exigent circumstances are also -- I

would say trump parental notification.

                    MR. GOODELL:  Okay.  And then -- but assuming,

you know, that the situation -- I mean, there's no active shooter so it's

**NYS ASSEMBLY**                              **JUNE 1, 2022**

not exigent circumstances anymore.  Then before you take them down
to have them interviewed, you have to notify the parents, you have to
give them Miranda Rights, right, you have to provide them with an
attorney, right, and anything that they do, videotaping, if it wasn't
done with an attorney in advance is inadmissible, correct?

MS. JOYNER:  Correct.

MR. GOODELL:  Okay.  I think I understand it.
Thank you very much for helping explain it to me.

Sir, on the bill.

ACTING SPEAKER ZEBROWSKI:  On the bill.

MR. GOODELL:  We have all been shaken by the
amount of violence that we have seen across the nation in the last few
weeks and, sadly, if you look at the data, a lot of the FBI data
indicates that -- well, the last data I saw were that 33 of the school
shootings involved kids that were under the age of 18, 17,
16-year-olds, 15-year-olds.  And it's just horrific when that happens,
right?  So if you have a gang shooting at a party or something like
that, current law requires the police to videotape the interview of the
child.  So they show up and before they can take them to the station to
videotape them and get the witness's testimony, they must notify the
parents.  And if it was a gang fight, what do you think the parents are
going to say to the child?  Are they going to say, *Yeah, identify the
gang member who pulled the trigger and shot three of your friends*.
That's not what's going to happen.  The parents are going to say to
their kid, *You keep your mouth shut or you might be the next victim*.

356

And if you don't think that happens, talk to the police in New York City and ask them how much cooperation they have with witnesses after their parents talk to them and after they lawyered up.

Are we serious about stopping violence?  Do we want to solve these crimes?  Do we want the police to be able to respond to a school shooting and talk to the kids?  Or are we more concerned about making sure the parents tell the kids to shut up and don't get involved?  Are we more concerned about making sure that these kids have lawyers?  Because that's what this bill does.

I'm not going to have that blood on my hand, and I hope you won't have it on your hands either.  Our number one mission is not to make sure that child witnesses are lawyered up.  That's not our mission.  Our mission is to reduce crime, to reduce deaths, to find out who the perpetrators are, to get to the truth, and this makes it harder, not easier.  For that reason, I cannot support it.

ACTING SPEAKER ZEBROWSKI:  Mr. Tannousis.  On the bill.

MR. TANNOUSIS:  You know, my time as a prosecutor in both the Bronx and on Staten Island, I have dealt with shooting victims with witnesses, bodies on the street, child witnesses, child victims, and it was a struggle to get them to cooperate in order for us to get the bad guys, the people responsible for these acts off the street.  And this Body continues to have the assumption that the police are violating or purposely violate people's rights.  They are trying to do the right thing and laws like this will hinder the police officers

from being able to carry out these investigations so they can do their part to keep our streets safe.

We just went through a budget process a few months ago and we sat here and we talked about the fact that 16- and 17-year-olds are being used by gang members to carry out crimes. And instead of passing any type of substantive legislation that would go after the people that are harming our communities, we are now passing bills that will make it more difficult for police officers to do their jobs. We are more concerned with the assumption that the police is out there violating people's rights and not doing the right thing instead of adequately protecting our community. I have dealt with members of the police department. The vast majority of police officers are with us, serving their community to do the right thing. And we need them. We need police to do the right thing and to work with us, not make their jobs more difficult. I vote in the negative. Thank you, Mr. Speaker.

ACTING SPEAKER ZEBROWSKI: Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES: Thank you, Mr. Speaker, for the opportunity to -- I was actually going to ask the sponsor some questions, but I don't think I will after I listened to the last couple of my colleagues' comments because it always appears as if in our efforts of trying to protect people that we're somehow going against other people. That's not the case here. And just to, you know, make people understand how important it is not to protect people just

358

because they have a title, I'm going to use the example of just what happened in Buffalo. There's a FBI agent who was on a call 30 minutes with this murderous young man who could have alerted people. He swore and protect, and he might be retired, but he took an oath. He said nothing. That's not to say all FBI agents are bad, but it is to say that they're people, they're human and sometimes they do the wrong thing.

