UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EUGENE VOLOKH, RUMBLE CANADA INC., and
LOCALS TECHNOLOGY INC.

                              Plaintiffs,

                 - against -

LETITIA JAMES, in her official capacity as Attorney
General of New York,

                              Defendant.

No. 22 Civ. 10195 (ALC)


**DEFENDANT LETITIA JAMES' MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**


LETITIA JAMES
Attorney General
State of New York
*Attorney for State Defendant*
28 Liberty Street
New York, NY 10005
(212) 416-8029


Seth J. Farber
  Special Litigation Counsel
Katherine Rhodes Janofsky
  Assistant Attorney General
Rick Sawyer
  Special Counsel for Hate Crimes

Of Counsel

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...........................................................................................iii

PRELIMINARY STATEMENT ....................................................................................... 1

STATEMENT OF RELEVANT FACTS AND LEGISLATIVE HISTORY ...................... 3

PROCEDUAL HISTORY AND THE INSTANT MOTION .............................................. 6

STANDARD OF REVIEW ............................................................................................... 7

ARGUMENT .................................................................................................................... 7

I.      PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS .................... 7

        A.   Section 394-ccc Does Not Target Protected Expression Based on Content or
             Viewpoint ....................................................................................................... 7

             i.    The Court should apply the rational basis test ........................................ 7
             ii.   Section 394-ccc does not regulate speech ............................................... 9

        B.   The Statute Does Not Compel Plaintiffs to Endorse a State Message or Respond to
             Reports of Any Kind, Including Reports Involving Protected Speech ............... 11

             i.    Section 394-ccc requires the constitutionally permissible disclosure of accurate
                   commercial information only ................................................................ 12

             ii.   Section 394-ccc does not require Plaintiffs' response to any report ................ 13

        C.   The Statute Does Not Unconstitutionally Burden Plaintiffs' Publication of Protected
             Speech ........................................................................................................... 14

        D.   The Statute is Facially Constitutional and Plaintiffs Cannot Show Likelihood of
             Success on their Overbreadth Contention ...................................................... 15

             a.    The Statute does not prohibit speech ................................................... 16

             b.    To the extent the Statute compels speech at all, it compels commercial speech and
                   overbreadth fails because the Statute does not reach noncommercial speech ............ 17

             c.    Even if the Statute burdens some protected speech of conduct, it is not overbroad
                   in relation to its legitimate scope ........................................................ 17

        E.   Plaintiffs Cannot Show Likelihood of Success on their Claim of Vagueness ........... 18

i

i.   The Statute provides adequate notice of the required conduct ..............................19

ii.  The Statute provides sufficiently clear enforcement standards.............................21

iii. The Statute does not have any chilling effect on the exercise of First
     Amendment freedoms...........................................................................................22

iv.  The Statute's Savings Clause is not vague ........................................................22

F.   The Statute is not preempted by 47 U.S.C. § 230..................................................23

II.   PLAINTIFFS FAIL TO ESTABLISH THEY WILL SUFFER IRREPARABLE
      HARM ........................................................................................................................24

III.  THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY IN
      FAVOR OF THE STATE DEFENDANT ................................................................24

CONCLUSION..................................................................................................................25

## TABLE OF AUTHORITIES

CASES                                                              Page(s)

*Am. Booksellers Found. v Dean,*
    342 F.3d 96 (2d Cir. 2003).................................................................................*15*

*Amato v. Elicker,*
    460 F. Supp. 3d 202 (D. Conn. 2020).....................................................*25*

*Ancheta v. Watada*
    135 F. Supp. 2d 1114, 1125 (D. Haw. 2001) .........................................17

*Backpage.com, LLC v. Dart,*
    807 F.3d 229 (7th Cir. 2015) .................................................................14

*Bantam Books, Inc. v. Sullivan,*
    372 U.S. 58 (1963).................................................................................14

*Bd. of Trs. of State Univ. of N.Y. v. Fox,*
    492 U.S. 469 (1989)...............................................................................*17*

*Beal v. Stern,*
    184 F.3d 117 (2d Cir. 1999)...................................................................*24*

*Bell & Howell: Mamiya Co. v. Masel Supply Co.,*
    719 F.2d 42 (2d Cir. 1983)......................................................................*24*

*Berg v. Vill. of Scarsdale,*
    No. 20-4130-CV, 2021 WL 5751385 (2d Cir. Dec. 3, 2021)................*20*

*Broadrick v. Oklahoma,*
    413 U.S. 601 (1973)...............................................................................*16*

*Brockett v. Spokane Arcades, Inc.,*
    472 U.S. 491 (1985)...............................................................................*15*

*Bronx Household of Faith v. Bd. of Educ.,*
    331 F.3d 342 (2d Cir. 2003)...................................................................*24*

*CISPES v. F.B.I.,*
    770 F.2d 468 (5th Cir. 1985) .................................................................*22*

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach,*
    657 F.3d 936, 944-45 (9th Cir. 2011) ....................................................*17*

*Doe v. Internet Brands,*
    824 F.3d 846 (9th Cir. 2016) .................................................................................24

*Dumitru v. Princess Cruise Lines,*
    732 F. Supp. 2d 328 (S.D.N.Y. 2010) ....................................................................21

*Fla. Dept. of Revenue v. Piccadilly Cafeterias, Inc.,*
    554 U.S. 33 (2008) ..................................................................................................21

*Elliott v. Donegan,*
    469 F. Supp. 3d 40 (E.D.N.Y. 2020) ......................................................................23

*Ent. Software Ass'n v. Blagojevich,*
    469 F.3d 641 (7th Cir. 2006) ..................................................................................12

*Evergreen Ass'n, Inc. v. City of New York,*
    740 F.3d 233 (2d Cir. 2014) ...................................................................................10

*Farrell v. Burke,*
    449 F.3d 470 (2d Cir. 2006) ........................................................................ 16-17, 22

*FTC v. LeadClick Media, LLC,*
    838 F.3d 158 (2d Cir. 2016) ...................................................................................23

*Hill v. Colorado,*
    530 U.S. 703 (2000) ................................................................................................18

*Hoffman Estates v. Flipside, Hoffman Estates,*
    455 U.S. 489 (1982) ................................................................................................16

*Kamerling v. Massanari,*
    295 F.3d 206 (2d Cir. 2002) (per curiam) ..............................................................24

*Knox v. Serv. Emps. Int'l Union, Loc. 1000,*
    567 U.S. 298 (2012) ................................................................................................11

*Los Angeles Police Dep't v. United Reporting Publishing Corp.,*
    528 U.S. 32 (1999) ..................................................................................................16

*Maryland v. King,*
    567 U.S. 1301 (2012) ..............................................................................................25

*Matal v. Tam,*
    137 S.Ct. 1744 (2017) .............................................................................................10

*Miami Herald Pub. Co. v. Tornillo,*
    418 U.S. 241 (1974) ................................................................................................13

*Minnesota Voters All. v. Mansky,*
  138 S. Ct. 1876 (2018)....................................................................................20

*Monserrate v. N.Y. State Senate,*
  599 F.3d 148 (2d Cir. 2010).............................................................................25

*N.Y. State Rest. Ass'n v. New York City Bd. of Health,*
  No. 08 Civ. 1000(RJH), 2008 WL 1752455 (S.D.N.Y. Apr. 16, 2008) ...............................8-9

*N.Y. State Rest. Ass'n v. New York City Bd. of Health,*
  556 F.3d 114 (2009).......................................................................................*8, 11*

*Nat'l Elc. Mfrs. Assin v. Sorrell,*
  272 F.3d 104 (2d Cir. 2001).......................................................................... *passim*

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra,*
  138 S. Ct. 2361 (2018)....................................................................................*10*

*Nken v. Holder,*
  556 U.S. 418 (2009)..........................................................................................7

*Okwedy v. Molinari,*
  333 F.3d 339 (2d Cir. 2003).............................................................................*14*

*Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California,*
  475 U.S. 1 (1986).............................................................................................*13*

