UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EUGENE VOLOKH, RUMBLE CANADA INC., and LOCALS TECHNOLOGY INC., <br><br> *Plaintiffs,* <br><br> v. <br><br> LETITIA JAMES, in her official capacity as Attorney General of New York, <br><br> *Defendant*. | Civil Action No.: 1:22-cv-10195-ALC |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

JAMES M. DIAZ*
(Vt. Bar No. 5014)
DARPANA SHETH
(N.Y. Bar No. 4287918)
DANIEL M. ORTNER**
(Cal. Bar No. 329866)
FOUNDATION FOR INDIVIDUAL RIGHTS AND
  EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Telephone: (215) 717-3473
jay.diaz@thefire.org
darpana.sheth@thefire.org
daniel.ortner@thefire.org

BARRY N. COVERT
(N.Y. Bar No. 271118)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Ave Suite 120
Buffalo, NY 14202
Tel: 716 849 1333 x 365
bcovert@lglaw.com

*Attorneys for Plaintiffs*
\* Admitted *Pro Hac Vice*
\*\* *Pro Hac Vice* Motion Pending

*Counsel for Plaintiffs Eugene Volokh, Rumble Canada Inc., and Locals Technology Inc.*

# **TABLE OF CONTENTS**

Page(s)

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION .....................................................................................................................1

ARGUMENT..............................................................................................................................2

    I.     New York's Online Hate Speech Law Regulates Speech, Not Conduct. ................................................................................................... 2

    II.    The Online Hate Speech Law Cannot Withstand Strict Scrutiny. ......................... 5

    III.   The Online Hate Speech Law Regulates Solely Noncommercial Speech. .................................................................................................. 6

    IV.   New York's Law Is Overbroad and Vague................................................. 8

    V.    Section 230 Preempts New York's Law. ............................................... 10

    VI.   The Court Must Grant a Preliminary Injunction. ................................... 10

CONCLUSION.........................................................................................................................10

CERTIFICATE OF SERVICE .................................................................................................12

# **TABLE OF AUTHORITIES**

**Cases** Page(s)

*Ashcroft v. Free Speech Coal.*,
　535 U.S. 234 (2002) ................................................................................................................. 6

*Barr v. Am. Ass'n of Pol. Consultants*,
　140 S. Ct. 2335 (2020) ............................................................................................................. 5

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
　447 U.S. 557 (1980) ................................................................................................................. 6

*CISPES (Comm. in Solidarity with People of El Salvador) v. F.B.I.*,
　770 F.2d 468 (5th Cir. 1985) ................................................................................................... 2

*Citizens United v. Fed. Election Comm'n*,
　558 U.S. 310 (2010) ................................................................................................................. 4

*Conn. Bar Ass'n v. United States*,
　620 F.3d 81 (2d Cir. 2010) ....................................................................................................... 6

*Davis v. Avvo, Inc.*,
　345 F. Supp. 3d 534 (S.D.N.Y. 2018) ...................................................................................... 7

*Doe v. Internet Brands, Inc.*,
　824 F.3d 846 (2016) ............................................................................................................... 10

*Ent. Software Ass'n v. Blagojevich*,
　469 F.3d 641 (7th Cir. 2006) ................................................................................................... 7

*Gorran v. Atkins Nutritionals, Inc.*,
　279 F. App'x 40 (2d Cir. 2008) ............................................................................................... 7

*Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*,
　452 U.S. 640 (1981) ................................................................................................................. 7

*Hess v. Indiana*,
　414 U.S. 105 (1973) ................................................................................................................. 6

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
　515 U.S. 557 (1995) ............................................................................................................ 3, 7

*Iancu v. Brunetti*,
　139 S. Ct. 2294 (2019) ............................................................................................................. 2

*Jones v. Dirty World Entm't Recordings LLC*,
　755 F.3d 398 (6th Cir. 2014) ................................................................................................. 10

*Matal v. Tam*,
    137 S. Ct. 1744 (2017) ................................................................................................................ 2

*Mia. Herald Pub. Co. v. Tornillo*,
    418 U.S. 241 (1974) .................................................................................................................... 4

*Minneapolis Star & Trib. Co. v. Minn. Com'r of Revenue*,
    460 U.S. 575 (1983) .................................................................................................................... 2

