UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK


EUGENE VOLOKH, RUMBLE CANADA
INC., and LOCALS TECHNOLOGY
INC.,                                 : Docket #
                                        1:22-cv-10195-ALC
                          Plaintiff,  :

      -against-                       :

LETITIA JAMES, in her official
capacity as Attorney General of
New York,                             : New York, New York

                          Defendant.

-------------------------------:

                      PROCEEDINGS BEFORE
                THE HONORABLE ANDREW L. CARTER
                    UNITED STATES DISTRICT

```
APPEARANCES:

For Plaintiff:       FOUNDATION FOR INDIVIDUAL
                     RIGHTS AND EXPRESSION
                     BY:  DANIEL ORTNER, ESQ.
                          DARPANA MUKUND SHETH, ESQ.
                          JAMES MICHAEL DIAZ, ESQ.
                          JARED MIKULSKI
                     510 Walnut Street, Suite 1250
                     Philadelphia, Pennsylvania 19106


                     LIPSITZ GREEN SCIME CAMBRIA LLP
                     BY:  BARRY COVERT, ESQ.
                          42 Delaware Street, Suite 120
                          Buffalo, New York 14202



For Defendant:       NEW YORK STATE OFFICE OF
                     THE ATTORNEY GENERAL
                     BY:  SETH J. FARBER, ESQ.
                          KATHERINE R. JANOFSKY, ESQ.
                          RICHARD W. SAWYER, ESQ.
                     28 Liberty Street
                     New York, New York 10005



Transcription Service: Marissa Mignano Transcription
                       Phone:  (631) 813-9335
                       E-mail:marissamignano@gmail.com



Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

<u>INDEX</u>

<u>E X A M I N A T I O N S</u>

| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> | Re-<br><u>Direct</u> | Re-<br><u>Cross</u> |
|---|---|---|---|---|
| None | | | | |

<u>E X H I B I T S</u>

| Exhibit<br><u>Number</u> | <u>Description</u> | <u>ID</u> | <u>In</u> | Voir<br><u>Dire</u> |
|---|---|---|---|---|
| None | | | | |

```
 1                    THE DEPUTY CLERK:  Good afternoon.  This is
 2      Tara, Judge Carter's deputy.  Who just joined the
 3      call, please?
 4                    MR. FARBER:  Good afternoon.  This is Seth
 5      Farber from the Attorney General's office.  With me
 6      is Kate Janofsky.
 7                    MS. JANOFSKY:  Good afternoon.
 8                    THE DEPUTY CLERK:  Thank you, Mr. Farber.
 9      Thank you, Ms. Janofsky.
10                    And someone else is on the line?
11                    MR. SAWYER:  This is Rick Sawyer, also from
12      the Attorney General's Office.
13                    THE DEPUTY CLERK:  Thank you, Mr. Sawyer.
14      Is there anyone else?
15                    MR. SAWYER:  Thank you.
16                    THE DEPUTY CLERK:  Good afternoon.  This is
17      Tara, Judge Carter's deputy.  Who just joined the
18      call, please?
19                    MS. GANS:  Hi.  This is Courtney Gans,
20      Judge Carter's law clerk.
21                    THE DEPUTY CLERK:  Good afternoon,
22      Courtney.
23                    Is there any other counsel on the line
24      whose name I did not take at this time?  Thank you.
25                    Good afternoon.  This is Tara, Judge
```

1    Carter's deputy.  Who just joined the call, please?

2          MR. ORTNER:  Good afternoon.  This is

3    Daniel Ortner on behalf of the plaintiffs.

4          THE DEPUTY CLERK:  Thank you, Mr. Ortner.

5          Mr. Ortner, how do you pronounce the last

6    name of the first plaintiff listed, please?

7          MR. ORTNER:  Eugene Volokh.

8          THE DEPUTY CLERK:  Volokh.  Thank you, sir.

9    Do you have cocounsel --

10         MR. ORTNER:  I'm sorry, could you repeat

11    your question?  I apologize.

12         THE DEPUTY CLERK:  Will you be having

13    cocounsel joining you, Mr. Ortner?

14         MR. ORTNER:  Yes, several of my colleagues

15    are going to be joining.  I can -- do you want me to

16    give you their names or do you want to wait until

17    they join?

18         THE DEPUTY CLERK:  I'll wait until they

19    join.

20         Good afternoon.  This is Tara, Judge

21    Carter's deputy.  Who just joined the call, please.

22         THE COURT:  Hi, Tara.  It's Judge Carter.

23         THE DEPUTY CLERK:  Hi, Judge.

24         Good afternoon.  This is Tara, Judge

25    Carter's deputy.  Who just joined the call, please?

1            MR. ROSS:  Yes, this is Michael Ross.
2    Member of the public.
3            THE DEPUTY CLERK:  Thank you, Mr. Ross.
4    You can just put your phone on mute.
5            MR. ROSS:  Will do.
6            THE DEPUTY CLERK:  This is Tara, Judge
7    Carter's deputy.  Who just joined the call, please?
8            MR. CASTILLO:  Hi, Tara.  This is Julio
9    Castillo, Judge Carter's law clerk.
10            THE DEPUTY CLERK:  Hi, Julio.
11            Do we have any additional counsel on the
12    phone as of yet for the plaintiffs?
13            MR. ORTNER:  I don't know who has joined.
14    I know there's a few that -- a few that are planning
15    to join, but I haven't heard them join yet.
16            THE DEPUTY CLERK:  Okay.  Thank you.
17            Hello.  Good afternoon.  This is Tara,
18    Judge Carter's deputy.  Who just joined the call,
19    please?
20            MS. SHETH:  This is Darpana Sheth from
21    FIRE.
22            THE DEPUTY CLERK:  Thank you, Ms. Sheth.
23    Who else just joined?
24            MR. ELLIS:  Michael Ellis from Rumble
25    Canada and Local Technology, Inc.

