# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EUGENE VOLOKH, RUMBLE CANADA INC., and LOCALS TECHNOLOGY INC. | |
| *Plaintiffs,* | Civil Action No.: 1:22-cv-10195-ALC |
| v. | |
| LETITIA JAMES, in her official capacity as Attorney General of New York, | Date: January 8, 2024<br>Time: 8:30 AM<br>Place: Courtroom 1306<br>Judge: The Honorable Andrew L. Carter |
| *Defendant.* | ORAL ARGUMENT REQUESTED |

## REPLY MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION TO ENFORCE PRELIMINARY INJUNCTION

DANIEL M. ORTNER*
(California State Bar No. 329866)
JAMES M. DIAZ*
(Vermont Bar No. 5014)
FOUNDATION FOR INDIVIDUAL RIGHTS AND
EXPRESSION
510 Walnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 717-3473
daniel.ortner@thefire.org
jay.diaz@thefire.org
*Admitted *Pro Hac Vice*

BARRY N. COVERT
(N.Y. Bar No. 271118)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Ave., Suite 120
Buffalo, NY 14202
Tel: (716) 849-1333 x365
bcovert@lglaw.com

*Counsel for Plaintiffs Eugene Volokh, Rumble Canada Inc., and Locals Technology Inc.*

## <u>TABLE OF CONTENTS</u>

**Page(s)**

TABLE OF AUTHORITIES.........................................................................................................iii

INTRODUCTION.......................................................................................................................1

ARGUMENT ............................................................................................................................2

    I.    The Attorney General's Investigation Violates the Preliminary
        Injunction Order. ....................................................................................................2

        A.    Contrary to the State's assertions, the scope of the
            injunction is clear.......................................................................................3

        B.    The investigation letters enforce the Online Hate Speech
            Law. ...........................................................................................................4

        C.    Responding to the investigation letters was not voluntary. ........................5

    II.    The State Has No Authority to Carry Out This Investigation
        Outside of the Online Hate Speech Law. ................................................................7

    III.    Enforcement of the Injunction Is Necessary to Prevent First
        Amendment Injury and Will Not Limit the Government's Ability
        to Investigate Violence. ..........................................................................................9

CONCLUSION .........................................................................................................................10

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                                                          **Page(s)**

*Bd. of Regents v. Southworth*,
   529 U.S. 217 (2000) ...........................................................................................................7, 8

*CF & I Steel Corp. v. United Mine Workers of Am.*,
   507 F.2d 170 (10th Cir. 1974) ................................................................................................3

*Citizens Union of City of New York v. Att'y Gen. of New York*,
   No. 16 Civ. 9592 (RMB) (KHP), 2017 WL 2984167 (S.D.N.Y. June 23, 2017) .....................8

*Friedman v. Hi-Li Manor Home For Adults*,
   366 N.E.2d 1322 (N.Y. 1977) ..............................................................................................8, 9

*Kennedy v. Warren*,
   66 F.4th 1199 (9th Cir. 2023) .................................................................................................6

*Makhani v. Kiesel*,
   211 A.D.3d 132 (2022) ...........................................................................................................7

*Missouri v. Biden*,
   83 F.4th 350 (5th Cir. 2023) ...........................................................................................5, 6, 7

*Murthy v. Missouri*,
   No. 23-411, 2023 WL 6935337 (U.S. Oct. 20, 2023) ..........................................................5, 6

*Nat'l Rifle Assn. of Am. v. Vullo*,
   49 F.4th 700 (2d Cir. 2022) .....................................................................................................6

*Nat'l Rifle Assn. of Am. v. Vullo*,
   No. 22-842, 2023 WL 7266997 (U.S. Nov. 3, 2023) ..............................................................6

*People v. Romero*,
   91 N.Y.2d 750 (1998) ..............................................................................................................7

*Sanders v. Air Line Pilots Ass'n, Int'l*,
   473 F.2d 244 (2d Cir. 1972) ...................................................................................................3

*United States v. Visa U.S.A., Inc.*,
   No. 98 Civ. 7076 (BSJ), 2007 WL 1741885 (S.D.N.Y. June 15, 2007) ..................................3

*Zieper v. Metzinger*, 392 F. Supp. 2d 516 (S.D.N.Y. 2005) ..............................................................6

**STATUTES**

N.Y. Civ. Prac. L. & R. § 2302 ................................................................................................8

