USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 4/30/2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VOLOKH, et al.,

                 **Plaintiffs,**

-against-

JAMES,

                 **Defendant.**

22-cv-10195 (ALC)

**OPINION AND ORDER**

**ANDREW L. CARTER, JR., United States District Judge:**

The Court considers herein Plaintiffs' motion to enforce the prior preliminary injunction against the Attorney General of the State of New York. For the reasons stated herein, the Court **DENIES** Plaintiffs' motion.

## BACKGROUND

### I. Procedural Background

Plaintiffs filed their Complaint against Defendant on December 1, 2022 and their initial motion for preliminary injunction on December 6, 2022. ECF Nos. 1, 8. Following a telephonic conference in which the Court heard argument on Plaintiffs' motion for a preliminary injunction, Plaintiffs' motion was granted. ECF No. 29 ("PI Order"). Defendant then filed an interlocutory appeal of this Court's opinion and order granting the preliminary injunction and this Court stayed the present case. *See* ECF Nos. 30, 37; *Volok v. James*, 23-356 (2d Cir. 2023). The Second Circuit has held Defendant's appeal in abeyance pending the Supreme Court's decision in *NetChoice LLLC v. Paxton*, 144 S. Ct. 477 (2023). *Id.* at Dkt. 141. Plaintiffs filed the present motion to enforce the preliminary injunction on December 1, 2023. ECF No. 44; *see also* ECF No. 46 ("Mot."). Defendant filed their opposition on December 15, 2023. ECF No. 50 ("Opp."). Plaintiffs filed their reply memorandum on December 22, 2023. ECF No. 51 ("Reply").

II. **Factual Background**

The Court presumes the Parties' knowledge of the factual background underlying the Plaintiffs' suit against the enforcement of the Hateful Conduct Law, N.Y. Gen. Bus. Law § 394-ccc(1)(a), and recites only those fundamental facts relevant to the disposition of the instant motion. For a more fulsome recitation of those background facts, the Court directs readers' attention to its prior opinion granting the preliminary injunction at *Volokh v. James*, 656 F. Supp. 3d 431, 436-438 (S.D.N.Y. 2023) (hereafter *Volokh I*). *See also* PI Order at 2-5. This law "has two main requirements: (1) a mechanism for social media users to file complaints about instances of "hateful conduct" and (2) disclosure of the social media network's policy for how it will respond to any such complaints" and "empowers the Attorney General to investigate violations of the law and provides for civil penalties for social media networks which knowingly fail to comply with the requirements." *Volokh I* at 438 (internal quotation marks omitted).

On October 12, 2023, following entry of the Court's preliminary injunction barring enforcement of the Hateful Conduct law, Defendant James sent investigative letters to six social media networks including Plaintiff Rumble. *See* ECF No. 47 ("Ortner Decl."), Ex. A; Ex B. In the letters, the Defendant references the state's concerns of "growing reports of growing antisemitism and Islamaphobia [*sic*]" and "press reports that terrorist groups and individuals that sympathize with them are disseminating calls for violence and other materials that may incite violence against Jewish and Muslim people and institutions on social media platforms." *Id.*, Ex. A at 1. Defendant then goes on to "request" that the recipients respond to a series of interrogatories in writing. *Id.* The letter asks recipients to state, *inter alia*, "[w]hat actions, if any [they] ha[ve] . . . taken to address the recent calls for violence against Jewish and Muslim people and institutions and the possibility that the Platform may be used to plan, encourage, or

disseminate those acts," to describe their "public-facing terms of service, community rules, . . . company-facing policies that govern the determination of whether content is a call for violence, . . . process for reviewing and removing calls for violence, . . . process for identifying and removing calls for violence, . . . methods for blocking the re-posting of content that has been removed, . . . [and] policies regarding disciplining, suspending, and/or banning users for posting content that has been removed." *Id.* at 1-2. The letters made no mention of the Hateful Conduct Law and did not, by their text, compel response or disclosure or threaten the imposition of penalties for failure to respond.

On October 13, Defendant James stated at a press conference that "social media ha[d] been widely used by bad actors to spread horrific material, disseminate threats, and encourage violence," that social media platforms "have a responsibility to keep their users safe and prohibit the spread of violent rhetoric that puts vulnerable groups in danger," and "call[ed] on . . . companies to explain how they are addressing threats and how they will ensure that no online platform is used to further terrorist activities." Ortner Decl., Ex. C at 1. The press release discussing the letters also referenced the prior "consistent[] action[s]" Defendant James has undertaken "to hold social media companies accountable and limit dangerous material from spreading online." *Id.* at 2. None of the listed prior consistent actions reference the Defendant's enforcement of the Hateful Conduct Law.