And in the same instance, there's a correction officer who went online and almost applauded this young man for his murderous things that he did at that supermarket. We pay him with public tax dollars. So don't try to protect everybody that's supposed to be a public defender, because they're all not. Let's just be analysts, let's just be objective. The sponsor here is trying to protect young people, whether it be from their family, or whether it be from the public servants who are supposed to be working to defend them. Don't try to judge them all as if they're perfect because they are not, some of them are not. And, by the way, just like you can find people who will on the street and be gang bangers, you can find people in the correction institution that promote that, that push it, that agitator.

And so please, let us stop trying to protect people who are not always right. Just because you have the title and perhaps even the skin complexion doesn't make you freaking perfect. Please, let's stop trying to act like it does.

Let me congratulate the sponsor on her piece of legislation and hope that we can move forward in a world that doesn't

always make us right because we've had some previous experience

with law enforcement or with our buddies who work in -- who have

all taken a public oath.  We took a public oath, too, and our public

oath didn't say we're going to only protect people who have a badge,

or only protect people who are sworn to an oath, or only protect

people who wear their uniform on.  It says we're going to protect all

people, and these children that she's talking about need protection.

Let's make that happen.  Thank you, Mr. Speaker.

(Applause)

ACTING SPEAKER ZEBROWSKI:  Read the last

section.

THE CLERK:  This act shall take effect April 1st,

2023.

ACTING SPEAKER ZEBROWSKI:  The Clerk will

record the vote on Assembly Bill 5891-C.  This is a Party vote.  Any

member who wishes to be recorded as an exception to the Conference

position is reminded to contact the Majority or Minority Leader at the

numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  The Republican

Conference is generally not in favor of this legislation.  Those who

support it are certainly encouraged to vote yes here on the floor or by

contacting the Minority Leader's Office.  Thank you, sir.

ACTING SPEAKER ZEBROWSKI:  Mrs.

Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker.  Majority colleagues are generally going to be in favor of this; however, there may be some of us who would choose to be an exception.  That's okay, call the Majority Leader's Office, we'll be happy to record your vote, or if you're in the Chambers, press your own vote.  Thank you, Mr. Speaker.

(The Clerk recorded the vote.)

ACTING SPEAKER ZEBROWSKI:  Mr. Angelino to explain his vote.

MR. ANGELINO:  Thank you, Mr. Speaker, to explain my vote.  This -- I listened very intently to all of this and this seems to be a bill that is going to maybe work and maybe work well in a metropolitan area, but there's probably police stations in the Bronx that on any particular shift have more people calling in sick than we have working in the entire county that I live in, and any of the counties I represent.  This isn't going to be workable when you have one officer working and the nearest backup car is another agency 16 miles away.  I have been on the scenes where it's hectic, and one officer, one car, and six people.

And again, it's not specifically this one.  This is looking out for the rights of people, I get that, and -- but it's just not workable.  Even some of the ones that were brought up in the debate, you know, the videotaping, I've had people handcuffed to ball rings in three different locations trying to operate video equipment, and I'll be working this Saturday unless we're still here in Session and I would

361

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

ask anybody to come see what it's like to be a one-man department, or a small agency with only two or three officers working.  It's very difficult and this is not going to make it easier.

        For those reasons, because it seems like police agencies all over New York State are not New York City police, for those reasons I'll be voting no.  Thank you.

        ACTING SPEAKER ZEBROWSKI:  Mr. Angelino in the negative.

        Mr. Reilly to explain his vote.

        MR. REILLY:  Thank you, Mr. Speaker, to explain my vote.  So we had a lot discussed during the debate, there's a lot of ambiguity here.  I'm a little concerned with the whole consultation with an attorney.  And then during the debate we've talked about the part of being able to -- for the child to waive that right after that consultation.  I think that creates a very gray area here where once they've invoked their right to an attorney by that consultation, because I think that's something that's going to be challenged in court to see if that truly is a, you know, them invoking their right to an attorney.  And then once they hang up after that consultation, can they waive that right to talk to the police during interrogation?  I think that's a slippery slope and I think it's going to be challenged, because anything they would say probably would be dismissed, in my opinion, because during my training it was once they invoke the right to an attorney, all questioning stopped no matter what.  So I think this is something that really needs to be worked out and I'm going to be voting in the

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

negative.  Thank you.