*Perrin v. United States,*
  444 U.S. 37 (1979)...........................................................................................*19*

*Restaurant Law Ctr. v. City of New York*
  360 F. Supp. 3d 192 (S.D.N.Y. 2019)..................................................................8

*Reed v. Town of Gilbert, Ariz.,*
  576 U.S. 155 (2015)..........................................................................................*10*

*Reno v. ACLU,*
  521 U.S. 844 (1997)..........................................................................................*10*

*Rubin v. Garvin,*
  544 F.3d 461 (2d Cir. 2008)..............................................................................*18*

*Safelite Group, Inc. v. Jepsen,*
  764 F.3d 258 (2d Cir. 2014)................................................................................8

*SAM Party of N.Y. v. Kosinski,*
  987 F.3d 267 (2d Cir. 2021)........................................................................ *24-25*

*Schleifer by Schleifer v. City of Charlottesville,*
    159 F.3d 843 (4th Cir. 1998) ..............................................................................22

*Snyder v. Phelps,*
    562 U.S. 443 (2011)..............................................................................*10, 17*

*Stuart v. Loomis,*
    992 F. Supp. 2d 585 (M.D.N.C.), *aff'd sub nom Stuart v. Camnitz,* 774 F.3d
    238 (4th Cir. 2014)...........................................................................................*11*

*Thistlethwaite v. Dowty Woodville Polymer, Ltd.,*
    110 F.3d 861 (2d Cir. 1997)...........................................................................*21*

*U.S.R.R. Retirement Bd. v. Fritz,*
    449 U.S. 166 (1980)...........................................................................................*8*

*Union Square Supply Inc. v. De Blasio,*
    572 F. Supp. 3d 15 (S.D.N.Y. 2021)............................................... *20-21*

*United States v. Williams,*
    553 U.S. 285 (2008)....................................................................................*16, 18*

*United States v. Wunsch,*
    84 F.3d 1110 (9th Cir. 1996) ........................................................................*20*

*VIP of Berlin, LLC v. Town of Berlin,*
    593 F.3d 179 (2d Cir. 2010)................................................................. *18-19*

*Virginia v. Hicks,*
    539 U.S. 113 (2003)................................................................................. *17-18*

*Washington State Grange v. Washington State Republican Party,*
    552 U.S. 442 (2008).........................................................................................*16*

*West Virginia State Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943).........................................................................................*11*

*Winter v. NRDC, Inc.,*
    555 U.S. 7 (2008)...............................................................................................7

*Wooley v. Maynard,*
    430 U.S. 705 (1977)........................................................................................*11*

*Zauderer v. Office of Disciplinary Counsel,*
    471 U.S. 626 (1985)...........................................................................................8

## CONSTITUTIONS

United States Constitution First Amendment ...................................................... passim

United States Constitution First and Fourteenth Amendments..................................................1, 6

**FEDERAL STATUTES**

Communications Decency Act
    § 230, 47 U.S.C. § 230................................................................................... passim

**STATE STATUTES**

General Business Law
    § 394-ccc................................................................................................ passim
    § 394-ccc(2) ...............................................................................................5
    § 394-ccc(4) ......................................................................................... 6, 22-23

**STATE REGULATIONS**

N.Y. State Assembly Memo. in Support of Legislation, A7865A (2022)......................................5

**MISCELLANEOUS AUTHORITIES**

Merriam–Webster Online Dictionary, https://www.merriam-
    webster.com/dictionary/humiliate.................................................................................19

Merriam–Webster Online Dictionary, https://www.merriam-
    webster.com/dictionary/vilify .....................................................................................19

Norman J. Singer Sutherland Statutory Construction
    § 47:3 (7th ed. 2010)................................................................................................21

Defendant LETITIA JAMES, in her official capacity as Attorney General of New York ("A.G. James" or "State Defendant"), respectfully submits this memorandum of law, together with the Declaration of Rick Sawyer dated December 13, 2022 ("Sawyer Decl.") and the exhibits annexed thereto, in opposition to Plaintiffs' motion for a preliminary injunction (ECF Nos. 8-11.)  Plaintiffs' motion should be denied.

## PRELIMINARY STATEMENT

Plaintiffs Eugene Volokh, Rumble Canada Inc., and Locals Technology Inc. (collectively "Plaintiffs") allege that they own and operate social media networks subject to the recently enacted New York General Business Law § 394-ccc ("the Statute").  (*See* Memorandum of Law In Support of Plaintiffs' Motion for Preliminary Injunction ("Pl. Mem."), ECF No. 9, at 2; Compl., ECF No. 1, at ¶¶ 5-6.)  Plaintiffs claim that § 394-ccc violates their right to free speech by unlawfully prohibiting "hate speech" on the internet, and seek a declaration that § 394-ccc is unconstitutional both facially and as-applied to them under the First and Fourteenth Amendments of the United States Constitution, as well as a declaration that the Statute is preempted by Section 230 of the Communications Decency Act, 47 U.S.C. § 230.  By the present motion, Plaintiffs seek preliminary injunctive relief enjoining A.G. James from enforcing § 394-ccc during the pendency of this litigation.

Plaintiffs' action is based on a fundamentally incorrect reading of the Statute.  Contrary to Plaintiffs' core contention, Section 394-ccc does not regulate speech.  Nowhere in the statute is a social media network required to remove so-called "hate speech"—or any other kind of speech— from any platform.  And nowhere in the statute is a social media network punished or penalized based on content or viewpoint.  As demonstrated herein, Plaintiffs are wrong about the text and plain meaning of § 394-ccc and fail to meet their heavy burden to warrant the extraordinary remedy of a preliminary injunction.  Plaintiffs' request for injunctive relief should accordingly be denied.

Plaintiffs cannot meet any of the requisite elements on their motion:

*First*, Plaintiffs cannot show a likelihood of success on their claims because § 394-ccc does not regulate speech or infringe upon Plaintiffs' freedom of speech or other constitutional rights. Section 394-ccc, which only applies to social media networks doing business for profit in New York, amounts to little more than a requirement that covered social media networks establish an electronic "complaint box." Social media networks subject to § 394-ccc are required only (1) to provide a readily accessible means for individual users to report "hateful conduct" and a means to directly respond to such reports, and (2) to state what the *social media network's own policy is* with respect to how it will respond to and address such reports, if and when it receives them. This prevents user confusion and deception about a network's policies. There is no requirement that a social media network adopt any particular policy and no requirement that a social media network respond to or address a report in any particular manner. A social media network may have a policy to do nothing.

In addition, § 394-ccc is neither overbroad nor unconstitutionally vague in those requirements. "Hateful conduct," as defined in the Statute, specifies the scope of the conduct that individual users, in their own view, must be able to report; it in no way refers to any speech or viewpoint that is prohibited. Nor is the Statute somehow preempted by 47 U.S.C. § 230, which protects social media platforms from liability for third-party content, because it does not impose liability for third-party content.

*Second*, Plaintiffs' motion fails because they have not shown that they will suffer irreparable injury absent the requested injunctive relief. Plaintiffs allege that their First Amendment rights to free speech will be adversely affected by § 394-ccc and that this alleged infringement, by itself, constitutes irreparable harm. Because § 394-ccc does not regulate speech, however, this argument fails. The required disclosure of a social media network's policy on how it will respond and address reports of hateful speech is, at most, informational commercial speech that the State may lawfully require without violation of First Amendment freedoms. Plaintiffs need not disclose their views on "hate speech" or

2

on any other speech in order to comply.

*Finally*, Plaintiffs cannot establish that the balance of the equities weighs in their favor. The requested injunction would undermine the State's ability to provide individual social media users with a means of reporting hateful conduct to a social media network and a readily ascertainable disclosure from the network about how it will respond and address the individual user's report. This mechanism allows the individual users to easily communicate with the platform. These policies inform individual users about what, if any, action might be taken, and help inform users about whether to seek assistance with hateful conduct from other authorities. The State's efforts to require such disclosure at a time of increasing incidents of violence directed against groups is a compelling public interest, and Plaintiffs cannot reasonably argue otherwise.