*N.Y. State Ass'n of Realtors, Inc. v. Shaffer*,
    27 F.3d 834 (2d Cir. 1994) ......................................................................................................... 7

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018) ........................................................................................................... 3, 7

*Nelson v. McClatchy Newspapers, Inc.*,
    936 P.2d 1123 (Wash. 1997) ...................................................................................................... 6

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
    475 U.S. 1 (1986) ........................................................................................................................ 4

*Palmieri v. Lynch*,
    392 F.3d 73 (2d Cir. 2004) ......................................................................................................... 5

*R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*,
    845 F. Supp. 2d 266 (D.D.C. 2012) ........................................................................................... 8

*R.J. Reynolds Tobacco Co., v. U.S. Food & Drug Admin.*,
    No. 6:20-CV-00176, 2022 WL 17489170 (E.D. Tex. Dec. 7, 2022) ......................................... 8

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) .................................................................................................................... 2

*Rest. Law Ctr. v. City of N.Y.*,
    360 F. Supp. 3d 192 (S.D.N.Y 2019) ......................................................................................... 5

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988) .................................................................................................................... 7

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
    547 U.S. 47 (2006) ...................................................................................................................... 3

*Satawa v. Macomb Cnty. Rd. Comm'n*,
    689 F.3d 506 (6th Cir. 2012) ...................................................................................................... 6

*Shaw v. Hunt*,
    517 U.S. 899 (1996) .................................................................................................................... 6

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
    502 U.S. 105 (1991)............................................................................................................ 2

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000)............................................................................................................ 4

*United States v. Williams*,
    553 U.S. 285 (2008)............................................................................................................ 8

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (2013)............................................................................................................ 6

*Wooley v. Maynard*,
    430 U.S. 705 (1977)............................................................................................................ 3

*Zeran v. Am. Online, Inc.*,
    129 F.3d 327 (4th Cir. 1997) ............................................................................................ 10

**Statutes**

N.Y. Gen. Bus. Law § 394-ccc(3) ............................................................................................... 4

N.Y. Gen. Bus. Law § 394-ccc(b) ............................................................................................... 2

**Other Authorities**

Suzanne Nossel, *No, Hateful Speech is Not the Same Things as Violence*, Wash. Post
    (June 22, 2017).................................................................................................................... 9

**INTRODUCTION**

New York's Online Hate Speech Law regulates "social media networks" as speakers and publishers of protected speech and compels them to speak by requiring them to (1) develop and publish a policy on State-defined hate speech and no other topic, (2) create a report and response mechanism specifically for State-defined hate speech and no other topic, and (3) respond to reports of State-defined hate speech and no other topic. But the State now mystifyingly claims the law regulates only conduct and thus does not compel or burden speech. This characterization is inconsistent not only with the law's text and application to "social media networks," but also with public statements from the Defendant and other State officials. By design, New York's law targets constitutionally protected publishers and expression based on viewpoint—not "violence" as the Defendant claims. Even under the State's overly narrow reading, New York's statute plainly regulates social media networks as speakers and publishers—compelling them to create a hate speech policy and reporting mechanism that convey the State's message when they otherwise would not and burdening their publication of protected speech. Strict scrutiny therefore applies, and Defendant makes no argument the law can survive it.

The State further claims the law is, at worst, a purely factual commercial disclosure requirement. But the Online Hate Speech Law neither regulates commercial speech nor acts as a purely factual and uncontroversial commercial disclosure requirement. Further, the law is overbroad and vague, and imposes liability based on Plaintiffs' publication of third-party content, such that Section 230 preempts it. Plaintiffs are thus likely to prevail on the merits and entitled to an injunction.

**ARGUMENT**

**I.     New York's Online Hate Speech Law Regulates Speech, Not Conduct.**

The State's opposition arguments are based almost entirely on the same fundamentally flawed premise: "Section 394-ccc does not regulate speech." To preserve their mantra, the State has no choice but to ignore that the Online Hate Speech Law, on its face, (1) regulates "social media network[s]," speakers and publishers of protected speech, and (2) compels social media networks to speak about hate speech.