```
 1                    THE DEPUTY CLERK:  Thank you, Mr. Ellis.
 2               Good afternoon.  This is Tara, Judge
 3      Carter's deputy.  Who just joined the call, please?
 4                    MR. DIAZ:  This is James Diaz on behalf of
 5      plaintiffs.
 6                    THE DEPUTY CLERK:  Thank you, Mr. Diaz.
 7               Mr. Ortner, is that everyone, sir?
 8                    MR. ORTNER:  I believe that Barry Covert,
 9      who's the New York based local counsel, should be
10      joining as well.  I'm not sure if he's been on the
11      call yet.
12                    THE DEPUTY CLERK:  No, he hasn't joined as
13      of yet.  I'll give him --
14               Good afternoon.  This is Tara, Judge
15      Carter's deputy.  Who just joined the call, please?
16                    MR. MIKULSKI:  Hi.  Yes, my name is Jared
17      Mikulski.  I am a litigation fellow at FIRE.
18                    THE DEPUTY CLERK:  You just called to
19      listen to the argument today, sir?
20                    MR. MIKULSKI:  Correct.
21                    THE DEPUTY CLERK:  Okay.  If you can just
22      place the phone on mute.
23                    MR. ORTNER:  He's with plaintiffs, although
24      he's not on the briefs but -- not admitted, but he's
25      with us -- with FIRE.
```

1          THE DEPUTY CLERK:  That's fine.  He can
2     just place his phone on mute.  Thank you.
3          Good afternoon.  This is Tara, Judge
4     Carter's deputy.  Who just joined the call, please?
5          MR. COVERT:  Barry Covert.
6          THE DEPUTY CLERK:  Thank you, Mr. Covert.
7          So, counsel, this oral argument -- this
8     telephone -- telephonic oral argument is being
9     recorded.  So I ask that each time when you address
10    the Court, please state your name prior to speaking
11    and when you're not addressing the Court, to please
12    place your phone on mute.  Thank you.
13         Civil cause for a telephone oral argument
14    on the motion for preliminary injunction in case
15    number 22-CV-10195, Volokh, et al. vs. James.
16         Counsel, please state your appearances.
17         For the plaintiff.
18         MR. ORTNER:  Thank you.  My name is Daniel
19    Ortner, here on behalf of the plaintiffs, Eugene
20    Volokh, Rumble Canada, Inc., and Locals Technology,
21    Inc.
22         MR. COVERT:  Good afternoon.  This is Barry
23    Covert.  I'm also attorney for the plaintiff.
24         THE DEPUTY CLERK:  Mr. Diaz, if you're
25    speaking, we can't hear you, sir.

1              MR. DIAZ:  Yes.  This is James Diaz,

2     attorney for plaintiffs.

3              THE DEPUTY CLERK:  And Ms. Sheth?

4              MS. SHETH:  Yes.  This is Darpana Sheth,

5     attorney for plaintiff.

6              THE DEPUTY CLERK:  Thank you.

7              And for the defendant.

8              MR. FARBER:  Good afternoon.  This is Seth

9     Farber, special litigation counsel with the Office

10     of the New York Attorney General appearing for the

11     defendant, Leticia James in her official capacity as

12     Attorney General.

13              With me are --

14              MS. JANOFSKY:  Katherine Rhodes Janofsky,

15     attorney for defendant.

16              MR. SAWYER:  And I'm Rick Sawyer, special

17     counsel with the Office of the Attorney General for

18     defendant.

19              THE DEPUTY CLERK:  Thank you.

20              THE COURT:  Hi.  Good afternoon.  We're

21     here for oral argument related to the preliminary

22     injunction issue.

23              Here's how we'll proceed.  I have some

24     specific questions that I'll pose to the parties.

25     And then at the end of that, I'll give each side an

1    opportunity to make any brief oral argument they
2    would like to make, touching upon any of those
3    issues that were not addressed in the questions, or
4    if they want to more fully expand on that.  I'll
5    give each side seven minutes at the end of my
6    questions.  Hopefully, the questions are such that
7    it may obviate the need for much oral argument.
8    We'll have the plaintiffs go first for oral
9    argument, followed by the defendants.
10          But first, let me ask my questions.  First
11   question is that there seems to be some disagreement
12   over what the law actually does.  Can both parties
13   just briefly explain their interpretation of the new
14   law?
15          Let me hear from plaintiffs first, and then
16   I'll hear from defendant.
17          MR. ORTNER:  Sure.  Thank you, Your Honor.
18          We read the law as, at a minimum, requiring
19   three things from plaintiffs and other social media
20   networks.  The development of a policy dealing with
21   how they will respond to state-defined hate speech,
22   hateful conduct as the State has defined, and the
23   posting of that policy -- the publishing of that
24   policy on their website in a clear and accessible
25   location.  Second, a mechanism for reporting hateful

1    conduct on the website, which would include a way to
2    respond to that.  And third, we read the law as
3    requiring a response based on the plain reading of
4    the text as well, that there is a response
5    requirement that's presumed in the text of the
6    statute.  So we see at least those three
7    requirements.  And then we also point to some of the
8    language, the title of the law, the Attorney
9    General's remarks and reports as suggesting that
10   there's possibly a greater expectation of even
11   removing content with a concomitant threat of action
12   from the Attorney General if content is not removed.
13          But at the very minimum, the three things
14   that we believe are required is the policy, the
15   report mechanism and the response requirements.
16          THE COURT:  Okay.  Let me hear from the
17   defendants what's your view on what the law actually
18   does?
19          MR. FARBER:  Thank, Your Honor.
20          In effect, the law requires two things.
21   The first is that it set up a mechanism for users of
22   a site to report complaints of online hateful
23   conduct to the operator of the website.  And part of
24   that mechanism is a mechanism to respond to reports
25   of those complaints.  We do not believe that the

```
1    statute actually requires a response to the
2    complaint, although it does require that the
3    mechanism that allows for a report does provide a
4    mechanism for a response.  And second, it does --
5    the statute does require the posting of a policy as
6    to how the site operator intends to respond or if it
7    intends to respond to complaints and reports of
8    online hateful conduct that are brought to its
9    attention.
10         So there's some disagreement -- some
11   disagreement -- some agreement and some disagreement
12   on what the meaning of the statute is.  But our view
13   is the reporting mechanism and the policy are what
14   the statute requires.  Anything beyond that is not
15   required by the statute.
16         THE COURT:  Okay.  So let me ask this
17   question.  It seems that there is still a
18   disagreement as to whether a response is required
19   and what that response must be if it is required.
20         Let me ask plaintiffs this question.  Would
21   it be within the purview of the law for the
22   plaintiffs to state on their website that you have
23   this mechanism to complain?  If you have a
24   complaint, you should email this address, but you
25   should understand that we take the First Amendment
```

1    seriously, and we may or may not respond to your

2    request.  That's one option.  Another option --

3    that's option one.

4           Option two could be an automated response

5    that says, yes, we've received your complaint, and

6    then either we are going to consider it or we won't

7    consider it.  If you don't hear back from us in a

8    certain number of days, understand we're not going

9    to do anything about it.  Or it could simply be an

10   automated response that says, we received your

11   complaint, period.

12          It doesn't seem to me that there is a

13   necessity that any response, if one is required,

14   must be specifically tailored to the user's

15   complaint.  But let me hear from plaintiffs on that

16   in terms of those options.

17          MR. ORTNER:  Sure.  So first of all, the

18   first option that you mentioned, the we may or may

19   not respond, I think that opposing counsel in their

20   opposition brief suggests that all you could say is

21   we don't respond to any complaints.  That's like --

22   a general policy like that.  I don't think that

23   would be enough as far as the hate-speech policy

24   goes because if you look at the language of the

25   statute, it requires a clear -- clear policy that

1    states how they will respond and address their

2    reports of incidents of hateful conduct on their

3    platform.  So I think at the very least it requires

4    specific statement from the site of how they will

5    respond to the speech that the State has identified

6    in the statute as hateful conduct.  So just like a

7    very general statement, like we may or may not

8    respond to any reports, feel free to submit them.

9    We don't read the stat- -- sufficient because of

10   that language that they have to have a clear policy

11   about how they will respond specifically to

12   incidents of hateful conduct.  And I think because

13   of the we'll respond language in section -- in

14   subsection 3, sites are going to read that --

15   reasonably read that as requiring an affirmative

16   substantive response to posts.  And that's going to

17   put pressure on them to do so.  Put a burden on them

18   that will pressure them to want to take the content

19   down in the first place so they don't have such an

20   obligation.  And I would just point the Court to the

21   fact that we had to bring a lawsuit to have the

22   Attorney General clarify and say no response is

23   required.  That puts -- chills First Amendment

24   activity for websites that are going to read the

25   law.  I think reasonably so, does it require a