N.Y. C.R. Law § 79-n(3) ...........................................................................................................9

N.Y. Exec. Law § 63 ..............................................................................................................7, 8

N.Y. Exec. Law § 60 ................................................................................................................8

N.Y. Gen. Bus. Law § 394-ccc ........................................................................................*passim*

## <u>INTRODUCTION</u>

In February 2023, this Court unambiguously enjoined enforcement of New York's Online Hate Speech Law, N.Y. Gen. Bus. Law § 394-ccc, which requires social media networks to create and disclose policies describing how the network "will respond [to] and address" reports of hate speech. This Court's order necessarily enjoins a subsection of the law authorizing the Attorney General to "take proof and make a determination of relevant facts" concerning a social media network's hate speech policies. But on October 12, in violation of this Court's preliminary injunction, the Attorney General sent Plaintiff Rumble Canada Inc., and five other networks (the "Investigated Networks") investigation letters demanding that they disclose those very same policies and practices in the wake of the renewed Israeli-Palestinian conflict.

The State responded that the letters have nothing to do with the Online Hate Speech Law. But the context and content of the letters belie the State's assertion. Although the Attorney General does not invoke the law by name, the letters "call[] on" the Investigated Networks to provide the exact information necessary to "take proof" of violations of the Online Hate Speech Law—an investigation that this Court's injunction forbids. To rule otherwise would allow government agencies to evade a lawful injunction by simply failing to cite the enjoined law.

The State also claims that the Attorney General's investigation letters, sent under the banner of "Removing Calls for Violence," are mere "voluntary requests"—not an exercise of the laws's "specific coercive powers." Opp'n Mtn. Enf., ECF No. 50, at 9. But neither the letters nor the Attorney General's press release that publicly accompanied the letters describe the letters as "voluntary." To the contrary, they accuse the Investigated Networks of fostering an environment that is "used to further terrorist activities" and "plan acts of violence," and then threaten that the Investigated Platforms will be held "accountable" if they fail to respond and "limit dangerous material from spreading online." Ortner Decl., ECF No. 47, Ex. C.

1

Alternatively, the State claims that it can investigate under other authority, despite never referencing any other authority before its opposition brief. But none of the State's cited authority let it investigate the lawful speech policies of the Investigated Networks.

Finally, the State hyperbolically claims that Plaintiffs seek to "strip[] A.G. James of any and all authority she has to act on a wide swath of issues." Opp'n Mtn. Enf. at 1. But enforcing the injunction to halt the Attorney General's investigation will not result in any of the State's "sky-is-falling" predictions. Nothing in Plaintiffs' motion or proposed order requires stopping investigations into illegal conduct or unrelated content outside the scope of the Online Hate Speech Law or stopping the State from advocating its positions. Enforcing the injunction, however, *will* stop the State from "giving effect" to the enjoined statute and chilling the exercise of innumerable websites' and users' free-speech rights—the very reason for this Court's injunction. The Court should, therefore, grant Plaintiffs' Motion to Enforce.

## ARGUMENT

### I.      The Attorney General's Investigation Violates the Preliminary Injunction Order.

This Court's order is clear and straightforward: It enjoins all enforcement of the Online Hate Speech Law, without exception. Mem. and Op., ECF No. 29, at 20. Therefore, it necessarily enjoins the Attorney General's efforts to "take proof" and make a "determination of any such violation." N.Y. Gen. Bus. Law § 394-ccc(5). The Attorney General's investigation letters closely parallel and give effect to the enjoined law. And contrary to the Defendant's assertions, responding to the investigation letters was not voluntary, as evidence by the Attorney General's confrontational language and threats of adverse consequences.

**A.      Contrary to the State's assertions, the scope of the injunction is clear.**

As an initial matter, the State suggests that this Court's order, which they did not appeal or ask this court to revise, is too ambiguous to be enforced.[1] Opp'n Mtn. Enf. at 13. But all that is required for an enforceable injunction is that it is "specific in terms" and sets out what is forbidden "in reasonable detail" so that the enjoined party is "able to ascertain from the four corners of the order precisely what acts are forbidden." *Sanders v. Air Line Pilots Ass'n, Int'l*, 473 F.2d 244, 247 (2d Cir. 1972); *see also CF & I Steel Corp. v. United Mine Workers of Am.*, 507 F.2d 170, 173 (10th Cir. 1974) (injunction was valid because it did not contain "an abstract conclusion of law" or "incapacitating vagueness" and its "operating command" was clear).[2] This Court's injunction easily satisfies that standard.