Plaintiff social media network Rumble objected in writing to the letter and demanded, in response, that the Defendant rescind the letters on the grounds that they violated the terms of the preliminary injunction. Ortner Decl. Ex. D. Defendant's Office responded, noting their "wholehearted[] disagree[ment]" with Plaintiffs' analysis, and withdrew the letter because "Rumble ha[d] already provided its content-moderation policies." *Id.* at Ex. E.

**LEGAL STANDARD**

"A motion to enforce is an appropriate procedural vehicle for parties to seek compliance with a court order." *United States v. Visa U.S.A., Inc.*, 2007 U.S. Dist. LEXIS 42133, at *3 (S.D.N.Y. June 7, 2007) (citing *Pena v. New York State Div. for Youth*, 708 F.2d 877 (2d Cir. 1983)). "[A] finding of contempt is not a prerequisite for enforcement." *Id.* (citing *Berger v. Heckler*, 771 F.2d 1556, 1569 (2d Cir. 1985)). "Although contempt standards may be appropriate where sanctions are sought or imposed . . . such is not the case here." *Id.* (collecting cases). A movant seeking enforcement of a preliminary injunction must establish the non-movant's failure to abide by the injunction by a preponderance of the evidence. *Id.*; *see also United States SEC v. Collector's Coffee, Inc.*, 2022 U.S. Dist. LEXIS 24482, at *22 (S.D.N.Y. Feb. 10, 2022) ("A motion to enforce may be granted where it is shown by a preponderance of the evidence that a court order has been violated . . . and is granted even where there is no finding that a party has acted contemptuously.") (internal citations and quotation marks omitted).

**DISCUSSION**

Plaintiffs' have failed to show by a preponderance of the evidence that the Attorney General has violated this Court's prior injunction of enforcement of the Hateful Conduct Law. The Hateful Conduct Law compels certain forms of non-commercial speech from social media networks, grants the Attorney General investigative authority into potential violations, and imposes civil penalties for those networks which fail to comply. *See Volokh I* at 438. By granting Plaintiffs' requested preliminary injunction against enforcement of the law, the Attorney General was enjoined from taking any such action constituting the compulsion of speech, initiation of coercive investigation, or seeking imposition of civil penalties. The interrogatory letters, by their own text, make no reference to the Hateful Conduct Law or its enforcement and

do not mandate any response at all or threaten the imposition of penalties for failure to respond. What's more, the issuance of such voluntary interrogatories falls within the ambit of authority granted to the Attorney General by statutes outside of the Hateful Conduct Law.

I. **Whether the Interrogatory Letters Were Coercive**

As Defendant argues, the interrogatory letters were voluntary and did not constitute enforcement of the enjoined law. Plaintiffs' argument that response was not voluntary is unconvincing. In determining whether a public official's speech is coercive, district courts must consider the speech's tone and content, *Zieper v. Metzinger*, 474 F.3d 60, 66 (2d Cir. 2007), whether the official has "regulatory or other direct decisionmaking authority," *Okwedy v. Molinari*, 333 F.3d 339, 343 (2d Cir. 2003), whether the perceived threat had a "demonstrable" impact, *Rattner v. Netburn*, 930 F.2d 204, 210 (2d Cir. 1991), and whether the speech "referred to . . . adverse consequences that might be suffered." *Hammerhead Enters. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983). While government actors may express the policy positions which they "plainly favor" and "s[eek] to convince . . . regulated entities" to pursue, that government speech which is "written in an evenhanded, nonthreatening tone and employed words intended to persuade rather than intimidate" does not constitute an attempt to coerce. *NRA of Am. v. Vullo*, 49 F.4th 700, 717 (2d Cir. 2022) (internal citations omitted); *see also id.* (stating that a lack of references "to any pending investigations or possible regulatory action" and allusions to de minimis reputational "adverse consequences" are insufficient to constitute coercion). So long as "[t]he statements did not intimate that some form of punishment or adverse regulatory action would follow the failure to accede to the request," no coercion has occurred. *Id.* (citing *Hammerhead Enters. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983)) (cleaned up).