            ACTING SPEAKER ZEBROWSKI:  Mr. Reilly in

the negative.

            Ms. Walsh to explain her vote.

            MS. WALSH:  Thank you, Mr. Speaker.  So I want to

thank the sponsor for the debate that we were able to have.  It was -- it

was very detailed.  You handled the questions I thought, you know,

very well.  I feel that the bill, in my opinion, still needs some more

work.  What -- in regard to what the previous speaker and what he

said, I'm an attorney for the child.  I have represented juvenile

defendants.  I can tell you that in my county, the AFC Panel is

dwindling.  You cannot get attorneys who want to be on the AFC

Panel anymore and the reason is that the pay stinks, the pay's terrible.

And this Body, there was a big push from the AFC, the Office of

Attorneys for Children this year during budget to try to basically

double the hourly rate and it didn't make it into the budget.  And

attorneys for the child are saying, you know, I can do -- *I can do*

*matrimonial work and make $350-$400 an hour, even Upstate, or I*

*can make $75 an hour as an attorney for the child*.  And they're

saying, *I'm not doing it*, they're not on the panel.

            So we can't even in my county figure out and handle

centralized arraignments yet.  So we're not prepared.  I know -- I

respect the fact that the sponsor said that there will be funding to

support AFCs.  I'd like to say when?  You know, when is that going to

happen because right now, if, you know, requiring a consultation with

363

**NYS ASSEMBLY**                                              **JUNE 1, 2022**

an attorney who doesn't exist is not -- is not a solution here.  So I think that that needs to get figured out before we put something this big into place.

I don't want to see anybody's rights getting trampled ever, but I'm not prepared to vote for this bill now.  I just think it needs some more work.  But I do thank the sponsor for her -- for her work on the bill.  I do think it's an improved version, but I'm not ready to vote for it yet.  I vote no.  Thank you.

ACTING SPEAKER ZEBROWSKI:  Ms. Walsh in the negative.

Mr. Meeks to explain his vote.

MR. MEEKS:  Thank you, Mr. Speaker, for the opportunity to explain my vote.  I want to say thank you to the sponsor for this legislation.  I think it is highly relevant.  One of our colleagues stated that everywhere is not New York City; you're absolutely right.  There's Rochester, there's Syracuse, there's Buffalo and a number of other places in between.  I only wish that I had a community in which we had three law enforcement officers because it's likely that those three individuals would know every family and every relative within those families; however, I don't live in that type of community.  We live in a community where we have 7- to 800 police officers and 4 percent live in the city in which they work in.  We constantly see the tax base as it relates to the resources that we pay as taxpayers taking flight to the surrounding suburbs.  We also see a practice of an occupying force coming in, treating us as if we're insurgents.  So I

364

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

think that our children and members of our community need to know their rights and their rights need to be upheld and we, as legislators, need to do our due diligence in doing so.  Thank you.

ACTING SPEAKER ZEBROWSKI:  Mr. Meeks in the affirmative.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, would you please record our colleague Mr. Colton in the negative on this one. Thank you, sir.

ACTING SPEAKER ZEBROWSKI:  So noted.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker and my colleagues, if we could now call our attention to Calendar No. 631 by Ms. Tapia, followed by Rules Report No. 458 by Mr. Jacobson.

ACTING SPEAKER ZEBROWSKI:  Page 47, Calendar No. 631, the Clerk will read.

THE CLERK:  Assembly No. A09606, Calendar No. 631, Tapia.  An act to amend the Public Health Law, in relation to requiring third trimester syphilis testing.

ACTING SPEAKER ZEBROWSKI:  Ms. Tapia, an explanation has been requested.

MS. TAPIA:  Thank you, Mr. Speaker, for the

365

opportunity.  This bill would require physicians and authorized practitioners attending to pregnant patients to order a syphilis test for their patients during the third trimester of pregnancy.  Congential syphilis dramatically increases the risk of miscarriages, fetal growth restriction and neonatal deaths because the number of early syphilis diagnoses in pregnant individuals and congenital syphilis diagnoses have increased dramatically in the last ten years, and syphilis is treatable during any point during the pregnancy.  This bill represents a practical (inaudible) threshold to reduce the likelihood that babies are born with -- with or die from -- from a preventable disease.