Plaintiffs' motion for a preliminary injunction should therefore be denied in its entirety.

### STATEMENT OF RELEVANT FACTS AND LEGISLATIVE HISTORY[1]

On May 14, 2022, a teenage white supremacist livestreamed himself systematically slaughtering Black people with an assault rifle at a grocery store in East Buffalo, New York. Sawyer Decl., Ex. A at 9–10. The attack left 10 Black people dead and three others wounded. *Id.* Within hours, a recording of the livestream went viral on social media. *Id.* at 34. Before the shooting began, the shooter published a manifesto touting his racist views and calling for the mass killing of Black people. *Id.* at 9, 15–16. That, too, was shared widely on social media. *Id.* at 34–35. The shooter's expressed intention in livestreaming his attack and posting his manifesto online was to inspire others to follow in his footsteps and commit racially motivated murder. *Id.* at 9, 15–16.

This was not the first time that social media had been used to carry out and incite mass murder. The Buffalo shooter took his inspiration from a 2019 massacre in Christchurch, New Zealand, in

---

[1] A more detailed statement of facts is contained in the accompanying Declaration of Rick Sawyer dated December 13, 2022, and the exhibits attached thereto.

which a shooter also livestreamed his attack on two separate mosques, killing 51 people. *Id.* at 15, 17–19.  Like the Buffalo shooter, the Christchurch shooter published a manifesto on social media that was widely shared across the internet.  *Id.* at 19.  The Buffalo shooter explicitly credited the Christchurch livestream as the impetus for "my real research into the problems with immigration and foreigners in our White lands."  *Id.*

These incidents are not isolated.  The U.S. Department of Homeland Security has labeled domestic violent extremists, like the Buffalo shooter, as one of the key threats facing national security today.  Sawyer Decl., Ex. B at 17 (Department of Homeland Security, Homeland Threat Assessment, October 2020).  The significance of hateful conduct on social media networks is clear: "[v]iolent extremist media almost certainly will spread violent extremist ideologies, especially via social media, that encourage violence and influence [terrorist] action within the United States."  *Id.* at 17.

In June 2022, the New York State Legislature amended the General Business Law to require social media networks to "provide and maintain mechanisms for reporting hateful conduct on their platform" and "have a clear and concise policy" about "how such social media network will respond and address the reports of incidents of hateful conduct on their platform."  N.Y. L. 2022, c. 204, § 1, eff. Dec. 2, 2022.[2]

---

[2] The full text of § 394-ccc is as follows:

1. As used in this section, the following terms shall have the following meanings:

(a) "Hateful conduct" means the use of a social media network to vilify, humiliate, or incite violence against a group or a class of persons on the basis of race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression.

(b) "Social media network" means service providers, which, for profit-making purposes, operate internet platforms that are designed to enable users to share any content with other users or to make such content available to the public.

2. A social media network that conducts business in the state, shall provide and maintain a clear and easily accessible mechanism for individual users to report incidents of hateful conduct. Such mechanism shall be clearly accessible to users of such network and easily accessed from both a social media networks' application and website, and shall allow the social media network to provide a direct response to any individual reporting hateful conduct informing them of how the matter is being handled.

Section 394-ccc has five operative components.  First, it requires a social media company to have "a clear and accessible mechanism for users to report incidents of hateful conduct." § 394-ccc(2).  Second, the reporting mechanism must "allow the social media network to provide a direct response to any individual reporting hateful conduct."  *Id.*  Third, the social media company must publish "a clear and concise policy" describing how it will respond to and address user reports.  *Id.* at (3).  Fourth, the Statute authorizes the Attorney General to enforce its provisions and seek civil penalties of up to $1,000 per day for failure to comply.  *Id.* at (5).  Finally, § 394-ccc contains a savings clause that the statute shall impose no obligation that "adversely affects the rights or freedoms of any persons, such as exercising the right of free speech pursuant to the first amendment to the United States Constitution."  *Id.* at (4).  And the Statute provides that nothing in it shall be construed "to add to or increase liability of a social media network for anything other than the failure to provide a mechanism for a user to report to the social media network any incidents of hateful conduct on their platform and to receive a response on such report."  *Id.* at (4).

Section 394-ccc is a law about facilitating a reporting mechanism for individual social media users, not a law about regulating speech.  The Legislature expressly intended the statute to "empower users of social media to keep virtual spaces safer for all by providing clear and consistent reporting mechanisms for instances of hateful conduct."  Sawyer Decl., Ex. C (N.Y. State Assembly Memo. in

---

3. Each social media network shall have a clear and concise policy readily available and accessible on their website and application which includes how such social media network will respond and address the reports of incidents of hateful conduct on their platform.

4. Nothing in this section shall be construed (a) as an obligation imposed on a social media network that adversely affects the rights or freedoms of any persons, such as exercising the right of free speech pursuant to the first amendment to the United States Constitution, or (b) to add to or increase liability of a social media network for anything other than the failure to provide a mechanism for a user to report to the social media network any incidents of hateful conduct on their platform and to receive a response on such report.

5. Any social media platform that knowingly fails to comply with the requirements of this section shall be assessed a civil penalty for such violation by the attorney general not to exceed one thousand dollars. Each day such offense shall continue shall constitute a separate additional violation. In determination of any such violation, the attorney general shall be authorized to take proof and make a determination of the relevant facts and to issue subpoenas in accordance with the civil practice law and rules.

Support of Legislation, A7865A (2022)).  The Legislature intentionally did not require the companies to adopt any particular policy or response: "[T]he social media networks themselves need to show how they plan to respond. But we have left this purposefully open…because we are leaving it up to them."  *Id.*, Ex. D (Assembly Debate) at 195.  The Legislature recognized that "the bill is not about the First Amendment, we don't tell the social media sites…what to keep up or what to take down." *Id.* at 202.  Instead, the substance of the policy response was left completely to the social media platforms' discretion.  *Id.* at 203.  The bill explicitly does not create liability for any company's chosen response—even if a company never takes any action on user complaints.  *See id.* at 207; § 394-ccc(4).

Plaintiffs allege that they own and operate businesses they claim to be covered by § 394-ccc, and they claim that they have not complied with the Statute.  (Compl. at ¶¶ 86, 93, 97, 107–08, 113, 118, 126, 130–31, 134, 179.)[3]  Plaintiffs do not allege that A.G. James has taken any enforcement action under § 394-ccc against them, nor do Plaintiffs allege that they have been the subject of any complaint made to A.G. James for a violation of that statute.

## PROCEDURAL HISTORY AND THE INSTANT MOTION

Plaintiffs commenced this action by filing a Complaint on December 1, 2022 (ECF No. 1.) The Complaint asserts five causes of action, including facial and as-applied challenges arising under the First and Fourteenth Amendments as alleged content- and viewpoint-based regulation of speech (Count I), compelled speech (Count II), overbreadth (Count III), vagueness (Count IV), and a statutory preemption challenge under 47 U.S.C. §230 (Count V).  (ECF No. 1.)

On or about December 5, 2022, Plaintiffs moved for a preliminary injunction to enjoin enforcement of § 394-ccc.  (ECF Nos. 8-11.)  By Order dated December 7, 2022, the Court directed A.G. James to serve and file opposition papers by December 13, 2022, with reply papers due on

---

[3] For the purposes of this motion, A.G. James does not challenge Plaintiffs' assertions that they are subject to the Statute or that they have failed to comply with it.  A.G. James reserves the right to argue that Plaintiffs lack standing and/or are not subject to the Statute.

December 15, 2022, and a telephonic hearing scheduled for December 19, 2022.  (ECF No. 12)

## STANDARD OF REVIEW

Injunctive relief is "an extraordinary remedy *never* awarded as of right."  *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) (emphasis added).  The movant bears the burden of establishing, by clear and convincing evidence, that (a) it is likely to succeed on the merits; (b) it is likely to suffer irreparable harm in the absence of preliminary relief; (c) the balance of equities tips in its favor; and (d) an injunction is in the public interest.  *See id.* at 20.  The final two factors—the balance of equities and the public interest—"merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  As demonstrated herein, Plaintiffs cannot meet this heavy burden.