New York's law regulates social media networks—by definition, publishers engaged in speech—and, more specifically, only those networks engaged in publishing third-party content, *see* New York General Business Law § 394-ccc(b), which it cannot do.[1] The law also targets protected speakers and speech in a content-[2] and viewpoint-based manner, contravening Supreme Court holdings in *R.A.V. v. City of St. Paul, Matal v. Tam,* and *Iancu v. Brunetti*. *See* Opening Br. at 1, 8–9; *Iancu*, 139 S. Ct. 2294, 2299 (2019) (bans on "immoral" and "scandalous" trademarks viewpoint discriminatory). *Matal* explicitly confirms that statutes singling out "offensive" expression for regulation, as New York's law does here, are unconstitutionally viewpoint-based. 137 S. Ct. 1744, 1747 (2017).

New York's law also unquestionably compels Plaintiffs to speak about hate speech.[3] Per the law, social media networks must (1) develop and publish a policy—*i.e.*, must speak—

---

[1] It is well-settled that such entities receive First Amendment protection from regulation of their speech, publications, or editorial processes. *See Minneapolis Star & Trib. Co. v. Minn. Com'r of Revenue*, 460 U.S. 575, 575 (1983) (striking law that "singled out the press for special treatment"); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) (striking law that singled "out income derived from expressive activity for a burden the State places on no other income" and "directed only at works with a specified content.").

[2] *Reed v. Town of Gilbert* also held a law is content-based if it is "content based on its face" or was adopted with a "content-based purpose." 576 U.S. 155, 165 (2015). New York's law is both.

[3] Defendant's reliance on the law's "savings clause" is misplaced. A savings clause "cannot substantively operate to save an otherwise invalid statute." *CISPES (Comm. in Solidarity with People of El Salvador) v. F.B.I.*, 770 F.2d 468, 474 (5th Cir. 1985).

describing "how such social media network will respond [to] and address reports of" State-defined hate speech on their platform; (2) create a report and response mechanism for users to complain about such State-defined hate speech;[4] and (3) "respond [to]," "address," and "handle" reports of State-defined hate speech. And despite the State's arguments, a response *is* required, as shown by the text of the law[5] and the State's own brief.[6] These provisions unconstitutionally compel social media networks to speak when they otherwise would not, and to parrot the State's message that hate speech must be singled out and treated differently from all other types of speech. *See Wooley v. Maynard*, 430 U.S. 705, 715 (1977) (state cannot compel individual to become "an instrument for fostering public adherence to an ideological point of view [they] find[] unacceptable."). Indeed, the State admits as much: "Social media networks . . . are required . . . to *state what the social media network's own policy is* with respect to" reports of "vilifying" or "humiliating" speech, and to provide "a readily ascertainable disclosure . . . about how it will respond and address the individual user's report." Def.'s Opp'n 2–3.[7] The law plainly compels and regulates speech.[8]

---

[4] As described in Plaintiffs' opening brief, this compels speech in two ways: the development and transmission of speech and conveying that hate speech is worthy of a special report and response mechanism. Opening Br. 12–13. No report and response mechanism is required for any other type of speech.

[5] Section 394-ccc(2) demands that the complaint mechanism "shall allow the social media network to provide a direct response to any individual reporting hateful conduct informing them of how the matter is being handled," and notes that the policy must "include[] how such social media network *will respond [to] and address* the reports of incidents of hateful conduct on their platform." (emphasis added) The law's savings clause, § 394-ccc(4)(b), states that liability may attach if users fail "to receive a response on [their] report." These provisions, read in context, demonstrate that responses to reports of hate speech are mandatory.

[6] Defendant's brief repeatedly emphasizes that a website's policy must state how a social media network "will respond" to complaints. *See, e.g.*, Def.'s Opp'n 2, 5.

[7] The State attempts to distinguish Supreme Court cases like *NIFLA* by arguing that Plaintiffs are not required to adopt a particular "form" of disclosure. Def.'s Opp'n 10–11. But *in addition to the* "form" of the disclosure, NIFLA also objected to the fact that crisis pregnancy centers were compelled to say *anything*. *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018).

[8] Even if New York's law could be construed to primarily regulate conduct, it would still be subject to strict scrutiny because Plaintiffs "own message [is] affected" by the law. *See Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 63 (2006); *see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 572 (1995) (State cannot compel inclusion of message if it "affects the message conveyed"). New York's law compels speech that is directly antithetical to Plaintiffs overarching and stated messages, *see* V. Compl. ¶¶ 20, 95, 115, 132, and therefore goes much further than an incidental impact on speech.