```
1    response, as it says.  Will -- you know, the policy
2    has to say how they will respond and address.  And
3    then in Subsection 5 -- sorry, Subsection 4, where
4    it says what they could be held liable for, it
5    mentions receiving -- receive a response on such
6    report.  And so I think a reasonable reading for a
7    website would be we have to respond, we have to have
8    every individual receive a response on the report
9    and if we don't, we're going to be investigated and
10   fined by the Attorney General.  That chills First
11   Amendment protected activity on these websites.
12          THE COURT:  Let me ask plaintiff this.
13   Why -- if the policy that the social media platform
14   adopts says that this is how we will respond, we
15   will ignore it.  This is how we will address it, we
16   will ignore it.  Doesn't that comply with the law?
17          MR. ORTNER:  I think that the law is
18   ambiguous and open-ended enough to -- that a
19   plaintiff -- a website would reasonably believe that
20   an obligation, especially if you look at some of the
21   language we cite in our brief from the Attorney
22   General and from the legislative history.  For
23   instance, the governor, you know -- when the press
24   conference signing the law said that the Attorney
25   General will be championing this cause of every
```

1   power her office can bring in at her disposal.  The

2   floor debate emphasized that we have an active

3   Attorney General.  I think -- that the language

4   pointing to that the Attorney General is going to --

5   actively be applying this to the fullest power that

6   she's been given.  And so in light of that, this law

7   has a -- those languages.  If it is an ambiguity, we

8   think it's the best reading.  But even if it's

9   ambiguous, it chills protected activity.  It

10  pressures these sites to take down this content to

11  avoid investigation, to avoid stepping -- writing

12  afoul of what the Attorney General is going to do.

13          THE COURT:  Okay.  Thank you.  Let me ask

14  this question to both parties.  We'll start with

15  defendants first.

16          Can you address the title of the law?

17  Because the title indicates that the law will

18  prohibit hateful conduct, but that doesn't seem to

19  comport with the text of the actual law.  Can you

20  address that, defense counsel?  And then I'll give

21  plaintiffs' counsel an opportunity to address that.

22          MR. FARBER:  Sure.

23          No, Your Honor is absolutely right on that.

24  The title of 394-CCC is Social Media Networks

25  Hateful Conduct Prohibited.  I cannot speak to why

1    it was titled that.  I can tell you that the text of

2    the operative statute itself deals with the two

3    points I made, the reporting mechanism and the

4    policy.

5           So in this case, this is a pretty

6    unambiguous statute as to what it requires as far as

7    a reporting policy and a reporting policy and the

8    reporting mechanism.  So in that sense, we cited

9    some cases for the proposition that under these

10   circumstances, the title just does not preempt or

11   override what the plain text of the statute does.

12   So, as I said, I can't speak to why it's called

13   that, but no hateful conduct as described in this

14   statute is actually prohibited by the statute.

15   Thank you.

16           THE COURT:  Okay.  Let me hear from

17   plaintiffs' counsel.

18           MR. ORTNER:  Sure.  Your Honor, with the

19   First Amendment, there's a real fear of a chilling

20   effect on First Amendment activity.  The First

21   Amendment is there to protect against that chill.

22   And so the title is another piece of that chilling

23   effect that this law has on plaintiffs and other

24   social media networks.  So, you know, the

25   combination, again, of the title, the language in

1    the Attorney General's report, the finding

2    statements, the floor debates, all very clearly

3    suggest that there's more being demanded than simply

4    stating a policy of we won't do anything about

5    speech.

6            I really want to point Your Honor to the

7    Bentham Books case that we discuss in our opening

8    brief.  This combination of the kind of carrot and

9    stick, the you do need to do this, and if you don't,

10   we're going to hammer down on you and take action

11   against you and investigate you and pass additional

12   policies that are going to regulate you further.

13   That violates the First Amendment in and of itself.

14   That combination, that's what's really happening in

15   this case with the law and the title.  And all these

16   pieces together are putting pressure on plaintiffs

17   and others and chilling their First Amendment

18   activity.  And so that, at the very least, title

19   plays that role of, again, hitting -- you know,

20   suggesting the plaintiffs that they have to act or

21   there's going to be consequences for the failure to

22   act.

23           THE COURT:  Okay.  Let me ask defense

24   counsel this question.  Can you articulate why, in

25   your view, this law does not regulate speech?  You

1    indicate that you think this regulates conduct but

2    not speech.  Can you elucidate that a little bit

3    more?

4              MR. FARBER:  Yes, Your Honor.

5              It does not require the removal, the

6    moderation, indeed the regulation of any speech

7    that's on any of the plaintiffs' websites, or indeed

8    on anyone's website.  What it does is it affords a

9    channel that in some cases may already exist for

10   those entities that already post a means to

11   facilitate complaints being brought to their

12   attention.  It mandates that.  In this case, it

13   mandates a specific category of complaints.  But the

14   statute does not limit what the platform for

15   complaints shall be limited to.

16             Similarly, it does require the posting of a

17   policy which may well constitute speech of a kind,

18   but it's commercial speech.  The policy would

19   presumably be truthful.  It would presumably be the

20   website's factual policy as to how they intend to

21   deal with these responses.  And that's it.  We are

22   not regulating speech.  The definition of hateful

23   conduct is simply a guide to users who may want to

24   bring complaints of what they perceive as hateful

25   conduct to the website operator.  The website

1   operator may have a completely different definition

2   of hateful conduct, or the website operator may not

3   believe that there is such a thing as online hateful

4   conduct, and they can either respond or not respond

5   as they see fit, and they are welcome to have that

6   as their policy, or indeed any policy they want.  As

7   we showed in our brief, the legislative history was

8   quite consistent with broad discretion on the part

9   of the website operators as to how or if they want

10   to respond to these complaints.  So Your Honor was

11   absolutely right in suggesting that the possibility

12   of no response complies with this law.

13          Thank you.

14          THE COURT:  But let me ask defense counsel

15   this follow up.

16          MR. FARBER:  Sure.

17          THE COURT:  The law doesn't -- it would be

18   one thing if this was a law that said social media

19   platforms must have a policy for users to complain

20   about content, period.  But this law targets a

21   certain category of speech, hate speech, and it

22   targets a particular category of speech and a

23   particular viewpoint in terms of those people who

24   the speech is pointed at.  How does that change the

25   consideration and how does that not then burden

1    speech?

2           It'd be one thing if this was a very

3    neutral policy that simply said you must have a

4    policy -- you must have a methodology for users to

5    complain about content, but it specifies a certain

6    type of speech.  Would you agree that the hate

7    speech is, in fact, speech?  And if so, how should I

8    analyze that?

9           MR. FARBER:  Well, first of all, Your

10   Honor, we do take issue with the term hate speech,

11   which is not at all found within the statute,

12   notwithstanding that that's plaintiffs'

13   characterization.  The statute speaks to hateful

14   conduct.  Our reading on this is that the complaint

15   mechanism sets a floor.  At a minimum, the website

16   is obliged to take complaints of hateful conduct.

17   If the website wants to take all manner of

18   complaints through the same facility, as long as

19   hateful conduct is permitted to be conveyed to them,

20   we believe the statute is complied with.

21           So in that sense, Your Honor, it's actually

22   much closer to the hypothetical you suggested than

23   it is to plaintiffs' version on this.  Nonetheless,

24   the legislature believed it was important in this

25   era of increasing violent incidents, some of which

1    are linked to the web, to facilitate this kind of
2    complaint and communication mechanism.
3             Thank you.
4             THE COURT:  Okay.  Thank you.
5             But I guess the concern I have is that in
6    the statute, the definition of hateful conduct means
7    the use of a social media network to vilify,
8    humiliate, or incite violence against a group or
9    class of persons on the basis of race, color,
10   religion, ethnicity, national origin, disability,
11   sex, sexual orientation, gender identity, or gender
12   expression.  Again, it's only specifying this
13   "conduct" as it relates to certain groups of people.
14   And it's one thing if this is prohibiting the use of
15   a social media network to incite violence.  If we're
16   talking about true threat, those things are not
17   protected by the First Amendment.  But to humiliate
18   or vilify a group of people seems to me to be
19   something that's protected by the First Amendment.
20            Let me hear from defendants on that.
21            MR. FARBER:  Sure.  We are not disagreeing
22   that some humiliating speech, to the extent it
23   doesn't involve inciting a violence or, you know,
24   arguably the fighting words or obscenity the
25   standards that have been deemed not to be protected

1    speech, may well constitute protected speech.  The
2    point of this statute is that there's no consequence
3    to the website.  They do not have to take it down.
4    The State is not mandating you must take it down,
5    you must put a warning label on it, you must
6    discipline the poster, or you must do anything.
7    This is a complaint mechanism.  The statute provides
8    conduct that it wants to create a channel for site
9    users to bring it to the attention of the site
10   operator.
11        In that sense, Subsection A of the statute
12   is a guide for users in forming their reports and
13   complaints to the site.  And arguably, it's a guide
14   to those website operators that want to respond to
15   it, if that is their policy.  So, yes, Your Honor,
16   arguably the subject matter might be protected
17   speech, but this statute neither compels nor
18   prohibits protected speech.
19        Thank you.
20        THE COURT:  All right.  And let me ask
21   defense counsel this question, because it seemed to
22   me that you were suggesting that these social media
23   platforms could come up with their own definition of
24   hateful conduct.  It seems to me that the way this
25   statute is written is it's more than just a guide

1    and that the statute sets the floor.  Perhaps a

2    website could go beyond that under this statute.

3    But it says "hateful conduct means," and then it

4    goes through the definition.  And then Section 2

5    says, "A social media network that conducts business

6    in the state shall provide and maintain a clear and

7    easily accessible mechanism for individual users to

8    report incidents of hateful conduct."

9              It seems to me that there's not discretion,

10   the way the law is written for users -- or for the

11   social media platforms to have a definition of

12   hateful conduct that goes below the floor set by the

13   statute.

14             Can defendants weigh in on that?

15             MR. FARBER:  Yes, Your Honor.

16             The hateful conduct refers to the

17   complaints.  There's no question that the website

18   operators are obliged to take complaints from users

19   concerning hateful conduct.  At the end of the day,

20   however, those complaints are in the user's view.

21   The user may well be very adept at identifying

22   things tied to the statute's definition of hateful

23   conduct or not.  The user may have a much broader or

24   a much narrower definition of hateful conduct.  What

25   this statute requires of these websites, however, is

1    that it set up the mechanism.  It's largely a

2    procedural statute, it sets up the mechanism, the

3    complaints and reports are reported to the website,

4    the website responds to them based on its policy,

5    which is entirely within its discretion.  So while

6    hateful conduct may inform the reports, as far as

7    what the website operator may actually be liable for

8    under this statute, it does not impact that.  What

9    they are liable for is if they don't set up the

10   reporting mechanism again.

11           As far as the reporting mechanism, that

12   just sets the minimum of the complaints that they

13   have to receive.  That's all they have to do.  They

14   have to receive them.  As Your Honor indicated,

15   there does not have to be a response.  In fact, it's

16   not -- they don't even have to read them if they

17   don't want to.  But they do have to receive them.

18   That is true.  At a minimum, they have to set up a

19   facility to receive reports of complaints of hateful

20   conduct.

21           Thank you.

22           THE COURT:  Okay.  And again, for

23   defendants, don't the social media platforms have an

24   editorial right to keep information off of their

25   websites, allow certain information, and to make

1    decisions as to what sort of community they want to
2    create online?
3            And if so, does this law that requires a
4    mechanism for only one type of hateful
5    conduct/speech infringe upon those editorial
6    decisions because the websites are not required to
7    set up a reporting mechanism for people who want to
8    make hateful comments about movie directors or
9    something like that?
10           Let me hear from defendants on that.
11           MR. FARBER:  Yes, Your Honor.
12           Again, the reporting mechanism is for the
13    minimum.  Again, if the site wants to set up a
14    broader mechanism of complaints, that's within their
15    discretion.  If they would rather not go on record
16    as to how they intend to respond to complaints,
17    reports of online hateful conduct, under the
18    statute -- they can comply with the statute with a
19    policy that says we have no policy.  As long as they
20    post that, they can respond with we will address
21    each report on a case-by-case basis and do not say
22    how we will respond in advance.  They have numerous
23    options to do that.
24           But with respect to receiving the
25    complaints, this does not impact their editorial

1    freedom.  This sets up a complaint mechanism that
2    does not require them to take a position on hateful
3    conduct.  It doesn't actually require them to take a
4    position on anything other than that they've set up
5    the mechanism.
6              THE COURT:  Okay.  Let me hear from
7    plaintiffs on these issues.
8              MR. ORTNER:  Sure.  I'll start just briefly
9    on the last thing that opposing counsel said that
10   saying you have no policy would suffice.  I would
11   just -- I would say, Your Honor, first of all, I
12   already suggested that we don't read that as
13   compatible with the law's requirement that the
14   policy, has to how they will deal with this type of
15   speech on their platform.  But really, if that's the
16   case, it's hard to see how the law furthers the
17   government's interest at all if the policy can just
18   state, we have no policy.  So I think that really
19   undermines their ability to justify this under any
20   level of scrutiny, ultimately, that the Court
21   applies to this.
22             So going back to the beginning of your
23   questions, Your Honor, the first question is, is
24   this speech versus conduct?  I think in this case,
25   there is no -- they have not -- counsel has not

1    pointed to any conduct here.  These are websites
2    that are publishing speech.  Everything on there is
3    speech.  The user content is speech.  Everything
4    that -- on The Volokh Conspiracy has news posts
5    about legal current events.  There's nothing there
6    other than pure protected speech on those websites.
7    So it's -- to say it's conduct is, I think,
8    disingenuous.  Opposing counsel also in their brief,
9    uses disinformation to describe this.  They're using
10   other -- trying to find labels to label this other
11   than what it really is, which is fully protected
12   speech.
13            I point, Your Honor, to our briefing, the
14   opening brief, where we have -- and the complaint.
15   We have hypotheticals that this law would apply to a
16   variety of types of speech; John Oliver comedy
17   sketch, news analysis of a tweet by The Onion, an
18   analysis of an art gallery opening which has
19   something to say about patriarchy and sex and gender
20   issues.  All of that is covered by this law.  So it
21   applies very broadly to a wide range of speech.
22            I would say, Your Honor, that this law is
23   clearly focused on speech.  And a hypothetical that
24   might be useful for that is to imagine a law that
25   said a website had to have a policy dealing with

1    conservative speech or liberal speech or

2    anti-American speech or pro-American speech.  That

3    would clearly be targeting speech, and it would be

4    unconstitutional.  And that's the same thing that's

5    happening here with hateful conduct, that it's

6    targeting this subset of speech.  And I think Your

7    Honor pointed out the language of vilify and

8    humiliate, that it goes to all the -- it's a very

9    subjective category of expression.  Everything is in

10   the eye of the beholder what vilifies or humiliates.

11   And it goes to core protected speech like parody and

12   satire that's been part of our constitutional

13   tradition from the founding.  So it sweeps up a lot

14   of protected speech there.  The plaintiffs here are

15   publishers of speech of others, similar to what

16   newspapers do when they compile op-eds by outside

17   writers and letters to the editor and publish them

18   in a newspaper.  So the contrast between the case

19   that opposing counsel uses, the Restaurant Law

20   Center case they use in their brief, is really

21   stark.  It's very different than a restaurant

22   serving food.  These are websites functioning as

23   publishers of speech.

24           And then going to the burden on the

25   website, I think opposing counsel suggested that

1   this is just a guide and it doesn't do anything
2   really that they don't have to do much of -- that
3   much of anything.  That's not compatible with what
4   the statute actually says.  But also they suggest
5   that you need to be banning speech or outlawing
6   speech to violate the First Amendment.  And that's
7   not the case.  The Supreme Court has repeatedly held
8   that burdens are enough.  I point, Your Honor, to
9   the Riley case that we cite in our reply brief.
10  That case -- all that the solicitors in that case
11  had to do was as part of their phone call,
12  solicitation call, mention the percentage of money
13  that they're generating that they're going to take
14  from the money that they raise in proceeds from the
15  call.  And that was a minor burden of just having to
16  mention, disclose the fact on a phone call.  And the
17  Supreme Court said that that burden, that changed
18  the nature of their conversation.  It undermined and
19  diluted their message ultimately.  And therefore,
20  even though it was a relatively minor burden, still
21  violated the First Amendment.
22         And then we also cite two cases involving
23  the requirement to respond -- to either appear like
24  you're endorsing the message of the government or
25  respond to it.  The Pacific Gas & Electric case and

1    the Miami Herald v. Tornillo case that we cite in

2    our reply brief, the Supreme Court said the

3    obligation to either to appear to agree with a

4    viewpoint or to respond, it compels speech because

5    it takes away that -- this is from the Court -- the

6    choice of what not to say.  And that's really what's

7    at stake here is, the choice not to respond, not to

8    have to either endorse -- appear to endorse the

9    State's message that this type of speech is unique,

10   is deserving of being taken down, or to have to

11   respond affirmatively.  And so it takes away their

12   choice not to speak.  It burdens expression.  And I

13   think Your Honor is right.  The other question they

14   have an editorial right to keep information off the

15   website at a minimum, this burdens that by requiring

16   them to say what they're going to say, takes away

17   their ability to just have no policy or have

18   discretion in that regard.  So it at a minimum,

19   imposes a First Amendment burden on plaintiffs.

20           THE COURT:  Okay.  And plaintiffs, let me

21   ask you this question.  Hypothetically if there was

22   a law that said that social media platforms needed

23   to have a mechanism for users to complain about

24   content, period, without specifying any particular

25   type of content, would that violate the First