The Online Hate Speech Law (the "Law") requires networks to create and disclose policies describing how the network "will respond [to] and address" reports of hate speech. § 394-ccc(3). The statute's definition of hate speech—incorrectly labeled "hateful conduct"— includes speech that "humiliate[s], vilif[ies], or incite[s] violence" against groups on the basis of protected-class statuses. § 394-ccc(1)(a). The Law also requires networks to create a mechanism for users to report hate speech and receive a response to that report, § 394-ccc(2), and mandates that networks provide a direct response to those reports, § 394-ccc(2)–(4). The statute grants the New York Attorney General authority to "take proof and make a determination of the relevant facts"—i.e., to investigate—compliance with the statute's requirements. § 394-ccc(5).

---

[1]      The State offers no justification for why it failed to seek clarification or challenge the terms of the preliminary injunction in either this Court or in its Second Circuit appeal *See* Mtn. Enf., ECF No. 46, at 9.

[2]      Defendants conflate the standard for contempt (requiring willful violation of an unambiguous order) with the standard for enforcing the injunction (requiring "a preponderance of the evidence" that an injunction was violated). *United States v. Visa U.S.A., Inc.*, No. 98 Civ. 7076 (BSJ), 2007 WL 1741885, at *4 (S.D.N.Y. June 15, 2007). *accord Opp'n Mtn. Enf.* at 6 (noting that "a movant must show that the subject order has been violated"). The Court should enforce its injunction, even if it does not find the State in contempt of the Court's order.

The order enjoins *any* enforcement of *all* of the provisions of the Online Hate Speech Law, including the investigation provision. Mem. and Op. at 20. It is "specific in terms" and sets out what is forbidden "in reasonable detail" within "the four corners of the order."[3] The "operative command" is clear—the State may not enforce any part of the law, period.

**B.      The investigation letters enforce the Online Hate Speech Law.**

The State's claim that the Attorney General's investigation letters are "unrelated" to the Online Hate Speech Law is baseless. Opp'n Mtn. Enf. at 8. But the letters closely track the law, demanding precisely the information that the State would need to enforce violations of the statute. Therefore, they are an exercise of prosecutorial power to enforce the enjoined statute.

On their faces, the statute and investigation letters closely parallel each other. The Attorney General's investigation letters demand that the Investigated Networks describe and disclose their policies and practices related to how they "will respond [to] and address" reports of "hateful" content—effectively asking them to admit or deny whether they comply with the enjoined law. For example, the letters demand details concerning policies and practices for addressing "calls for violence" or "other materials that may incite violence against Jewish and Muslim people." Ortner Decl., Ex. A at 1–2, Ex. B at 1–2.

The letters include similar interrogatories regarding how the Investigated Networks "process" and respond to "reports from platform users"—which is tantamount to describing whether they have a report and response mechanism or provide direct responses to reports. Ortner Decl., Ex. A at 1–2, Ex. B at 1–2. In other words, the investigative letters give "force or

---

[3]      The State incorrectly argues that if the language of the Online Hate Speech Law is unconstitutionally vague, an injunction barring investigations under the law is similarly too vague to enforce. Opp'n Mtn. Enf. at 13 n. 7. But the present investigation seeks information using terms that closely parallel the language of the Online Hate Speech Law like "hateful" and "incitement." *See infra* Section I.B. It cannot be gainsaid that such an investigation violates the order.

effect" to the Online Hate Speech Law's grant of investigative authority to the Attorney General, and therefore are enjoined by this Court's Order.

Finally, the State's contention that the Order can only apply to investigations that explicitly claim that they are "pursuant to" the enjoined statute is "patently absurd." Opp'n Mtn. Enf. at 9, 13. The State cannot evade the preliminary injunction by simply not mentioning the most direct (and indeed the only) source of its authority to investigate. *See infra* Section II.