At the outset, the Court notes that it is "clearly the case" that the Attorney General has regulatory authority over Plaintiffs. *Missouri v. Biden*, 83 F.4th 350, 384 (5th Cir. 2023). Of course, that fact is not outcome-determinative. *See NRA of Am. v. Vullo*, 49 F.4th 700, 717 (2d Cir. 2022). Nothing in the Attorney General's statements to the press or statements contained within the interrogatory letters makes any reference to adverse consequences. Defendant makes much of the press releases' reference to Defendant's "consistent[] . . . action[s] to hold social media companies accountable and limit dangerous material from spreading online" but tellingly fails to note that such actions are stated to include: (1) the advancement of legislation unrelated to this present action, (2) leadership in a multistate coalition unrelated to this present action, (3) the release of a report "on the role social media platforms played in the Buffalo mass shooting and online extremism," and (4) enrollment in a multistate coalition unrelated to this present action. Ortner Decl., Ex. C at 2-3. These statements could not reasonably be read to constitute threats of adverse consequences to Plaintiffs and those similarly situated akin to that contemplated by the Hateful Conduct Law.

The interrogatory letters similarly make no reference at all to any adverse consequences. While the interrogatory letters themselves did ask recipients to describe certain policies in detail within eight days of the letter's issuance, they did not do so in a manner which indicated "persisten[ce] [or] urgen[cy]." *Missouri v. Biden*, 83 F.4th 350, 383 (5th Cir. 2023). Plaintiff does not allege that Defendant's office sent any follow-ups to the interrogatories. Rather, the record establishes that Defendant rescinded the interrogatory letter upon Plaintiff Rumble's adversarial response. ECF No. 49 at Ex. 8.

Plaintiffs' attempts to construe the letters' tone as "confrontational and aggressive" is unsupported by the letters' text. Reply at 6. Defendant expressly phrased the letters'

interrogatories as a "request" rather than a demand or order. Ortner Decl., Ex. A at 1. The letters' statement that the Attorney General "would like to better understand" how networks are "ensuring" that their platforms are "not being used to incite violence and further terrorist activities" does not constitute an accusation that Plaintiffs are fostering such conduct. *Id*. Plaintiff also fails to make any allegation that the letters had any impact on the recipient social media networks at all. *See Missouri v. Biden*, 83 F.4th 350, 383 (5th Cir. 2023) (noting that "it is more likely to be coercive if there is some evidence that the recipient's subsequent conduct is linked to the official's message").

### II.     Whether the Attorney General Had Other Statutory Authority to Issue Such Letters

Plaintiffs' argument that the Attorney General had no other statutory authority under which to issue these letters is also similarly unavailing. Defendant's opposition brief presents several statutory grants of power under which the issuance of such letters might be permissible including, but not limited to, N.Y. Exec. L. § 63(8), N.Y. Civ. R. L. § 79-n(3), N.Y. C.P.L.R. §2302. N.Y. Exec L. § 63(8) states, in relevant part, the following:

> Whenever in his judgment the public interest requires it, the attorney-general may, with the approval of the governor, and when directed by the governor, shall, inquire into matters concerning the public peace, public safety and public justice. . . . The attorney-general, his deputy, or other officer, designated by him, is empowered to subpoena witnesses, compel their attendance, examine them under oath before himself or a magistrate and require that any books, records, documents or papers relevant or material to the inquiry be turned over to him for inspection, examination or audit, pursuant to the civil practice law and rules. If a person subpoenaed to attend upon such inquiry fails to obey the command of a subpoena without reasonable cause, or if a person in attendance upon such inquiry shall, without reasonable cause, refuse to be sworn or to be examined or to answer a question or to produce a book or paper, when ordered so to do by the officer conducting such inquiry, he shall be guilty of a misdemeanor. It shall be the duty of all public officers, their deputies, assistants and subordinates, clerks and employees, and all other persons, to render and furnish to the attorney-general, his deputy or other designated officer, when requested, all information and assistance in their possession and within their power. . . . Any officer participating in such inquiry and any person examined as a witness upon such inquiry who shall

disclose to any person other than the governor or the attorney-general the name of any witness examined or any information obtained upon such inquiry, except as directed by the governor or the attorney-general, shall be guilty of a misdemeanor.