ACTING SPEAKER ZEBROWSKI:  Mr. Byrne.

MR. BYRNE:  Thank you, Mr. Speaker, and thank you to the sponsor for that explanation.  I'm going to be explaining my vote a little bit to share some of the concerns that have been raised, but I do want to thank the sponsor for the explanation.

Thank you.

ACTING SPEAKER ZEBROWSKI:  Read the last section.

THE CLERK:  This act shall take effect on the 365th day.

ACTING SPEAKER ZEBROWSKI:  The Clerk will record the vote on Assembly bill 9606.  This is a fast roll call.  Any member who wishes to be recorded in the negative is reminded to contact the Majority or Minority Leader at the numbers previously provided.

(The Clerk recorded the vote.)

Mr. Byrne to explain his vote.

MR. BYRNE:  Thank you, Mr. Speaker.  Again, I want to thank the sponsor for the explanation of the bill.  I think it's very well-intentioned to try to help address syphilis with pregnant women to try to not only help the -- the mother but also the child. There's some concerns that have been raised because we're talking about adding another mandate.  There's already a required mandatory testing early on in the pregnancy with blood tests, but we're adding another one in the third trimester.  It just doesn't seem to be considering whether or not it's necessary for pregnant women who are not sexually active and it seems to be something that's just not being accounted for in this bill.  And one of the things that some of my colleagues and I discussed was in the Health Committee, it was just a bit odd because this is one bill we're voting on and some of us may oppose this, some may vote -- vote yes.  But there's always some underlying concerns when as legislators we're intervening in the doctor-patient relationship.  Also, there's another bill that some of us are expecting to be on the calendar maybe tomorrow that goes in the opposite direction that would actually make it hard or prohibit doctors from requiring certain drug tests and alcohol tests for pregnant women.  So there seems to be this little bit of contradiction in the policymaking in our State's Capitol.  That said, I certainly admire the goals of this bill, and hearing the explanation I'm going to continue to vote yes.

NYS ASSEMBLY                                        JUNE 1, 2022

ACTING SPEAKER ZEBROWSKI:  Mr. Byrne in the affirmative.

Ms. Tapia to explain her vote.

MS. TAPIA:  Thank you, Mr. Speaker.  Congenital syphilis had nearly been completely eliminated in New York State in -- in 2000.  Since that time it has come back at an alarming rate.  Last year, DOH, the Department -- Department of Health reported syphilis diagnosis in women have nearly doubled since 2015 to 1,700 diagnoses, with 41 infants born with congenital syphilis.  In 2015 there were only 12 cases.  2015 (inaudible) we had 41 cases.  The screening again in the third trimester presents an instant solution to a preventable disease.

I vote in the affirmative.

ACTING SPEAKER ZEBROWSKI:  Ms. Tapia in the affirmative.

Mr. Goodell to explain his vote.

MR. GOODELL:  I appreciate my colleague's desire to protect kids from syphilis.  But this is a mandatory medical test that we are requiring every pregnant woman in the State of New York to take in their third trimester, even though the first test was negative.  And in my district, thankfully, most people, as far as I know, are relatively monogamous and we don't care.  We say, *We don't care if you're with the same person, we don't care if your husband's just with you.  We don't care if you have zero risk factors, you've got to take the second test.*  And for -- for those of us who live in those kind of

368

communities it's really kind of insult to say you've got to take the test regardless of your risk factor.  I fully support having the physician say to patients, *Look, if you have any risk -- of these risk factors you ought take the test*.  I don't have any problem saying you ought to take the test if you have a risk factor.  But that isn't what this bill says.  This bill says you must take the test regardless of any risk factors.

Thank you, sir.

ACTING SPEAKER ZEBROWSKI:  Mr. Goodell in the negative.

Ms. Walsh.