## ARGUMENT

## I.     PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS

### A.     Section 394-ccc Does Not Target Protected Expression Based on Content or Viewpoint.

Plaintiffs argue § 394-ccc "targets" expression and "forces online services to penalize 'bias-motivated' speech, by singling it out for special procedures."  (Pl. Mem. at 8-11.)  Plaintiffs claim that the Statute obligates them to take action with respect to "hateful conduct" or "hate speech" posted on their internet sites (whether by themselves or by their users) in derogation of their First Amendment rights.  Plaintiffs largely rely on recitations of proposed legislation never enacted into law, or from press statements of the Governor or reports of the Attorney General (Pl. Mem. 3, 4), rather than on the text of § 394-ccc itself.  As a result, Plaintiffs entirely the miss the mark.  Section 394-ccc does not require Plaintiffs to do any of things of which they complain: no speech is prohibited or restricted.  Plaintiffs' motion must accordingly be denied.

#### i.     The Court should apply the rational basis test.

Despite Plaintiffs' broad contentions, § 394-ccc places a minimal burden on Plaintiffs *as commercial entities* and does not burden their speech or the speech of their users *at all.*  Accordingly, the

appropriate standard of review is not strict scrutiny or any heightened scrutiny at all, but merely rational basis, easily met in the present case. *See N.Y. State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 134 (2d Cir. 2009) (applying rational basis to compelled commercial disclosures in First Amendment challenge).

The recent case *Restaurant Law Ctr. v. City of New York* is instructive on this point. 360 F. Supp. 3d 192 (S.D.N.Y. 2019). There, the court found that a city law requiring employers of fast-food workers to set up a scheme by which those workers could elect to donate a portion of their paychecks to certain non-profit entities was not speech (let alone "compelled" speech"), but rather a requirement of conduct for the employers. *Id.* at 209-210. The court found that rational basis review applied, and held that where "there are plausible reasons for [a legislative body's] action, [the court's] inquiry is at an end. It is, of course, 'constitutionally irrelevant whether this reasoning in fact underlay the legislative decision.'" *Id.* at 221 (quoting *U.S.R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 179 (1980)). *See also N.Y. State Rest. Ass'n v. New York City Bd. of Health*, No. 08 Civ. 1000(RJH), 2008 WL 1752455 at *6-7 (S.D.N.Y. Apr. 16, 2008) *aff'd* 556 F.3d 114 (2d Cir. 2009) (finding city requirement that restaurants disclose calorie information in connection with certain restaurant meals was commercial speech entitled to "less stringent constitutional requirements than other forms of speech," quoting *Nat'l Elc. Mfrs. Assin v. Sorrell*, 272 F.3d 104, 113 (2d Cir. 2001)); *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985) ("disclosure requirements trench much more narrowly on an advertiser's interests than do flat prohibitions on speech").[4]

---

[4] Notwithstanding that § 394-ccc does not provide for a restriction on commercial speech, even if the Court were to apply "intermediate scrutiny," § 394-ccc survives and is constitutional. This is because § 394-ccc advances a substantial government interest in ensuring that in a time of increased violence against groups, complaints of alleged online hateful conduct are brought to the attention of social media platform operators, and the requirements that a platform operator set up a channel for complaints and disclose a policy for handling such complaints is hardly overly restrictive. *See Safelite Group, Inc. v. Jepsen,* 764 F.3d 258, 261-262 (2d Cir. 2014) ("In *Central Hudson,* the Court established that a restriction on commercial speech is subject to intermediate scrutiny, that is, a determination of whether the restriction directly advances a substantial governmental interest and is not overly restrictive. 447 U.S. at 564, 100 S.Ct. 2343. In *Zauderer,* however, the Court created an exception that an informational disclosure law—as opposed to a prohibition on speech—was subject to rational review, that is, a determination of whether the required disclosure is reasonably related to the state's interest. 471

ii.     **Section 394-ccc does not regulate speech.**

Under the Statute, social media platforms can face increased liability only for failing to engage in enumerated *conduct*, not speech, to wit, by providing their users with a mechanism to make reports of hateful conduct and to receive a response to such reports.  There is no requirement as to how the network must respond or what such a policy with respect to such reports must be; a network merely must have a mechanism to receive reports and a policy about what it will do, if anything, when it receives one.  There is no requirement that networks must affirmatively act with respect to reports it receives.  Assuming, *arguendo*, that an individual chose to submit a report about another user's constitutionally protected speech, the mere ability to report that speech to a network does not, in turn, regulate that speech.  Plaintiffs are not required to remove that speech based on its content or for any other reason under the Statute.  Plaintiffs may, indeed, do nothing.

"Innumerable federal and state regulatory programs require the disclosure of product and other commercial information."  *Sorrell*, 272 F.3d at 116.  Requiring the disclosure of information "to better inform consumers about the products they purchase . . . [is not] inconsistent with the policies underlying First Amendment protection of commercial speech."  *Sorrell*, 272 F.3d at 114-15.  *See N.Y. State Rest. Ass'n,* 2008 WL 1752455 at *8 (rejecting contention that requiring restaurants to post calorie counts—a practice with which the restaurants disagreed—constituted "compelled speech" and finding that rational basis review applied).

The Section 394-ccc requirement to "have a clear and concise policy readily available and accessible," is a disclosure of factual and uncontroversial information—i.e., whatever policy the platform has for responding to such complaints, including affirmatively stating that it has no policy at all.  This supports the State's interest in preventing confusion among consumers about what happens, if anything, after a report is submitted to a social media network.  Nothing precludes the social media

---

U.S. at 651, 105 S.Ct. 2265.").

platform of being critical of § 394-ccc or any other topic.

Unsurprisingly, Plaintiffs cite no cases striking down requirements for establishing content neutral complaint channels, as § 394-ccc does.  Instead, Plaintiffs cite a litany of inapposite cases involving laws that were clearly intended to regulate, curtail, or prohibit certain categories of speech *based on their content*, *by the government,* and hence, found impermissible under the First Amendment.[5] None of this authority supports Plaintiffs' flawed reading of § 394-ccc.

Plaintiffs misconstrue the purpose of the definition of "hateful conduct" in § 394-ccc. "Hateful conduct" is defined to describe the scope of reports social media networks must maintain a mechanism to receive; it does not, in any way, regulate "hateful conduct" or require that "hateful conduct" be removed from any platform.  Plaintiffs therefore face no consequence arising from of this definition: Plaintiffs are not *required* to take any action with respect to anything reported to them by their users.

And, as discussed in Section I.B, *infra,* contrary to Plaintiffs' arguments, they are not required to endorse or recite any State message.  The cases offered by Plaintiffs on this point—for example, where the government mandated certain disclosures by crisis pregnancy centers *in the form provided by the government* notwithstanding that these disclosures were at odds with the viewpoint of the crisis pregnancy centers, such as *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) ("*NIFLA*") and *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 244 (2d Cir. 2014)—are of no moment.  Unlike in *Nilfa* or *Evergreen*, Plaintiffs are not required to adopt or present "the State's

---

[5] *See, e.g.,* Pl. Mem. at 8-9, citing *Snyder v. Phelps*, 562 U.S. 443 (2011) (protesters picketing a military funeral found to be raising matter of public concern, and thus, state tort law permitting suit against such protesters found to violate First Amendment for targeting content or viewpoint); *Matal v. Tam*, 137 S.Ct. 1744 (2017) (prohibition in law governing trademark registration against marks that might disparage any person found facially invalid under the First Amendment); *Reno v. ACLU,* 521 U.S. 844, 885 (1997) (Communications Decency Act's prohibition of "obscene or indecent" material constitutionally overbroad content based restriction under First Amendment); *R.A.V. v. City of St. Paul, Minn.*, 521 U.S. 844 (1997) (city ordinance prohibiting graffiti, symbols or displayed objects known to cause anger, alarm or resentment on the basis of race, creed, color, religion, gender or sexual orientation was unconstitutional content based restriction); *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (town ordinance restricting signage based on content "temporary direction," "political" and "ideological" signs differing treatment was an unconstitutional content based restriction).

perspective." Indeed, § 394-ccc permits them to set forth any policy they chose, whether an aggressive content moderation policy, or something else, or indeed, that they have no policy at all, as long as it clearly provides notice to the users as to the policy by which they can expect their complaints to be addressed.[6]

Accordingly, Plaintiffs have failed to show likelihood of success on the merits on the basis that § 394-ccc targets protected expression based on content and viewpoint.