As the State argues the policy requirement does not demand a particular perspective, it is nonetheless forced to concede that the law requires Plaintiffs to speak. *See* Def.'s Opp'n 11 n. 6 (claiming that "Plaintiffs could well *advance* their own viewpoint with a policy that expresses that they intend to take minimal or no action at all because they entirely disagree with their perception of the intent of the Statute."). Even if social media networks could post a policy of non-response, which Plaintiffs dispute as an option, they must still speak about State-defined hate speech when they otherwise would not. The obligation "either to appear to agree with" a contrary viewpoint or to respond, equally compels speech because it takes away "the choice of what not to say." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 15 (1986); s*ee also Mia. Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (compelled speech law unlawful "even if a newspaper would face no additional costs . . . and would not be forced to forgo publication of news or opinion by the inclusion of a reply . . . because of its intrusion into the function of editors.").[9]

Moreover, as described in Plaintiffs' opening brief, New York's law—particularly when read in combination with its title and statements from Governor Hochul, Attorney General James, and the law's chief sponsor—burdens their publication of protected speech. *See* V. Compl. ¶ 44 ("Our great leader, our Attorney General, will be championing this cause with every power her office can bring in at their disposal."); *see also* V. Compl. ¶¶ 38, 39, 44, 46, 47, 53; Sawyer Decl. Ex. D., 191 ("[W]e will be relying on the cooperation of -- of the social media networks to set up that policy and to -- to begin to better *monitor*." (emphasis added)). And "content-based burdens must satisfy the same rigorous scrutiny as . . . content-based bans." *United States v. Playboy Ent.*

---

[9] The State argues that Plaintiffs need not "label or otherwise call attention to any hateful conduct in order to comply." Def.'s Opp'n 12. But the law requires a "clear" and "concise" policy stating how a website "will respond and address the reports of incidents of hateful conduct on their platform." N.Y. Gen. Bus. Law § 394-ccc(3). A policy that did not specifically label and define "hateful conduct" would be deficient.

*Grp., Inc.*, 529 U.S. 803, 812 (2000).[10]

The State's citation to a single case, *Restaurant Law Center v. City of New York*, to support its dubious assertion that New York's law does not regulate speech is inapposite. Def.'s Opp'n 8 (citing 360 F. Supp. 3d 192 (S.D.N.Y. 2019)). In that case, the law did not regulate or compel restauranteurs' speech—such as by forcing them to transmit donations to any specific charity—but instead required only that they enable employees to make donations via direct paycheck deduction. By contrast, social media networks publish constitutionally protected speech, and the Online Hate Speech Law requires that they speak through policies, mechanisms, and responses to complaints—functions of "editorial discretion," a distinction the *Restaurant Law Center* court itself drew. *See* 360 F. Supp. 3d at 211. The central conceit of the State's opposition—that the law does not regulate speech—crumbles under even superficial examination.

## II.   The Online Hate Speech Law Cannot Withstand Strict Scrutiny.

Because the State fails to counter Plaintiffs' argument that the Online Hate Speech Law is content- and viewpoint-based, and therefore subject to strict scrutiny, its opposition to the entry of a preliminary injunction is doomed. *Cf. Palmieri v. Lynch*, 392 F.3d 73, 87 (2d Cir. 2004) (as plaintiff "failed to . . . raise this argument" it "has been waived."). Regardless, the law flunks such review. *See* Opening Br. at 8–11 (strict scrutiny standard); s*ee also Barr v. Am. Ass'n of Pol. Consultants*, 140 S. Ct. 2335, 2347 (2020) ("The Government concedes that it cannot satisfy strict scrutiny to justify the government-debt exception. We agree.").[11]

While the State swings wildly from alleged interest to alleged interest in its brief—pointing to everything from reducing violence, to providing disclosures about content moderation, to

---

[10] Laws restricting speech "may operate at different points in the speech process." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 336–37 (2010).

[11] Even if intermediate scrutiny for commercial speech applies, the law still fails because it does not serve an important governmental interest and is not closely tailored, for the same reasons described below.