```
1    Amendment?
2              MR. ORTNER:  I think it would still impose
3    a burden on the First Amendment.  And then you'd
4    have to analyze that under the standard of view,
5    just to look at the evidence that the opposing
6    counsel would have for a compelling interest.  But
7    the big difference there is it would be content
8    neutral and viewpoint neutral.  It would be you just
9    have to have a policy -- or you just have to have a
10   mechanism, it doesn't matter for what kind of
11   speech.
12             What's really at stake here is that -- Your
13   Honor mentioned this is content based and viewpoint
14   based.  So let's say that a website wanted to have
15   either a policy that just said, we will only accept
16   complaints about conduct that, let's say, incites
17   violence or is a true threat, that would not suffice
18   under New York's law.  You have to include the
19   category, all the category, the whole category of
20   speech that New York is pointing to, including
21   vilifying and humiliating speech.  And so that's
22   what makes this law particularly egregious, is that
23   it requires them to -- it required -- it includes
24   that subset of speech in what they're including in
25   their policy and in what reports they're going to
```

1    take, what complaints they're going to take.  And
2    then we also believe -- argued that they have an
3    affirmative duty to respond.  Also, again, defined
4    based on viewpoint.  If someone complains about
5    something that's not subject to the law, there's no
6    obligation.  So the obligation is based on, again,
7    the viewpoint and the content of the speech.  And
8    that's what really makes this law particularly
9    egregious.  And clearly, in the realm of strict
10   scrutiny, which defendants do not -- defendant does
11   not argue that the law satisfies strict scrutiny in
12   their briefing and that because it's a viewpoint
13   based, it falls under that category, under that
14   standard.
15        THE COURT:  Plaintiffs, let me ask you this
16   hypothetically.  If New York enacted a law that
17   required social media companies to provide a
18   mechanism for its users to complain about a data
19   privacy breach, would that also run afoul of the
20   First Amendment?
21        MR. ORTNER:  Sorry, Your Honor.  I'm
22   thinking through that.  I think the -- you know,
23   data privacy breach -- complaining about that, a
24   data privacy breach, is not complaining about a
25   particular content or viewpoint of speech.  And so

1    that puts us in a different category than this law,
2    which requires the ability to complain about speech
3    on the website.  The data privacy breach is an
4    action that has happened to a user.  So there's
5    still the element of requiring them to set up a
6    mechanism which has an element of speech to it.  But
7    I think it's substantially different because you're
8    not allowing that -- requiring them to be able to
9    complain about the speech on the website.  It's
10   unrelated to speech, ultimately, the fact that there
11   was a data privacy bridge on the website.  And so
12   that would put it out of the realm of these First
13   Amendment cases that we're talking about, out of the
14   realm of scrutiny, and it would be likely -- much
15   more likely to survive scrutiny under a lesser
16   standard.
17           THE COURT:  Okay.  And let me ask
18   plaintiffs this question.  Defendant hasn't
19   specifically addressed standing, but does this law
20   apply to all of the plaintiffs?  In particular,
21   Plaintiff Eugene Volokh operates a legal blog.  Does
22   that constitute a social media network under this
23   law?
24           MR. ORTNER:  It does, Your Honor, under the
25   definition that the law uses.  New York has used an

1    incredibly broad definition.  It really covers any

2    website that makes a profit in the State of New York

3    and has comments or some ability to share content

4    because it says service providers, which operate

5    platforms designed to enable users to share content

6    with other users or to make such content available

7    to the public.

8           And there were ways that the law could have

9    been drafted more narrowly.  Earlier versions of

10   laws that legislators in New York attempted or

11   considered were drafted to exclude websites like

12   Volokh -- like The Volokh Conspiracy.  We talked

13   about that in our opening brief.  There was language

14   readily available to the State of New York to narrow

15   the law, but they chose very broad language.  And

16   then the floor speech that we point to, also in our

17   opening brief, the lawmakers there were -- one of

18   the chief sponsors of the bill, Congresswoman Fahey,

19   was specifically asked about who would the law apply

20   to and specifically said it would apply to anyone

21   that has a presence in the State of New York that

22   operates a website.  Essentially, very, very broad

23   interpretation.  Finding her exact language -- and I

24   apologize, Your Honor.  But the language there

25   specifically was broad and open-ended in who it

1    applied to.

2           And then I would also then finally point to

3    the fact that opposing counsel does not contest the

4    fact that we assert that it applies to

5    Eugene Volokh, and they don't respond to that.  And

6    then I would say it finally clearly applies to

7    Rumble and to Locals.  And Rumble is even mentioned

8    in the AG's report, which strongly suggests that

9    Rumble is on their radar and the law would be

10   applied to them -- to Rumble.

11          THE COURT:  Defense counsel, can you

12   explain why you believe that rational basis is the

13   appropriate standard of review as opposed to strict

14   scrutiny?

15          MR. FARBER:  Yes, Your Honor.

16          We are not prohibiting speech.  We are not

17   compelling non-commercial speech.  In order for the

18   Court to grant the injunction requested, it would

19   have to find that GBL394-CCC is a content based

20   regulation that compels non-commercial speech.  And

21   it is not.  Speech is not compelled here.  A

22   mechanism for complaints, which, of course, must

23   include what users believe is online hateful conduct

24   is provided for.  There is no requirement that that

25   be responded to.  There is no requirement as to what

1    policy the given websites must have in response to
2    it.  We are not compelling viewpoint.  We are not
3    compelling any message.
4            Frankly, counsel alluded to the contents of
5    his client's websites, which we do not dispute could
6    well be largely, or perhaps even entirely protected
7    speech, certainly to the extent it is the speech of
8    third parties.  And that is why this statute does
9    not regulate it.  We do not require any particular
10   moderation policies.  We do not require any
11   sanctions for any kind of speech, including removal,
12   highlighting, flagging, or anything of the kind.
13   This is a very specific statute.  It requires the
14   reporting mechanism.  As Your Honor noted, it could
15   have required all complaints, in which case counsel
16   for plaintiff responded that he would regard that as
17   unconstitutional.  With regard to Your Honor's
18   question of a data breach, that's a number of
19   possible implications of that.  One possible data
20   breach could be that one user posts data of another
21   user online, in which case how that would be
22   addressed would arguably be part of a complaint
23   mechanism.
24           At this point, we believe that the
25   complaint mechanism, as we set it up, does not

1    regulate protected speech and therefore is not

2    subject to strict scrutiny.  In fact, it is rational

3    basis.  The State has a strong interest in that

4    users of websites are well informed as to what those

5    websites policies are and that they have an ability

6    to complain to them.  And similarly with the policy

7    of the website posting, it is rationally related to

8    advancing that policy.

9              Thank you, Your Honor.

10             THE COURT:  Let me just follow up then with

11   defense counsel.

12             MR. FARBER:  Sure.

13             THE COURT:  Tell me more about why you

14   think that there is a rational basis here and what

15   is the -- because the briefing seems to indicate

16   that you take the position that somehow this is

17   related to incidents like the shooting in Buffalo.

18   Is that no longer your position?

19             Can you tell me -- especially since, as you

20   indicated, it seems that many social media users are

21   quite knowledgeable, and it seems that certain

22   social media platforms, I think folks kind of know

23   which ones tolerate all sorts of speech as opposed

24   to others, and maybe that's why they go to certain

25   social media platforms.

1            But can you just tell me more about that,
2    defense counsel?
3            MR. FARBER:  Certainly, Your Honor.
4            To the extent that we are in an unfortunate
5    era of increasing acts of violence and that
6    oftentimes those acts of violence are, if not
7    foreshadowed, at least indicated online, the ability
8    of users of social media networks to bring such
9    incidents to the attention of the web operator is a
10   reasonable response to the unfortunate increase in
11   those kinds of events.  Second, this statute is
12   advancing the cause of more informed consumers.
13   It's true that certain websites develop certain
14   reputations over time, but not all.  It's not
15   readily apparent to consumers.  This will make it
16   more readily apparent at the outset.  So both of
17   those are important State concerns, and both of them
18   are addressed by the statute.
19           To go back to the case of the Buffalo
20   shooting and to compare and contrast it to another
21   famous shooting in New Zealand.  In the Buffalo
22   situation, the livestream on a platform called
23   Twitch was promptly brought to the operator's
24   attention by various users of social media, and they
25   managed to take that livestream down, I understand,

1    in less than three minutes.  By contrast, the

2    horrible mass shooting incident in New Zealand, I

3    believe was on a Facebook platform there, that

4    incident lasted well over nine minutes.  There were

5    no complaints, as we understand it, made to the

6    operator, or at least none were facilitated, and the

7    operator was not aware of those events and did not

8    manage to take it down.

9           So in this case, the difference is Twitch

10   had set up a means of users making complaints and it

11   chose to take action.  For purposes of this

12   argument, I'm not suggesting that it was required to

13   take action, but it did take action and providing it

14   with the information to do so helped it to achieve

15   its goal in that case.  In any event, what we are

16   suggesting by the statute is that creating this

17   facility does not impact anyone's speech.  It does

18   not require that any speech at all, even what some

19   people might regard as hate speech, be taken down or

20   sanctioned in any way.  On the other hand,

21   complaints that might very well be very important to

22   the operator are brought to the operator's

23   attention.

24          So we would respectfully submit that the

25   statute easily meets rational basis.  And I note

1    that in the reply papers, the plaintiff did not

2    challenge that there was no rational basis for the

3    statute.  I should add that in the <u>Restaurant</u>

4    context, similarly, the information we require with

5    regard to policy is factual in nature, analogous to

6    the <u>Restaurant</u> case we cite with calorie count.  It

7    may be information that the user doesn't want its

8    customers to have, but it is factual and does not

9    violate the First Amendment when required to do so.

10   So we believe that the statute amply meets the

11   rational basis standard.

12        Thank you.

13        THE COURT:  And let me just ask a follow-up

14   question.  It seems to me that the livestream that

15   you're referencing regarding the Buffalo shooting,

16   that probably isn't speech in the first place.  And

17   the issue here is if the platforms are not required

18   to do anything, then I'm not sure what -- I

19   understand that in the abstract there's a

20   possibility that something could happen and the

21   website might take something down.  So the harm that

22   is being sought to prevent is the what?  Is the

23   exposure of other people to the livestream?  Because

24   this statute goes further than just the inciting

25   violence.  This talks about, again, the vilification

1    humiliation, these other things.  And certainly that

2    may have been part of the incitement to violence,

3    but it seems to me that there are some important

4    distinctions there.

5              Can I hear from defense counsel on that?

6              MR. FARBER:  Yes, Your Honor.

7              Yeah.  The Buffalo shooting was obviously a

8    unique tragedy and we are not suggesting that this

9    statute will guarantee that events like that never

10   happen again.  But in this case, this was a growing

11   body of what could be perceived as online hateful

12   conduct and basically was not, as far as we know,

13   previously brought to the attention of website

14   operators that might or might not have taken action

15   on it.  But nonetheless, the channel to bring this

16   sort of thing to website operators who might choose

17   to respond, even though the government does not

18   compel them to suspend a user or remove content, the

19   websites may choose to do so.  In any event, to, in

20   this case, compel more information available rather

21   than less is rational.  So in this case, the law

22   doesn't -- there's no way to say that this law would

23   prevent the next Buffalo shooting, but it allows

24   complaints to be brought to the attention of

25   operators, and it allows users to know what's going

1    to happen to those complaints, and those are
2    rational purposes.  And the legislature was careful
3    here.  The legislature was very cognizant of the
4    First Amendment.  That's why we have the savings
5    provision of paragraph four of the statute.  And so
6    the legislature was concerned with the First
7    Amendment and wanted to operate within its bounds.
8    That's why we have the law we have, so it's
9    rationally based.
10              Thank you, Your Honor.
11              THE COURT:  Okay.  And also for defense
12   counsel, you said that this doesn't compel the
13   plaintiffs to speak, but can you tell me why
14   requiring the plaintiff to have a policy regarding a
15   certain type of conduct/speech isn't compelling them
16   to speak?  It may not be compelling them to
17   necessarily take an affirmative up-or-down position
18   on that, but it is compelling them to speak about
19   that and to speak about that conduct and speech as
20   opposed to any other.
21              Can you tell me about that, defense
22   counsel?
23              MR. FARBER:  Certainly, Your Honor.
24              This again comes back to the Restaurant and
25   the calorie case, or a case involving disclosure of