**C.**     **Responding to the investigation letters was not voluntary.**

The State claims that the investigation letters do not violate this Court's injunction because they are "voluntary request[s]."[4] Opp'n Mtn. Enf. at 2. But the State ignores all of the evidence put forward in Plaintiff's opening brief that a response was required. Mtn. Enf., ECF No. 46, at 14–15. Instead, the State cites cases dealing with the separate question of whether a state unlawfully coerces someone to take down speech. Opp'n Mtn. Enf. at 11. But these cases are *not* controlling. Here, the question is not whether the investigation letters violate the First Amendment, but whether they violate this Court's injunction.

Nevertheless, the same factors of governmental coercion identified in the State's cited cases support the conclusion that the Investigated Platforms were forced to respond to the letters, and, therefore, the letters are an exercise of the State's enjoined investigative and prosecutorial power. This includes "word choice and tone," "the existence of regulatory authority," that the letters were "perceived as a threat," and that the "speech refers to adverse consequences." *Missouri v. Biden*, 83 F.4th 350, 378 (5th Cir. 2023), *cert. granted sub nom. Murthy v. Missouri*,

---

[4]     The State also asserts that "the voluntary nature of [the Investigation Letters] is shown by the Attorney General's withdrawal of the letter at Rumble's request." Opp'n Mtn. Enf. at 12. But the State only withdrew its letter to Rumble, a represented party currently challenging the Online Hate Speech Law, under protest and because Rumble had already provided its content-moderation policies in the past. The State still claims the authority to send additional investigation letters at any time. Hardly voluntary. *See* Mtn. Enf. at 11, 13.

No. 23-411, 2023 WL 6935337 (U.S. Oct. 20, 2023); *accord Nat'l Rifle Assn. of Am. v. Vullo*, 49 F.4th 700, 717 (2d Cir. 2022), *cert. granted in part sub nom. Nat'l Rifle Assn. of Am. v. Vullo*, No. 22-842, 2023 WL 7266997 (U.S. Nov. 3, 2023).

First, the State's "word choice and tone" is confrontational and aggressive. The letters were "phrased virtually as orders," *Missouri*, 83 F.4th at 383. For instance, they were titled "Removal of Calls for Violence on [] Platform." The Attorney General's press release went further, demanding "cooperation [] couched in language referring to criminal conduct," *Zieper v. Metzinger*, 392 F. Supp. 2d 516, 531 (S.D.N.Y. 2005) (an FBI agent's allegation that the host of a provocative video was "inciting a riot" could be considered coercive), accusing the Investigated Networks of fostering an environment "used to further terrorist activities" and "plan acts of violence." Ortner Decl., Ex. C.

Second, the letters have inherent authority and force coming from the Attorney General. This contrasts with the facts in *Kennedy v. Warren*, 66 F.4th 1199 (9th Cir. 2023), on which the State relies. There, U.S. Senator Elizabeth Warren's letter to Amazon regarding its sale of a controversial book was not coercive because "a single Senator" "has no unilateral power to penalize." *Id.* at 1210. Here, however, the State's chief "law enforcement official[]" has that power—meaning that it would be foolish to not respond to her demands. *Zieper*, 392 F. Supp. 2d at 534; *see also Kennedy*, 66 F.4th at 1210 (Senator Warren's letter could "be inherently coercive if sent by a prosecutor with the power to bring charges against the recipient").

Third, the letters are reasonably perceived as a threat, in light of their content and timing—the Investigated Networks were given only a week to respond—as well as the Attorney General's rhetoric lambasting social media networks for failing to remove disfavored hate speech. *See* Verif. Compl., ECF No. 1, at ¶¶ 18, 46–54; Mtn. Enf. at 15.

Finally, the Attorney General has threatened "adverse consequences." The Attorney General's press release emphasizes that she has "[c]onsistently taken action to hold social media companies accountable and limit dangerous material from spreading online." Ortner Decl. Ex. C, ECF No 47-3.[5] This strongly suggests that "adverse consequences . . . will follow if the recipient does not accede to the request." *Missouri,* 83 F.4th at 385 (citations omitted). Thus, a response to the investigation letters was not voluntary and the letters violated this Court's order.[6]

## II.    The State Has No Authority to Carry Out This Investigation Outside of the Online Hate Speech Law.

The State also claims that other authorities authorize its investigation. Opp.'n Mtn. Enf. at 11. The State is wrong. As an initial matter, the Attorney General has no inherent authority and is "limited *strictly* to those matters permitted by statute." *Makhani v. Kiesel*, 211 A.D.3d 132, 140 (2022) (emphasis added); *see also People v. Romero*, 91 N.Y.2d 750, 754 (1998) (New York Attorney General "is without any prosecutorial power except when specifically authorized by statute") (cleaned up). While the State cites New York Executive Law section 63, subsection 3 of that statute provides only that the Attorney General is authorized to "investigate the alleged commission of any indictable offense or offenses in violation of the law." This does *not* provide the Attorney General with free-ranging power to investigate lawful social media policies.