While the statute's direct predecessor was enacted "because of [the] war emergency" during World War I, the New York Court of Appeals has expressly stated on numerous occasions that the statute's applicability was "not[] either expressly or by implication[] limit[ed] . . . to a time of war." *In re Di Brizzi*, 303 N.Y. 206, 214, 101 N.E.2d 464, 468 (1951). Since its enactment, the New York Court of Appeals has stated that § 63(8) permits the Attorney General to issue subpoenas upon nursing home facilities due to, *inter alia*, "the State's recognized responsibility for the care of the elderly," *Friedman v. Hi-Li Manor Home for Adults*, 42 N.Y.2d 408, 414, 397 N.Y.S.2d 967, 970, 366 N.E.2d 1322, 1325 (1977) (citing *Sigety v. Hynes*, 38 N.Y.2d 260, 379 N.Y.S.2d 724, 342 N.E.2d 518 (1975), as well as "an individual witness' testimony in relation to organized crime." *N.Y. Republican State Comm. v. N.Y. State Com. on Gov't Integrity*, 138 Misc. 2d 790, 795, 525 N.Y.S.2d 527, 531 (Sup. Ct. 1988) (citing *Friedman*, 42 N.Y.2d at 414); *see also In re Di Brizzi*, 303 N.Y. 206. While the state high court's decision in *Friedman* encouraged "the enactment of specific, *ad hoc* legislative authority for particular inquiries," rather than sweeping reliance upon § 63(8), 42 N.Y.2d at 414, the Court of Appeals later clarified that these statements "suggested" a "preferable approach" and constituted dicta not core to the Court's prior ruling. *Landau v. Hynes*, 49 N.Y.2d 128, 134, 424 N.Y.S.2d 380, 382, 400 N.E.2d 321, 323 (1979) (citing *Friedman*, 42. N.Y.2d at 414) (internal quotation marks omitted). Considering the weight of this precedent from the state high court, as well as contemporaneous intermediate state court decisions construing the authorizing statute as "having general application," *In re Carey*, 68 A.D.2d 220, 224, 416 N.Y.S.2d 904, 907 (App. Div. 4th Dept. 1979), Plaintiffs' attempts to cabin the Attorney General's authority under § 63(8) to that of a "wartime emergency" power rings hollow. Reply at 8; *see also Sigety v. Abrams*, 632 F.2d 969,

970 n.1 (2d Cir. 1980) (stating that § 63(8) "authorizes the attorney general to subpoena witnesses and require production of documents relevant to . . . inquir[ies]" related to "the public peace, public safety and public justice" without mention of any wartime constraints upon such authority).

N.Y. Civ. R. L. § 79-n(3) of the New York Civil Rights Law states in relevant part:

> Whenever there shall be a violation of this section, an application may be made by the attorney general in the name of the people of the state of New York to a court or justice having jurisdiction for an injunction to enjoin and restrain the continuance of such activity. In connection with any such application, the attorney general is authorized to take proof and determine the relevant facts and to issue subpoenas in accordance with the civil practice law and rules.

Plaintiffs, without citing to supporting statute or case law, argue that the Attorney General's issuance of voluntary interrogatory letters is impermissible under this grant of authority because those letters fail to identify a person or specific instance of harassment being investigated and does not utilize the statute's language. This Court is unable to identify any such constraints upon the Attorney General's authority vis-à-vis voluntary requests whether in the statute's text or elsewhere. Rather, § 79-n(3)'s plain text grants the Attorney General authority to issue such voluntary interrogatory letters.

## CONCLUSION

Taken all together, the Attorney General has issued non-coercive interrogatory letters pursuant to at least one independent statutory authority unrelated to the Hateful Conduct Law in a manner which does not maintain any of the trappings constituting enforcement of the enjoined law. The Defendant has not compelled any speech or levied or threatened to levy penalties upon the letters' recipients. For the reasons stated herein, the Court denies Plaintiffs' motion to enforce the preliminary injunction as to the Attorney General's issuance of voluntary interrogatory letters to regulated social media networks for failure to establish Defendant's

failure to abide by this Court's preliminary injunction by a preponderance of the evidence. The Court has considered the Parties' remaining arguments and finds them insufficient to make the requisite showing. The Clerk of the Court is respectfully directed to terminate the motions at ECF Nos. 44 and 45.

**SO ORDERED.**

Dated:    **April 30, 2024**
           **New York, New York**

                                                **ANDREW L. CARTER, JR.**
                                                **United States District Judge**