MS. WALSH:  Thank you, Mr. Speaker.  I'll be brief, I know it's late.  I -- I just would prefer to leave decisions as far as what kind of testing should occur between a patient and -- and her doctor.  I just -- I just don't think that this is something that should be -- there could be a best practice that's developed within that profession as far as this.  I just don't think as a state we should be legislating this.  So I'm going to vote in the negative on this one.

Thank you.

ACTING SPEAKER ZEBROWSKI:  Ms. Walsh in the negative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 16, Rules Report No. 458, the Clerk will read.

THE CLERK:  Assembly No. A08200-B, Rules

Report No. 458, Jacobson, Gunther, Simon, Buttenschon, Lunsford, Wallace.  An act to amend the General Municipal Law, in relation to prohibiting individuals in certain positions from taking any position with a business or entity dong business with an industrial development authority.

ACTING SPEAKER ZEBROWSKI:  On a motion by Mr. Jacobson, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER ZEBROWSKI:  The Clerk will record the vote on Senate bill 7445-B.  This is a Party vote.  Any member who wishes to be recorded as an exception to the Conference position is reminded to contact the Majority or Minority Leader at the numbers previously provided.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  The Republican Conference will be generally opposed to this legislation for the reasons that I hope to explain in a moment.

ACTING SPEAKER ZEBROWSKI:  Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker.  The Democratic Majority is generally going to support our colleague on this legislation.  However, there may be some of us who would choose to be an exception.  They should feel free to do so by

370

either pressing their vote in the Chambers or call the Majority Leader's Office and we'll make sure your vote is properly recorded.

Thank you, sir.

(The Clerk recorded the vote.)

ACTING SPEAKER ZEBROWSKI:  Thank you.

Mr. Goodell to explain his vote.

MR. GOODELL:  Thank you, sir.  This bill has the laudable and positive intent of trying to prohibit conflicts of interest involving our IDAs, and that's a great thing to -- to see. Unfortunately, the language is extraordinarily broad and when -- and provides that no independent contractor that's working for an IDA can be an independent contractor or anybody who has received any financial assistance from the IDA.  So let me give you a simple example.  Try calling a plumber to fix the toilet at the IDA.  If the -- if the tradesman comes and the plumber, the electrician, the carpenter, the cleaning service, they're independent contractors.  And under this language if they come and work for the IDA they can't work for anyone else who has received any financial assistance from the IDA. So presumably, if they come and do the electrical or plumbing or contracting work or cleaning work or any other independent contracting work for the IDA, any subsequent client would have to say, *Are you getting a PILOT agreement from the IDA?  Sorry, I can't do the electrical work for you, can't do plumbing work for you, can't do any trades work for you*.  So, the concept is right.  I agree with my colleague -- my colleague, the sponsor, that we need to tighten these

**NYS ASSEMBLY**                                      **JUNE 1, 2022**

conflict of interest rules so that people aren't working both sides of the equation.  And I look forward to working with my colleague to see if we can come up with the language that accomplishes that. Unfortunately, this language which includes independent contractors is way too broad and for that reason I can't support it.  But again, I look forward to working with my colleague to see if we can come up narrower language that accomplishes our objectives.

ACTING SPEAKER ZEBROWSKI:  Mr. Goodell in the negative.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  Please record my colleagues Mr. Brabenec, Mr. Mikulin, Mr. Schmitt and Mr. Smith in the affirmative.

Thank you, sir.

ACTING SPEAKER ZEBROWSKI:  So noted.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, do you have further housekeeping or resolutions?

ACTING SPEAKER ZEBROWSKI:  We do have both, Mrs. Peoples-Stokes.

On a motion by Mr. Lawler, page 30, Calendar No. 168, Bill No. 5373-A, the amendments are received and adopted.

372

**NYS ASSEMBLY**                               **JUNE 1, 2022**

On a motion by Mr. Schmitt, page 31, Calendar No. 181, Bill No. 5585-B, the bill is amended to its previous number of 5585-A.

We have two privileged resolutions.  Resolution 1057, the Clerk will read.

THE CLERK:  Assembly Resolution No. 1057, Ms. González-Rojas.

Legislative Resolution commemorating the 30th anniversary of the Queens LGBTQ Pride Parade on June 5, 2022.

ACTING SPEAKER ZEBROWSKI:  Ms. González-Rojas.