### B.  The Statute Does Not Compel Plaintiffs to Endorse a State Message or Respond to Reports of Any Kind, Including Reports Involving Protected Speech.

Plaintiffs argue that § 394-ccc "demand[s] under threat of punishment that Plaintiffs and similar online services endorse the State's message of disdain for 'hate speech' by explaining to those who complain how they will 'address' and 'handle' it." (Pl. Mem. at 12.)  Plaintiffs further argue that the Statute will require them "to endorse and parrot the State's message about 'hate Speech'" (*id.* at 12-15), and that the Statute will require them to respond to complaints (*id.* at 15-16) in derogation of their First Amendment rights.  As set forth in Section I.A, *supra*, § 394-ccc does no such thing. Plaintiffs' contention that this violates their First Amendment rights by restricting or precluding or punishing protected speech is wrong.  *See Sorrell*; *Restaurant Law Ctr.*; *N.Y. State Rest. Ass'n*, *supra*.

Plaintiffs again elect to cite a litany of cases that stand for the uncontroversial proposition that the government cannot *require* Plaintiffs to state or to endorse any particular *message*.[7]  Plaintiffs also

---

[6] Indeed, contrary to the contention made by Plaintiffs that this compels Plaintiffs who might well disagree with the State's policy to provide a channel for reporting hate speech, Plaintiffs could well *advance* their own viewpoint with a policy that expresses that they intend to take minimal or no action at all because they entirely disagree with their perception of the intent of the Statute.

[7] *See, e.g.*, Pl. Mem. at 12, 14, citing *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (compelling children of Jehovah Witnesses to salute American flag and give pledge of allegiance violates First Amendment's guarantees of freedom of speech and freedom of worship); *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 309 (2012) (government's compelling of nonmember of union to pay for union's political and ideological projects without giving nonmember fair opportunity to assess impact of paying for such activities violates First Amendment); *Wooley v. Maynard*, 430 U.S. 705, 715 (1977) (finding that New Hampshire statute making it a crime to obscure words "Live Free or Die" on state license plates violated First Amendment and that state could not constitutionally require individual to participate in dissemination of ideological message by displaying it on his private property in manner and for express purpose that it be observed and read by the public).

rely on cases involving governmental attempts to force speech in the area of abortion, such as *Stuart v. Loomis*, 992 F. Supp. 2d 585, 598 (M.D.N.C.), *aff'd sub nom Stuart v. Camnitz*, 774 F.3d 238 (4th Cir. 2014) (finding requirements that physicians providing medical care to women seeking abortions to perform an ultrasound, display the sonogram and describe the fetus to their patients violated the physicians' right to free speech well beyond extent needed for reasonable regulation of the medical profession). This misses the mark: § 394-ccc does not restrict, punish, or compel speech.

### i. Section 394-ccc requires the constitutionally permissible disclosure of accurate commercial information only.

Plaintiffs conflate the Statute's requirement for opening a complaint channel and identifying a policy for responding to complaints made via that channel into a (non-existent) requirement that they either ban or otherwise limit or curtail "hateful conduct" or "hate speech" on their platform. (Pl. Mem. at 12-13.) Plaintiffs are wrong. Plaintiffs are required *only* to publicly state what their policy is in responding to such complaints, and nothing in the Statute provides for the ability of A.G. James to seek a penalty against any social media platform that creates a channel for complaints and publishes a policy for responding to it. As shown by the legislative history of the Statute, Plaintiffs have complete control over their own policy for responding to such complaints by design. *See* Sawyer Decl., Ex. D (Assembly Debate) at 195 ("[T]he social media networks themselves need to show how they plan to respond. But we have left this purposefully open…because we are leaving it up to them."). Plaintiffs are not required to "label" or otherwise call attention to any "hateful conduct" in order to comply.[8]

Plaintiffs argue that they "intentionally maintain moderation policies and practices that do not arbitrarily exclude viewpoints that some may perceive as 'hateful.'" (Pl. Mem. at 14; Compl. at ¶¶ 20, 95, 115, 132.) What Plaintiffs *fail to show* is why being required to *publicly post this* as their stated policy

---

[8] *Cf. Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006) (State requirement that retailers affix label "sexually explicit" on certain video games and to maintain at least three large signs, as well as brochures, in stores, constituted compelled speech, in violation of the Free Speech Clause of First Amendment, where signs and brochures were required to communicate messages that were neither purely factual nor uncontroversial.).

for responding to complaints of online hateful conduct (if this, in fact, is their policy) constitutes "endorsing the State's message."  Such a policy statement is consumer information only.  This is in sharp contrast to the cases cited by Plaintiffs for the uncontroversial proposition that the First Amendment strongly disfavors the Government compelling a particular viewpoint or message,[9] something that the Statute does not do.  Any "subjective judgment" as to whether speech, conduct, or anything else constitutes hateful conduct rests with the users (or with the platform operators, but only if they choose to make such a determination).

> **ii.  Section 394-ccc does not require Plaintiffs' response to any report.**

Plaintiffs' contention that the Statute compels them to respond to complaints is also wrong.  Section 394-ccc requires social media networks to provide and maintain a mechanism for individual users to *make* complaints (and *a mechanism* to respond), but their *policy* for how they will respond may well be that they intend not to respond or address the reports *at all*, they cannot argue that they are "compelled" to respond to such complaints (at least insofar as if their stated policy is not to do so.).  Such a scenario does not burden Plaintiffs' First Amendment rights.

Similarly, Plaintiffs' argument that "[e]ven if the law merely requires a response (without dictating the substance), requiring Plaintiffs to respond to each complaint is a paradigmatic unconstitutional speech compulsion" (Pl. Mem. at 15) is erroneous.  Plaintiffs are required to create a channel for complaints and a policy for responding to and addressing such complaints.  As noted above, that policy may well be *not* to respond to and address such complaints at all, in which case, there is clearly no speech compulsion.  *See* Section I.A, *supra*.

---

[9] *See, e.g.,* Pl. Mem. at 14-15, citing *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*, 475 U.S. 1, 9 (1986) (public utilities commission requirement that a utility place a newsletter containing the views of a third-party beyond the utility's control into its billing envelopes both penalized the utility for including its own newsletter containing protected speech and forced it to alter its speech to conform with an agenda it did not set violated First Amendment); *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 257 (1974) (state statute requirement that newspapers provide political candidates "right of reply" to editorials attacking candidate's personal character violates First Amendment guarantee of free press).

Finally, Plaintiffs argue that they will face "a Hobson's choice" of either indicating that they will not handle complaints of conduct that *their own users* believe is hateful conduct or might be "hateful," and risk alienating visitors concerned about "the State's animating concern," or have a policy addressing such concerns and alienate visitors "opposed to censorship." Thus, Plaintiffs argue that the Statute "denies Plaintiffs the option of not inviting complaints and not responding to them, and thus forces Plaintiffs to speak in ways they would otherwise forgo." (Pl. Mem. at 15-16.) But such an "option" is not constitutionally protected: the State plainly can regulate Plaintiffs *as businesses*, and, in the present case, can compel them to disclose factual matter without running afoul of the First Amendment. *See Sorrell*, 272 F.3d at 114-16.

Accordingly, Plaintiffs cannot show a likelihood of success on the merits on the basis of the Statute allegedly compelling them to adopt the State's message or compelling their response.