5

addressing confusion—it fails to show these "alleged objective[s]" are the "actual purpose" for the law, or that there is "a strong basis in evidence to support" these justifications. *Shaw v. Hunt*, 517 U.S. 899, 908 n. 4 (1996) (quotation marks omitted); *Satawa v. Macomb Cnty. Rd. Comm'n*, 689 F.3d 506, 522 (6th Cir. 2012). Indeed, the State now claims that Plaintiffs "may have a policy to do nothing," Def.'s Opp'n 2. But if so, the law furthers no legitimate interest, let alone a compelling one. And regarding New York's interest in preventing hate crimes: "The government may not [regulate] speech because it increases the chance an unlawful act will be committed 'at some indefinite future time.'" *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002) (quoting *Hess v. Indiana*, 414 U.S. 105, 108, (1973) (per curiam)). Likewise, mandating disclosure of a publisher's editorial process is contrary to the First Amendment and cannot be a compelling interest. *Nelson v. McClatchy Newspapers, Inc.*, 936 P.2d 1123, 1131 (Wash. 1997) (en banc) ("Editorial integrity and credibility are core objectives of editorial control and thus merit protection under the free press clauses"). And the State provides no evidence for its argument that confusion or deception by social media networks justify a need for disclosure. *See, e.g.*, Def.'s Opp'n 2. None of these justifications hold up to strict scrutiny.

**III.    The Online Hate Speech Law Regulates Solely Noncommercial Speech.**

Because the law plainly regulates speech and fails strict scrutiny, the State attempts an alternative—but meritless—gambit, claiming its law is a permissible commercial speech regulation. But commercial speech is that which does "no more than propose a commercial transaction," *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (2013), or is "expression related solely to the economic interests of the speaker and its audience," *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 94 (2d Cir. 2010) (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980)). It is axiomatic that economic

6

motivation does not convert noncommercial speech into commercial speech.[12] Similarly, targeting a profit-making entity does not transform a speech regulation into a commercial speech regulation.

When the "nature of [Plaintiffs'] speech [is] taken as a whole," it is clear Plaintiffs are not engaged in commercial speech. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988). The Volokh Conspiracy is essentially an online newsletter and message board of editorials, articles, and legal commentary—pure speech, not commercial in nature. *Hurley*, 515 U.S. at 570 (a "presentation of an edited compilation of speech generated by other[s] . . . fall[s] squarely within the [] First Amendment"). And Rumble and Locals are platforms for speech content generated by their users. Video content creators on both platforms address myriad noncommercial topics such as news, sports, art, and entertainment. *See Gorran v. Atkins Nutritionals, Inc.*, 279 F. App'x 40, 41 (2d Cir. 2008) (holding that the portion of a diet website that sought "to communicate a particular view on health, diet, and nutrition," was noncommercial speech even though the website contained commercial elements). Plaintiffs and similar social media networks do not engage in commercial speech, and their speech is "inextricably intertwined" with noncommercial elements. The law is therefore subject to strict scrutiny. *Riley*, 487 U.S. at 796.

Even if Plaintiffs *were* engaged in commercial speech, the hate speech policy requirement is far from a "purely factual and uncontroversial" disclosure. Developing and publishing a disclosure of Plaintiffs' "hateful conduct" policy compels them to speak on "anything but an 'uncontroversial' topic," *Becerra*, 138 S. Ct. at 2372. Rather, the message conveyed by the existence of a hate speech policy is "a subjective and highly controversial message": that hate speech requires a policy, a reporting mechanism and a response. *Ent. Software Ass'n v.*

---

[12] *See N.Y. State Ass'n of Realtors, Inc. v. Shaffer*, 27 F.3d 834, 840 (2d Cir. 1994); *Davis v. Avvo, Inc.*, 345 F. Supp. 3d 534, 540 (S.D.N.Y. 2018); *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) ("[First Amendment] protection is [not] lost because the written materials sought to be distributed are sold rather than given away . . . .").

*Blagojevich*, 469 F.3d 641, 643 (7th Cir. 2006). The disclosure also requires social media networks to describe and create mechanisms regarding "hateful conduct," a "provocative" and "value laden" term,[13] that is "crafted to evoke a strong emotional response."[14] This is not a "purely factual and uncontroversial" disclosure. If anything, because the law singles out vilifying and humiliating speech, it discriminates on the basis of viewpoint.