```
1    mercury hazards out of Vermont that we cited in our
2    brief.  There are situations where truthful
3    commercial speech can be compelled without running
4    afoul of the First Amendment.  We cite them on
5    pages 7 through 11 of our opposition brief.
6              In this case, we would argue that that's
7    what the policy falls into.  It falls into a
8    truthful disclosure of fact.  The substance of
9    what's hateful conduct may be very controversial,
10   but how the website intends to respond to it is not.
11   That's a binary.  That's we will respond, we won't
12   respond.  And then if we will respond, this is what
13   our response is going to be.  So that may well be
14   compelled speech.  But it is -- if it is so, it is
15   compelled commercial speech of a factual nature that
16   the case law has permitted.  The amount of calories
17   in a meal is not a viewpoint.  A complaint policy is
18   not a viewpoint.  Although even if plaintiffs are
19   going to argue that it is, it's their policy.  It's
20   not compelling a position at all.  It's simply
21   disclosing what are they going to do to these
22   reports of hateful conduct brought to their
23   attention.
24              THE COURT:  Okay.  And let me ask defense
25   counsel this question.  What is the defendant's
```

1    position if this case is analyzed under strict

2    scrutiny?  Does the sentence concede that this law

3    doesn't pass strict scrutiny?

4            MR. FARBER:  We will have a very difficult

5    time, Your Honor, with that.

6            First of all, we did not address that in

7    our brief, just as plaintiffs did not address

8    rational basis.  I would concede that we would have

9    a very difficult time with strict scrutiny.  We

10   certainly have a compelling state interest in

11   minimizing and reducing events like the Buffalo

12   event and similar acts of hateful conduct, violence,

13   mass shootings and the like.  It is not clear that

14   this particular statute is narrowly tailored under

15   those circumstances.

16           So I would answer it that way.  I would

17   answer that we would have a difficult time.

18   However, I would argue that we never get there

19   because this is not a content-based statute.  This

20   does not compel speech.  This does not prohibit

21   speech.  This does not -- plain and simple, this

22   does not require these websites to alter their

23   editorial content or their editorial policy.  It

24   does not require the removal or flagging of anything

25   that appears on their website.

1          Thank you.

2          THE COURT:  Okay.  Thank you.

3          Plaintiffs, let me hear from you as to why

4     you believe that strict scrutiny is appropriate

5     here.

6          MR. ORTNER:  Sure.  Thank you, Your Honor.

7          I think we obviously interpret the statute

8     more broadly than defendants do.  We think our

9     reading is the best reading of the text of the

10    statute, and our reading is true that it requires a

11    direct response to every single complaint that is

12    lodged.  Clearly, that's compelled speech, and under

13    strict scrutiny.  I don't think defendants would

14    necessarily -- they don't try to disagree with that.

15    And so I think under our interpretation of the

16    statute, strict scrutiny applies.

17         But even at, like, the minimum level of the

18    policy, which requires the posting of -- well, first

19    of all, the development of a policy if they don't

20    have one already, which I think is significant, it

21    requires these websites to actually come up with a

22    policy to deal with the specific subset of speech if

23    they don't already have one, and then post it

24    publicly.  That is compelled speech.

25         I would just -- to point out, make the

1    analogy, look at the Zauderer standard and the Big

2    Mac case about calorie counts.  I think two things

3    to that, Your Honor.  First of all, dealing with

4    hate speech is not like the number of calories in

5    the Big Mac.  Everyone disagrees about what is hate

6    speech.  It's a very case-by-case assessment for a

7    website operator to decide is this speech acceptable

8    or not.  That discretion is left to the website now

9    and -- and New York's law requires them to

10   clearly -- articulate a clear policy about this, so

11   to actually spell it out what they're going to do.

12   And so that requires them to take a stance on that

13   where now they have the ability to be silent.

14          So Zauderer doesn't apply in that regard

15   because it's not -- uncontroversial factual

16   information.  It's much more similar to the

17   Entertainment Software Association.  It's a case

18   about video games -- video game makers having to

19   label -- put a sexually explicit content label on

20   their games, very similarly casting a value judgment

21   of sorts about the nature of the speech or the R.J.

22   Reynolds cases, two of them, involving tobacco

23   labeling and skull and crossbones or other images on

24   tobacco labels.  Again, it's the fact that -- just

25   the nature of the label that they're using of