The State also cites *Bd. of Regents v. Southworth*, 529 U.S. 217, 229 (2000) for the proposition that voluntary requests for information are within the Attorney General's "general

---

[5]    Notably, this closely parallels how the Attorney General described the Online Hate Speech Law as a law that would allow her to "address this growing threat" of "dangerous and corrosive ideas" from "dangerous and hateful platforms" Verif. Compl. ¶ 45; *see also id.* ¶ 29 (Senator Carlucci noting that "[t]his bill will allow the State to take action and hold social media platforms accountable").

[6]    As Plaintiffs argued earlier, neither the Online Hate Speech Law nor this Court's order distinguishes between "voluntary" and involuntary investigations on their face. Reply to Opp'n Req. Conf., ECF No. 40-1 at 2. Indeed, such a distinction is illogical because even a "voluntary" but highly publicized investigation would still have a chilling effect as "part of a larger scheme of government coercion or significant encouragement" to remove protected speech. *Missouri*, 83 F.4th at 395.

duties and authority." Opp'n Mtn. Enf. at 11. But this case—which involved a challenge to a university charging a student activity fee—stands only for the proposition that the government will, at times, use tax money in ways that may be contrary to the "sincere convictions" of some taxpayers. *Southworth*, 529 U.S. at 229. *Southworth* says nothing about the inherent authority of New York's Attorney General to exercise investigative powers.

In its opposition brief, the State points for the first time to several specific provisions that were not invoked in its investigation letters, press release, correspondence with Plaintiffs' counsel, or opposition to Plaintiffs' request for a pre-motion conference. Ortner Decl. Ex A–D; Opp'n Req. Conf., ECF No. 39, at 2; Opp'n Mtn. Enf. at 11. The fact that these provisions are now invoked for the first time betrays they are a post-hoc rationalization.[7] Regardless, these provisions do not authorize the State to demand disclosure of lawful speech policies.

New York Executive Law, section 60, is the enabling statute for the New York Attorney General and does not specify her powers. N.Y. Civ. Prac. L. & R., § 2302, which authorizes the Attorney General to issue subpoenas, does not provide any basis for an investigation into the speech policies of the Investigated Networks.

The State then points to a provision that grants it the power to "inquire into matters concerning the public peace, public safety and public justice." N.Y. Exec. Law, § 63(8). However, section 63(8) was originally conceived as a wartime "emergency" provision. *Citizens Union of City of New York v. Att'y Gen. of New York*, No. 16 Civ. 9592 (RMB) (KHP), 2017 WL 2984167, at *5 (S.D.N.Y. June 23, 2017) (citing *Friedman v. Hi-Li Manor Home For Adults*, 366 N.E.2d 1322, 1325 (N.Y. 1977)). In *Friedman,* the New York Court of Appeals warned that

---

[7] The fact that Rumble previously complied with a subpoena issued by the Attorney General is likewise of no consequence. The plaintiffs had not yet sought and secured a preliminary injunction, and they are now entitled to enforce that injunction to prevent ongoing improper investigations.

section 63(8) did not provide "any reservoir of latent authority for investigations, however desirable they may be thought to be, into other areas of legitimate governmental concern or responsibility." 366 N.E.2d at 1326. Instead, "recourse to this section [is] intended only when for compelling reasons reliance cannot or should not necessarily be placed on specific, individualized grants of authority from the Legislature." *Id*. There is no compelling reason why the Attorney General would need to rely on emergency powers to investigate a social media network's policies for removing protected speech.

Finally, the State also points to New York Civil Rights Law, section 79-n(3), which allows the Attorney General to investigate a "person" suspected of criminal harassment or "an imminent threat to a person or property" on the basis of protected-class status. This provision is inapplicable. The letters fail to identify any "person" being investigated or any specific instance of harassment on the Investigated Networks. Instead, the State asks for information concerning content moderation policies to hold social media networks "accountable", and to pressure them to remove protected speech. Ortner Decl. Ex C. Furthermore, the letters do not cite any of the law's key terms like "harassment" or "imminent threat", but instead refer to "hateful" conduct and "incitement," terms used by the Online Hate Speech Law. Ortner Decl. Exs. A–B. Therefore, none of the provisions that the State retroactively points to authorize the letters, and this Court must conclude that the State is operating pursuant to the Online Hate Speech Law.