MS. GONZÁLEZ-ROJAS:  Thank you, Mr. Speaker. First off, Happy Pride.  I know it's after midnight, but I want to wish everyone Happy Pride.  I want to thank the Speaker and the staff for their assistance with this resolution.  My home Borough of Queens is home to the second-oldest and second-largest parade -- Pride Parade in New York City, which will happen on June 5th this year.  It was cofounded by my friend and the former New York City Council Member Danny Dromm.  The neighborhood of Jackson Heights where it's held and which I live and represent is rich with a history of queer and transgender people who have fought for their right to live and to thrive.  This year we'll marching as our ancestors and our trans-cestors before us, remembering the lives of so many whose shoulders we stand on.  We will remember Julio Rivera and Edgar Garzon and so many lives lost to violence against our LGBTQIA siblings from

NYS ASSEMBLY                                            JUNE 1, 2022

Queens.  We will march for resources, for our human rights, and to remind each other that we got us.  But, we will also dance, we will sing and we will celebrate.  So this Sunday we will be queer and proud because we live in the World's Borough and because Queens is the future.

So to conclude, please join us, please march with us, and as Sylvia Rivera said, I am not missing a minute of this.  It is the resolution -- the revolution.  So, thank you so much.

ACTING SPEAKER ZEBROWSKI:  On the resolution, all those in favor signify by saying aye; opposed, nay.  The resolution is adopted.

Resolution 1055, the Clerk will read.

THE CLERK:  Assembly No. 1055, Mr. Manktelow.

Legislative Resolution congratulating Leo Malone upon the occasion of celebrating his 100th birthday.

ACTING SPEAKER ZEBROWSKI:  Colleagues, if we could have a little bit quiet in the Chambers.

Mr. Manktelow.

MR. MANKTELOW:  Thank you, Mr. Speaker.  On behalf of Leader Barclay and myself, it is my pleasure to do this introduction of a gentleman I met about six weeks ago.  His name is Leo -- Leo Malone, and it is on his occasion of his 100th birthday, which is June 27th of this month.  But what's so special about this gentleman is he is one of our few left World War II veterans.  Joining the United States Army Air Corps in 1942, Leo Malone trained to be

374

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

an airplane engine mechanic.  He went to Stewart Technical School in

New York City to hone his craft and later work on B-17 bomber

aircraft.  He was stationed in Honington Air Base in England where he

was both a mechanic and part of the Salvage Crew.  He and his team

would go out to a crash site and salvage what they could from crashed

airplanes.  Leo Malone was honorably discharged on December 23,

1945.  He earned the Marksman Medal, European Theater of

Operation Medal, and the "Ruptured Duck" Medal for his honorable

discharge.  When I met this gentleman he -- his zest for life was

amazing.  He's the type of guy that would be here on this floor with us

tonight doing -- arguing for New Yorkers, what he did for us as a

country.

So on behalf, again, of Leader Barclay and myself,

it's my honor and privilege to introduce him and say thank you, Mr.

Speaker, for allowing me to bring this forward.  And thank you so

much here on an early Thursday morning.  Happy Birthday, Leo.

ACTING SPEAKER ZEBROWSKI:  On the

resolution, all those in favor signify by saying aye; opposed, nay.  The

resolution is adopted.

We also have a group of other resolutions we'll take

up together.

All those in favor signify by saying aye; opposed,

nay.  The resolutions are adopted.

(Whereupon, Assembly Resolution Nos. 1051-1054

and 1056 were unanimously adopted.)

**NYS ASSEMBLY**                                    **JUNE 1, 2022**

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, I move that the Assembly stand adjourned until 10:00 a.m., Thursday, June the 2nd, tomorrow being a Session day.  I will say this, colleagues. The sooner you get in and get swiped into the base and get ready for those committee meetings that we probably will have to have - Codes, Ways and Means and Rules - the sooner we can start Session at 10:00.  How about that?  Wouldn't that be great?  Yes, let's do it.

ACTING SPEAKER ZEBROWSKI:  The Assembly stands adjourned.

(Whereupon, at 12:09 a.m., the House stood adjourned until Thursday, June 2nd at 10:00 a.m., that being a Session day.)

376