## C. The Statute Does Not Unconstitutionally Burden Plaintiffs' Publication of Protected Speech.

Plaintiffs argue that the Statute places "burdens on the publication of protected speech [that] violate the First Amendment." (Pl. Mem. at 16.) But contrary to their arguments, Plaintiffs do not face chilling of otherwise protected speech out of fear of legal enforcement against what their users might perceive as hate speech, because the Statute does not require an endorsement of *any* definition of online hate speech nor any mandated response to it (as long as a policy for responding to complaints—or not responding to them—is clearly enumerated and published). Hence, the cases cited by Plaintiffs for the proposition that the Statute constitutes an unconstitutional compulsion to act under direct or indirect threats of punishment for failure to act are inapposite.[10] Section 394-ccc

---

[10] *See, e.g.,* Pl. Mem. at 16-17, citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963) (state commission that threatened paperback book distributors of materials it deemed containing obscene material with invoking legal sanctions and other means of coercion, persuasion, and intimidation to achieve suppression of publications it deemed objectionable and succeed in its aim violated First Amendment); *Backpage.com, LLC v. Dart*, 807 F.3d 229, 237-38 (7th Cir. 2015) (county sheriff's "informal" letters to credit card companies to stop processing payments to classified advertising website constituted unlawful prior restraint by state actors entitling website to injunctive relief); *Okwedy v. Molinari*, 333 F.3d 339, 342 (2d Cir. 2003) (City borough president's letter to billboard company displaying religious organization's signs proclaiming

regulates the conduct of certain entities operating a social media platform in this State *for profit*, and the State can regulate business *conduct*. *See Sorrell*, *supra*.

Finally, Plaintiffs argue that because "failing to promptly remove 'hate speech' from a platform may increase the risk of investigation and penalty, online services like Plaintiffs will be pressured to address the protected speech that New York has targeted." (Pl. Mem. at 17.) But the Statute does not require removal of "hate speech" *or anything else*. And Plaintiffs are well aware that they will not be *required* to "review, and respond to visitor complaints" if it is not their policy to do so.

Because Plaintiffs cannot show that their publication of protected speech is being unconstitutionally burdened, they fail to show a likelihood of success on the merits.

### D. The Statute is Facially Constitutional and Plaintiffs Cannot Show Likelihood of Success on their Overbreadth Contention.

Plaintiffs argue that the Statute is overbroad "because it pressures online services to chill, prohibit, or remove a substantial amount of constitutionally protected online speech and compels them to voice the state's pro-censorship view." (Compl. ¶ 192; *see also* Pl. Mem. at 17-18.) Plaintiffs claim this reaches beyond the Statute's legitimate sweep because "it applies to a substantial amount of protected speech, especially compared to its nonexistent or minimal lawful application . . . includ[ing] a broad array of comedy, art, journalism, historical documentation, and commentary on matters of public concern." (Pl. Mem. at 17-18.) Plaintiffs are wrong on all counts, and their as-applied and facial overbreadth challenges to the Statute should be rejected.[11]

---

homosexuality to be a sin that resulted in the signs being removed found to violate the religious organization's First Amendment rights where letter could be construed as containing implicit threat of government retaliation if company failed to accede to borough president's requests to remove the signs).

[11] Because Plaintiffs argue that the statute is unconstitutional as applied to them, the Court should not consider Plaintiffs' facial overbreadth claim. As Plaintiffs' own cited authority makes clear, it is "not desirable" or necessary for a court to "determine whether the statute is substantially overbroad [where it] can simply determine whether the statute can be constitutionally applied to the internet speech upon which plaintiffs base their suit." *Am. Booksellers Found. v Dean*, 342 F.3d 96, 104 (2d Cir. 2003) (declining to reach overbroad claim). *See also Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985) ("[W]here the parties challenging the statute are those who desire to engage in protected speech that the overbroad statute purports to punish . . . [t]he statute may forthwith be declared invalid to the extent that it reaches too far, but otherwise

Under the overbreadth doctrine, "a statute is facially invalid if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292–93 (2008). The doctrine "seeks to strike a balance" between chilling constitutionally protected speech and the "harmful effects" of "invalidating a law that in some of its applications is perfectly constitutional[.]" *Id. See also Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008) ("Facial challenges are disfavored[.]"). The overbreadth doctrine is therefore an "exception to the general rule against third-party standing." *Farrell v. Burke*, 449 F.3d 470, 498 (2d Cir. 2006) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)).

"Invalidation for overbreadth is 'strong medicine' that is not to be 'casually employed.'" *Williams*, 553 U.S. at 293 (quoting *Los Angeles Police Dep't v. United Reporting Publishing Corp.*, 528 U.S. 32, 39 (1999)). For a party to prevail on such a theory, the overbreadth of a statute must not only be real, but also "substantial", judged in relation to the statute's "plainly legitimate sweep." *Williams*, 553 U.S. at 292. There must also be no narrowing construction that would cure the statute's constitutional infirmity. *See, e.g., Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 494 n. 4 (1982) ("In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction."); *Williams,* 553 U.S. at 292 ("[I]t is impossible to determine whether a statute reaches too far without first knowing what the statute covers.").

### a. The Statute does not prohibit speech.

The Statute, on its face and by its plain terms, does not prohibit or regulate speech. Contrary to Plaintiffs' contentions, there is no requirement that social media networks "chill, prohibit, or remove" any content from their websites whatsoever. *See* Section I.A.ii, *supra*. Accordingly, Plaintiffs cannot show likely success on their overbreadth claim because they misread Section 394-ccc entirely;

---

left intact."). In any event, Plaintiffs' as-applied challenge fails for the reasons set forth herein, and because they have failed to adequately allege injury and other elements.

the Statute does not apply to speech, let alone the "broad array of speech" to which Plaintiffs' refer. *See Virginia v. Hicks*, 539 U.S. 113, 124 (2003) ("Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating).").[12]

### b. To the extent the Statute compels speech at all, it compels commercial speech, and overbreadth fails because the Statute does not reach noncommercial speech.

An "overbreadth analysis does not normally apply to commercial speech . . . [because] commercial speech is more hardy, less likely to be 'chilled,' and not in need of surrogate litigators." *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 481 (1989). Therefore, an overbreadth challenge to commercial speech restrictions may be brought if the overbreadth "reach[es] some noncommercial speech." *Id.* at 482. Here, none of the alleged overbreadth reaches noncommercial speech. Section 394-ccc plainly states that social media networks must disclose their policies for responding to and addressing individual user reports. They are not required to make any other disclosure, commercial or otherwise, to their individual users. As such, Plaintiffs' challenge fails. As the statute, if it compels speech, compels commercial speech *only*, *see* Sections I.A and I.B(i), *supra,* Plaintiffs have failed to demonstrate a likelihood of success that the statute is so overbroad as to reach noncommercial speech.

### c. Even if the Statute burdens some protected speech or conduct, it is not overbroad in relation to its legitimate scope.

Even if § 394-ccc reaches some protected speech or activity, which it does not, Plaintiffs' facial

---

[12] The authority on which Plaintiffs rely is inapposite. In *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, the Ninth Circuit considered a city ordinance that regulated solicitation, a protected form of First Amendment expression, in roadways and other places, not a statute that required a website doing business to make an informational disclosure. 657 F.3d 936, 944-45 (9th Cir. 2011) (finding anti-solicitation ordinance was geographically overbroad, among other things). In *Ancheta v. Watada*, the District of Hawaii struck down a content-based ban on certain campaign speech, including speech that engaged in "personal vilification." 135 F. Supp. 2d 1114, 1125 (D. Haw. 2001). Unlike that law, § 394-ccc does not ban content. That an individual user may report conduct that user identifies as "vilifying" does not mean that the network must then take that content down. Section 394-ccc goes no further than requiring a mechanism through which a report to be made. It does not ban "vilifying" speech or another kind of speech. Overbreadth and vagueness were not issue in *Snyder v Phelps*, 562 U.S. 443 (2011). Finally, in *Farrell*, the plaintiff's overbreadth challenge failed where there was neither real nor substantial overbreadth in relation to plainly legitimate sweep. 449 F.3d at 498-99.

overbreadth claim still fails because Plaintiffs cannot show that Section 394-ccc is overbroad in relation to its legitimate sweep.  The Statute's legitimate sweep is apparent: it informs individual social network users about whether there will be a response to a report and how the report may be addressed—plainly constitutional regulation of disclosure of business practices.