### IV.     New York's Law Is Overbroad and Vague.

The State largely premises its arguments against overbreadth and vagueness on the plainly incorrect argument that the Online Hate Speech Law either regulates only conduct or commercial speech. *See supra*. To the extent these arguments rest on the mistaken notion that the law regulates only conduct or commercial speech, they should be ignored. The remaining argument against overbreadth is that there is no "realistic danger" the statute will reach a substantial amount of protected speech. *See United States v. Williams*, 553 U.S. 285, 302–03 (2008).[15] This ignores two obvious dangers. First, as described in Plaintiffs' opening brief, the law's response requirement demands social media networks to devote financial and temporal resources to review and respond to complaints of hate speech—making it more likely protected speech will instead be removed, endangering a broad swath of potentially offensive, but protected, speech. *See, e.g.*, Opening Br. 13–14; V. Compl. ¶ 23. Second, creators', commenters', and visitors' speech will be chilled when they see the "clear and concise policy" and "clear and easily accessible" reporting mechanism for

---

[13] *R.J. Reynolds Tobacco Co., v. U.S. Food & Drug Admin.*, No. 6:20-CV-00176, 2022 WL 17489170, at *14 (E.D. Tex. Dec. 7, 2022).

[14] *R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*, 845 F. Supp. 2d 266, 272 (D.D.C. 2012), *aff'd sub nom.*, *R.J. Reynolds Tobacco Co. v. Food & Drug Admin.,* 696 F.3d 1205 (D.C. Cir. 2012).

[15] Defendant cites *United States v. Williams*, which affirmed a criminal statute prohibiting proposals to engage in illegal receipt of child pornography–unprotected speech. Here, New York's statute targets a disturbingly broad array of protected speech without a legitimate justification. The distinction could not be plainer.

"hateful conduct," in order to avoid any potential negative consequences.[16]

Regarding the law's vagueness, the State fails to recognize that to have a hate speech policy that "inform[s] individual users about what . . . action might be taken" regarding "hateful conduct," Def.'s Opp'n 3, requires that the policy define "hateful conduct." But the law's use of subjective terms like "vilify," "humiliate," "incite," and "violence"[17] to define "hateful conduct"[18] prevents sites from knowing what their policies must say to comport with its requirements and whether they must respond to a complaint. As a result, the law also encourages arbitrary and discriminatory enforcement. During the floor debate, the law's chief sponsor acknowledged that definitions of "vilify" and "humiliate" "would be . . . laid with the Attorney General," Sawyer Decl. Ex. D., 208., making it even clearer that the law provides broad discretion to the Defendant to decide if a social media network's policy comports with the law, and "authorizes or even encourages arbitrary and discriminatory enforcement."[19] For these reasons, the law is void for vagueness.[20]

---

[16] Even if Plaintiffs have a policy that says that "hateful conduct" will not be removed, the damage is already done as visitors will see the policy and reporting mechanism and self-censor rather than risk reporting.

[17] Despite the State's baseless assertion, Def.'s Opp'n 19, Plaintiffs do not concede any understanding of the statute's terms "incite" or "violence." See Opening Br. 18 n. 12. In addition, New York's reference to "incite violence" is apparently defined by individual complainants, Def.'s Opp'n 2 ("'Hateful conduct,' . . . specifies the scope of the conduct that individual users, in their own view, must be able to report."), and is therefore *per se* vague. Moreover, it is a longstanding and common refrain in United States political culture to label offensive protected speech as "violence." See Suzanne Nossel, *No, Hateful Speech is Not the Same Things as Violence*, Wash. Post (June 22, 2017), https://www.washingtonpost.com/outlook/no-hateful-speech-is-not-the-same-thing-as-violence/2017/06/22/63c2c07a-5137-11e7-be25-3a519335381c_story.html. The State appears to make this same mistake. See Def.'s Opp'n 20 (noting law "gives consumers a 'complaint box' for alerting social media platforms to *violence* on their services" (emphasis added)).

[18] Indeed, on the floor of the New York Assembly, the law's chief sponsor all but acknowledged that "vilify" and "humiliate" are subjective terms requiring further definition. During floor debate, when asked to describe the meaning of "vilify" and "humiliate," Assemblywoman Fahy demurred, stating that "I think some of these things will get defined in the regs," Sawyer Decl. Ex. D., 187, and admitting "different people may be humiliated with different things," Sawyer Decl. Ex. D., 209.