```
1    hateful conduct is provocative value laden.  It's
2    crafted to evoke an emotional response.  It's a
3    subjective and highly controversial message that
4    they're forcing plaintiffs to either endorse or
5    refute through stating something to the contrary in
6    their policy.  So that is very different than
7    Zauderer.
8            Also, the defendants never argue why the
9    speech here is commercial speech.  For Eugene Volokh
10   and The Volokh Conspiracy, that website generates
11   some profit from advertisements.  Publishing speech
12   for profit does not make something automatically
13   commercial speech.  The most obvious case we've
14   talked about already is the Miami Herald v.
15   Tornillo case, that involves a newspaper that makes
16   a profit from the sale of speech and their strict
17   scrutiny applies.  So the fact that someone makes a
18   profit does not sweep it into the category of
19   commercial speech.  And the speech on Volokh's
20   website is not commercial speech.  It is analysis
21   about legal and current events.  The videos on
22   Rumble and Locals also are largely focused on news,
23   entertainment, sports, current events, politics, not
24   selling a product, not an advertisement for a
25   product.  And so the speech on these platforms is
```

1    not commercial speech.  There's no reason to assume
2    that commercial speech is the proper framework to
3    apply here.
4            And finally, even if it is, the Matal v.
5    Tam case, which we cite to, that was a case
6    involving trademark law.  And so that was a
7    trademark over the label of the name of the band,
8    The Slants, which is actually illustrative here
9    because it shows how hate speech is in the eye of
10   the beholder.  This is a group trying to reclaim the
11   label of an anti-agent label and it was labeled
12   hateful by the trademark office, and not -- you
13   know, trademark wasn't granted because of that.  It
14   shows a little bit of the subjectivity of calling
15   something hate speech.  But in that case, it was
16   commercial speech standard, but the Supreme Court
17   still struck that down because it was viewpoint
18   based.  And so the fact that this law is viewpoint
19   based, targeting a specific subset of expression
20   only speech that is vilifies or humiliates based on
21   specific characteristics, that clearly places this
22   in the realm of strict scrutiny, even if commercial
23   speech is still -- at least even if it's under
24   Central Hudson, analyzed very aggressively as the
25   Court did in the Matal v. Tam case.  And so for --

1    all the reasons falls under strict scrutiny.

2         And I would just say one last thing is even

3    if opposing counsel says that we just concede that

4    rational basis that we would lose, I would disagree

5    slightly with that, Your Honor, and to say -- to

6    point out that we cite cases saying that one of the

7    state's primary interest, which is getting the

8    speech off the internet, that's what they turn to

9    again and again and again in the legislative

10   debates, in the AG's report, clearly saying we need

11   the speech removed, protected expression.  We cite

12   to the US v. Eichman case, where it says the

13   suppression of free expression is not even a

14   legitimate government interest.  And in Hurley they

15   say it's a decidedly fatal objective to try to

16   remove protective expression.

17        And so we think that the primary interest

18   the State is pushing for in everything that they're

19   saying in their debates in the report is not even a

20   rational interest.  And the State otherwise is just

21   inconsistent about articulating what their interest

22   is.  And they kind of go back and forth and

23   articulate a lot of different interests without any

24   evidence that this is what the legislature was

25   really thinking about or that there's evidence that

1    the law is needed if a higher standard applies.

2    There's not evidence -- not sufficient evidence at

3    all to satisfy any degree of scrutiny other than

4    rational basis on the level of evidence.  They don't

5    point to evidence that this is necessary, that

6    existing laws are inadequate.  But you need to come

7    into your -- draft websites into posting policies to

8    target protect expression.  And so the law clearly

9    fails strict scrutiny.

10           Last thing I'd say on this, Your Honor, is

11   the requirement to post a policy is a burden on the

12   website's expressive activity.  Eugene Volokh and

13   The Volokh Conspiracy, Rumble and Locals, we cite to

14   many statements on their platform about how they are

15   facilitating free speech.  People you mentioned go

16   to these platforms because they want a place where

17   free speech is widely tolerated.  Volokh is free

18   minds and free markets.  Rumble, their purpose and

19   mission is to protect free and open Internet and to

20   create technologies that are immune to cancel

21   culture.  And Locals have similar statements on

22   their website.  And so being required to have a hate

23   speech or hateful conduct policy on their website

24   and a place for complaints, but they're going to

25   facilitate complaints undermines their core First

1   Amendment message of we allow this wide variety of
2   speech.  We don't take speech down based on the
3   viewpoint, in particular.  That's really the key is
4   they don't take speech based on the viewpoint down.
5   And this law requires a policy dealing with just a
6   specific viewpoint of expression.  And so it
7   undermines their First Amendment message just having
8   it -- having to post it, even if they can respond.
9   Again, pointing to Miami Herald and Pacific Gas
10  Companies, that imposes a serious burden on first.
11          THE COURT:  Okay.  Thank you.
12          So I don't have any other questions.  I'm
13  ready for a brief, brief oral argument.  I'll give
14  each side seven minutes.  You don't have to take a
15  full seven, but let's have oral argument quickly by
16  plaintiffs and then followed up by defendants.  Go
17  ahead.
18          MR. ORTNER:  Sure.  I think we've addressed
19  a lot of the issues in the case.  So I'll just turn
20  very briefly, Your Honor, to the couple of things we
21  haven't addressed and mentioned them, which is a
22  couple of other ways that this law could be
23  invalidated.
24          I think overbreadth and vagueness haven't
25  been addressed.  And I think overbreadth has really

1    been at the heart of the discussion in this oral

2    argument, how this law sweeps a broad swath of

3    potentially offensive but protected speech under its

4    scope.  If the law really was targeting what

5    happened in the Buffalo shooting, which we say is

6    horrific and unacceptable, but if that's what it's

7    trying to do, the law went so far beyond just that

8    kind of expression.  Any speech that vilifies or

9    humiliates, which as you mentioned already, could be

10   anything from a comedy sketch to a news report

11   discussing or to a Tweet that's retweeted to art

12   show, really anything can be seen as offensive -- as

13   vilifying or humiliating based on these kind of

14   characteristics like race and sex that the State has

15   identified.  And so I think that's a real

16   significant issue with overbreadth.  It's requiring

17   policies to deal with clearly protected expression.

18   And I think opposing counsel conceded that

19   effectively that this is vilifying and humiliating.

20   Speech is protected expression.  And so I think that

21   really shows why there's an enormous overbreadth

22   problem.

23           And then with vagueness, I would just point

24   out that these laws like this, they chill not only

25   the policies of websites, they are going to feel