## III.   Enforcement of the Injunction Is Necessary to Prevent First Amendment Injury and Will Not Limit the Government's Ability to Investigate Violence.

The Attorney General's investigation should be enjoined because it enforces the chilling effect of the Online Hate Speech Law.[8] The State oddly claims that these speech-chilling effects

---

[8]   Defendants do not contest Plaintiffs' standing to enforce the preliminary injunction order. *See* Mtn. Enf. at 17–19.

are "hyperbolic contentions" "of no moment and well beyond the scope of the PI Order." Opp'n Mtn. Enf. at 8-9. But the investigation letters "target[] and singl[e] out," Mem. and Op. at 18, the same category of protected speech as the law to pressure the Investigated Networks to remove it. The State does not deny this is its goal.[9] The letters also compel the Investigated Networks to "speak about the contours of hate speech," by disclosing their policies for addressing "hateful" conduct, Mem. and Op. at 1, even those that are "company-facing" and not public. Ortner Decl. Ex. A. The letters therefore threaten both the letter and spirit of the order.

Enforcing the injunction will not strip the State of its ability to pursue investigations and advocate for its own views. The State claims Plaintiffs seek "a sweeping ban on the Attorney General's day-to-day work and responsibilities" and "blanket immunity for all social media companies from even voluntary inquiries." Opp'n Mtn. Enf. at 13. But Plaintiffs moved to prevent investigations falling directly in the scope of the enjoined law. The State may conduct authorized investigations of any other kind, hardly "a sweeping ban" or "blanket immunity."

## **CONCLUSION**

This Court should grant Plaintiffs' motion to enforce the preliminary injunction. In accordance with Local Rule 6.1(c) and Judge Carter's Individual Practice 2.F., Plaintiffs request that the Court schedule oral argument on their Motion to Enforce the Preliminary Injunction.

---

[9]    The State cites to an article from the New York Times in support of its claim that calls for violence have increased on social media since October 7. Opp'n Mtn. Enf. at 2 n. 1. But this article, written more than a month after the letters were sent, only shows that the State targets constitutionally protected "hate speech" without evidence that this speech on the Investigated Platforms has led to violence.

DATED: December 22, 2023

Respectfully submitted,

/s/ Daniel M. Ortner

DANIEL M. ORTNER*                         BARRY N. COVERT
(California State Bar No. 329866)          (N.Y. Bar No. 271118)
JAMES M. DIAZ*                             LIPSITZ GREEN SCIME CAMBRIA LLP
(Vermont Bar No. 5014)                     42 Delaware Ave., Suite 120
FOUNDATION FOR INDIVIDUAL RIGHTS AND       Buffalo, NY 14202
    EXPRESSION                             Tel: (716) 849-1333 x365
510 Walnut Street, Suite 900               bcovert@lglaw.com
Philadelphia, PA 19106
Telephone: (215) 717-3473
daniel.ortner@thefire.org
jay.diaz@thefire.org

*Attorneys for Plaintiffs*
* Admitted *Pro Hac Vice*

## CERTIFICATE OF SERVICE

Plaintiff's counsel confirms that a true and correct copy of the foregoing was served via the Court's electronic filing system on this day, December 22, 2023. Notice of this filing will be sent by operation of the Court's electronic filing system.

DATED: December 22, 2023

Respectfully submitted,

/s/ Daniel M. Ortner

DANIEL M. ORTNER*
(California State Bar No. 329866)
JAMES M. DIAZ*
(Vermont Bar No. 5014)
FOUNDATION FOR INDIVIDUAL RIGHTS AND
    EXPRESSION
510 Walnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 717-3473
daniel.ortner@thefire.org
jay.diaz@thefire.org

*Attorneys for Plaintiffs*
*Admitted Pro Hac Vice*

BARRY N. COVERT
(N.Y. Bar No. 271118)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Ave., Suite 120
Buffalo, NY 14202
Tel: (716) 849-1333 x365
bcovert@lglaw.com

12