Here, Plaintiffs fail to make the requisite showing that "from the text of the law and from actual fact, that substantial overbreadth exists." *Hicks*, 539 U.S. at 122 (internal citations and brackets omitted).  Any hypothetical possibility that this will in some way unlawfully chill protected speech, when the Statute in no way regulates speech, is without merit.  Thus, Plaintiffs cannot establish that there is a "realistic danger" that the statute's reach is "substantially overbroad." *Williams*, 533 U.S. at 302–03.  There is no basis to support Plaintiffs' broad claim that protected speech must be removed from a social media network under this statute.  Because in "the vast majority of [the Statute'[s] applications, [it] raises no constitutional problems whatsoever," it is not overbroad and is not facially unconstitutional.  *Id.*

### E.  Plaintiffs Cannot Show Likelihood of Success on their Claim of Vagueness.

Plaintiffs also challenge the facial and as-applied constitutionality of the Statute on the grounds that it is void for vagueness, arguing that the Statute is unconstitutionally vague as-applied to their platforms because " 'it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.'"  (Pl. Mem. at 18, quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000).)  "The degree of vagueness tolerated in a statute varies with its type: economic regulations are subject to a relaxed vagueness test, laws with criminal penalties to a stricter one, and laws that might infringe constitutional rights to the strictest of all." *Rubin v. Garvin*, 544 F.3d 461, 467 (2d Cir. 2008).  Because this statute does not regulate speech or First Amendment activity, it is subject to a lower level of specificity in a vagueness challenge.  *See VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 188 (2d Cir. 2010) (rejecting as-applied vagueness challenge to ordinance definition of "Adult Oriented

18

Store").  Even held to a stricter standard, however, the Statute is not unconstitutionality vague, and Plaintiffs will not likely succeed on the merits.

### i. The Statute provides adequate notice of the required conduct.

The law does not require statutory language to provide notice with "mathematical certainty," but rather, "the relevant inquiry is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Berlin*, 593 F.3d at 187.

The thrust of Plaintiffs' argument is that the Statute is unconstitutionally vague because it does not provide any definition for the words "vilify," "humiliate," "incite violence," as they appear in the definition of "hateful conduct," and that these words simply have no "objective plain meaning."[13]  (Pl. Mem. at 19.)  Plaintiffs are wrong.  These words do have objective plain meanings[14] and the context in which these words are used provides clear notice to social media networks as to what kinds of reports they must create a mechanism to accept.  *See generally Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.").  Plaintiffs further allege that the term "incite violence" as it is used in the Statute is broader than the objective standard set forth in *Brandenburg* and its progeny—which they concede they understand—but they provide no basis or explanation for this apparently broader reading.  (Pl. Mem. at 19.)  Plaintiffs cannot claim plain meanings simply do not exist when it does not suit them.

Plaintiffs allege that these terms are vague in so far as they purportedly prohibit speech and

---

[13] Plaintiffs also allege that Section 394-ccc is unconstitutionally vague because "hate speech" has no objective meaning. (Pl. Mem. at 19.)  Notably, the phrase "hate speech" does not appear in the Statute.

[14] For example, a common definition of "vilify" is "to utter slanderous and abusive statements against : DEFAME." Merriam–Webster Online Dictionary, https://www.merriam-webster.com/dictionary/vilify (last visited December 13, 2022).  One common definition of "humiliate" is "to reduce (someone) to a lower position in one's own eyes or others' eyes : to make (someone) ashamed or embarrassed : MORTIFY."  Merriam–Webster Online Dictionary, https://www.merriam-webster.com/dictionary/humiliate (last visited December 13, 2022).

other conduct.  That is not how § 394-ccc uses these terms.  These terms appear for the purpose of defining the scope of reports Plaintiffs must maintain a mechanism to receive.[15]  Applying these definitions to the present case, Plaintiffs and social media networks have adequate notice that they must provide a mechanism whereby individual users may report "hateful conduct,"[16] such as a general online complaint box.  A social media platform must provide a mechanism, and a reasonable person would understand that failure to provide such a mechanism results in noncompliance with the Statute. *See Berg v. Vill. of Scarsdale*, No. 20-4130-CV, 2021 WL 5751385, at *2 (2d Cir. Dec. 3, 2021) ("[C]ode is not unconstitutionally vague because the language of the challenged provisions clearly notifies persons of ordinary intelligence what is proscribed."); *Union Square Supply Inc. v. De Blasio*, 572 F. Supp. 3d 15, 22 (S.D.N.Y. 2021) ("This plain-language rule provides sufficient guidance to regulated parties, particularly given the relaxed vagueness test applicable in the context of this civil enforcement regime.").  In addition, disclosure of a policy—including a policy of no response and no action— satisfies the plain meaning of the statute to "have" a policy.[17]  A reasonable person would understand that failure to have and disclose such a policy also fails to comply with Section 394-ccc.  Moreover, Plaintiffs cannot challenge the Statute for vagueness because their conduct is clearly proscribed by Section 394-ccc. *See Union Square*, 572 F. Supp. 3d at 22.  Plaintiffs misread the statute and improperly

---

[15] Unlike the statute at issue in *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1888 (2018), a case upon which Plaintiffs' rely, where there was no definition of the term "political" in a statute that prohibited wearing "political insignia" at a polling station among other things, Section 394-ccc provides a clear definition of "hateful conduct" reports that individual users must have a mechanism to make.  "What may come in" through those reports is at the discretion of the individual user, and there is no prohibition or regulation of any speech that may be the subject of a report.

[16] Plaintiffs' reliance on *United States v. Wunsch*, 84 F.3d 1110, 1119 (9th Cir. 1996) is misplaced.  In that case, the Ninth Circuit held the term "offensive personality" was unconstitutionally vague in the context of the statute because, in relevant part, "'offensive personality' could refer to any number of behaviors that many attorneys regularly engage in during the course of their zealous representation of their clients' interests, [and] it would be impossible to know when such behavior would be offensive enough to invoke the statute." *Id.*  Here, the statute does not prohibit speech or expressive behaviors; instead, it merely requires that individual users be able to report to a social media network incidents the user deems to be "hateful conduct."

[17] The Complaint challenges the vagueness of other words and phrases in the Statute that are not raised in the present motion, including, for example, the phrase "clear and concise."  (Compl. at ¶ 199.)  State Defendant contends that this phrase and the entire Statute has a plain, objective meaning and reserves the right to argue that all the text of § 394-ccc is constitutional and not vague.

conflate an individual user's ability to report conduct that the *individual user* identifies as "hateful conduct," with a content-based regulation of speech.  Plaintiffs make much of the fact that the subsection title of the statute is "Social media networks; hateful conduct prohibited."  (Pl. Mem. at 1, 15, 16.)  Indeed, it seems that the entirety of Plaintiffs' case is based upon the word "prohibited."  But the word "prohibited" is not part of the law.  Plaintiffs cannot rely upon that word where, as here, the law is clear.  *See Thistlethwaite v. Dowty Woodville Polymer, Ltd.,* 110 F.3d 861, 866 (2d Cir.1997) ("Headings and titles are not meant to take the place of the detailed provisions of the statutory text; nor are they necessarily designed to be a reference guide or a synopsis." (internal brackets omitted)); *Dumitru v. Princess Cruise Lines*, 732 F. Supp. 2d 328, 337 (S.D.N.Y. 2010) ("While section headings "are tools available for the resolution of a doubt about the meaning of a statute," they do not override clear statutory  text," citing *Thistlewaite*, 110 F.3d at 866 and *Fla. Dept. of Revenue v. Piccadilly Cafeterias, Inc.,* 554 U.S. 33, 43 (2008) and quoting Norman J. Singer, 2A *Sutherland Statutory Construction* § 47:3 (7th ed. 2010) (section headings "may not be used to create ambiguity when the body of the act itself is clear")).