[19] This is troubling especially because the terms "vilify" and "humiliate" can apply to a wide range of protected speech based solely on the eye of the beholder. V. Compl. ¶ 23.

[20] The law is vague in numerous additional ways. See V. Compl. ¶¶ 22, 122, 196–206; Opening Br. at 18–19. Plaintiffs contend that the entire statute is fatally vague and reserve the right to argue that it is unconstitutionally vague.

## V. Section 230 Preempts New York's Law.

Although the State admits that Section 230 immunity is broad, it seeks to apply the law's protection narrowly. Section 230 does not protect websites only when, as Defendant claims, "a website 'displays content that is created entirely by third parties.'" Def.'s Opp'n 23. Rather, courts have consistently held that Section 230 applies any time a provider exercises "a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." *Jones v. Dirty World Entm't Recordings LLC,* 755 F.3d 398, 407 (6th Cir. 2014); *see also Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997).

The State claims liability under the Online Hate Speech Law has "nothing to do with [the website's] efforts, or lack thereof, to edit, monitor, or remove user generated content." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 852 (2016). But the law has *everything* to do with Plaintiffs' moderation of user-generated content; in fact, it is the law's entire purpose, as written and as interpreted by the State. Def.'s Opp'n 9. ("[A] network merely must have a mechanism to receive reports and a policy about what it will do, if anything, when it receives one."). The law thus regulates Plaintiffs based on policies related to third-party content, and in so doing, seeks to impose liability on Plaintiffs as publishers and is preempted by Section 230.

## VI. The Court Must Grant a Preliminary Injunction.

Plaintiffs have shown a likelihood of success on the merits and the State has failed to satisfy its burden of showing New York's law satisfies strict scrutiny. The State concedes that if Plaintiffs suffer a First Amendment harm, that harm is irreparable, and that the other preliminary injunction factors hinge on the merits. Def.'s Opp'n 23–24. Accordingly, Plaintiffs are entitled to a preliminary injunction.

## **CONCLUSION**

This Court should grant Plaintiffs' motion for a preliminary injunction.

DATED: December 15, 2022

Respectfully submitted,

/s/ James Diaz
  JAMES M. DIAZ*
  (Vt. Bar No. 5014)
  DARPANA SHETH
  (N.Y. Bar No. 4287918)
  DANIEL M. ORTNER**
  (Cal. Bar No. 329866)
  FOUNDATION FOR INDIVIDUAL RIGHTS AND
      EXPRESSION
  510 Walnut Street, Suite 1250
  Philadelphia, PA 19106
  Telephone: (215) 717-3473
  jay.diaz@thefire.org
  darpana.sheth@thefire.org
  daniel.ortner@thefire.org

BARRY N. COVERT
(N.Y. Bar No. 271118)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Ave Suite 120
Buffalo, NY 14202
Tel: 716 849 1333 x 365
bcovert@lglaw.com

*Attorneys for Plaintiff*
\* Admitted *Pro Hac Vice*
\*\**Pro Hac Vice* Motion Pending

## CERTIFICATE OF SERVICE

Plaintiffs' counsel confirms that a true and correct copy of the foregoing was served via the Court's electronic filing system on this day, December 15, 2022. Notice of this filing will be sent by operation of the Court's electronic filing system

DATED: December 15, 2022

Respectfully submitted,

/s/ James Diaz
JAMES M. DIAZ*
(Vt. Bar No. 5014)
DARPANA SHETH
(N.Y. Bar No. 4287918)
DANIEL M. ORTNER**
(Cal. Bar No. 329866)
FOUNDATION FOR INDIVIDUAL RIGHTS AND
  EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Telephone: (215) 717-3473
jay.diaz@thefire.org
darpana.sheth@thefire.org
daniel.ortner@thefire.org

BARRY N. COVERT
(N.Y. Bar No. 271118)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Ave Suite 120
Buffalo, NY 14202
Tel: 716 849 1333 x 365
bcovert@lglaw.com

*Attorneys for Plaintiff*
*Admitted *Pro Hac Vice*
**Pro Hac Vice* Motion Pending