```
 1    obligated to take speech down, especially if they
 2    have to respond to complaints.  They're going to
 3    think, well, I might as well take down speech so I
 4    don't have to respond to all the complaints that are
 5    going to come if I allow controversial speech to
 6    remain on my platform.  But it also chills user
 7    speech, because if someone goes to website and
 8    they've thought in the past it's a place for free
 9    expression, and now they see a link in the bottom
10    saying, see our hateful conduct policy, that creates
11    a very different environment on the website for
12    freedom of speech.  It shows user expression.
13    They're going to be more cautious in posting speech
14    that they presume now the website doesn't want and
15    the State of New York is targeting and opposing.
16    And then there is I think it has already come up in
17    this argument.  There are a lot of vague terms that
18    leave discretion to the Attorney General.  The
19    debate over whether there is a reporting
20    mechanism -- or sorry, a response requirement at all
21    is illustrative of that, Your Honor.  That it's not
22    clear whether one is required, the Attorney General
23    now says it's not required.  But if the Attorney
24    General enacted or someone enacted regulations or
25    said we are now interpreting this to require it,
```

1    they certainly could do that under the discretion --

2    the discretion to read the statute more broadly.

3    And that creates serious problems, enforcement

4    problems, especially with the aggressive rhetoric

5    that we point to in the report.  It really creates a

6    sword of Damocles, hanging over the head of

7    websites, where they know -- if you turn to the

8    saying, if you don't take action, there is going to

9    be consequences.  They list several in the report

10   legislative proposals, but with this law on the

11   books also, it's another aspect of that where

12   websites are afraid of investigations, of fines, of

13   public shaming from the Attorney General.  And so I

14   think it creates an environment of chill when the

15   law is so -- drafted with so many vague and

16   arbitrary and unclear terms, and it really fails to

17   define many of the key terms of the statute, as we,

18   I think, point out in our briefing.  So I think that

19   creates a serious problem.

20          And then finally, Section 230 also applies

21   and provides an alternative basis for striking down

22   the law.  It implies anytime a provider exercises a

23   publisher's editorial function -- we cite a case in

24   our reply, Jones v. Dirty World Entertainment

25   Recordings from the Sixth Circuit, which talks about