By its plain meaning, § 394-ccc is not a law that regulates speech; it is a law that allows individual users to report hateful conduct to social media networks.  Plaintiffs' efforts to read the law otherwise are disingenuous and ignore the text on the page.  The Statute is in no way vague about what kinds of speech it prohibits because the Statute in no way prohibits speech.

   ii.   **The Statute provides sufficiently clear enforcement standards.**

Plaintiffs are also wrong that the Statute is vague such that it authorizes or encourages arbitrary and discriminatory enforcement.  When analyzing this issue, a court may determine that a statute provides adequate guidance if either: (1) the "statute as a general matter provides sufficiently clear standards to eliminate the risk of arbitrary enforcement;" or (2) "even in the absence of such standards, the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before

the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute." *Farrell*, 449 F.3d at 494.

For the same reasons that the Statute provides adequate notice, the language here, which defines the nature of reports social media networks must receive for "hateful conduct," does not encourage or authorize arbitrary enforcement.  The plain meaning of the Statute is not vague: conduct must simply be reportable; it need not be banned.

### iii.   The Statute does not have any chilling effect on the exercise of First Amendment freedoms.

Section 394-ccc does not require any social media network to address, form a view, censor, or promote hate speech or speech of any kind.  The requirement to accept reports from individual users is not expressive activity that falls within the scope of the First Amendment; it is a constitutional business law that merely requires a social media network doing business in New York to accept reports of hateful conduct from its users.

### iv.   The Statute's Savings Clause is not vague.

Plaintiffs allege that the savings clause in § 394-ccc(4) that "nothing in this section shall be construed . . . as an obligation imposed on a social media network that adversely affects the rights or freedoms of any persons, such as exercising the right of free speech pursuant to the first amendment to the United States Constitution" is similarly void for vagueness.  Plaintiffs cannot use the Legislature's efforts to protect First Amendment freedoms as a sword against them, however.  *See Schleifer by Schleifer v. City of Charlottesville*, 159 F.3d 843, 853 (4th Cir. 1998) ("[Construing vagueness and meaning it] hardly seems fitting, however, for courts to chastise elected bodies for protecting expressive activity.").  *See also CISPES v. F.B.I.*, 770 F.2d 468, 474 (5th Cir. 1985) ("[Such] a provision cannot substantively operate to save an otherwise invalid statute, since it is a mere restatement of well-settled constitutional restrictions on the construction of statutory enactments. However, it is a valuable indication of Congress' concern for the preservation of First Amendment rights in the specific context

of the statute in question. Thus, it serves to validate a construction of the statute which avoids its application to protected expression."). Here, the Legislature expressly sought to avoid violating the First Amendment, and this section adds even more clarity to the otherwise very clear meaning of this Statute, which in no way prohibits expressive activity.

###### F.  The Statute is not preempted by 47 U.S.C. § 230.

Plaintiffs' argument that 47 U.S.C. § 230, which protects social media platforms from liability for third-party content, preempts § 394-ccc fails because the Statute does not require Plaintiffs to take any action related to publishing user content.  (Pl. Mem. at 20-21.)  While broad, § 230 immunity shields conduct only where a party "(1) is a provider or user of an interactive computer service, (2) the claim is based on information provided by another information content provider, and (3) the claim would treat [the provider] as the publisher or speaker of that information."  *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 173 (2d Cir. 2016).  In other words, § 230 immunity applies only when a website "displays content that is created entirely by third parties"; it does not apply to "content that [a website] creates itself."  *Elliott v. Donegan*, 469 F. Supp. 3d 40, 56–57 (E.D.N.Y. 2020).

Here, the Statute explicitly avoids creating *any* liability for *content* published on a website by its *users*.  Under § 394-ccc(4), "[n]othing in this section shall be construed… to add… liability to… a social media network for anything *other than* the failure to provide *a mechanism* for a user to report to the social media network any incidents of hateful conduct on their platform and to receive a response on such report" (emphasis supplied).  As discussed *supra* (*see e.g.* Section I.A.(ii)), the Statute does not require the removal of, or otherwise regulate, *any* content provided by a third party, and § 230 therefore does not apply.

Analyzing similar state-law requirements, the Ninth Circuit rejected the contention that § 230 immunized a website from its duty to warn under California law.  *Doe v. Internet Brands*, 824 F.3d 846 (9th Cir. 2016).  There, the court held that an obligation to warn "would not require [the website] to

remove any user content or otherwise affect how it publishes or monitors such content," and the required warning "would involve only content that [the website] itself produced" and thus did not trigger immunity.  *Id.* at 851.  There, as here, liability has "nothing to do with [the website's] efforts, or lack thereof, to edit, monitor, or remove user generated content."  *Id.* at 852.  And there, as here, Section 230's shield does not apply.

## II.  PLAINTIFFS FAIL TO ESTABLISH THEY WILL SUFFER IRREPARABLE HARM

Plaintiffs' application also should be denied because they cannot establish that they will suffer irreparable harm in the absence of injunctive relief, which is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (per curiam) (alteration in original) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983)).

In a case alleging a deprivation of First Amendment rights, the requirements for showing likelihood of success on the merits and irreparable harm effectively merge.  The presence of irreparable injury to First Amendment rights "turns on whether the plaintiff has shown a clear likelihood of success on the merits." *SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 278 (2d Cir. 2021) quoting *Beal v. Stern*, 184 F.3d 117, 123-24 (2d Cir. 1999).  *See also Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349-50 (2d Cir. 2003) (holding that the presumption of irreparable harm applies only when the challenged law "directly limits speech" and not, as here, where the law "may only potentially affect speech").

Accordingly, because, as set forth above, Plaintiffs cannot show a likelihood of success on the merits of their claims, they also cannot establish irreparable harm and their motion should be denied.

## III.  THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF THE STATE DEFENDANT

Because the Plaintiffs "have failed to show a likelihood of success on the merits of their First Amendment challenge[]," the Court need not weigh the public's interest against Plaintiffs' purported

injury. *Amato v. Elicker*, 460 F. Supp. 3d 202, 224 (D. Conn. 2020). And the "extraordinary remedy" of a preliminary injunction would substantially harm the State's ability to empower its citizens to report violent content on the internet. *Monserrate v. N.Y. State Senate*, 599 F.3d 148, 154 (2d Cir. 2010). "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *see also SAM Party of N.Y.*, 987 F.3d at 278 ("In a suit against the government, balancing of the equities merges into our consideration of the public interest.").

Here, Plaintiffs seek to invalidate a duly enacted consumer protection statute addressing rising violence incited by—and captured on—social media platforms. The Statute gives consumers a "complaint box" for alerting social media platforms to violence on their services, and it requires the platforms to be transparent in how they will address such complaints. The reporting mechanism will allow consumers to directly inform a social media company about conduct that concerns them (and anything else prohibited by a platform's terms of service) so that the company can take action as it sees fit. The transparency provisions—the published policy and the requirement of a response—will allow consumers to know whether reporting to the company was enough or whether to take further action—for example, by calling local or federal law enforcement. The Statute leaves policymaking to each platform's "own morality and their own conscience," Sawyer Decl., Ex. D (Assembly Debate) at 203, but empowers consumers by providing transparency into what decisions the platform has made and will make. Accordingly, the public interest and balance of equities strongly favor denial of Plaintiffs' motion for injunctive relief.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied in its entirety.

Dated:  New York, New York
        December 13, 2022

LETITIA JAMES
Attorney General
State of New York
*Attorney for State Defendant*
28 Liberty Street
New York, New York 10005

By:  **/s/ Seth J. Farber**
Seth J. Farber
Special Litigation Counsel
(212) 416-8029
Seth.Farber@ag.ny.gov
Katherine Rhodes Janofsky
Assistant Attorney General
(212) 416-8621
Katherine.Janofsky@ag.ny.gov
Rick Sawyer
Special Counsel for Hate Crimes
(212) 416-6182
Richard.Sawyer@ag.ny.gov