```
1    that, and that includes whether to publish,
2    withdraw, or postpone or alter content.  The Second
3    Circuit has interpreted Section 230 very broadly to
4    protect editorial discretion of publishers.  And
5    that's what's at stake here.  Our websites that are
6    publishing third party content, having the
7    discretion to set their own policies, to not have to
8    articulate them in the way that New York wants them
9    to do, to not have to take feedback about it the way
10   the New York -- the State of New York wants them to
11   take feedback, and to not have to respond to
12   complaints the way the State of New York demands
13   that they respond to complaints.  All of that
14   trumps -- supersedes their traditional editorial
15   functions and compels them to have certain positions
16   or to have positions and publicly state them and
17   respond in certain ways to complaints.  All of that
18   violates Section 230.  And so that's another
19   independent reason that New York's law should be
20   invalidated.
21           And then just finally, I think whatever
22   strict scrutiny applies, defendants have essentially
23   conceded the law fails.  Even if we think -- even if
24   Central Hudson or a lower standard applies, New
25   York's law fails.  Again, they have still have the
```

1    burden under even those lesser standards to prove
2    the need for the law to show how this law furthers
3    their interest.  And they've really failed to do
4    that.  They undermine their own interests --
5    asserted interests.  You know, if they're right that
6    the law requires almost nothing from plaintiffs at
7    all, they can't meet that.  And if it requires what
8    we say it does, then obviously strict scrutiny
9    applies to it and it fails.  And so under either
10   conception, New York's law cannot survive scrutiny
11   and has to be invalidated, and we're entitled to
12   (inaudible).
13            THE COURT:  Okay.  Thank you.
14            Let me hear from defense counsel.
15            MR. FARBER:  Thank you, Honor.  This is
16   Seth Farber again.
17            Your Honor, this is a preliminary
18   injunction motion, and plaintiffs bears the burden
19   on each of the elements.  And in this case, they are
20   asking the Court to strike down, find
21   unconstitutionally duly enacted statute.  So we
22   would argue that they bear an even higher burden
23   than they would in an ordinary PI.  But under any
24   burden, they have failed to meet their burden
25   because Section 394-CCC simply does not target

1    protected expression based on content or viewpoint.
2    In this case, the Court should apply a rational
3    basis test.  And contrary to counsel's argument,
4    rational basis does not require a finding that a
5    legislature had a specific rational basis in mind
6    and that this statute brings it forth.  Is there a
7    rational basis for this?  Yes.  We provide consumer
8    knowledge as to how websites operate and the State
9    has a strong interest in taking steps to hopefully
10   alleviate violence.  That's it.  We've met rational
11   basis.

12          In this case, for the Court to grant the
13   injunction sought, it would have to find that the
14   statute is a content-based regulation that compels
15   noncommercial speech.  And it clearly is not.  As we
16   indicated in our brief, the statute does not
17   regulate protected speech law.  It applies to
18   commercial conduct.  It facilitates a reporting
19   mechanism for individual social media users to
20   report to the website operator.  The ability of a
21   user to report speech is not regulating speech.
22   This contention of a chilling effect is entirely
23   speculative.  Plaintiffs fail to meet their burden
24   on that element of the motion.  The disclosure of
25   their policy as to how to respond to reports and

1    nothing else is itself factual and uncontroversial.

2    They do not have to get into the definition provided

3    by the State or provided by anybody else on what

4    constitutes hateful conduct.  We are regulating a

5    commercial business.  In this case, they may well be

6    in the business of putting out protected content of

7    other people.  We are not regulating that protected

8    content.  We are not regulating anything they do

9    that is an editorial function.  We are simply

10   compelling them to have a reporting mechanism.

11        And I should add that the definition of

12   hateful conduct found in the statute does not itself

13   regulate hateful conduct.  It is simply a guide to

14   users to make complaints and to platforms as to how

15   they respond in their discretion.  The statute does

16   not compel plaintiffs to endorse any State message

17   or to respond to reports of any kind, including

18   involving protected speech.  The State is not

19   requiring plaintiffs to state or endorse any

20   particular message of conduct.  The required

21   disclosure is the constitutional disclosure of

22   accurate commercial information only.  The statute

23   does not require any particular response or a

24   response at all, just that the channel for reporting

25   and responses be facilitated.  There is no speech

```
 1    compulsion.

 2              With regard to the overbreadth contention.

 3    Because plaintiffs argue that the statute is

 4    unconstitutional as applied to them, we respectfully

 5    submit that the Court should not consider their

 6    facial overbreadth claim, because clearly narrowing

 7    constructions are possible even if plaintiffs want

 8    to rule them out.  The statute does not prohibit or

 9    regulate speech.  No restriction or removal of any

10    content is required.  To the extent speech is

11    compelled, it is commercial speech, and overbreadth

12    fails on this basis because the statute cannot be

13    found overbroad if the subject is commercial speech

14    only.  Even if the statute reaches some protected

15    speech or conduct, it is still not overbroad in

16    relation to its legitimate scope.

17              With respect to vagueness, this statute

18    clearly affords plaintiffs of notice of conduct they

19    would be liable for.  They have to have a complaint

20    mechanism, and they have to have a response policy.

21    That's it.  The definitions of hateful conduct

22    themselves are readily understood and have plain

23    objective meanings, but those terms are only

24    provided to define the scope of reports from users.

25    Adequate notice to plaintiffs is more than
```

1    adequately spelled out here.  The title of the
2    statute does not override the clear statutory text.
3    The statute provides sufficiently clear enforcement
4    standards to eliminate the risk of arbitrary
5    enforcement or to prohibit conduct that falls within
6    the core of the statute's prohibition.  Enforcement
7    is not the result of unfettered latitude here.
8            To the extent that plaintiffs argue that
9    the statute has a chilling effect on the exercise of
10   First Amendment freedoms, that is nothing more than
11   speculative in this case.  The saving clause is not
12   vague in its own right.  And in any event,
13   plaintiffs can't use the legislature's efforts to
14   protect First Amendment freedoms to claim that the
15   statute violates the First Amendment.
16           Regarding Section 230 preemption.  Section
17   230 immunity applies only when content is created
18   entirely by third parties.  It does not apply to
19   content the website creates itself, which in this
20   case would be the complaint mechanism, and their
21   policy.  The statute avoids liability on these users
22   for content published by third parties.  They would
23   be liable only for their own failure to create a
24   reporting mechanism.
25           Finally, with regard to Section 4, we

1    respectfully submit that plaintiffs misread

2    Section 4.  What it requires is a mechanism to

3    report and a mechanism to respond.  As Your Honor

4    indicated, it does not require a specific response

5    on their part if they choose not to make one.

6              Thank you, Your Honor.

7              THE COURT:  Okay.  Thank you.

8              I do have one other question.  I know that

9    plaintiffs request is that I strike down the entire

10   statute.

11             Let me just ask counsel this

12   hypothetically.  Would it be permissible for me to

13   strike sections of the statute, or is this an all or

14   nothing proposition?

15             Let me hear from plaintiffs counsel, then

16   I'll hear from defense Counsel.

17             MR. ORTNER:  I think, Your Honor, the law

18   is integrated ultimately.  All these sections work

19   together.  Going, for instance, the saving statute

20   that defendant points to, that saving statute can't

21   save the law, the plain meaning of which is

22   regulating and compelling speech.  I'm not sure

23   exactly what Your Honor has in mind of what to

24   strike down or not to strike down, but the law

25   ultimately works together and has an effect together

1    on all unburdening protected First Amendment

2    activity.  And so don't believe that just striking

3    down certain provisions is possible in this case,

4    given the First Amendment impact of the whole law

5    that the legislature has enacted altogether in one

6    package.  So we would not support that outcome as

7    the law justifies it.

8              THE COURT:  Okay.  Defense counsel?

9              MR. FARBER:  Well, I'm not sure which

10   provisions Your Honor would consider.

11             THE COURT:  This is just a hypothetical.

12   This is just a hypothetical.

13             MR. FARBER:  Hypothetically.  I mean,

14   hypothetically, you know, I'm not sure.  I will

15   candidly say I was not expecting that question.

16             I note that plaintiffs, of course, are

17   asking to strike the entire statute.  And I think

18   I'll go back to where I came in on this, is that the

19   statute requires a couple of different things.  The

20   statute requires a, you know, reporting mechanism,

21   that that reporting mechanism contain a response

22   mechanism, and the statute requires the posting of

23   the policy.  I would argue that those are separate

24   things.  And that, hypothetically, if the Court were

25   so inclined, it could treat them separately.  I note

```
 1    that the statute does not contain a non-severability
 2    proceeding -- I'm sorry -- a provision that says
 3    it's non-severable.  That's not necessarily binding
 4    in any event.
 5            But in this case, the plaintiffs say that
 6    the statute is content based.  It is not.  We
 7    don't -- that said, Your Honor, under these
 8    circumstances, we respectfully submit that what you
 9    should do is deny the entire preliminary injunction
10    motion.
11            Thank you.
12            THE COURT:  Okay.  Thank you.  We are
13    adjourned.
14            Anything else from plaintiffs' counsel?
15            MR. ORTNER:  No, Your Honor.  Thank you
16    very much.
17            THE COURT:  Anything else from defense
18    counsel?
19            MR. FARBER:  Thank you, Your Honor.  Just a
20    housekeeping matter.  Our response to the complaint
21    is due in about four days.  We will be contacting
22    plaintiff concerning extending that time.
23            THE COURT:  Okay.
24            MR. FARBER:  Thank you.
25            THE COURT:  Thank you.  We are adjourned.
```

1        Thank you.
2                MR. FARBER:   Thanks so much.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                    C E R T I F I C A T E

2

3        I, Marissa Mignano, certify that the foregoing

4   transcript of proceedings in the case of

5   VOLOKH, et al. v. JAMES, Docket #1:22-cv-10195-ALC,

6   was prepared using digital transcription software and

7   is a true and accurate record of the proceedings.

8

9

10  Signature   ___*Marissa Mignano*_____

11              Marissa Mignano

12

13  Date:       December 21, 2022

14

15

16

17

18

19

20

21

22

23

24

25